EXHIBIT 8

# The State Bar
## of California

**OFFICE OF CHIEF TRIAL COUNSEL**

845 S. Figueroa Street, Los Angeles, CA 90017          213-765-1000          ctc.cpra@calbar.ca.gov

*Via e-mail only* - justintimesd@gmail.com

June 14, 2022

Justin S. Beck

RE:     Request for State Bar Records

Dear Mr. Beck:

This letter is an additional response to your Public Records Act request dated May 7, 2022, addressed to Assistant General Counsel Carissa Andresen and received by the State Bar of California on May 12, 2022.  You requested the following:

- Per BPC 6086.10: (c) Notwithstanding the confidentiality of investigations, the State Bar shall disclose to any member of the public so inquiring, any information reasonably available to it pursuant to subdivision (o) of Section 6068, and to Sections 6086.7, 6086.8, and 6101, concerning a licensee of the State Bar that is otherwise a matter of public record, including civil or criminal filings and dispositions."

  Please send me "any information [from State Bar, from courts in any jurisdiction, from State Bar licensees on mandatory reporting, from insurers on mandatory reporting] reasonably available to [public entity State Bar and its public employees] pursuant to subdivision (o) of Section 6068, and to Sections 6086.7, 6086.8, and 6101, concerning a licensee of the State Bar [see below] that is otherwise a matter of public record, including all judgments, orders, civil or criminal filings and dispositions related to the following:

  1) Kenneth Joseph Catanzarite

Please be advised that State Bar disciplinary complaints and investigatory records are confidential and not subject to disclosure.  (Gov. Code, § 6254 subd. (f) [Investigatory files

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 S. Figueroa Street
Los Angeles, CA 90017

Complaint Supplement #30 2020-01-14599B
Exhibit #8: 001

Back - Superior Court of California County of Orange
ADA Complaint Exhibits 310

Exhibit #35: 002
22-CV-01616-BAS-DDL

Justin S. Beck
June 14, 2022
Page 2

compiled by a state agency for licensing purposes are not subject to disclosure under the California Public Records Act]; Bus. & Prof. Code, § 6086.1 subd. (b) ["[D]isciplinary investigations ... shall not be disclosed pursuant to any state law, including, but not limited to, the California Public Records Act."].)

Without waiving said exemptions, please see the enclosed records.

       7) Drexel Bradshaw

State Bar disciplinary complaints and investigatory records are confidential and not subject to disclosure.  (Gov. Code, § 6254 subd. (f); Bus. & Prof. Code, § 6086.1 subd. (b).)

Without waiving said exemptions, the State Bar has conducted a diligent search of its records and has located no documents responsive to your request.  The State Bar reserves the right to determine whether the requested records are exempt from disclosure pursuant to the California Public Records Act should we later locate responsive documents.

If you wish to discuss this matter further, I can be reached at the telephone number above.

Best regards,

Alex Hackert
Senior Trial Counsel

Complaint Supplement #30 2020-01145998
Exhibit #8: 002

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 311

Exhibit #35: 003
22-CV-01616-BAS-DDL



## 1. <u>SANCTIONS AGAINST KENNETH CATANZARITE</u>

### (See Attached Cases)

- ### Edwards v. Noroski (2013) $14,000 sanction  + $1,200 see Order (11/28/12)

In this case that is ongoing, the Court punished Catanzarite for saying one thing, then switching his story. The court stated that Catanzarite's case was a "sham." First, Catanzarite claimed that the dental practice run by Dr. Noroski and Dr. Schneider should give back money to patients who had been treated at the dental office, but did not say anything was wrong with the dentistry. Then, Catanzarite realized he had no case, because the plaintiffs who were former patients had their depositions and said they were happy with Dr. Noroski and happy with Dr. Schneider. (See attached.) The plaintiffs dropped out and Catanzarite had no case. Catanzarite asked to file an amended complaint that now said that the dental services were bad. The Court punished Catanzarite by sanctioning him $14,000 for wasting everybody's time.

- ### Alexandros v. Cole (2011) $10,000 sanction

Catanzarite violated court rules by making statements to the court without any proof. The court said: "But here plaintiffs [Catanzarite] admit they violated several rules. They also continued to cite the excluded evidence in their reply brief even after defendants noted the error in their briefs." The Court pointed out that Catanzarite's brief made 39 unsupported factual statements, and paragraphs lacking references. Some statements were completely incorrect. Catanzarite does not care about the truth in making statements to the Court. The Court said "Kenneth J. Catanzarite and Laurence M. Rosen are ordered to pay defendants the $10,000 sanctions award..."

- ### In Re Perrine (2007) $30,000 or refund of fees

Catanzarite did not tell the Court that his client, who was declaring bankruptcy, deeded his home to Catanzarite. In bankruptcy, the person declaring bankruptcy cannot sell or give away without telling the Court. Catanzarite took the property to pay for his fees, but did not tell the Court about this, violating this strict rule. The Court took away all of Catanzarite's fees: "<u>Given the gravity of Catanzarite's non-disclosure, the court will deny all fees to Catanzarite for legal services rendered to Perrine to the petition date due to its failure to comply with Section 329(a) and Rule 2016(b). Catanzarite was ordered to give back either his fees, or the property he took.</u> (p. 586)

Complaint Supplement #30-2020-01145998
Exhibit #8: 003

Back # Superior Court of California County of Orange
ADA Complaint Exhibits 312

Exhibit #35: 004
22-CV-01616-BAS-DDL

**Edwards vs.
Noroski**

1. Plt., Edwards and Gans, Motion for Leave to File Fifth Amended Complaint --- Granted; Despite serious reservations as to the sham nature of the pleading at least as to FPS, the court applies the rule of allowing liberal amendments to pleadings.

The court finds that it is in the interests of justice for the Plt. to pay monetary compensation to Def.s for the time they spent in the preparation of the summary judgment motions currently pending. The court finds that the delay in filing the amended complaint has caused injustice to the Def. by their filing a motion for summary judgment that Plt. knew would be brought yet Plt. delayed the filing of their request for leave to amend until 1 week before the motion for summary judgment is to be heard.

In furtherance of justice the court orders that the ruling granting leave to amend is predicated on the condition that payment by Plt. to Def. the amount of $11,374.85 is to be made for the costs and fees Def. incurred in preparing and filing the summary judgment. CCP 473(a)(1). Plt. delayed filing this motion for leave to amend until after Def.'s filed their motion for summary judgment even though Plt. had knowledge that Def. intended to file such a motion and the cost such a motion would be to Def. Def., Noroski, request for reimbursement for prior investigation and discovery in the amount of $17,915 is denied. This discovery is still useable in this action.

All discovery is ordered "stayed" except that discovery related to the Doherty standing issue. The court would like Counsel to submit a time line for briefing schedule as to MSJ re standing of Doherty. Counsel should meet and confer regarding any issues and the amount of discovery needed relating to the Doherty standing. When can Plt. be ready for a motion to certify and what discovery is needed for that motion?

**FINAL RULING:**

Tentative ruling is final. In addition, Plt. is to pay to Def., Noroski the amount of $2500 for the depositions/discovery for the Edwards and Gans depositions.

Complaint Supplement #30
Exhibit #8: 004

Bank # Superior Court of California County of Orange
ADA Complaint Exhibits 313

Exhibit #35: 005
22-CV-01616-BAS-DDL



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

NEWMEYER & DILLION LLP

ELECTRONICALLY RECEIVE
Superior Court of California,
County of Orange

11/20/2012 at 10:30:48 AM
Clerk of the Superior Court
By Irma Cook, Deputy Clerk

ALAN CARLSON, Clerk of the Court

L. LABRADOR

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ORANGE – CIVIL COMPLEX CENTER

JUDITH L. EDWARDS and SCOTT C.
GANS, individually and on behalf of
themselves and all others similarly situated,

Plaintiffs,

vs.

DANIEL NOROSKI, D.D.S., an
individual; DANIEL A. NOROSKI,
D.D.S., INC., A PROFESSIONAL
DENTAL CORPORATION, a California
Corporation; FIRST PACIFIC
CORPORATION, an Oregon corporation;
and DOES 1 through 100, inclusive,

Defendants.

AND RELATED CROSS-ACTION.

CASE NO.: 30-2011-00510638-CU-MC-CXC
ASSIGNED TO HON. STEVEN L. PERK,
DEPT. CX102

UNLIMITED JURISDICTION
AMENDED
[PROPOSED] ORDER GRANTING
DEFENDANT DANIEL NOROSKI, D.D.S.,
INC.'S MOTION TO COMPEL
DEPOSITIONS OF PLAINTIFF JUDITH L.
EDWARDS AND PLAINTIFF SCOTT C.
GANS AND TO PRODUCE RESPONSIVE
DOCUMENTS TO DEPOSITION
DOCUMENT DEMANDS; AND FOR
SANCTIONS IN THE AMOUNT OF $1,200

FILE DATE:        September 23, 2011
TRIAL DATE SET:   No Date Set

On November 16, 2012 at 10:30 a.m. in Department CX102 of the above-entitled court,

located at 751 Civic Center Drive West, Santa Ana, California, 92701, defendant Daniel A.

Noroski, D.D.S., Inc. ("Noroski APC") motion to compel depositions of Plaintiffs Judith Edwards

and Scott Gans came on for a regularly noticed hearing.

After considering the moving papers, opposing papers, reply papers and oral argument,

the Court orders as follows:

J470481.1

[AMENDED] [PROP.] ORDER ON DEFENDANTS NOROSKI'S MOT. TO COMPEL AND PROD. DOCS.

RECEIVED IN DEPT CX 102 ON 11/28/12
AT 8:10 AM/PM

Bank v. Superior Court of California County of Orange
ADA Complaint Exhibits 314

1        1.     That Plaintiff Judith Edwards and Plaintiff Scott Gans must attend their

2   depositions at Daniel A. Noroski, D.D.S., Inc.'s counsel's office located at 895 Dove Street, 5th

3   Floor, Newport Beach, California by no later than <u>December 10, 2012</u>.

4        2.    <u>By no later than November 26, 2012</u>, both Plaintiff Judith Edwards and Scott Gans

5   are to produce all responsive documents to Request Nos. 1-34 with respect to the deposition

6   document demands that are attached to the notices of deposition of plaintiffs.  If a protective order

7   is needed, Defendants' counsel will prepare a draft protective order and circulate the same to all

8   and file it with the Court.  Plaintiff will have five days from receipt of the protective order to

9   submit any objections.

10        3.    The Court awards sanctions in the amount of $1,200 to Daniel Noroski, D.D.S.,

11   Inc. against Plaintiffs' Judith Edwards and Scott Gans, jointly and severally.  The sanctions shall

12   be paid in full on or before December 7, 2012 to Daniel Noroski, D.D.S. Inc., to be made payable

13   to Newmeyer & Dillion, LLP.  The Court finds that there was no substantial justification

14   presented for the objections raised by Plaintiffs.  There is no authority supporting Plaintiffs theory

15   of "priority" setting of depositions.  <u>*Young vs. Rosenthal*</u>, 212 Cal. App. 3d 96 does not stand for

16   the proposition cited by Plaintiffs in their opposing papers.  *Young* involved a priority established

17   by express agreement which is lacking in this case.  Nothing in this case triggers the application

18   of the "priority" contemplated in *Weil and Brown* either.  The objections to these depositions and

19   documents production are not well taken and are stricken.

20        4.    Defendants' counsel is to give notice.

22   Dated: _____11/28/2012_____

                        JUDGE OF SUPERIOR COURT

                        STEVEN L. PERK

3470481.1

- 2 -

NEWMEYER & DILLION LLP

**AMENDED** [PROP.] ORDER ON DEFENDANTS NOROSKI'S MOT. TO COMPEL DEPOSITIONS AND PROD. DOCS.

Complaint Supplement #30
Exhibit #8: 006
Book # Superior Court of California County of Orange
ADA Complaint Exhibits 315
Exhibit #35: 007
22-CV-01616-BAS-DDL

<u>**PROOF OF SERVICE**</u>

*Judith L. Edwards, et al. v. Daniel Noroski, D.D.S., et al.*
OCSC Case No. 30-2011-00510638-CU-MC-CXC

STATE OF CALIFORNIA        )
                                              )  ss.
COUNTY OF ORANGE         )

   I, DEE NOVOA, declare:

   I am a citizen of the United States and employed in Orange County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 895 Dove Street, 5th Floor, Newport Beach, California 92660. On November 20, 2012, I served a copy of the within document(s):

   *AMENDED*
   [PROPOSED] ORDER GRANTING DEFENDANT DANIEL NOROSKI, D.D.S., INC.'S MOTION TO COMPEL DEPOSITIONS OF PLAINTIFF JUDITH L. EDWARDS AND PLAINTIFF SCOTT C. GANS AND TO PRODUCE RESPONSIVE DOCUMENTS TO DEPOSITION DOCUMENT DEMANDS; AND FOR SANCTIONS IN THE AMOUNT OF $1,200

☐    by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒    by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Newport Beach, California addressed as set forth below.

☐    by placing the document(s) listed above in a sealed NORCO OVERNITE/FEDERAL EXPRESS envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a NORCO OVERNITE/FEDERAL EXPRESS agent for delivery.

☐    by transmitting via e-mail or electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

PLEASE SEE ATTACHED SERVICE LIST

   I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

   I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

   Executed on November 20, 2012, at Newport Beach, California.

_Dee Novoa_
DEE NOVOA

3290397.1                                       - 1 -

PROOF OF SERVICE

NEWMEYER & DILLON LLP



1

## SERVICE LIST

2

*Judith L. Edwards, et al. v. Daniel Noroski, D.D.S., et al.*
OCSC Case No. 30-2011-00510638-CU-MC-CXC

3

4  Kenneth J. Catanzarite, Esq.                    Tel:  (714) 520-5544
   Nicole Catanzarite-Woodward, Esq.               Fax:  (714) 520-0680
5  CATANZARITE LAW CORPORATION                     Email: kcatanzarite@catanzarite.com
   2331 West Lincoln Ave.                          Email: ncatanzarite@catanzarite.com
6  Anaheim, CA 92801                               [PLAINTIFFS]

7  Robert L. Kenny, Esq.                           Tel: (619) 234-1616
   Law Office of Robert L. Kenny                   Fax: (619) 233-1969
8  501 West Broadway, Ste. 1370                    Email: rkenny@kennylaw.net
   San Diego, CA  92101                            [FIRST PACIFIC CORPORATION]
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

3290397.1                                  - 2 -

SERVICE LIST

NEWMEYER & DILLON LLP

# IN RE PERRINE

*369 B.R. 571 (2007)*

In re Eugene H. PERRINE, Jr., Debtor.

## No. RS 05-13979 PC.

United States Bankruptcy Court, C.D. California, Riverside Division.

April 13, 2007.

Kenneth J. Catanzarite, Anaheim, CA, for Debtor.

Thomas H. Casey, Rancho Santa Margarita, CA, for Chapter 7 Trustee.

---

## AMENDED MEMORANDUM DECISION

 The v

PETER H. CARROLL, Bankruptcy Judge.

Steven M. Speier, Chapter 7 Trustee ("Speier") seeks an order compelling Kenneth J. Catanzarite, Richard Vergel de Dios and the Catanzarite Law Corporation (collectively, "Catanzarite"), attorneys for Debtor, Eugene H. Perrine, Jr. ("Perrine") to disgorge undisclosed fees received by Catanzarite within one year before the filing of Perrine's bankruptcy petition allegedly "in contemplation of or in connection with" his bankruptcy case. Catanzarite objects to the disgorgement of the fees, claiming that the compensation was not received for services rendered either "in contemplation of or in connection with" Perrine's bankruptcy case. At the continued hearing, Kathleen Goldberg appeared for Speier and Richard Vergel de Dios appeared for Catanzarite and Perrine. The court, having considered Speier's motion and the opposition of Catanzarite and Perrine thereto, the evidentiary record, and arguments of counsel, makes the following findings of fact and conclusions of law[1] pursuant to Fed.R.Civ.P. 52, as incorporated into Fed. R. Bankr.P. 7052 and made applicable to contested matters by Fed. R. Bankr.P. 9014 (c).

## I. STATEMENT OF FACTS

Prior to August 8, 2003, Perrine owned as his separate property a 30.32 acre tract of land located in Klamath Falls, Oregon ("Oregon Property"). On August 8, 2003, Perrine transferred the Oregon Property to the Eugene H. Perrine and Vicki L Perrine Family Trust dated August 8, 2003 ("Perrine Trust") by Trust Transfer Grant Deed recorded on August 22, 2003, at Volume M03, Page 61460, Real Property Records, Klamath County, Oregon.

The Perrine Trust is an *intervivos* revocable trust established in the name of Perrine and his wife, Vicki. Perrine is the trustor, co-trustee and beneficiary of the Perrine Trust. In addition to the Oregon Property, the assets of the Perrine Trust ostensibly included at its inception the following marital property:

> *Community Property:* "All items of tangible personal property, including, but not limited to, furniture and furnishings, silverware, clothing, books, collections of tangible personal property, and
>
> [ 369 B.R. 575 ]
>
> other tangible personal property usually kept at the Trustor's residence."[2]

http://www.lawriter.com/application/documents.aspx?020-01-14599B

Complaint Supplemental Documents Exp

Exhibit #8: 009

Back # Superior Court of California County of Orange
ADA Complaint Exhibits 318

Exhibit #35: 010

22-CV-01616-BAS-DDL

3/8/2013

*Perrine's Separate Property:* (a) Real property and improvements located at 285 West Skyline Drive, La Habra Heights, California ("La Habra Property"), transferred into the Trust by Trust Transfer Grant Deed recorded on September 26, 2003, as Instrument No. 03-2864459, Official Records, Los Angeles County, California; (b) 50 shares of stock in Perrine Electric Company, Inc. and (c) a pension at Schwab & Company, Inc.[3]

Section 1.02 of the Perrine Trust states, in pertinent part:

"All property now or hereafter conveyed or transferred to the [Trust] . . . shall remain, respectively, community property, quasi-community property, or the separate property of the Trustor transferring such property to the Trustee."

Perrine is also the president of Perrine Electric Company, Inc. ("Perrine Electric"). On April 29, 2004, Perrine was sued by AAA Electrical Supply, Inc. ("AAA") in Case No. BC 324665, styled *AAA Electrical Supply, Inc. v. Perrine Electric Company, Inc. and Eugene H. Perrine, Jr.,* in the Superior Court of Los Angeles County, for the sum of $71,167.05, plus attorneys fees and costs, based upon his personal guaranty of the debts of Perrine Electric. Catanzarite was the attorney of record for Perrine and Perrine Electric in the state court action.

On January 11, 2005, Perrine and Vicki Perrine, individually and as trustee, executed a document entitled "Retainer Agreement and Application of In Kind Payment" agreeing to transfer the Oregon Property to Catanzarite at a stipulated value of $30,000 for payment of accrued attorneys fees and costs and as a credit for future attorneys fees and costs to be incurred by Perrine and Vicki Perrine. The Retainer Agreement states specifically that the payment is "for the purpose of securing the continued representation of the Trust and the individuals in future litigation including without limitation, with creditors and to protect the home equity of Vicki and the pension of Eugene." On January 13, 2005, Perrine and Vicki Perrine, as Co-Trustees of the Trust, executed a Statutory Bargain and Sale Deed conveying the Oregon Property to Kenneth J. Catanzarite for $30,000. The deed was recorded on January 14, 2005, at Volume M05, Page 03482, Real Property Records, Klamath County, Oregon. Ten days later, Perrine stipulated to entry of a judgment in the state court action in favor of AAA in the amount of $76,767.

On April 21, 2005, Perrine filed his voluntary petition under chapter 7 of the Bankruptcy Code.[4] Speier was appointed as trustee. In his schedules filed on May 6, 2005, Perrine disclosed assets valued at $415,740 and liabilities in excess of $174,073.[5] According to Schedule A, Perrine

[ 369 B.R. 576 ]

did not own an interest in any real property on the petition date. Perrine's assets, as disclosed in Schedule B, consisted of cash, clothing, two vehicles, and his interest in a profit sharing plan valued at $400,000. Perrine declared under penalty of perjury that he neither owned stock or an interest in a business at the time of bankruptcy[6] nor any interest in a trust on the petition date.[7]

In his Statement of Financial Affairs filed on May 6, 2005, Perrine declared under penalty of perjury that he had not made any payments to creditors within 90 days preceding the commencement of the case[8] nor transferred any property (other than in the ordinary course of business or financial affairs of the debtor) within one year preceding the date of bankruptcy.[9] In response to Question # 9 of the Statement of Financial Affairs, Perrine disclosed that he had paid the sum of $3,000 to Catanzarite on January 14, 2005, for debt counseling or bankruptcy.

On May 6, 2005, Catanzarite filed a document entitled "Disclosure of Compensation of Attorney for Debtor" ("Rule 2016(b) Statement") signed by Richard Vergel de Dios on behalf of Catanzarite, stating:

Pursuant to 11 U.S.C. § 329(a) and Fed. Bankr.P.2016(b), I certify that I am the attorney for the above-named debtor(s) and that compensation paid to me within one year before the filing of the petition in

http://www.leagle.com/PrintDocument.aspx?xmldoc=20110114598

Complaint Supplement #35 20-01145998

Exhibit #8: 010

Back # Superior Court of California County of Orange
ADA Complaint Exhibits 319

Exhibit #35; 011

5/8/2013

22-CV-01616-BAS-DDL

bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

```
For legal services, I have agreed to
  accept                                    $3,000.00
Prior to the filing of this statement I
  have received                             $3,000.00
Balance Due                                 $    0.00
```

Mr. de Dios further certified that Catanzarite had agreed to accept $3,000 for the following legal services in the case:

> a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;
>
> b. Preparation and filing of any petition, schedules, statements of affairs and plan which may be required;
>
> c. Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof; [and]
>
> d. Representation of the debtor in adversary proceedings and other contested bankruptcy matters.[10]

Mr. de Dios's signature on the Rule 2016(b) Statement appears beneath the following certification:

> I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceedings.[11]

On May 23, 2005, Perrine appeared and was examined by Speier under oath at a meeting of creditors conducted pursuant to § 341(a).[12] Based upon the examination

[ 369 B.R. 577 ]

and his investigation of Perrine's actions before bankruptcy, Speier filed a complaint in Adversary No. RS-05-01243 PC, styled *Steven M. Speier, Chapter 7 Trustee v. Vicki L. Perrine, et. al.,* on June 15, 2005, seeking, in part, to recover as a fraudulent conveyance funds received by Perrine from the sale of the La Habra Property prior to bankruptcy, which were then transferred to Vicki and used to purchase, as her separate property, certain real property located at 4025 Prarie Dunes Drive, Corona, California.

On July 15, 2005, Perrine filed a motion to dismiss his case pursuant to § 707(a), alleging that Speier's fraudulent conveyance claims were unfounded and that the unsecured non-priority creditors holding claims in excess of $174,000 would not suffer significant legal prejudice by a dismissal of the case.[13] Perrine's dismissal motion was opposed by Speier and Perrine's largest creditor, AAA.[14] On August 15, 2005, the court denied Perrine's motion to dismiss finding that dismissal of the case would be prejudicial to creditors.[15] An Order Denying Debtor's Motion for Voluntary Dismissal of Case was entered on September 20, 2005. Shortly thereafter, Speier filed a complaint in Adversary No. RS 05-01473 PC, styled *Steven M. Speier, Chapter 7 Trustee v. Eugene H. Perrine, Jr.,* objecting to Perrine's discharge pursuant to § 727(a)(2)(A), (a)(3), (a)(4)(A) and (a)(5).

On November 2, 2006, Speier filed a motion seeking an order compelling Catanzarite to amend its Rule 2016(b) Statement to disclose the transfer of the Oregon Property claiming that the property was received for services "in contemplation of or in connection with" Perrine's bankruptcy case. Perrine and Catanzarite opposed the motion, asserting that the fees incurred "in contemplation of or in connection with" the bankruptcy case were limited to the $3,000 disclosed in the Rule 2016(b) Statement on May 6, 2005, and that the Oregon Property was transferred to Catanzarite primarily for non-bankruptcy services. Catanzarite explained that there

was an outstanding balance of $12,000 due the Catanzarite firm when it received the Oregon Property on January 14, 2005. After payment of the outstanding balance, the $18,000 credit was used to pay $3,000 in fees for preparation of the bankruptcy petition and "the remaining amount was used to pay fees incurred pre-bankruptcy related to the AAA Electric

[ 369 B.R. 578 ]

litigation."[16]

At a hearing on December 4, 2006, the court determined that Perrine's transfer of the Oregon Property to Catanzarite on January 14, 2005, within 97 days prior to the filing of Perrine's bankruptcy petition, was made "in contemplation of or in connection with" Perrine's bankruptcy case. Catanzarite was ordered to amend its Rule 2016(b) Statement to disclose all facts concerning its receipt of the Oregon Property. A hearing on the issue of disgorgement was continued to February 26, 2007.

On December 15, 2006, Catanzarite filed an Amended Disclosure of Compensation of Attorney for Debtor ("Amended Rule 2016(b) Statement"). Catanzarite's Amended Rule 2016(b) Statement did not mention the Oregon Property nor explain the method used by Catanzarite and Perrine to arrive at the $30,000 "stipulated" value. Catanzarite's Amended Rule 2016(b) Statement stated only that "payments and credits received from the Debtor in the amount of $30,000 were paid on behalf of the following categories: $21,000 in defense of the AAA Electrical litigation; $3,000 with regard to the dispute with MBNA, $3,000 for pension work and $3,000 for preparation of bankruptcy petition and schedules."[17] Prior to the continued hearing, Speier and Catanzarite filed supplemental memorandums of points and authorities on the issue of disgorgement. At the continued hearing on February 26, 2007, the matter was taken under submission.

## II. DISCUSSION

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(b) and 1334(b). This matter is a core proceeding under 28 U.S.C.

[ 369 B.R. 579 ]

§ 157(b)(2)(A), (B), (E) and (O). Venue is appropriate in this court. 28 U.S.C. § 1409(a).

A. *Strict Duty of Disclosure*

Section 329(a) requires a debtor's attorney to disclose to the court the amount of compensation paid or promised for services rendered "in contemplation of or in connection with the case."[18] Section 329(a) is implemented by Rule 2016(b) which requires the filing of the statement required by § 329(a) not later than 15 days after the order for relief.[19] Rule 2016(b) imposes a continuing duty on debtor's counsel to supplement the original statement pursuant to § 329(a).[20] The disclosure requirements of § 329(a) apply "whether or not the attorney ever applies for compensation" *Consumer Seven Corp. v. United States Trustee (In re Fraga),*210 B.R. 812, 822 (9th Cir. BAP 1997).

Rule 2017(a) directs the court to determine, either *sua sponte* or upon motion by a party in interest, whether any payment or transfer of property to an attorney "in contemplation of" the filing of the bankruptcy petition is excessive.[21] Taken together, § 329(a) and Rule 2017(a) "furnish the court with express power to review payments to attorneys for excessiveness and to restore the status quo when assets have improvidently been bartered for legal services[.]" *In re Martin,*817 F.2d 175, 180 (1st Cir.1987).

Complaint Supplement #30-2020-01145998
Exhibit #8: 012

Book 4: Superior Court of California County of Orange
ADA Complaint Exhibits 321

Exhibit #35: 013
22-CV-01616-BAS-DDL

3/8/2013

Section 329's disclosure requirements are "'mandatory, not permissive.'" *Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.),*4 F.3d 1556, 1565 (10th Cir.1993) (quoting *In re Bennett,*133 B.R. 374, 378 (Bankr. N.D.Tex.1991)); *In re Keller Fin. Servs. of Fla., Inc.,*248 B.R. 859, 883 (Bankr. M.D.Fla.2000). Section 329(a), which is derived from § 60(d) of the Bankruptcy Act of 1898,[22] seeks to prevent over-reaching

[ 369 B.R.<br>580 ]

by debtor's attorneys and serves to counteract the temptation of a failing debtor to deal too liberally with his property in employing counsel to protect him in view of financial reverses and probable failure.'" *Conrad, Rubin & Lesser,* 289 U.S. at 477-78, 53 S.Ct. 703 (quoting *In re Wood,*210 U.S. 246, 28 S.Ct. 621, 52 L.Ed. 1046 (1908)). Section 329(a) demands that an attorney be forthright in disclosing "the precise nature of the fee arrangement" with the debtor. *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park — Helena Corp.),*63 F.3d 877, 881 (9th Cir.1995) (quoting *In re. Glenn Elec. Sales Corp.,*99 B.R. 596, 600 (D.N.J.1988)). "Counsel's fee revelations must be direct and comprehensive. Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient." *In re Saturley,*131 B.R. 509, 517 (Bankr.D.Me.1991).

Congress intended to permit bankruptcy courts to reexamine the reasonableness of fees within the one-year look back period, irrespective of the nature of the services rendered. *See Keller Fin. Servs.,* 248 B.R. at 878 (concluding that § 329 permits the court to review fees paid for services "performed at a time when the debtor was contemplating bankruptcy," regardless of the nature of the services (internal quotations omitted)); *Wootton v. Ravkind (In re Dixon),*143 B.R. 671, 678 (Bankr.N.D.Tex.1992) (stating that § 329 "imposes no restriction on the nature of the services rendered . . ."); *Rheuban,* 121 B.R. at 378 (observing that § 329 does not limit the nature of the legal services that are subject to reexamination. Absent complete disclosure, the court is unable to make an informed judgment regarding the nature and amount of compensation paid or promised by the debtor for legal services in contemplation of bankruptcy.

The failure to satisfy the disclosure requirements of § 329(a) and Rule 2016(b) may result in sanctions, "even if proper disclosure would have shown that the attorney had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule." *Park-Helena Corp.,* 63 F.3d at 880; *Fraga,* 210 B.R. at 822. An attorney who violates § 329(a) and Rule 2016(b)

[ 369 B.R.<br>581 ]

forfeits any right to receive compensation for services rendered on behalf of the debtor and may be ordered to disgorge fees already received. *See, e.g., Law Offices of Nicholas A. Franke v. Tiffany (In re Lewis),*113 F.3d 1040, 1045 (9th Cir. 1997) (concluding that "[a]n attorney's failure to obey the disclosure and reporting requirements of the Bankruptcy Code and Rules gives the bankruptcy court the discretion to order disgorgement of attorney's fees"); *Park-Helena Corp.,* 63 F.3d at 882 ("Even a negligent or inadvertent failure to disclose fully relevant information [in a Rule 2016 statement] may result in a denial of all requested fees."); *Jensen v. U.S. Trustee (In re Smitty's Truck Stop, Inc.),*210 B.R. 844, 849 (10th Cir. BAP 1997) (stating that an attorney's failure to disclose a retainer in his Rule 2016(b) statement is sufficient to deny all fees, even if the non-disclosure was negligent or inadvertent); *Fraga,* 210 B.R. at 822 ("The consequences of an attorney's violation of the disclosure requirements regarding fees include denial of all fees requested.").

B. *Services "In Contemplation of" the Bankruptcy Case*

Courts broadly apply a *subjective test* to determine whether attorneys fee payments were made "in contemplation of" bankruptcy. *Dixon,* 143 B.R. at 675 n. 3 (observing that "[a] subjective and not an objective test applies in determining whether payments to attorneys were

http://www.lexgle.com/PrintDocument.aspx?DocId=2020-0114.0908

Back & Superior Court of California County of Orange
ADA Complaint Exhibits 322

Complaint Supplement Book #
Exhibit #8: 013

Exhibit #35; 014
22-CV-01616-BAS-DDL

5/8/2013

made `in contemplation of bankruptcy.'"); *Rheuban*, 121 B.R. at 378 (stating that a "*subjective* review [is] embodied in the `in contemplation of' language of § 329 and its predecessors, § 60(d) and Bankruptcy Rule 220"). The subjective inquiry is "whether the debtor was influenced by the possibility or imminence of a bankruptcy proceeding in making the transfer." *Brown v. Luker (In re Zepecki)*, 258 B.R. 719, 724 (8th Cir. BAP 2001), *aff'd*, 277 F.3d 1041 (8th Cir.2002); *see Dixon*, 143 B.R. at 675 n. 3 (articulating the standard as "whether, in making the transfer, the debtor is influenced by the possibility or imminence of a bankruptcy proceeding"). The "controlling question," as the Supreme Court explained in *Conrad, Rubin & Lesser*, "is with respect to the state of mind of the debtor and whether the thought of bankruptcy was the impelling cause of the transaction." 289 U.S. at 477, 53 S.Ct. 703.

> If the payment or transfer was thus motivated, it may be re-examined and its reasonableness be determined. Undoubtedly, while the question thus relates to the debtor's motive, the nature of the services which he seeks and for which he pays may be taken into consideration as it may throw light upon his motive. It is not impossible that the services may have been so wholly separate from any exigency of bankruptcy as to indicate that the thought of bankruptcy was in no sense controlling. But, given the fact that the payment or transfer was in contemplation of bankruptcy, the inducement of the transaction affords, from the standpoint of the statute, sufficient ground for authorizing a summary inquiry into its reasonableness. The manifest purpose of the provision is to safeguard the assets of those who are acting in contemplation of bankruptcy, so that these assets may be brought quickly and without unnecessary expense into the hands of the trustee, and to provide a restraint upon opportunities to make an unreasonable disposition of property through arrangement for excessive payments for prospective legal services.

*Id.*

Services aimed at the *prevention* of bankruptcy likewise necessarily contemplate bankruptcy, and compensation received

[ 369 B.R. 582 ]

for such services falls within the ambit of § 329(a). *See, e.g., Conrad, Rubin & Lesser*, 289 U.S. at 479, 53 S.Ct. 703 (holding that the court had jurisdiction to review fees paid to an attorney retained by debtor to negotiate a 50% cash settlement with creditors prior to bankruptcy, and opining that "[a] man is usually very much in contemplation of a result which he employs counsel to avoid"); *Matter of Prudhomme*, 43 F.3d 1000, 1004 (5th Cir. 1995) (holding that evidence suggesting that the debtors, who in desperate financial straits, consulted an attorney for representation to restructure debt and resolve disputes with their largest creditor supported a finding that the fee was paid in contemplation of or in connection with the case); *In re Greco*, 246 B.R. 226, 231 (Bankr.E.D.Pa.2000) (holding that a $2,200 payment to an attorney two months before bankruptcy for legal research concerning the effect of bankruptcy on the debtor's student loans was "in contemplation of" bankruptcy); *Rheuban*, 121 B.R. at 379 (finding that debtor acted "in contemplation of bankruptcy" upon entering into a fee agreement with a firm to represent him in connection with investigation and litigation of possible criminal and regulatory matters arising out of debtor's business relationship with a savings & loan); *GIC Gov't Sec.*, 92 B.R. at 533 (concluding that payments made to attorneys retained on the eve of bankruptcy to resist efforts by the State of Florida to revoke the debtor's securities registration were "in contemplation of" bankruptcy). Those cases in which a debtor's counsel has received undisclosed non-exempt assets shortly before bankruptcy as compensation primarily for future services have merited particularly close scrutiny by bankruptcy courts.

In *Dixon*, an attorney, William H. Ravkind ("Ravkind") was employed by Don Ray Dixon ("Dixon") in November 1986, to represent him in criminal matters arising out of his association with Dondi Financial Corporation and Vernon Savings & Loan Association for a flat fee of $450,000. 143 B.R. at 673. Ravkind ultimately received $200,000 in cash and certain artwork valued at $100,000 as payment in full. *Id.* at 674. The cash and artwork, which were Dixon's non-exempt assets, were paid for future services to be rendered by Ravkind. *See id.* At the time he

received the transfer, Ravkind was aware that Dixon was considering bankruptcy. *Id.* Ravkind and Dixon were concerned that the federal government was planning to seize Dixon's assets pursuant to the Racketeer Influenced and Corrupt Organizations Act.[23] *Id.* Ravkind immediately deposited the $200,000 cash in his operating account and used the funds to pay business expenses. *Id.* Ravkind then sold most of the artwork for less than $25,000. *Id.* at 675.

On April 22, 1987, Dixon filed a voluntary petition under chapter 11 of the Code. *Id.* at 673. Ravkind was not Dixon's general counsel in the bankruptcy case, but continued to represent him on criminal matters after the petition date. *Id.* at 674. Dixon disclosed the $300,000 transfer to Ravkind in his statement of financial affairs. *See id.* at 675. However, Ravkind failed to timely disclose the $300,000 fee and his agreement with Dixon pursuant to § 329(a) and Rule 2016(b). *Id.* Furthermore, Ravkind neither sought authorization to act as special counsel for Dixon under § 327(e) nor authorization to use any unearned portion of the $300,000 retainer in his possession. *Id.*

On October 14, 1987, Dale Wooten, as chapter 11 trustee, filed a complaint seeking to recover the $300,000 fee from Ravkind as a fraudulent transfer under

[369 B.R. 583]

§ 548(a). *Id.* at 673. It was undisputed that at all material times, Dixon was insolvent within the meaning of § 548(a). *See id.* at 674. Ravkind had not kept time records, but the evidence supported a finding that he had earned approximately $35,000 for legal services rendered to Dixon prior to bankruptcy. *Id.* It was also undisputed that the reasonable value of Ravkind's post-petition criminal defense work, which accounted for the majority of his services to Dixon, exceeded the amount that he had been paid. *Id.*

Although relief was sought by the trustee under § 548(a), the bankruptcy court concluded that "the more appropriate standard" for review of Ravkind's fee arrangement with Dixon was § 329(a) and § 330. *Id.* at 673. Applying a subjective test, the bankruptcy court found that Dixon's $300,000 transfer to Ravkind was made in contemplation of bankruptcy, stating:

> Prior to the filing of the bankruptcy proceedings, Dixon was the target of several major criminal investigations, and had received national media attention as an alleged central figure in the savings and loan scandal. At the time [Ravkind] received the money and art as a payment from Dixon, both he and Dixon were concerned that Dixon's assets might be seized under a RICO seizure. Bankruptcy counsel had already been retained for the Debtors in California, and Debtors were insolvent. From the testimony adduced at trial, it was clear the cash payment and art represented part of the last liquid and available assets of the Debtors. At the time [Ravkind] was engaged, he undertook representation of Dixon in several criminal investigations, and related civil suits with the Federal Deposit Insurance Corporation (the "FDIC"). In addition, he participated with Dixon's California bankruptcy lawyers in some bankruptcy planning. At the time [Ravkind] received the transfers of Dixon's money and property, Dixon's general counsel Simmons was parceling out funds and property for retainers. The Court finds that the transfers were received by [Ravkind] within a year of the filing of bankruptcy, in contemplation of a bankruptcy proceeding, and that, therefore, [Ravkind's] fee arrangement is subject to review under § 329 of the Code.

*Id.* at 675 n. 3. The court then ordered Ravkind to disgorge all but $35,000 of the payment received from Dixon, *i.e.*, the remaining art on hand, $160,000 of the cash received, and $90,000 representing the value of the artwork disposed of, finding that the fee arrangement was excessive and violated § 329 and § 330. *Id.* at 679. The court also determined that Ravkind's failure to disclose the $300,000 fee and agreement with Dixon pursuant to § 329(a) and Rule 2016(b) constituted "an independent and alternative basis" for disgorgement of the fees. *Id.* at 680. In ordering the disgorgement, the court concluded that Ravkind's criminal defense work was personal to Dixon and resulted in no benefit to creditors or the estate, stating "the only thing the transfers to [Ravkind] achieved was to further deplete the assets of the bankruptcy estate." *Id.* at 679.

Complaint Supplement #39 2020-01-145998
http://www.leagle.com/PrintDocument.aspx
Exhibit #8: 015
Back # Superior Court of California County of Orange
ADA Complaint Exhibits 324
Exhibit #35: 016
3/8/2013
22-CV-01616-BAS-DDL

In *Zepecki*, Robert Zepecki ("Zepecki") filed a voluntary chapter 7 petition on February 7, 1996. 277 F.3d at 1043. Three months earlier, Zepecki's attorney, Steven C.R. Brown ("Brown") had received the net proceeds of $102,989 from the sale of certain real property owned by Zepecki in Illinois pursuant to a "1031 Exchange of Property Escrow Agreement."[24] *Id.* at 1044. Acting as escrow agent under the

[ 369 B.R. 584 ]

agreement, Brown disbursed the sum of $65,000 to the bank account of a third party, Ted Holder ("Holder") prior to Zepecki's bankruptcy. *Id.* The balance was disbursed by Brown to Holder shortly after the petition date. *Id.* Brown received $40,000 in attorneys fees as part of the transaction, $20,000 following each payment to Holder. *Id.*

Zepecki failed to disclose in his schedules and statements either the sale of the Illinois property or the transfer of the sale proceeds to Brown. *Id.* at 1043. The bankruptcy court denied Zepecki's discharge under § 727(a)(4), and *sua sponte* ordered Brown to account for the $40,000 fee received under the agreement. *Id.* at 1043-44. Brown documented attorneys fees and expenses totaling $7,160 incurred prior to Zepecki's bankruptcy in conjunction with the tax-free exchange. *Id.* at 1044. Ultimately, the bankruptcy court determined that the $40,000 fee was paid to Brown in contemplation of or in connection with Zepecki's bankruptcy. *Id.* at 1046. Brown was ordered to disgorge fees of $32,840 to the estate, representing the entire post-petition fee of $20,000 and $12,840 of the $20,000 fee, received prior to the petition date. *Id.* at 1044. Brown appealed and the Bankruptcy Appellate Panel for the Eighth Circuit affirmed. *Zepecki*, 258 B.R. at 726. The Eighth Circuit then affirmed the judgment of the Bankruptcy Appellate Panel, holding:

> We also find no clear error in the bankruptcy court's finding that Brown's representation was in connection with or in contemplation of the possibility or imminence of a bankruptcy proceeding. The Illinois land transaction occurred within one month after Zepecki's divorce from Ms. Kania, who was Zepecki's largest creditor, and within four months prior to the bankruptcy filing. The proceeds of the land sale constituted Zepecki's largest asset with which to satisfy Ms. Kania's judgment. The bankruptcy court found that the land transaction was a sham and was performed in an effort to prevent the asset from becoming property of Zepecki's bankruptcy estate and prevent his ex-wife from recovering on her judgment. Zepecki lost his right to a bankruptcy discharge because he failed to identify the transaction or its proceeds on his bankruptcy schedules, which further supports the court's conclusion that Zepecki was trying to keep the asset from his wife. These facts support the bankruptcy court's conclusion that Zepecki was contemplating bankruptcy when he transferred the Illinois property and when Brown assisted in the attempted section 1031 transfer of that same property.

*Zepecki*, 277 F.3d at 1046.

### C. *Perrine Transferred the Oregon Property to Catanzarite In Contemplation of Bankruptcy*.

As the Supreme Court explained in *Conrad, Rubin & Lesser,* the test for determining if a payment or transfer was made "in contemplation of bankruptcy hinges upon the debtor's state of mind and, more precisely, "whether the thought of bankruptcy was the impelling cause of the transaction." 289 U.S. at 477, 53 S.Ct. 703. Four months prior to bankruptcy, Perrine was embroiled in a lawsuit with AAA, his largest creditor. On the eve of trial, Perrine transferred the Oregon Property from the Perrine Trust to his attorney, Catanzarite. The Perrine Trust specifically provided that the Oregon Property remained Perrine's separate property,

[ 369 B.R. 585 ]

notwithstanding its inclusion in the trust. The Oregon Property was Perrine's last and most significant non-exempt asset. At the time of the transfer, Catanzarite and Perrine had to have been concerned that the Oregon Property would be seized by AAA to satisfy any judgment that might be entered against Perrine in the state court action. Catanzarite concedes that once it received the Oregon Property, there was "no property remaining in the trust to satisfy

Complaint Supplement #35; 202 of 1455.338
Exhibit #8: 016

Back in Superior Court of California County of Orange
ADA Complaint Exhibits 325

Exhibit #35: 017
22-CV-01616-BAS-DDL

creditors."[25] With the Oregon Property in the hands of Catanzarite, Perrine stipulated to a judgment with AAA ten days later.

Moreover, the language of Catanzarite's retainer agreement belies any notion that the Oregon Property was not transferred in contemplation of bankruptcy. Like *Dixon*, the transfer was intended to barter non-exempt assets primarily for future legal services to be rendered by Catanzarite. Perrine transferred the Oregon Property to Catanzarite 97 days prior to his bankruptcy, after exhausting efforts to litigate with his largest creditor, and for the stated purpose of "securing the continued representation of the Trust and the individuals in future litigation including without limitation, with creditors and to protect the home equity of Vicki and the pension of Eugene."[26] The Oregon Property was given a "stipulated" value of $30,000 by Perrine to Catanzarite, but Catanzarite was owed only $12,000 at the time of the transfer. As in *Dixon*, the effect of the transfer was to further deplete the assets of the estate.

Catanzarite argues that Perrine did not contemplate or intend to file bankruptcy at the time he was sued by AAA on April 29, 2004.[27] The critical date, however, is the date of the transfer of the Oregon Property. The only direct evidence of Perrine's state of mind on January 14, 2005, is Perrine's deposition testimony that he "never really wanted to declare bankruptcy" and, in response to a question as to whether he was thinking about filing bankruptcy in January 2005, Debtor responded "I don't know." Even Perrine's deposition testimony lacks credibility when weighed against the facts as they existed 97 days prior to bankruptcy.

At the hearing on December 4, 2006, Catanzarite conceded that Perrine "wanted to avoid bankruptcy." Catanzarite explained that Perrine's business "operated from one large job to another," and that his client had been "down in the hole before" but he would receive "the golden phone call . . . where it was a big job would come in and it, pull his company out of its abyss, financial abyss." Taken together, these facts support a finding that Perrine was contemplating the possibility or imminence of bankruptcy when he transferred the Oregon Property to Catanzarite on January 14, 2005, and that the transfer is subject to review under § 329(a) and Rule 2017(a).

D. *Catanzarite Failed to Disclose Property Transferred to Catanzarite in Payment for Legal Services Rendered, or To Be Rendered, in Contemplation of Perrine's Bankruptcy Case*

Section 329(a) and Rule 2016(b) required that Catanzarite's disclosures be

[ 369 B.R. 586 ]

full, candid and complete. Catanzarite timely filed a Rule 2016(b) Statement in this case, but failed to disclose fully and candidly in its Rule 2016(b) Statement the precise nature of its fee agreement with Perrine. Catanzarite's failure to disclose its complete relationship with Perrine was neither negligent or inadvertent. Notwithstanding its receipt of the Oregon Property pursuant to its retainer agreement with Perrine, Catanzarite made a purposeful calculation of the amount that it chose to disclose in its Rule 2016(b) Statement. Catanzarite did not receive the sum of $3,000 from Perrine for legal services, as certified in its Rule 2016(b) Statement. On the contrary, Catanzarite received a transfer of the Oregon Property from the Perrine Trust on January 14, 2005, with a stipulated value of $30,000. Catanzarite then apportioned a value of $3,000 from the $30,000 transfer for legal services ostensibly rendered to Perrine in contemplation of or in connection with his bankruptcy case. No facts concerning Catanzarite's retainer agreement nor its receipt of the Oregon Property 97 days prior to bankruptcy were disclosed in either the Rule 2016(b) Statement or the Amended Rule 2016(b) Statement. Nor did Catanzarite disclose the method used to calculate the $30,000 "stipulated" value of the Oregon Property. Neither the retainer agreement nor the transfer of the Oregon Property to Catanzarite were disclosed by Perrine in the statement of financial affairs prepared by Catanzarite and filed with the court.

This Document is Provided by Leagle.com

An attorney who neglects to satisfy the disclosure requirements of § 329(a) and Rule 2016 (b), whether willfully or inadvertently, forfeits any right to receive compensation for services rendered on behalf of the debtor and may be ordered to return fees already received. *See Keller Fin. Servs.*, 248 B.R. at 885 (stating that "[t]here are no measurable damages which result from the non-disclosure of compensation required by § 329"). Given the gravity of Catanzarite's non-disclosure, the court will deny all fees to Catanzarite for legal services rendered to Perrine to the petition date due to its failure to comply with § 329(a) and Rule 2016(b).[28] Catanzarite will be ordered to disgorge and turn over to Speier either the Oregon Property or its stipulated value of $30,000, at the election of the trustee, for the benefit of the estate.

## III. CONCLUSION

Ninety-seven days prior to bankruptcy, Perrine transferred the Oregon Property to Catanzarite for legal services rendered, or to be rendered, in contemplation of his bankruptcy case. Catanzarite's failure to disclose both its retainer agreement with Perrine and its receipt of the Oregon

[ 369 B.R. 587 ]

Property pursuant to such retainer agreement, as mandated by § 329(a) and Rule 2016(b), warrants disgorgement of the Oregon Property and denial of fees.

A separate order will be entered consistent with this opinion.

## Footnotes

1. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. On March 30, 2007, Perrine filed a Notice of Request by Debtor's Counsel for Additional Findings of Fact and Conclusions of Law Re: Memorandum Decision Filed and Entered March 23, 2007 ("Notice"). The court has supplemented its findings of fact in this Amended Memorandum Decision in response to the Notice to clarify the factual basis for the court's decision. Insofar as the additional findings of fact and conclusions of law set forth in the Notice have not been incorporated into this Amended Memorandum Decision, Perrine's request is denied.

**Back to Reference**

2. The Eugene H. Perrine Jr. and Vicki L. Perrine Family Trust Declaration of Trust, Schedule A.

**Back to Reference**

3. *See* The Eugene H. Perrine Jr. and Vicki L. Perrine Family Trust Declaration of Trust, Schedule B.

**Back to Reference**

4. Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 prior to its amendment by the Bankruptcy Abuse and Consumer Prevention Act of 2005, Pub.L. 109-8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr.P."), which make applicable certain Federal Rules of Civil Procedure ("Fed. R. Civ.P.").

**Back to Reference**

5. In Schedule F, Perrine listed 9 creditors holding unsecured non-priority claims totaling $174,073.53. According to Schedules D and E, Perrine did not have any secured creditors or unsecured priority creditors on the petition date.

**Back to Reference**

6. Schedule B, # 12.

**Back to Reference**

7. Schedule B, # 19.

**Back to Reference**

8. Statement of Financial Affairs, Question # 3.
**Back to Reference**

9. Statement of Financial Affairs, Question # 10.
**Back to Reference**

10. Rule 2016(b) Statement, p. 1.
**Back to Reference**

11. Rule 2016(b) Statement, p. 2.
**Back to Reference**

12. The Code requires a debtor to appear and submit to examination under oath at a meeting of creditors. 11 U.S.C. § 343; Fed. R. Bankr.P.2003. The examination focuses on the debtor's acts, conduct, property, liabilities and financial condition, as well as any matter which might affect the administration of the bankruptcy estate and the debtor's right to a discharge. Fed. R. Bankr.P.2004(b).
**Back to Reference**

13. In fact, Perrine's unsecured debt was substantially in excess of the amount disclosed in Schedule F. On January 13, 2006, Perrine filed an Amended Schedule F disclosing 12 holders of unsecured non-priority claims totaling $202,277.65.
**Back to Reference**

14. On November 29, 2005, AAA filed a proof of claim in the amount of $76,767 based upon the Stipulation for Entry of Judgment entered in the state court action.
**Back to Reference**

15. A debtor has no absolute right to dismiss a chapter 7 case. *Bartee v. Ainsworth (In re Bartee),* 317 B.R. 362, 366 (9th Cir. BAP 2004); *Leach v. U.S. (In re Leach),* 130 B.R. 855, 857 n. 5 (9th Cir. BAP 1991). In the Ninth Circuit, "a voluntary Chapter 7 debtor is entitled to dismissal of his case so long as such dismissal will cause no `legal prejudice' to interested parties." *Leach,* 130 B.R. at 857. The debtor bears the burden of proving that dismissal will not prejudice creditors. *Bartee,* 317 B.R. at 366. In this case, Speier anticipated that there would be funds available to pay unsecured creditors, at least in part. Dismissal would have resulted in prejudice to creditors because there was no guarantee that Perrine would have paid their claims outside of bankruptcy. *Id.*
**Back to Reference**

16. Catanzarite's Opposition to Trustee's Motion to Compel Disclosure of Compensation and Disgorgement of Compensation for Failure to Disclose on Statement 2016, p. 3, 1.6-10. In a letter to Speier's attorney, Thomas H. Casey dated December 15, 2005, Catanzarite enclosed a document entitled "Client Ledger Report" reflecting amounts billed to Perrine for legal services rendered by Catanzarite for the period from May 3, 2004 through April 26, 2005. In the letter, Catanzarite explained that the ledger report demonstrated that

> "[A]s of December 22, 2004, the sum of $11,857.91 was due. After receipt and credit of the land transfer amount on January 13, 2005 for $30,000, there was an $18,000 credit balance. However, fees incurred pre-bankruptcy related to the then pending litigation, as through the statement dated April 26, 2005, consumed all but $1,040.44. The statement dated April 26, 2005 did not cover the services for the period of April 15, 2005 through April 20, 2005. . . . the total amount accrued pre-petition was the sum of $2,615."

> As such, on the date of petition, there was no credit balance. In fact, Perrine actually owed the firm approximately $1,600 at that point in time.

Trustee's Motion to Compel Disgorgement of Compensation for Failure to Disclose on Statement 2016, Ex. 10. In his statement of financial affairs, Perrine stated under penalty of perjury that he paid the $3,000 fee to Catanzarite on January 14, 2005. The Client Ledger Report does not contain a specific billing entry for the $3,000 fee disclosed in the Rule 2016(b) Statement nor is the absence of the entry explained in Catanzarite's letter of December 15, 2005.
**Back to Reference**

17. Amended Rule 2016(b) Statement, p. 3, 1.14-18. Catanzarite actually received payments and credits totaling $33,616.50 between April 22, 2004 and April 21, 2005, for legal services rendered and costs advanced on behalf of Perrine. This amount included the sum of $3,616.50 received by Catanzarite on August 18, 2004, for services rendered in conjunction with certain accounting and compliance issues that arose under a stipulated order concerning the division of a qualified retirement plan previously entered in Perrine's divorce case. At the hearing on December 4,

Complaint Supplement #3: 020-01-145998
http://www.leagle.com/PrintDocument.aspx    Back # Superior Court of California County of Orange
ADA Complaint Exhibits 328
Exhibit #8: 019

Exhibit #35: 020
3/8/2013
22-CV-01616-BAS-DDL

2006, the court determined that the sum of $3,616.50 was not paid to Catanzarite on August 18, 2004, in contemplation of Perrine's bankruptcy case.

**Back to Reference**

18. Section 329(a) states:

> Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

11 U.S.C. § 329(a).

**Back to Reference**

19. Rule 2016(b) provides:

> Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 15 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 15 days after any payment or agreement not previously disclosed.

Fed. R. Bankr.P.2016(b).

**Back to Reference**

20. *Id.*

**Back to Reference**

21. Rule 2017(a) states, in pertinent part:

> On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or *any transfer of property by the debtor*, made directly or indirectly and *in contemplation of the filing of a petition under the Code* by or against the debtor or before entry of the order for relief in an involuntary case, *to an attorney for services rendered or to be rendered is excessive.*

Fed. R. Bankr.P.2017(a) (emphasis added).

**Back to Reference**

22. Section 60(d) of the Bankruptcy Act of 1898 provided:

> If a debtor shall, directly or indirectly, in contemplation of the filing of a petition by or against him, pay money or transfer property to an attorney and counselor at law, solicitor in equity, or proctor in admiralty for services to be rendered, the transaction shall be reexamined by the court on petition of the trustee or any creditor, and shall only be held valid to the extent of a reasonable amount to be determined by the court, and the excess may be recovered by the trustee for the benefit of the estate.

Bankruptcy Act of 1898, ch. 541, 30 Stat. 544, § 60(d), *superceded by* Bankruptcy Reform Act of 1978, Pub.L.No. 95-598, 11 U.S.C. § 329. In *Conrad, Rubin & Lesser v. Pender*, the Supreme Court discussed the scope of § 60 (d), explaining:

> It contains no intimation of an intention to limit the jurisdiction to re-examine to a particular sort of legal services for the payment of which the debtor has disposed of his property. The point of the provision conferring jurisdiction for a summary reexamination is not the specific nature of the legal services to be rendered, but that the payment or transfer to provide for them is made "in contemplation of" bankruptcy. The purpose is shown by the sweeping description of payments or transfers "to an attorney and counselor at law, solicitor in equity, or proctor in admiralty."

289 U.S. 472, 476-77, 53 S.Ct. 703, 77 L.Ed. 1327 (1933) (quoting Bankruptcy Act of 1898, § 60(d)). This broad scope of review survives in the language of Rule 2017(a). *See In re Rheuban,*121 B.R. 368, 376 (Bankr.C.D.Cal. 1990) (concluding that "decisions interpreting and applying predecessors of § 329 and Bankruptcy Rule 2017(a) remain persuasive and, in certain instances, are controlling. . . ."); *rev'd in Part on other grounds,*124 B.R. 301 (C.D.Cal.1990), *on remand,*128 B.R. 551 (Bankr.C.D.Cal.1991); *In re GIC Gov't Sec., Inc.,*92 B.R. 525, 530 (Bankr.M.D.Fla. 1988) (stating that "the principles enunciated by pre-Code cases interpreting § 60(d) of the Bankruptcy Act of 1898 are still controlling").

**Back to Reference**

23. 18 U.S.C. § 1961, *et. seq.*

**Back to Reference**

Complaint Supplement #3: 30-2020-01145908 Superior Court of California County of Orange
ADA Complaint Exhibits 329
Exhibit #8: 020

Exhibit #35; 021
22-CV-01616-BAS-DDL

4. Zepecki sought avoid capital gains on the sale of the Illinois property by effectuating a tax-free exchange of property under § 1031 of the Internal Revenue Code. 26 U.S.C. § 1031. The parties to the 1031 Exchange of Property Escrow Agreement drafted by Brown included *Zepecki, B & B Diversified* Resources, Inc., Zepecki's closely held corporation, Brown, and the purchaser of the real estate identified as James Burch. *Zepecki,* 277 F.3d at 1044.

Back to Reference

5. Reply in Support of Supplemental Memorandum of Points and Authorities in Support of Reasonableness of Fees Incurred By Catanzarite Law Corporation, p. 3, 1.19-20.

Back to Reference

26. Retainer Agreement and Application of In Kind Payment, executed on January 11, 2005, Eugene H. Perrine and Vicki L. Perrine, Individually and as Trustee and Kenneth J. Catanzarite, Individually and as President of Catanzarite Law Corporation.

Back to Reference

27. Opposition to Trustee's Motion to Compel Disclosure of Compensation and Disgorgement of Compensation for Failure to Disclose on Statement 2016, p. 2, 23-24.

Back to Reference

28. In reaching its conclusion, the court makes no finding as to the reasonableness of the fees sought by Catanzarite for legal services rendered on behalf of Perrine prior to bankruptcy. *See Lewis,* 113 F.3d at 1046 (holding that where non-disclosure results in an order for disgorgement of all fees, an inquiry into the appropriate amount of the fee is not required). The court notes, however, that the bulk of Catanzarite's pre-petition fees were incurred defending Perrine in the AAA litigation for which Catanzarite ultimately disclosed a fee of $21,077.93. Under § 329(b), Catanzarite bore the burden of establishing the reasonableness of its fees. *Hale v. United States Trustee (In re Basham),* 208 B.R. 926, 931 32 (9th Cir. BAP 1997) (stating that "[t]he burden is on the applicant to demonstrate that the fees are reasonable"). The court questions the reasonableness of Catanzarite's fee for the AAA litigation, particularly in light of the results obtained. AAA sued Perrine for $71,167.05, plus interest, attorneys fees and costs. The AAA litigation was concluded, with a stipulated judgment for $75,000-10 days after Catanzarite received the Oregon Property. Moreover, Catanzarite admitted that, at the time of the transfer, fees attributable to the AAA litigation were only $12,000.

Back to Reference

Complaint Supplement #30 2020-01-14 330b
Exhibit #8: 021
https://www.leagle.com/PrintDocument.aspx
Back # 330 Superior Court of California County of Orange
DCA Complaint Exhibits 330
Exhibit #35: 022
22-CV-01616-BAS-DDL
3/8/2013



1 of 4 DOCUMENTS

Warning
As of: Feb 15, 2013

**MIKE ALEXANDROS et al., Plaintiffs and Appellants, v. JAMES A. COLE et al., Defendants and Respondents.**

**G043715 (Consol. with G044362)**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION THREE**

*2011 Cal. App. Unpub. LEXIS 9984*

**December 30, 2011, Filed**

**NOTICE:**   NOT TO BE PUBLISHED IN OFFICIAL REPORTS. *CALIFORNIA RULES OF COURT, RULE 8.1115(a),* PROHIBITS COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY *RULE 8.1115(b).* THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF *RULE 8.1115.*

**PRIOR HISTORY:** [*1]
Appeal from a judgment of the Superior Court of Orange County. Super. Ct. No. 06CC07881. Gary L. Taylor, Temporary Judge. (Pursuant to *Cal. Const., art. VI, § 21.*).

**DISPOSITION:**   Motion for sanctions. Judgment affirmed. Motion granted.

**COUNSEL:** The Rosen Law Firm, Laurence M. Rosen; Catanzarite Law Corporation and Kenneth J. Catanzarite for Plaintiffs and Appellants.

Foley & Lardner, Sonia Salinas, Roger A. Lane, and Courtney Worcester for Defendants and Respondents New Enterprise Associates IV, L.P. and Spectra Enterprise Associates, L.P.

DLA Piper, Robert Brownlie, Gerard A. Trippitelli, David F. Gross, and Francesca Cicero for Defendants and Respondents James A. Cole, Kevin M. Carnino, Albert

Jicha, Eugene Hovanec, Gregory T. George, Robert Kohler and KOR Electronics.

**JUDGES:**   RYLAARSDAM,   ACTING   P.   J.; BEDSWORTH, J., O'LEARY, J. concurred.

**OPINION BY:** RYLAARSDAM

**OPINION**

Plaintiffs Mike Alexandros, Richard Damon, Mike Maridakis, Rick Jensen, Vincent Battaglia, James Struble, Douglas Dwyer, David Schwartz, Mike Thielen, Howard Arnold Lefevre, Dean Groce, Susan Lovern Kahaunaele, Young Lu, Charles D. Cartledge, and David Conrad are minority shareholders owning common stock in defendant KOR Electronics (KOR), a privately held company. In 2006 [*2] they sued defendants New Enterprise Associates IV, L.P. (NEA IV), Spectra Enterprise Associates, L.P. (Spectra), and KOR's directors James Cole, Kevin Carnino, Albert Jicha, Eugene Havanec, Gregory George, and Robert Kohler for breach of fiduciary duty and related claims.

Following a bench trial, the court entered judgment in favor of defendants. It also awarded costs to defendants as the prevailing party under *Code of Civil Procedure section 1032.*

Plaintiffs appeal from both the judgment and the order awarding costs. We consolidated the appeals. (Conrad separately appeals from the order awarding attorney

Complaint Supplement #30: 2020-01-14590 County of Orange
Exhibit #8: 022
Superior Court of California County of Orange
ADA Complaint Exhibits 331
Exhibit #35: 023
22-CV-01616-BAS-DDL

fees and the denial of his motion to vacate that order in consolidated case Nos. G044682 and G044457.)

Plaintiffs contend the court erred in (1) applying the business judgment rule to two interested directors (Cole and Camino), (2) finding the independent directors were properly informed and acted in good faith, (3) requiring plaintiffs to show "control and abuse of that control" by the controlling shareholders, and (4) failing to rule on Camino's claim for breach of fiduciary duty as KOR's CEO and the issues of inherent unfairness, gross mismanagement, waste of corporate assets, and [*3] unjust enrichment. They also assert the court may have erroneously relied on Delaware law, California's public policy in "protect[ing] the public from fraud and deception in securities transactions" supports reversal, and if the underlying judgment is reversed so should the award of costs. Finding no error, we affirm the judgment and the award of costs.

Defendants filed a joint motion for sanctions based on plaintiffs' numerous violations of the California Rules of Court (all further rule references are to these rules) governing appendices and record citations. We grant the motion.

FACTS

Plaintiffs rely on "the undisputed facts and the [s]uperior court's factual findings." Accordingly, the facts are taken from the statement of decision, the joint list of uncontroverted issues, and trial testimony. We construe any disputed facts and all reasonable inferences in the light most favorable to defendants as the prevailing parties. (*Cuiellette v. City of Los Angeles (2011) 194 Cal.App.4th 757, 765*.)

Between 1987 and 1999, "NEA IV and Spectra made venture capital investments in KOR . . . and received convertible participating preferred stock[, which among other things,] had demand registration [*4] rights, permitting it to require KOR to undertake a public offering." "[I]n late 2005, NEA IV advised [KOR's] board [it] would exercise its demand registration rights or negotiate a KOR recapitalization to buy out NEA IV." "To evaluate NEA IV's proposal, KOR's board appointed a Special Committee (Committee) of four directors [George, Jicha, Kohler, and Havanec] who owned no preferred stock, but held KOR common stock or options for common stock."

Because Camino and Spectra both owned preferred stock, and Cole was affiliated with Spectra, neither Camino nor Cole was a member of the Committee. Nevertheless, Camino, with his knowledge, background, and document access as KOR's CEO, carried out certain tasks for the Committee, such as preparing financial analyses

and negotiating with third parties. Camino did not participate in the Committee's decisions.

"In early 2006, on the recommendation of the . . . Committee to KOR's board of directors, KOR recapitalized by repurchasing all the shares of its preferred stock for $40.3 million cash and $9 million in promissory notes, and selling new preferred stock at $40.3 million to new NEA venture capital investment groups" (transaction). Camino [*5] and Cole abstained from voting. In a shareholder vote, a majority of KOR's preferred stockholders and common stockholders with no preferred stock voted to approve the transaction.

Plaintiffs sued defendants, asserting direct claims for breach of fiduciary duty against KOR's board of directors, breach of fiduciary duty against NEA IV, Spectra, Cole, and Camino in their capacities as "controlling shareholders," and constructive fraud against all defendants, as well as derivative claims on KOR's behalf (not at issue in this appeal). During trial, plaintiffs voluntarily dismissed the constructive fraud count.

The court ruled in favor of defendants on all causes of action. In its statement of decision, it noted plaintiffs' claims were all premised on the same factual basis involving breach of fiduciary duty in approving the transaction. Applying the business judgment rule, it found "the evidence shows no conflict of interest, fraud, bad faith, or gross overreaching contaminated the . . . Committee's decision. On the contrary, the evidence shows the Committee members acted appropriately, using a process that was rational and used in a good faith effort to advance corporate interests."

"Faced [*6] with NEA IV's decision to conclude its investment by exercising its demand registration rights if KOR did not take it out by recapitalization, the KOR board of directors was compelled to study the alternatives and make what then appeared to be in the best business decision on what to do. This was a delicate and controversial issue because different interests would be impacted adversely, and there were different views about the best long-range plan."

"Considering all factors, the evidence shows the . . . Committee acted diligently and independently, and its members acted in good faith. Their testimony revealed a sincere and earnest interest in seeking to do the right thing for the long-term interests of the company and the common shareholders. At first, they disliked the NEA IV proposal. They viewed their task as a negotiation to buy NEA IV's demand registration rights and keep the company unsold and private, which they viewed as the best long range course. The evidence shows, and the Court finds, the . . . Committee and its members performed their task with due care and without negligence, they made reasonable inquiry into the facts and alternatives,

Complaint Supplement #30: 2020-01-14599b
Exhibit #8: 023
Back # 30: Superior Court of California County of Orange
ADA Complaint Exhibits 332
Exhibit #35: 024
22-CV-01616-BAS-DDL

and they weighed the advantages [*7] and disadvantages. They rejected [a] proposal alternative for what they found to be good and sufficient reasons. The evidence did not show that alternatives were ignored or brushed aside, and there was no evidence of a purpose or plan to give a special deal to favored persons."

"Carnino was an interested party, being a preferred shareholder, but he was the person most familiar with the details of the business. He was not a . . . Committee member, but he was used by the Committee to look for other options, provide data, and act as Committee secretary. Although there might have been a better choice than to have him connected to the . . . Committee, there is no evidence his involvement tainted the Committee's work or decision. He was the CEO with connections to possible alternatives. His stocks interests would probably have benefited from any alternative that was selected, and he was not a decision-maker on the Committee. To use him was within the range of reason.

" . . . Cole had interests which would have disqualified him from sitting on the independent . . . Committee. But, there is no evidence he improperly influenced the Committee."

As to plaintiffs' breach of fiduciary duty claim against [*8] "controlling shareholders," the court ruled that "[t]o establish . . . liability, control and abuse of that control must be shown." Assuming without deciding "the preferred shareholders were a controlling shareholder group, in the sense that they had the power to control certain aspects of the corporation's life," including "the lawful power to exercise 'veto' power and negotiation leverage because of the preferred shareholder rights they had" "the evidence does not show they abused that power. The evidence does not support a finding that they abused their relationship with the . . . Committee, tainted its work, or improperly used their corporate rights. On the contrary, the evidence shows the . . . Committee made its own independent decision about what to do."

The court concluded the Committee's decision to have KOR pay "a premium rate to retire NEA IV and chart its new course . . . had an immediate stock value disadvantage to the common shareholders, but the . . . Committee and full board concluded it was in the best long range interest of the company and the common stockholders. The decision making process used, and the decision that was made, were rational, in good faith, and within [*9] the range of reason. [¶] In addition to the rulings already made, the [c]ourt finds that, for the same reasons, the evidence does not support [p]laintiffs on the theories of gross mismanagement, waste of corporate assets, or unjust enrichment."

DISCUSSION

*1. Plaintiffs' Appeal*

*a. Erroneous Application of Business Judgment Rule*

*(1) General Legal Principles*

The business judgment rule "'establishes a presumption that directors' decisions are based on sound business judgment, and it prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest. [Citations.]' [Citation.]" (*Berg & Berg Enterprises, LLC v. Boyle (2009) 178 Cal.App.4th 1020, 1045*.) "'"A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be "attributed to any rational business purpose.' [Citation.]"' [Citation.]" (*Ibid.*)

"An exception to the presumption afforded by the business judgment rule . . . exists in 'circumstances which inherently raise an inference of conflict of interest' and the rule 'does not shield actions taken without reasonable inquiry, with improper motives, [*10] or as a result of a conflict of interest.' [Citations.] But . . . more is needed than 'conclusory allegations of improper motives and conflict of interest. Neither is it sufficient to generally allege the failure to conduct an active investigation, in the absence of (1) allegations of facts which would reasonably call for such an investigation, or (2) allegations of facts which would have been discovered by a reasonable investigation and would have been material to the questioned exercise of business judgment.' [Citation.] In most cases, 'the presumption created by the business judgment rule can be rebutted only by affirmative allegations of facts which, if proven, would establish fraud, bad faith, overreaching or an unreasonable failure to investigate material facts. [Citation.] Interference with the discretion of directors is not warranted in doubtful cases.' [Citation.]" (*Berg & Berg Enterprises, LLC v. Boyle, supra, 178 Cal.App.4th at p. 1045*.) "Once it is shown a director received a personal benefit from the transaction, . . . the burden shifts to the director to demonstrate not only the transaction was entered in good faith, but also to show its inherent fairness from the viewpoint [*11] of the corporation and those interested therein. [Citations.]" (*Heckmann v. Ahmanson (1985) 168 Cal.App.3d 119, 128*.)

*(2) Cole and Carnino*

Plaintiffs contend the business judgment rule should not have been applied to Carnino and Cole because they "voted with the full board to approve the transaction" and "also participated in the negotiating process, even though they stood on both sides of the transaction." But plaintiffs' failure to provide any supporting citations to the

Complaint Supplement #30: 020 of 149998
Exhibit #8: 024
Superior Court of California County of Orange
ADA Complaint Exhibits 333
Exhibit #35: 025
22-CV-01616-BAS-DDL

record forfeits the argument. (*Nwosu v. Uba* (2004) 122 *Cal.App.4th* 1229, 1246 [argument not supported by record citations treated as waived]; *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16 [record citations in statement of facts do not cure lack of citations in argument].) Even if not waived, the contention lacks merit.

Contrary to plaintiffs' claim, the record affirmatively shows Carnino and Cole abstained from voting on the transaction. Accordingly, they "are not subject to liability on the ground of having approved the [subject] agreement[]." (*Gaillard v. Natomas* (1989) 208 *Cal.App.3d 1250, 1268*.)

Plaintiffs acknowledge this but argue that under *Gaillard,* Carnino and Cole were not entitled [*12*] to rely on the business judgment rule because of their participation in the negotiation process. But *Gaillard* reversed the summary judgment in the defendant's favor because there were issues of fact regarding. "the nature and extent of [one defendant's] participation in the events" leading to the subject agreement's adoption, which "raise[d] . . . the inference that the agreement was not in the [corporation's] best interests . . . at the time of its adoption." (*Gaillard v. Natomas, supra,* 208 *Cal.App.3d at p. 1268*.) The judgment here, in contrast, occurred after a 12-day trial following which the court specifically found "no evidence [Carnino's] involvement tainted the Committee's work or decision" or that Cole "improperly influenced the Committee." Plaintiffs have not challenged these findings.

Plaintiffs maintain *Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93 required Carnino and Cole, "as conflicted directors, . . . to prove . . . their transaction with KOR was inherently fair." But that rule only applies to "[m]ajority shareholders . . . [who] use their power to control corporate activities to benefit themselves alone or in manner detrimental to the minority. Any use to which they [*13*] put the corporation or their power to control the corporation must benefit all shareholders proportionately and must not conflict with the proper conduct of the corporation's business. [Citations.]" (*Id. at p. 108.*) In that event, "'the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.'" [Citation.]" (*Ibid.*)

At trial, plaintiffs' counsel conceded this standard does not apply unless interested directors "exercise control in connection with the transaction" or "use their position in connection with assisting that transaction to come to fruition." In this case, it was unnecessary to reach the question of inherent fairness given the court's determination neither defendant had used any power or

control in a manner that affected the Committee's ultimate decision to approve the transaction.

For the same reason, *Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18 does not aid plaintiffs. There, Tenzer, a member of Superscope's board of directors, helped secure a purchaser for the corporation's property and requested a 10 percent finder's fee. Tushinsky, [*14*] Superscope's president, orally agreed but after the deal was consummated the board denied Tenzer a finder's fee. The Supreme Court reversed the summary judgment granted in favor of Superscope.

Among other things, Superscope argued that given Tenzer's fiduciary duties as a board member any reliance on Tushinsky's promise was unreasonable. Although the Court agreed Tenzer owed fiduciary duties, it concluded triable issues of material fact precluded summary judgment: "As a corporate director, Tenzer is charged with the knowledge that any contract he entered into with his own corporation, even if valid and enforceable in all other respects, could be avoided at the corporation's option if it were determined to be unfair or unreasonable to the corporation. Thus, in order to prove that his reliance upon Tushinsky's promise was justifiable, Tenzer will be required to prove that the arrangement was fair and reasonable to the corporation. [¶] Establishing whether Tenzer's agreement with Superscope was fair and reasonable involves determination of the particular factual circumstances of the agreement, and application of the standards of fairness and good faith required of a fiduciary to these [*15*] facts. These are functions mainly for the trier of facts. [Citations.]" (*Tenzer v. Superscope, Inc., supra,* 39 Cal.3d at p. 32.)

Here, in contrast, because. the trier of fact determined Cole and Carnino did not participate in the transaction in any manner that affected the Committee's decision, it had no occasion to determine whether their conduct was fair and reasonable. Plaintiffs maintain that under *Tenzer,* Cole and Carnino's "fiduciary duties imposed on them a duty not to use [their additional bargaining] leverage in a way that was not inherently fair." But the court's finding shows they did not do that.

### (3) Directors on Committee

Plaintiffs argue the directors on the Committee were not entitled to the business judgment presumption because they were "not properly informed and not acting in good faith." (Underscoring omitted.) They assert "[t]he directors on the [C]ommittee wrongfully abdicated their duty to inform themselves by relying on Carnino, who, as a directly interested, conflicted, preferred stockholder, was not . . . someone whom any director could 'believe[] to be reliable.'" We are not persuaded, given the findings the Committee members "performed their task with due

Complaint Supplement #30: 2020-01143908
Exhibit #8: 025

Superior Court of California County of Orange
ADA Complaint Exhibits 334

Exhibit #35: 026
22-CV-01616-BAS-DDL

care [*16] and without negligence, . . . ma[king] reasonable inquiry into the facts and alternatives, and . . . weigh[ing] the advantages and disadvantages," and that Carnino's actions in "look[ing] for other options, provid[ing] data, and act[ing] as Committee secretary" did not affect their evaluation.

Nor does the case plaintiffs cite, *Everest Investors 8 v. McNeil Partners (2003) 114 Cal.App.4th 411, 430*, support their claim it was "unreasonable as a matter of law" for the Committee to have Carnino assist them. Rather, as plaintiffs' acknowledge, that case merely held the business judgment rule "does not shield actions taken without reasonable inquiry . . . ." (*Ibid.*)

As to the good faith requirement, plaintiffs contend the court applied the wrong standard by limiting it "to an 'effort to advance corporate interests'" when in fact "directors, officers, and controlling shareholders owe a duty of good faith to all shareholders." (Underscoring omitted.) But none of the cases on which they rely--*Small v. Fritz Companies, Inc. (2003) 30 Cal.4th 167; Kennerson v. Burbank Amusement Co. (1953) 120 Cal.App.2d 157*, and *Remillard Brick Co. v. Remillard-Dandini Co. (1952) 109 Cal.App.2d 405*--involve application [*17] of the business judgment rule.

The argument further lacks merit in that "a court specifically found the Committee members had "a sincere and earnest interest in seeking to do the right thing for[, and based its decision on,] the long-term interests of the company *and the common shareholder*" (italics added), despite its "immediate stock value disadvantage to the" latter. Plaintiffs cite certain evidence to purportedly show the Committee members "knowingly acted in bad faith in approving a transaction that they knew was not fair to the common shareholders . . . ." Such resolutions of fact were for the trial court and we will not reweigh the evidence. (*Cuiellette v. City of Los Angeles, supra, 194 Cal.App.4th at p. 765*.)

Plaintiffs also argue the court applied the wrong burden of proof in finding the Committee members "us[ed] a process that was rational and used in a good faith effort to advance corporate interests." They reason that after the directors carry their "initial burden of proving . . . the business judgment rule affirmatively applies (i.e., that the director[s have] no conflict of interest)" and plaintiffs rebut that "presumption by proving any one of the four bases for rebuttal," [*18] "the burden shifts back to the director[s] to prove inherent fairness." In their view, "the court reversed the burden of proof . . . [by] plac[ing] the burden on [p]laintiffs to prove . . . the process used was not 'rational.'" It did no such thing.

To the contrary, the court determined plaintiffs had failed to carry their burden of rebutting the business judgment presumption in "that the evidence shows no

conflict of interest, fraud, bad faith, or gross overreaching contaminated the . . . Committee's . . . decision." Although it could have ended its analysis there, it went on to find "the evidence shows the Committee members acted appropriately, using a process that was rational and used in a good faith effort to advance corporate interests." In other words, defendants affirmatively showed they used a rational process, as plaintiffs contend they were obligated to do. But in no event did the court require plaintiffs to prove the process was not rational.

*b. NEA IV and Spectra*

As to NEA IV and Spectra, plaintiffs assert that because the business judgment rule does not apply to shareholders, and the court found NEA IV and Spectra were controlling shareholders and "the transaction disadvantaged [*19] the common shareholders," the court erred in requiring plaintiffs to prove "control and abuse of that control.'" Rather, they claim, once they proved control, the burden shifted to the controlling shareholders to prove "the transaction is inherently fair to the minority shareholders." We disagree.

The court assumed NEA IV and Spectra "were a controlling shareholder group, in the sense . . . they had the power to control certain aspects of [KOR's] life[,] . . . includ[ing] the lawful power to exercise 'veto' power and negotiation leverage." Even so, it found the "Committee made its own independent decision about what to do" and there is no evidence NEA IV and Spectra "abused that power [or] . . . their relationship with the . . . Committee, tainted its work, or improperly used their corporate rights." Thus, as in the case of Carnino and Cole, there was no need to establish inherent fairness because any use by NEA IV and Spectra of their asserted powers as controlling shareholders did not influence the Committee's decision. Because the court did not err in declining to reach the issue of inherent fairness as plaintiffs contend, we reject their claim the case should be remanded for a [*20] trial on damages for that reason.

*c. Failure to Address Carnino's Breach of Fiduciary Duties as CEO*

Plaintiffs argue the court erred in failing to analyze Carnino's breach of fiduciary duties in his capacity as CEO, separate from his capacity as a director and preferred stockholder, as alleged in their first cause of action for breach of fiduciary duty against KOR's officers and directors. But if there was error plaintiffs invited it by failing to litigate the issue at trial or identifying it to the court during opening or closing arguments. (*Portola Hills Community Assn. v. James (1992) 4 Cal.App.4th 289, 294*, disapproved of on other grounds in *Nahrstedt v. Lakeside Village Condominium Assn. (1994) 8 Cal.4th 361, 386* [error, if any, in not addressing issue invited

Complaint Supplement #30: 2020-01-14590B   Superior Court of California County of Orange
Exhibit #8: 026   ADA Complaint Exhibits 335

Exhibit #35: 027
22-CV-01616-BAS-DDL

where "subject . . . was not included in the stipulated facts or plaintiff's trial brief and was not presented orally during the evidentiary phase or argued to the court"].) As such, they are "'estopped from asserting it as a ground for reversal' on appeal. [Citation.]" (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403.)

Moreover, plaintiffs' failure to either request a statement of decision on this issue, or specifically note, [*21] in their objections to the proposed statement of decision, the court's omission of the issue, "absolutely forecloses any consideration of it now [citation]." (*Portola Hills Community Assn. v. James, supra,* 4 Cal.App.4th at p. 294; *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1138 ["It is clearly unproductive to deprive a trial court of the opportunity to correct such a purported defect by allowing a litigant to raise the claimed error for the first time on appeal"].)

Plaintiffs maintain Carnino is liable as a matter of law for breach of fiduciary duty in his capacity as CEO based on the court's undisputed factual findings he was the CEO and "an interested party" who was "used by the Committee to look for other options, provide data, and act as Committee secretary." From this, plaintiffs jump to the conclusion "Carnino violated his fiduciary duties to the common shareholder . . . ." But at most these demonstrate Carnino owed fiduciary duties as CEO. They do not prove breach of those duties or proximate damages. (*Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1101 [absence of damage proximately caused by breach defeats claim for breach of fiduciary duty].) Nor do plaintiffs cite any [*22] evidence showing Carnino proximately caused their damages by breaching his fiduciary duties as CEO.

### d. Remaining Issues

We reject plaintiffs' remaining claims. First, as to their contention the court erroneously "relied on Delaware law of special committees," they failed to show the court actually did so, as no out of state authority was referenced in its statement of decision. Their own reliance upon Delaware law and the fact plaintiffs never claimed California does not recognize special committees in the trial court also precludes them from asserting it for the first time on appeal. (*Portola Hills Community Assn. v. James, supra,* 4 Cal.App.4th at p. 294.)

Second, plaintiffs cite "California's policy . . . to protect the public from fraud and deception in security transactions." (*Hall v. Superior Court* (1983) 150 Cal.App.3d 411, 417.) But they voluntarily dismissed their constructive fraud claim and have not shown the court's findings were inconsistent with public policy.

Third, plaintiffs assert the court committed reversible error in "failing to reach [their] claims for gross

mismanagement, waste of corporate assets, and unjust enrichment." (Capitalization, bold and underscoring omitted.) [*23] This is belied by the statement of decision's express ruling those claims failed on the same grounds as the breach of fiduciary duty causes of action.

Plaintiffs' final argument is that if the underlying judgment is reversed so should the award of costs. We affirm both the judgment and the costs award.

### 2. Defendants' Motion for Sanctions

Defendants filed a combined motion for sanctions on the grounds plaintiffs failed to comply with various Rules of Court by including in their appendix documents never admitted at trial and documents unnecessary to the appeal, the majority of which was not referenced in their briefs, and by failing to include record references for many factual statements. Plaintiffs acknowledge their "technical rule violations" but claim they "did not cause the degree of prejudice, confusion or additional work for the clerk's office or for [defendants] as to warrant the imposition of sanctions." We disagree.

### a. Appendix

Under rule 8.124(b)(3), "[a]n appendix must not: [¶] (A) Contain documents or portions of documents filed in superior court that are unnecessary for proper consideration of the issues." Including in an "appendix . . . all of the parties' proposed trial exhibits, [*24] without any accompanying indication as to which exhibits were actually admitted in evidence" violates this rule (*Kreutzer v. City and County of San Francisco* (2008) 166 Cal.App.4th 306, 319, fn. 8, italics omitted), as does including "documents never referenced by plaintiffs" and those that are "not necessary to our determination of the issues" (*Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 167).

Here, plaintiffs included 76 documents in their 12-volume appendix, consisting of 2,958 pages, but only cited to 16 in their opening brief and 12 in their reply. Of those 76 documents, 39 were not admitted at trial.

Plaintiffs concede neither those 39 nonadmitted documents nor the volumes of foreign authorities lodged in the trial court were necessary to the appeal and should not have been included in the appendix, and that "they should have exercised more discretion and selected a smaller number of documents . . . ." But they ask sanctions not be imposed because although sanctions may be imposed for filing a faulty appendix (rule 8.124(g)), the Advisory Comment states such "sanctions do not depend on the degree of culpability of the filing party–i.e., on whether the party's [*25] conduct was willful or negligent–but on the nature of the inaccuracies and the importance of the documents they affect." (Advisory Com.

Complaint Supplement #30  2020-01-14590B

Superior Court of California County of Orange
ADA Complaint Exhibits 336

Complaint Supplement #30
Exhibit #8: 027

Exhibit #35: 028
22-CV-01616-BAS-DDL

com., 23 pt. 2 West's Ann. Codes, Rules (2006 ed.) foll. rule 8.124, p. 552.)

Plaintiffs conclusorily assert "the nature of the over-inclusiveness, while regrettably contributing to the bulk of papers filed, did not substantially hamper the [c]ourt or [defendants]," there were no inaccuracies that affected important documents, and that defendants' authorities suggest their "technical violations" were not "so egregious that sanctions should be imposed." They are correct *Evans v. Centerstone Development Co., supra, 134 Cal.App.4th 151* is the only case cited by defendants in which sanctions were awarded. They seek to distinguish *Evans* on the basis it involved violations of many rules and the prosecution of a frivolous appeal, whereas this case was meritorious and the "12-[volume] . . . [a]ppendix, though excessive, should not have hampered or caused confusion . . . ."

But here plaintiffs admit they violated several rules. They also continued to cite the excluded evidence in their reply brief even after defendants noted the error in their briefs. As for [*26] hampering, defense counsel's declarations supporting the sanctions motion state plaintiffs' deficient appendix required them to "review[] all documents submitted . . . to determine which documents were admitted trial exhibits, which documents were actually cited by [a]ppellants[] in their briefs, what additional admitted exhibits were necessary to the issues on appeal, and the selection of additional documents to be included in [r]espondents' [j]oint [a]ppendix." This is sufficient to support an award, especially given plaintiffs failure to cite any contrary evidence.

*b. Plaintiffs' Briefs*

Rule 8.204(a)(1)(C) requires parties to "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." Rule 8.204(a)(2)(C) also requires appellants to "[p]rovide a summary of the significant facts limited to matters in the record."

Plaintiffs' opening brief makes 39 unsupported factual statements, including full paragraphs lacking record references. Some assertions are contradicted by the record. The reply brief similarly contains 34 statements, and full paragraphs, without citations to the record.

Plaintiffs' counsel Laurence R. [*27] Rosen acknowledges noncompliance with these rules but claims "[t]he factual assertions in all material respects were accurate and can be supported by proper citations to the record." Because he "will be mindful of the [r]ules . . . in the future" and the violations were neither unintentional nor misleading, he states "there is no need for an imposition of monetary or other sanctions . . . ." According to him, the infractions were the fault of his "overwrought"

associate who made some mistakes and the hampering of his supervision by two serious emergencies--his mother's admission to the hospital and subsequent death, and his emergency back surgery to repair two herniated discs. He asserts the reply brief "supplies a better, more focused summary and substantial additional citations to the record" and goes on to address each of the unsupported factual statements identified by defendants. These efforts "at this point [were] too little, too late. Although we are not required to plow through mounds of appendices, at times we did, and we have no doubt defendants had to expend substantial additional and unnecessary time because of this violation." (*Evans v. CenterStone Development Co., supra, 134 Cal.App.4th at p. 167.*) [*28] We thus deny his request for leniency.

Plaintiffs maintain that because they "challenge[d] . . . the sufficiency of the evidence" the court's obligation to review the entire record "reduce[d] somewhat the otherwise burdensome efforts of [the] violations. But although plaintiffs assert "[t]he [statement of d]ecision is riddled with demonstrably false factual findings," the opening brief never actually claimed the evidence was insufficient to support the judgment. Even if they had, the burdens of their violations would not have been decreased.

*c. Sanctions Amount*

The repeated violation of appellate rules, compounded by the failure to correct the infractions in the reply brief after respondents brought the deficiencies to his attention, justifies imposition of sanctions in this case. (*Pierotti v. Torian (2000) 81 Cal.App.4th 17, 30-31* [sanctions warranted for "unreasonable infraction of the rules" made worse by further violations in reply brief after respondents pointed out violations].) Defendants request $30,000 in monetary sanctions. Plaintiffs contend this amount is "grossly inflated" (bold and capitalization omitted) because defendants double billed for the same tasks, erroneously included [*29] time spent to prepare the respondents' appendix, needlessly "spent time in determining which factual statements were supported by admitted evidence and which documents were admitted trial documents" and "spent an inordinate amount of time preparing charts and their motion for sanctions . . . ."

Attorney fees are a common measure of sanctions payable to an opposing party. (See, e.g., *Periotti v. Torian, supra, 81 Cal.App.4th at p. 33.*) Of the $30,000 in sanctions requested by defendants, only $10,000 appears to be for attorney fees. The remaining $20,000 is for "[a] portion of the costs incurred" by defendants. We conclude a sanction of in the amount of $10,000 is appropriate in this case to compensate defendants for additional burdens imposed on it and to deter similar conduct in the future.

Complaint Supplement #30 2020-01-14 9998
Exhibit #8: 028

Book of Superior Court of California County of Orange
ADA Complaint Exhibits 337

Exhibit #35: 029
22-CV-01616-BAS-DDL

Defendants request the sanctions be payable by plaintiffs, their counsel, or both. Plaintiffs' attorneys should be held liable for the sanctions, as they were the ones who failed to comply with the rules of the appellate court. (See *Pierotti v. Torian, supra, 81 Cal.App.4th at pp. 36-37*.) The $10,000 sanctions award shall be payable joint and severally by plaintiffs' attorneys, Kenneth J. Catanzarite [*30] and Laurence M. Rosen, to defendants. Although we could order the sanctions be paid instead to this court, or impose additional sanctions, to defray the extra cost to taxpayers to process the appeal (*Alicia T. v. County of Los Angeles (1990) 222 Cal.App.3d 869, 885*), we decline to do so. Because we did not rely on any documents that were not admitted at trial or any of the unsupported factual statements in the opening or reply briefs, we deny defendants' request to strike these items.

## DISPOSITION

The judgment is affirmed. The motion for sanctions is granted in the amount of $10,000. Counsel for plaintiffs, Kenneth J. Catanzarite and Laurence M. Rosen, are ordered to pay defendants the $10,000 sanctions award jointly and severally within 30 days of the filing of the remittitur. They shall provide this court with an affidavit stating they have not and will not bill their clients for any portion of the sanctions and are ordered to report the sanctions to the State Bar. (*Bus. & Prof. Code, § 6068, subd. (o)(3).*) The clerk of this court is directed to forward a copy of this opinion to the State Bar. (*Bus. & Prof. Code, § 6086.7, subd. (a)(3).*) [*31] Defendants shall recover their costs on appeal.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

BEDSWORTH, J.

O'LEARY, J.

Complaint Supplement #30: 2020-01149993
Exhibit #8: 029

Superior Court of California, County of Orange
ADA Complaint Exhibits 338

Exhibit #35: 030
22-CV-01616-BAS-DDL