EXHIBIT 2

Case 3:23-cv-00882-AGS-DDL Document 1-30 Filed 05/15/23 PageID.275 Page 2 of 215
Case 3:22-cv-01616-BAS-DDL Document 10-37 Filed 01/09/23 PageID.1458 Page 8 of 100
Case 18-23750-SMG Doc 476 Filed 05/08/20 Page 1 of 7



ORDERED in the Southern District of Florida on May 8, 2020.

**Scott M. Grossman, Judge**
**United States Bankruptcy Court**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:                                                    Chapter 7

Daymark Realty Advisors, Inc., *et al.*,                  Case No. 18-23750-SMG
                                                          (substantively consolidated)
        Debtors.
_____/

## ORDER LIQUIDATING AND AWARDING COMPENSATORY SANCTIONS

This matter came before the Court upon the *Order (1) Granting Motion by*

*Cottonwood Entities for Protective Order and (2) Imposing Sanctions* (the "Sanctions

Order"),[1] the *Notice of Filing Affidavit of Attorneys' Fees and Expenses* (the

_____
[1] ECF No. 395.

EXHIBIT #36: 008
22-CV-01616-BAS-DDL

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.276   Page 3 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1459   Page 9 of 100
Case 18-23750-SMG   Doc 476   Filed 05/08/20   Page 2 of 7

"Cottonwood Affidavits"),[2] and attorney Kenneth J. Catanzarite, Esq. and the Objecting Creditors' *Objection*[3] to the Cottonwood Affidavits.

In the Sanctions Order, the Court awarded compensatory sanctions to the Cottonwood Entities[4] under Federal Rule of Civil Procedure 26(g)(3)[5] for attorneys' fees and expenses they incurred relating to their *Expedited Motion for Protective Order*[6] (the "MPO") with respect to discovery requests served by Mr. Catanzarite in violation of Federal Rule of Civil Procedure 26(g)(1)(B).[7] The Court directed the Cottonwood Entities to file an affidavit of fees and expenses incurred and provided Mr. Catanzarite a deadline to file any objections thereto.[8]

The Cottonwood Entities timely filed the Cottonwood Affidavits, requesting $18,314.50 in fees and $36.43 in expenses, consisting of $4,350.00 in fees incurred by Henry H. Oh, Esq. and Shumener Odson & Oh LLP ("SOOLLP"),[9] and $13,964.50 in fees incurred and $36.43 in expenses advanced by Jerry M. Markowitz, Esq. and

---

[2] ECF No. 401.

[3] ECF No. 425.

[4] The Cottonwood Entities are Cottonwood Residential, O.P., LP, Cottonwood Capital Property Management II, LLC, Cottonwood Capital Management, Inc., and Daniel Shaeffer.

[5] Made applicable here by Federal Rules of Bankruptcy Procedure 9014 and 7026.

[6] ECF No. 365.

[7] Made applicable here by Federal Rules of Bankruptcy Procedure 9014 and 7026.

[8] Sanctions Order, ¶¶ 4-5. The Sanctions Order also stated that if an objection was filed, the Court would schedule a hearing to resolve the objection. Upon further reflection after review of the Cottonwood Affidavits and the Objection, however, the Court determines that a hearing is not necessary, as the Court now has everything it needs to address the matter on the papers. *See also* note 16, *infra*.

[9] Mr. Oh is a partner with the law firm of SOOLLP, which serves as co-counsel to the Cottonwood Entities in this matter.

2

EXHIBIT #36: 009
22-CV-01616-BAS-DDL

Complaint Supplement #3: 202201439 up
Exhibit #2: 002
Book #: 3022020011439 up
Superior Court of California County of Orange
ADA Complaint Exhibits 242

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.277   Page 4 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1460   Page 10 of
Case 18-23750-SMG   Doc 4700   Filed 05/08/20   Page 3 of 7

Markowitz, Ringel, Trusty & Hartog, P.A. ("MRTH").[10] Both Affidavits properly attached detailed time entries.

Mr. Catanzarite timely objected to the Cottonwood Affidavits, arguing that the fees are excessive with respect to both the rates charged by the attorneys, as well as the amount of time expended. According to the time entries attached to the Cottonwood Affidavits, attorneys with SOOLLP and MRTH collectively worked 33 hours in connection with filing and prosecuting the MPO, at the following rates: $725.00 per hour (Mr. Oh), $625.00 per hour (Mr. Markowitz), and $475.00/$490.00[11] per hour (Grace Robson, Esq.). Mr. Catanzarite suggests in his Objection that attorneys for the Cottonwood Entities should have spent no more than 3 hours on this matter at a rate of no more than $400.00 per hour – for a total of $1,200.00. For the reasons that follow, the Court finds no merit in Mr. Catanzarite's suggestion and will award most of the requested fees and all of the requested expenses.

Federal Rule of Civil Procedure 26(g)(3) provides that if a discovery certification "violates this rule without substantial justification, the court, on motion or on its own, *must* impose an appropriate sanction on the signer, the party on whose behalf the signer was acting, or both. The sanction may include an order to pay the reasonable expenses, including attorney's fees, caused by the violation."[12] In determining a sanctions award, the Court has significant discretion, and "may impose

---

[10] Mr. Markowitz is a partner with the law firm of MRTH, which is co-counsel to the Cottonwood Entities in this matter.

[11] According to the MRTH affidavit and time records, the hourly rate for Ms. Robson increased from $475 to $490 as of February 1, 2020.

[12] Fed. R. Civ. P. 26(g)(3) (emphasis added).

EXHIBIT #36: 010
22-CV-01616-BAS-DDL

Complaint Supplement #30-202001145999 Superior Court of California County of Orange
Exhibit #2: 003
Bank #: 309-2020-00114599
ADA Complaint Exhibits 243

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.278   Page 5 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1461   Page 11 of 100
Case 18-23750-SMG   Doc 476   Filed 05/08/20   Page 4 of 7

a penalty as light as a censure and as heavy as is justified—a fine that may exceed the amount of fees incurred by the opposing party."[13] In using that discretion, courts must always be mindful of the purpose of the particular sanctions award at issue.[14] Where, as here, the sanctions are compensatory, the purpose of the sanction is, of course, to compensate the aggrieved party "for the attorneys['] fees and expenses unnecessarily incurred as a result of the sanctioned party's conduct."[15]

As noted in Mr. Catanzarite's Objection, "[i]n evaluating a claim for attorney's fees, the Court, itself being an expert on this subject, may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment."[16] Based on that knowledge and experience, the Court determines that "[t]he aggrieved party . . . is entitled to hire whichever counsel it chooses and to pay the rates charged by that counsel" in order to represent its interests.[17] Thus, in order to compensate the aggrieved party, "the fee award must be based on evidence of the actual fees and costs incurred by that party. If the attorney's fees awarded are not based on evidence of the actual fees incurred and instead are based on reasonable fees, the aggrieved party will not be made whole."[18]

---

[13] *In re Rimsat, Ltd.*, 229 B.R. 914, 921 (Bankr. N.D. Ind. 1998) (internal citation and quotation marks omitted), *aff'd*, 230 B.R. 362 (N.D. Ind. 1999), *aff'd*, 212 F.3d 1039 (7th Cir. 2000).

[14] *Id.*

[15] *Id.*

[16] *In re TLFO, LLC*, 571 B.R. 880, 887 n.4 (Bankr. S.D. Fla. 2017) (internal quotation and citation marks omitted).

[17] *Id.* at 887.

[18] *Id.*

4

EXHIBIT #36: 011
22-CV-01616-BAS-DDL

Complaint Supplement #30: 020 of 145
Exhibit #2: 004
Bank #3 Superior Court of California County of Orange
ADA Complaint Exhibits 244

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.279   Page 6 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1462   Page 12 of
Case 18-23750-SMG   Doc 470   Filed 05/08/20   Page 5 of 7

In order to make the Cottonwood Entities substantially whole, it is therefore appropriate to award most of the attorneys' fees and expenses incurred in connection with filing and prosecuting the MPO. After all, the Cottonwood Entities were entitled to hire counsel of their choice and are obligated to pay the actual amounts billed to them by both SOOLLP and MRTH. If the Court were to limit its award to what Mr. Catanzarite contends to be "reasonable" attorneys' fees, the sanctions award would cease to be compensatory in nature.

That being said, the Court agrees with Mr. Catanzarite in part, that certain time entries reflect fees that do not appear to have been billed in connection with filing and prosecuting the MPO. Further, certain entries lack sufficient detail to enable the Court to determine whether they relate to the MPO, and certain others contain multiple tasks, some of which do not appear related to the MPO. Thus, the Court is unable to determine which portion of time of these "lumped" entries may be attributable to the MPO. Accordingly, the following time entries will not be included in the compensatory sanctions award:

| Date | Attorney | Description | Hours | Rate | Amount |
|------|----------|-------------|-------|------|--------|
| 1/6/2020 | JMM | Emails regarding discovery. | 0.2 | $625.00 | $125.00 |
| 1/7/2020 | JMM | Emails regarding discovery. | 0.2 | $625.00 | $125.00 |
| 1/10/2020 | JMM | Emails regarding discovery. | 0.3 | $625.00 | $125.00[19] |
| 1/14/2020 | JMM | Review emails regarding discovery | 0.3 | $625.00 | $187.50 |
| 1/29/2020 | JMM | Review motion for protective order and related drafts; notice of appeal; conference with A. Hartley | 0.5 | $625.00 | $312.50[20] |

[19] Although 0.3 hours at $625.00 per hour, which totals $187.50, is shown on the MRTH time records, the total listed in the "Amount" column was $125.00.

[20] Because this entry shows multiple tasks – some of which do not pertain to the MPO – without a breakdown of the specific tasks, the Court is unable to determine the amount of time allocable to each task and must disallow all of the fees for this entry.

EXHIBIT #36: 012
22-CV-01616-BAS-DDL

Complaint Supplement #30-2/2020 01 1 49000000
Exhibit #2: 005

Bank - Superior Court of California County of Orange
ADA Complaint Exhibits 245

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.280   Page 7 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1463   Page 13 of
Case 18-23750-SMG   Doc 470   Filed 05/08/20   Page 6 of 7

| 1/30/2020 | GER | Communications regarding appeal by Catanzarite of sanctions; hearing on motion for protective order. | 0.5 | $475.00 | $237.50[21] |
| 1/31/2020 | JMM | Numerous emails regarding Catanzarite; review subpoenas and trustee's motion; research regarding Catanzarite's suspension. | 1.1 | $625.00 | $687.50[22] |
| 2/2/2020 | JMM | Emails regarding Catanzarite's bar admissions; research regarding same | 0.4 | $625.00 | $250.00 |
| 2/3/2020 | GER | Continue preparation for hearing; review communications regarding depositions, motion for order to show cause | 1.5 | $490.00 | $735.00[23] |
| 2/3/2020 | JMM | Review emails and pleadings | 0.3 | $625.00 | $187.50 |
| 2/7/2020 | JMM | Emails regarding discovery | 0.2 | $625.00 | $125.00 |
| TOTAL | | | | | $3,097.50 |

The Court finds that the remainder of the time entries are appropriately related to the MPO and are not duplicative. Accordingly, pursuant to Rule 26(g)(3) and the Sanctions Order, the Court awards the Cottonwood Parties $15,217.00 in attorneys' fees and $36.43 in costs, as compensatory sanctions against Kenneth J. Catanzarite for serving discovery requests in violation of Federal Rule of Civil Procedure 26(g)(1)(B).

---

[21] *Id.*

[22] *Id.*

[23] *Id.*

6

EXHIBIT #36: 013
22-CV-01616-BAS-DDL

Complaint Supplement #30-2020-01453998
Exhibit #2: 006

Bank of Superior Court of California County of Orange
ADA Complaint Exhibits 246

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.281   Page 8 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1464   Page 14 of
Case 18-23750-SMG   Doc 4790   Filed 05/08/20   Page 7 of 7

For the reasons in the discussed in detail above and in accordance with the Court's Sanctions Order, it is therefore

**ORDERED** that:

1.      The Cottonwood Entities are awarded $15,253.43 as compensatory sanctions, consisting of $15,217.00 in attorneys' fees and $36.43 in costs incurred in filing and prosecuting the MPO.

2.      Mr. Catanzarite must pay $15,253.43 to the Cottonwood Entities within fourteen days of the entry of this Order.

# # #

Copies furnished to:

All interested parties

EXHIBIT #36: 014
22-CV-01616-BAS-DDL

Complaint Supplement #30-2 2020-01-14353-CU Superior Court of California County of Orange
ADA Complaint Exhibits 247
Exhibit #2: 007

EXHIBIT 3

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.283   Page 10 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1465   Page 15 of
100
Case 0:20-cv-61032-RS   Document 31   Entered on FLSD Docket 07/28/2021   Page 1 of 12

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 20-61032-CIV-SMITH**

KENNETH J. CATANZARITE,

        Appellant,

vs.

TODD A. MIKLES, *et al.*,

        Appellees.

_____/

## ORDER AFFIRMING ORDER OF BANKRUPTCY COURT

This is an appeal from an order entered by the Bankruptcy Court awarding compensatory sanctions against Appellant and to Appellees and the Chapter 7 Bankruptcy Trustee ("Trustee") for Appellant's violation of a preliminary injunction entered by the Bankruptcy Court. Appellant has appealed the Bankruptcy Court's May 8, 2020 Order Liquidating and Awarding Compensatory Sanctions ("Liquidating Order"). Prior to entry of the Liquidating Order the Bankruptcy Court had entered its Order Granting in Part Motion to Enforce Preliminary Injunction and Imposing Sanctions ("Sanctions Order"). In the Sanctions Order, the Bankruptcy Court awarded Appellees compensatory sanctions, to be paid by Appellant, for attorneys' fees and expenses incurred in connection with another lawsuit, because the Bankruptcy Court found that Appellant had violated a preliminary injunction issued by the Bankruptcy Court.

**I.    BACKGROUND**

This appeal arises out of the consolidated Chapter 7 proceedings of debtors, Daymark Realty Advisors, Inc., Daymark Properties Realty, Inc., and Daymark Residential Management, Inc. ("Daymark Bankruptcy"). On July 31, 2019, Appellees filed an adversary proceeding seeking injunctive relief ("Adversary Action") against Richard Carlson, Milton O. Brown, Tyrone

**EXHIBIT #36: 015**
**22-CV-01616-BAS-DDL**

Complaint Supplement #36: 0210 2021 01 4950
Exhibit #3: 001

Back to Superior Court of California County of Orange
ADA Complaint Exhibits 249

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.284   Page 11 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1466   Page 16 of 100
Case 0:20-cv-61032-RS   Document 31   Entered on FLSD Docket 07/28/2021   Page 2 of 12

Wynfield, Dennis Dierenfield, William B. Gilmer, NNN 1600 Barberry Lane 8, LLC, NNN 1600

Barberry Lane 9, LLC, NNN Plantations at Haywood 1, LLC, NNN Plantations at Haywood 2,

LLC, NNN Plantations at Haywood 13, LLC, and NNN Plantations at Haywood 23, LLC

("Carlson Defendants").   The Adversary Complaint sought to enjoin the Carlson Defendants'

pending and threatened state court actions against Appellees, brought by their shared attorney,

Appellant, Kenneth Catanzarite. The injunction was sought to maintain the status quo while the

Bankruptcy Court decided whether to approve a settlement agreement between Appellees and the

Chapter 7 Trustee (the "Settlement Agreement").   An essential term of the Settlement Agreement

requires the Trustee in the Daymark Bankruptcy to obtain a bar order concerning potential causes

of action by any and all conceivable parties against, among others, the Appellees.

On July 31, 2019, Appellees filed their first Motion for Temporary Restraining Order and

Preliminary Injunction in the Adversary Action.   On August 27, 2019, the Bankruptcy Court

granted the Motion for Preliminary Injunction and ordered:

> Plaintiffs are hereby granted a preliminary injunction for a period of sixty (60) days
> effective as of the Hearing, enjoining continuation of the Subject Lawsuits or the
> commencement of any further actions under same or similar facts or circumstances
> to the Subject Lawsuits, by these Defendants.

("Preliminary Injunction") (First Prelim. Inj. Order [DE 5-6] at 41.[1])  On October 18, 2019,

Appellees filed their Motion to Extend the Preliminary Restraining Order.  On October 23, 2019,

the Bankruptcy Court granted the extension, stating:

> The preliminary injunction is extended for an additional period through and
> including December 11, 2019, effective as of the Hearing, enjoining continued

---

[1] Appellant has designated as the record on appeal over 19,000 pages of documents and neither party has cited to the record as filed in this case, making it extremely difficult to find any particular document. The Court will cite to the docket entry number containing the cited portion of the record and the page number of the docket entry, not the internal page number of the individual document cited.

EXHIBIT #36: 016
22-CV-01616-BAS-DDL

Complaint Supplement #30-2020-01145090 Superior Court of California County of Orange
Exhibit #3: 002
Back # 30-2020-01145090
ADA Complaint Exhibits 250

Case 3:22-cv-01616-BAS-DDL   Document 19-37   Filed 01/09/23   PageID.1467   Page 17 of 215
Case 3:23-cv-00882-AGS-DDL   Document 1-300   Filed 05/15/23   PageID.285   Page 12 of 215
Case 0:20-cv-61032-RS   Document 31   Entered on FLSD Docket 07/28/2021   Page 3 of 12

prosecution of the Subject Lawsuits or the commencement of any further actions under same or similar facts or circumstances to the subject lawsuits by these Defendants.

(Second Prelim. Inj. Order [DE 5-7] at 1300.) This order was in effect on November 7, 2019, when Appellant allegedly violated the preliminary injunction. On November 8, 2019, Appellees filed a second Motion to Extend the Preliminary Restraining Order, which the Bankruptcy Court granted by extending the preliminary injunction through February 28, 2020.

On November 19, 2019, Appellees file their Motion to Enforce the Preliminary Injunction and for Sanctions against the Carlson Defendants' counsel, Appellant, Kenneth Catanzarite ("Sanctions Motion"). The Sanctions Motion alleged that on November 7, 2019, Appellant Catanzarite filed a complaint in the Superior Court of California, San Diego County (the "Henkin-Looper Case"), on behalf of Edward Henkin, Jonmar Partnership, Katherine Looper, Pat McRoberts, Chicago Houston Partners, LLC, William E. Bump, Thomas F. Scheidt, Ellen B. Friedman, Lawrence F. Leventon, and Paul L. Cohen (the "Henkin-Looper Parties") against Appellees Mikles and GCL, LLC, and against Global Lending Resources, LLC and Does 1-100. In connection with the newly filed case in San Diego County, Catanzarite filed a *lis pendens*.

On December 5, 2019, the Bankruptcy Court held a hearing at which it heard argument on the Sanctions Motion. At the hearing, the Bankruptcy Court heard from the Appellees and Appellant. The Court also heard from the Trustee on whether Appellant's actions violated the stay or otherwise were an attempt to exercise control over property of the estate. Appellant had an opportunity to respond to the Trustee's arguments.

On January 15, 2020, the Bankruptcy Court entered its Order Granting in Part Motion to Enforce Preliminary Injunction and Imposing Sanctions ("Sanctions Order"), in which the Bankruptcy Court found that Catanzarite had violated the Injunction by filing the Henkin-Looper

3

EXHIBIT #36: 017
22-CV-01616-BAS-DDL

Complaint Supplement #30: 2020-01145998
Exhibit #3: 003

Back # Superior Court of California County of Orange
ADA Complaint Exhibits 251

Case and the associated *lis pendens*. The Bankruptcy Court concluded that the filing of the Henkin-Looper Case constituted "the commencement of [ ] further actions under same or similar facts or circumstances to the subject lawsuits by these Defendants" because the Henkin-Looper Case was based on the same interests as existing enjoined lawsuits and arose from a common nucleus of facts as existing enjoined lawsuits.   Relying on Federal Rule of Civil Procedure 65(d)(2), which provides that an injunction or restraining order binds not only the parties named in the order, but also the parties' officers, agents, servants, employees, and attorneys and any other persons who are in active concert or participation with the named parties or their officers, agents, servants, employees, and attorneys, the Bankruptcy Court found that Catanzanite was the attorney for some of the parties specifically enjoined and also for the Henkin-Looper Parties.   Thus, Catanzanite was prohibited from engaging in conduct in which the specifically enjoined parties could not participate.   Noting that it had the power to issue sanctions for civil contempt pursuant to both its inherent power and § 105 of the Bankruptcy Code, the Bankruptcy Court found that Appellees and the Trustee were entitled to compensatory sanctions for any actual attorneys' fees and expenses incurred in connection with the filing of the Henkin-Looper Case, including the fees and expenses incurred in responding to the Henkin-Looper Complaint and in prosecuting the Motion to Enforce the Preliminary Injunction and for Sanctions.

On January 30, 2020, Catanzanite appealed the Bankruptcy Court's Sanctions Order.  That appeal was dismissed on July 6, 2020, after the district court found that it was premised on a non-final sanctions order.  Subsequently, the Bankruptcy Court issued an order liquidating the sanctions order (the "Liquidation Order").  The appeal of the Liquidation Order is the instant appeal.  The Liquidation Order awarded monetary compensatory damages to Appellees and the Trustee and ordered Catanzanite to pay the damages within fourteen days of entry of the Liquidation Order.

4

EXHIBIT #36: 018
22-CV-01616-BAS-DDL

Complaint Supplement #30: 249
Exhibit #3: 004

Superior Court of California County of Orange
ADA Complaint Exhibits 252

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.287   Page 14 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1469   Page 19 of 100
Case 0:20-cv-61032-RS   Document 31   Entered on FLSD Docket 07/28/2021   Page 5 of 12

Catanzanite filed the instant appeal on May 26, 2020. His Notice of Appeal [DE 1] states that he is appealing the Order Liquidating and Awarding Compensatory Sanctions entered by the Bankruptcy Court on May 8, 2020.

## II.     Standard of Review

A bankruptcy court's conclusions of law are reviewed *de novo* and the bankruptcy court's factual findings are reviewed for clear error. *In re Coady*, 588 F.3d 1312, 1315 (11th Cir. 2009). "A factual finding is not clearly erroneous unless, after reviewing all of the evidence, [a reviewing court is] left with 'a definite and firm conviction that a mistake has been committed.'" *In re Daughtrey*, 896 F.3d 1255, 1273 (11th Cir. 2018) (citations omitted). A decision to award sanctions is reviewed for abuse of discretion. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 55 (1991). "A bankruptcy court abuses its discretion when it either misapplies the law or bases its decision on factual findings that are clearly erroneous." *Daughtrey*, 896 F.3d at 1274.

## III.    DISCUSSION

Appellant raises eight issues on appeal:

1. Whether the Bankruptcy Court erred when it enforced a temporary restraining order and imposed sanctions.

2. Whether the Bankruptcy Court erred when it imposed sanctions against Appellant and certain real parties in interest without acquiring personal jurisdiction over the real parties in interest.

3. Whether the Bankruptcy Court erred when it granted the injunction without considering the imposition of a bond.

4. Whether the Bankruptcy Court erred when it awarded the Chapter 7 Trustee fees.

5. Whether the Bankruptcy Court erred when it awarded attorneys' fees sanction to the Chapter 7 Trustee.

EXHIBIT #36: 019
22-CV-01616-BAS-DDL

Complaint Supplement #30-2020-01143936 Superior Court of California County of Orange
Exhibit #3: 005
ADA Complaint Exhibits 253

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.288   Page 15 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1470   Page 20 of 100
Case 0:20-cv-61032-RS   Document 31   Entered on FLSD Docket 07/28/2021   Page 6 of 12

6. Whether the Bankruptcy Court erred when it awarded attorneys' fees to the Appellees in the absence of sufficient record substantiating the reasonableness of the hours billed and rates charged.

7. Whether the Bankruptcy Court erred when it awarded attorneys' fees to the Chapter 7 Trustee in the absence of sufficient record substantiating the reasonableness of the hours billed and rates charged.

8. Whether the Bankruptcy Court erred when it awarded attorneys' fees to Appellees that are excessive, unreasonable, and unconscionable.

First, the Court notes that a couple of the issues raised by Appellant are not properly before the Court. Appellant's issue number three is not properly before the Court because whether the Bankruptcy Court should have required a bond when it issued the Preliminary Injunction is not an issue that arose in the Sanctions Order or Liquidating Order. Appellant should have raised it in an appeal of the injunction. Thus, the Court will not address this issue. The Court also notes that issue number two is not properly before the Court because Appellant never raised the issue of personal jurisdiction below. Further, neither the Sanctions Order nor Liquidating Order found that anyone other than Appellant had violated the Preliminary Injunction and the sanctions were imposed against Appellant. Additionally, the record does not indicate that Appellant or his counsel are appearing on behalf of these "real parties in interest" and, thus, neither Appellant nor his counsel can assert arguments on their behalf. Consequently, the Court will also not address these issues.

Second, a review of Appellant's issues demonstrates that there are really only three issues on appeal: (1) whether the Bankruptcy Court erred when it entered the Sanctions Order by finding Appellant had violated the Preliminary Injunction, (2) whether the Bankruptcy Court erred in the amount of attorney's fees awarded to Appellees in the Liquidation Order; and (3) whether the

6

EXHIBIT #36: 020
22-CV-01616-BAS-DDL

Complaint Supplement #30 2020-01-14589B   Bank's Superior Court of California County of Orange
Exhibit #3: 006                            ADA Complaint Exhibits 254

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.289   Page 16 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1471   Page 21 of
100
Case 0:20-cv-61032-RS   Document 31   Entered on FLSD Docket 07/28/2021   Page 7 of 12

Bankruptcy Court erred in awarding attorneys' fees, and the amount of the fees awarded, to the Chapter 7 Trustee.

### A.   Violation of the Preliminary Injunction

The Bankruptcy Court found that Appellant, as the attorney for the enjoined Carlson Defendants, was prohibited, under Federal Rule of Civil Procedure 65(d)(2)(B), from engaging in conduct in which the Carlson Defendants could not engage. Thus, the Bankruptcy Court found that Appellant's filing of the Henkin-Looper Case and the associated *lis pendens* violated the Bankruptcy Court's second preliminary injunction order. As a result, the Bankruptcy Court imposed civil contempt sanctions against Appellant pursuant to its inherent powers and § 105 of the Bankruptcy Code. Appellant argues that this was error because he was not acting on behalf of the Carlson Defendants when he filed the Henkin-Looper Case.

Federal Rule of Civil Procedure 65(d)(2), titled "Persons Bound," states that every injunction "binds only the following who receive actual notice of it . . .: (A) the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) other persons who are in concert or active participation with anyone described in Rule 65(d)(2)(A) or (B)." Thus, under the plain language of Rule 65(d)(2)(B), Appellant, as the attorney for the enjoined Carlson Defendants, was bound by the Preliminary Injunction.

Appellant argues that, while he could not pursue enjoined conduct on behalf of the Carlson Defendants, he could pursue similar conduct on behalf of other clients. However, the language of Rule 65(d)(2)(B) is clear that Appellant, as the attorney of the Carlson Defendants, is also bound by the terms of the injunction. Moreover, the Bankruptcy Court found that the Henkin-Looper Parties and the Carlson Defendants were in active participation with each other through Appellant. Thus, even if Appellant was not acting directly on behalf of the Carlson Defendants, he was bound

EXHIBIT #36: 021
22-CV-01616-BAS-DDL

Complaint Supplement #3: 020   Superior Court of California County of Orange
Exhibit #3: 007   Book #3-2020-01-14-5998   ADA Complaint Exhibits 255

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.290   Page 17 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1472   Page 22 of 100
Case 0:20-cv-61032-RS   Document 31   Entered on FLSD Docket 07/28/2021   Page 8 of 12

by the Preliminary Injunction, under Rule 65(d)(2)(C), because his filing of the Henkin-Looper Case and the associated *lis pendens* was done in concert or active participation with the Carlson Defendants and the Henkin-Looper Parties.

Appellant takes issue with the Bankruptcy Court's finding that he was acting in concert with the Carlson Defendants and the Henkin-Looper Parties. However, we review the factual findings of the Bankruptcy Court for clear error. Based on the record, this Court does not have a definite and firm conviction that a mistake has been committed. While Appellant argues that the enjoined proceedings differ from the Henkin-Looper Case, the Bankruptcy Court did not find that the proceedings were the same; it found that the enjoined lawsuits and the Henkin-Looper Case were based on similar ownership interests and the same or similar facts or circumstances. The Bankruptcy Court did not find that the Carlson Defendants and the Henkin-Looper Parties had an identity of interest nor did it find that the enjoined lawsuits and the Henkin-Looper Case sought the same relief.

Finally, Appellant argues that the Bankruptcy Court's analysis is flawed because it would allow the Henkin-Looper Parties to file the Henkin-Looper Case through different counsel. But that is exactly why the Bankruptcy Court found that Appellant violated the Preliminary Injunction. The Appellant is the one against whom the injunction applied; in the Sanction Order, the Bankruptcy Court only enjoined the Henkin-Looper Parties, and the prosecution of the Henkin-Looper Case, because they acted through Appellant[2] and in concert with the Carlson Defendants.

---

[2] Appellant also seems to argue that the Bankruptcy Court erred in finding the injunction applied to the Henkin-Looper Parties because the Henkin-Looper Parties were not properly before the Bankruptcy Court. However, the Bankruptcy Court did not find that the injunction applied to the Henkin-Looper Parties under all circumstances; instead it found that the filing of the Henkin-Looper Case and the associated *lis pendens* violated the injunction because it was done through Appellant, against whom the injunction did apply pursuant to Rule 65(d)(2).

EXHIBIT #36: 022
22-CV-01616-BAS-DDL

Complaint Supplement #3: 020   Superior Court of California County of Orange
Exhibit #3: 008                ADA Complaint Exhibits 256

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.291   Page 18 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1473   Page 23 of
Case 0:20-cv-61032-RS   Document 31   Entered on FLSD Docket 07/28/2021   Page 9 of 12

Consequently, the Court finds that the Bankruptcy Court did not err in imposing sanctions against Appellant.

**B.    The Amount of Sanctions Awarded to Appellees**

The Liquidating Order awarded Appellees $49,020.50 in compensatory sanctions for the attorneys' fees and expenses that Appellees incurred in connection with responding to the Henkin-Looper Complaint and filing and prosecuting the Motion to Enforce the Preliminary Injunction and for Sanctions in the Bankruptcy Court. Appellant argues that the Bankruptcy Court erred in awarding these sanctions because the affidavits submitted in support of the amount of sanctions do not show that the fees were actually billed to Appellees. Appellant also argues that the amount of time billed by Appellees counsel was unreasonable and the Bankruptcy Court did not apply the lodestar method in determining the fees.

First, the Court notes that Appellant did not timely object to Appellees' affidavits related to the fees incurred and he did not seek an extension of time in which to object. Therefore, when the Bankruptcy Court considered the fee affidavits, it did not consider Appellant's untimely objections. Appellant's failure to object to the fee affidavit and his conclusory and vague challenges to the reasonableness of the fees in his initial brief are fatal to his argument. *See Barash v. Kates*, 585 F. Supp. 2d 1368, 1375 (S.D. Fla. 2008) (stating "in the attorney's fees context, failing to object is generally deemed fatal."). Further, as a general rule, an appellate court does not consider an issue raised for the first time on appeal. *Finnegan v. Comm'r of Internal Revenue*, 926 F.3d 1261, 1271 (11th Cir. 2019). Appellant had an opportunity to challenge the reasonableness of the fees sought by Appellees in the Bankruptcy Court and failed to do so in a timely manner.

EXHIBIT #36: 023
22-CV-01616-BAS-DDL

Complaint Supplement #30-2 2020-01-14 9998
Exhibit #3: 009

Back #30-2 Superior Court of California County of Orange
ADA Complaint Exhibits 257

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.292   Page 19 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1474   Page 24 of 100
Case 0:20-cv-61032-RS   Document 31   Entered on FLSD Docket 07/28/2021   Page 10 of 12

Second, the Court finds that the Bankruptcy Court did not abuse its discretion in awarding Appellees $49,020.50 in compensatory sanctions. The Bankruptcy Court stated that it "carefully reviewed the Affidavits and time records" submitted by Appellees and found the fees were "properly incurred in connection with responding to the Henkin-Looper Complaint and in prosecuting the [Motion to Enforce the Injunction], and are not excessive." Appellant has not shown that the Bankruptcy Court misapplied the law or based its decision on factual findings that are clearly erroneous. While Appellant argues that the Bankruptcy Court failed to utilize the lodestar approach to determine the amount of fees to award, a court imposing sanctions for civil contempt does not have to utilize the lodestar method in determining the amount of attorneys' fees. *See Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Olympia Holding Corp.*, 140 F. App'x 860, 864 n.1 (11th Cir. 2005) (stating "[s]anctions for civil contempt are not equivalent with typical payment of attorneys' fees, and civil contempt sanctions do not require the use of the lodestar method.") Thus, given the broad discretion courts have in fashioning contempt sanctions, *see F.T.C. v. Leshin*, 618 F.3d 1221, 1237 (11th Cir. 2010), the Bankruptcy Court did not abuse its discretion in awarding Appellees $49,020.50 in compensatory sanctions.

**C.     The Attorneys' Fees Awarded to the Trustee**

In the Sanctions Order, the Bankruptcy Court awarded the Trustee attorneys' fees as part of the sanction against Appellant. The Bankruptcy Court noted:

> Although Trustee Paiva is not a party to this particular adversary proceeding, in light of the pending settlement motion in the main bankruptcy case and the intent of the injunctive relief in this adversary proceeding – to maintain the status quo pending the hearing to consider approval of that settlement – the Court finds it appropriate to compensate the bankruptcy estate, in addition to the [Appellees] for any attorneys' fees and expenses incurred in connection with this matter.

10

EXHIBIT #36: 024
22-CV-01616-BAS-DDL

Complaint Supplement #36: 024
Exhibit #3: 010

Bank of Superior Court of California County of Orange
ADA Complaint Exhibits 258

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.293   Page 20 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1475   Page 25 of 100
Case 0:20-cv-01032-RS   Document 31   Entered on FLSD Docket 07/28/2021   Page 11 of 12

(Sanctions Order at 13 n.15.)  Appellant argues that the Bankruptcy Court erred in awarding attorneys' fees to the Trustee, who was not a party to the underlying Adversary Action and did not seek to enforce the Preliminary Injunction, which was issued in the Adversary Action.  The Trustee is also not a party to this appeal and has not filed an answer brief.

While Appellant argues that his due process rights were violated because he lacked notice and an opportunity to be heard on the Trustee's right to fees, Appellant seems to ignore that the fees were awarded to the Trustee as part of the contempt sanction.  Appellant had notice of the Motion to Enforce the Preliminary Injunction and for Sanctions and had an opportunity to respond in writing and at the hearing on the Motion to Enforce the Preliminary Injunction and for Sanctions. At the hearing, the Bankruptcy Court heard from the Trustee's counsel on whether Appellant's actions violated the stay or otherwise were an attempt to exercise control over property of the estate.  At the hearing, Appellant had an opportunity to respond to the Trustee's arguments.  Thus, Appellant was on notice that the Bankruptcy Court was also considering whether and how Appellant's actions may have affected the Trustee and the estate and whether that should give rise to sanctions.  Further, after the Trustee submitted his fee affidavit and accompanying records, Appellant had an opportunity to file objections but failed to timely do so.  Thus, Appellant had an opportunity to be heard on the issue.  As noted above, a court has broad discretion in fashioning contempt sanctions.  Thus, the Court finds that the Bankruptcy Court did not err in awarding the Trustee attorneys' fees as part of the sanctions against Appellant.

Appellant also challenges the amount of attorneys' fees awarded to the Trustee.  However, for the same reason that the amount awarded to Appellees was not an abuse of discretion, the $11,639.25 awarded to the Trustee was not an abuse of discretion.  Further, it is clear that the Bankruptcy Court carefully reviewed the submissions from the Trustee because it awarded only

11

EXHIBIT #36: 025
22-CV-01616-BAS-DDL

Complaint Supplement #36: 282.01-1459.00 County of Orange
Exhibit #3: 011

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.294   Page 21 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1476   Page 26 of 100
Case 0:20-cv-61032-RS   Document 31   Entered on FLSD Docket 07/28/2021   Page 12 of 12

50% of the fees billed for certain items because the record was not clear if the items related to the main case or the Adversary Action out of which the contempt arose.

Accordingly, the Bankruptcy Court's Sanctions Order and Liquidation Order are **AFFIRMED.**

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 28th day of July, 2021.

**RODNEY SMITH**
**UNITED STATES DISTRICT JUDGE**

cc:    All counsel of record

EXHIBIT #36: 026
22-CV-01616-BAS-DDL

Complaint Supplement #30-2021-01145998 County of Orange
ADA Complaint Exhibits 260
Exhibit #3: 012

EXHIBIT 4

Case 3:23-cv-00882-AGS-DDL Document 1-30 Filed 05/15/23 PageID.296 Page 23 of 215
Case 3:22-cv-01616-BAS-DDL Document 10-37 Filed 01/09/23 PageID.1477 Page 27 of
190
Case 19-01291-SMG Doc 132 Filed 05/08/20 Page 1 of 6



**ORDERED in the Southern District of Florida on May 8, 2020.**

*Scott M. Grossman*

Scott M. Grossman, Judge
United States Bankruptcy Court

---

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:                                                          Chapter 7

Daymark Realty Advisors, Inc., *et al.*,        Case No. 18-23750-SMG
                                                                (substantively consolidated)
    Debtors.
_____/

Todd A. Mikles, *et al.*,

    Plaintiffs,

v.                                                              Adv. No. 19-1291-SMG

Richard Carlson, *et al.*,

    Defendants.
_____/

## ORDER LIQUIDATING AND AWARDING COMPENSATORY SANCTIONS

This matter came before the Court upon the *Order Granting in Part Motion to Enforce Preliminary Injunction and Imposing Sanctions* (the "Sanctions Order"),[1] the

---

[1] ECF No. 112.

EXHIBIT #36: 027
22-CV-01616-BAS-DDL

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.297   Page 24 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1478   Page 28 of
Case 19-01291-SMG   Doc 182   Filed 05/08/20   Page 2 of 6

*Plaintiff's Affidavit of Fees Sought as Compensatory Sanctions and Notice of Filing Bill of Particulars* (the "Mikles Affidavits")[2] filed by the Mikles Plaintiffs,[3] the *Notice of Filing Affidavit of Attorney's Fees and Costs Incurred by Chapter 7 Trustee Chad S. Paiva* (the "Trustee's Affidavit"),[4] the *Notice of Late Filing of Paper Pursuant to Local Rule 5005-1(F)(2)* (the "Notice of Late Filing"),[5] with an attached Objection to the Affidavits, filed by Attorney Kenneth J. Catanzarite, and the *Response to Notice of Late Filing and Untimely Filed Joint Objections to Affidavits*[6] filed by the Mikles Plaintiffs.

In the Sanctions Order, the Court awarded compensatory sanctions to the Mikles Plaintiffs and to Chapter 7 Trustee Chad S. Paiva (the "Trustee"), to be paid by Mr. Catanzarite, for attorneys' fees and expenses incurred in connection with responding to the Henkin-Looper Complaint[7] and filing and prosecuting the *Motion to Enforce the Preliminary Injunction and for Sanctions* (the "MTE").[8] The Court

---

[2] ECF No. 118. The Mikles Affidavits consist of affidavits from attorneys Adam T. Kent, Robert K. Sparks, and Thomas M. Messana and his firm Messana P.A..

[3] The Mikles Plaintiffs are Todd Mikles; Etienne Locoh; Sovereign Capital Management Group, Inc.; Sovereign Strategic Mortgage Fund, LLC; Infinity Urban Century, LLC; and GCL, LLC.

[4] ECF No. 128. The Trustee's Affidavit was filed timely pursuant to the Court's *Order Granting Motion to Extend Time* (ECF No. 166).

[5] ECF No. 146.

[6] ECF No. 155.

[7] In violation of the preliminary injunction issued in this adversary proceeding, Mr. Catanzarite filed a Complaint in the Superior Court of California, San Diego County, on behalf of Edward Henkin, Jonmar Partnership, Katherine Looper, Pat McRoberts, Chicago Houston Partners, LLC, William E. Bump, Thomas F. Scheidt, Ellen B. Friedman, Lawrence F. Leventon, and Paul L. Cohen against Mr. Mikles, GCL, LLC, Global Lending Resources, LLC, and Does 1-100. *See* Case No. 37-2019-00059373 (the "Henkin-Looper Complaint").

[8] ECF No. 95.

2

EXHIBIT #36: 028
22-CV-01616-BAS-DDL

Complaint Supplement #30 2020-01-14 5908
Exhibit #4: 002

Superior Court of California County of Orange
ADA Complaint Exhibits 263

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.298   Page 25 of 215
Case 8:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1479   Page 29 of
Case 19-01291-SMG   Doc 182   Filed 05/08/20   Page 3 of 6

directed the Mikles Plaintiffs and the Trustee to file, within fourteen days of entry of the Sanctions Order, affidavits of their fees and expenses, and provided Mr. Catanzarite a deadline to object to the affidavits.[9]

The Court entered the Sanctions Order on January 15, 2020.[10] The Mikles Plaintiffs timely filed the Mikles Affidavits on January 29, 2020.[11] The Trustee properly and timely moved for an extension of time to file his affidavit,[12] which the Court granted.[13] The Trustee then timely filed his Affidavit on February 5, 2020.[14] Mr. Catanzarite, however, failed to timely object to either affidavit.[15] He also failed to timely move for an extension of time to object. Instead, on February 25, 2020, Mr. Catanzarite filed his Notice of Late Filing, to which he attached his Objection.[16] His Notice of Late Filing cited Local Rule 5005-1(F)(2)[17] and offered a variety of excuses for missing the deadline, none of which rise to the level of excusable neglect. Mr.

---

[9] Sanctions Order, ¶¶ 9-10.

[10] Although Mr. Catanzarite has appealed the Sanctions Order to the District Court, this Court retains jurisdiction to liquidate the amount of the sanctions as the amount of sanctions is not an issue on appeal. "The filing of a proper notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the appellate court and divests the trial court of its control *over those aspects of the case involved in the appeal*." *In re Walker*, 515 F.3d 1204, 1211 (11th Cir.2008) (emphasis added) (citation omitted); *see also*, *In re Barnwell Cty. Hosp.*, 491 B.R. 408, 413 (Bankr. D.S.C. 2013) (noting that an appeal does not divest a lower court of jurisdiction over issues not involved in the appeal).

[11] ECF No. 118.

[12] ECF No. 117.

[13] ECF No. 166.

[14] ECF No. 128.

[15] The Sanctions Order required objections to be filed within 7 days after the filing of the affidavits. Sanctions Order, ¶ 10.

[16] ECF No. 146.

[17] As noted by the Court at the hearing in this matter on March 5, 2020, Local Rule 5005-1(F)(2) governs submission of papers in matters *already* set for hearing and has absolutely no applicability to a deadline to file an objection set by a court order.

3

EXHIBIT #36: 029
22-CV-01616-BAS-DDL

Complaint Supplement #30-2020-01149098
Exhibit #4: 003

Bank of Superior Court of California County of Orange
ADA Complaint Exhibits 264

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.299   Page 26 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1480   Page 30 of 190
Case 19-01291-SMG   Doc 182   Filed 05/08/20   Page 4 of 6

Catanzarite's Objection is therefore untimely, and – as the Court explained at a hearing on March 5, 2020 – will not be considered.

Even though the Court is not considering Mr. Catanzarite's Objection, the Court has carefully reviewed the Affidavits and time records submitted by the Mikles Plaintiffs and the Trustee. The Court finds the Mikles Plaintiffs' attorneys' fees of $49,020.50[18] were properly incurred in connection with responding to the Henkin-Looper Complaint and filing and prosecuting the MTE, and are not excessive. The Court will therefore award $49,020.50 to the Mikles Plaintiffs as compensatory sanctions.

As to the Trustee, certain time entries include time for both main case issues as well as the pertinent issues in this adversary proceeding.[19] The Court does not fault the Trustee's counsel for failing to separate these time entries. At the time, the Trustee could not have known that the Court was going to award him fees in connection with the Henkin-Looper Complaint and the MTE. Nevertheless, because the Court is unable to determine which portion of the following entries may be

---

[18] This amount included an estimated 10 hours of work on preparing and filing the Mikles Affidavits. Noting that Mr. Catanzarite failed to timely object to these fees, the Court finds this fee estimate to be reasonable considering the detailed nature of the Mikles Affidavits.

[19] The Trustee is not a party to this adversary proceeding. But in light of the pending settlement motion in the main bankruptcy case and the intent of the injunctive relief in this adversary proceeding – to maintain the status quo pending the hearing to consider approval of that settlement – the Court found it appropriate to compensate the bankruptcy estate, in addition to the Mikles Plaintiffs, for any attorneys' fees and expenses incurred in connection with this matter. Sanctions Order at 12, n.15.

4

EXHIBIT #36: 030
22-CV-01616-BAS-DDL

Complaint Supplement #30: 20200019450B
Exhibit #4: 004

Bankruptcy Court of California County of Orange
ADA Complaint Exhibits 265

attributable to the Henkin-Looper Complaint and the MTE, the Court will exercise its discretion and award only 50% of the fees billed for the following time entries:

| | Date | Lawyer | Work Description | Time | Rate | Value |
|---|---|---|---|---|---|---|
| | 12/03/19 | CBH | Preparation of hearing notebook for status conference on 12/5/19; schedule E. Jacobs for court call appearance; review of hearing in Mikles case; update notebook. | 1.30 | 195.00 | 253.50 |
| | 12/05/19 | BPG | Preparation for and attendance at hearings on Order Setting Status Conference on Order Taking Motion to Establish Procedures Under Advisement, Setting Deadlines, and Postponing Hearing on Motion to Approve Settlement and Motion to Enforce Preliminary Injunction and for Sanctions and (2.0); Interoffice conferences with E. Jacobs, J. Delgado and Trustee re :preparation for hearings in connection with Motion to Approve Settlement Motion and Establishing Notice Procedures and Motion to Enforce Preliminary Injunction and for Sanctions (.5). | 2.50 | 525.00 | 1,312.50 |
| | 031/General Litigation | | | | | |
| | 12/11/19 | JAD | Attended Status Conference and hearing on injunction violation. | 1.10 | 265.00 | 291.50 |

| Date | Lawyer | Work Description | Time | Rate | Value |
|---|---|---|---|---|---|
| 001/Asset Analysis and Recovery | | | | | |
| 12/04/19- EJ | | Attention to file in preparation for hearing on status conference and injunction motion (.7). | 0.70 | 425.00 | 297.50 |
| 12/05/19 EJ | | Prepare for and participate in hearing on status conference and sanctions for Violating Injunction (2.6). Post hearing analysis call with Barry Gruher (.3). | 2.90 | 425.00 | 1,232.50 |
| 005/Case Administration | | | | | |

The remainder of the Trustee's counsel's time entries, however, are appropriately related to the Henkin-Looper Complaint and the MTE, and are not duplicative. Accordingly, and pursuant to the Sanctions Order, the Court will award the Trustee $11,639.25 in attorneys' fees as compensatory sanctions.

Therefore, for the reasons discussed in detail above and in accordance with the Sanctions Order, it is

**ORDERED** that:

1.    The Mikles Plaintiffs are awarded $49,020.50 as compensatory sanctions for attorneys' fees incurred in connection with the Henkin-Looper Complaint and filing and prosecuting the MTE.

EXHIBIT #36: 031
22-CV-01616-BAS-DDL

Complaint Supplement #30: 2020-01-23.docx
Exhibit #4: 005

Bank v. Superior Court of California County of Orange
ADA Complaint Exhibits 266

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.301   Page 28 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1482   Page 32 of
Case 19-01291-SMG   Doc 182   Filed 05/08/20   Page 6 of 6

2.     The Trustee is awarded $11,639.25 as compensatory sanctions for attorneys' fees incurred in connection with the Henkin-Looper Complaint and the MTE.

3.     Mr. Catanzarite must pay $49,020.50 to the Mikles Plaintiffs within fourteen days of the entry of this Order.

4.     Mr. Catanzarite must pay $11,639.25 to the Trustee within fourteen days of the entry of this Order

# # #

Copies furnished to:

All interested parties

6

EXHIBIT #36: 032
22-CV-01616-BAS-DDL

Complaint Supplement #30-2020-01145099
Exhibit #4: 006
Book # Superior Court of California County of Orange
ADA Complaint Exhibits 267

EXHIBIT 5

Case 3:23-cv-00882-AGS-DDL Document 1-30 Filed 05/15/23 PageID.303 Page 30 of 215
Case 3:22-cv-01616-BAS-DDL Document 10-37 Filed 01/09/23 PageID.1483 Page 33 of
Case 19-01291-SMG Doc 112 Filed 01/15/20 Page 1 of 15



ORDERED in the Southern District of Florida on January 15, 2020.

**Scott M. Grossman, Judge**
**United States Bankruptcy Court**

---

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Chapter 7 |
| Daymark Realty Advisors Inc.,<br>Daymark Properties Realty, Inc.,<br>Daymark Residential Management Inc.,<br>    Debtor(s). | Case No. 18-23750-SMG<br>Case No. 18-23751-SMG<br>Case No. 18-23752-SMG<br>(substantively consolidated) |
| Todd A. Mikles, *et al.,*<br>    Plaintiff(s),<br>v.<br>Richard Carlson, *et al.,*<br>    Defendant(s). | Adv. No.: 19-1291-SMG |

## ORDER GRANTING IN PART MOTION TO ENFORCE
## PRELIMINARY INJUNCTION AND IMPOSING SANCTIONS

This matter came before the Court for a hearing on December 5, 2019 (the

"Hearing"), upon the *Motion to Enforce the Preliminary Injunction and for Sanctions*

*against Defendants' Counsel* (ECF No. 95) filed by the Plaintiffs (the "Mikles

1

EXHIBIT #36: 033
22-CV-01616-BAS-DDL

Complaint Supplement #30: 2020-01-14-999B
Exhibit #5: 001

Superior Court of California, County of Orange
ADA Complaint Exhibits 269

Case 3:22-cv-00082-AGS-DDL Document 1-30 Filed 05/15/23 PageID.304 Page 31 of 215
Case 3:22-cv-01616-BAS-DDL Document 10-37 Filed 01/09/23 PageID.1484 Page 34 of

Case 19-01291-SMG Doc 112 Filed 01/15/20 Page 2 of 15

Plaintiffs").[1] The Court has considered the Motion, the judicially noticed court

filings,[2] the *Declaration of Todd Mikles* (ECF No. 97) filed in support of the Motion,

the *Response* (ECF No. 107)—including the Declaration and Exhibits attached

thereto—filed by attorney Kenneth J. Catanzarite,[3] counsel for the Defendants (the

"Carlson Defendants"),[4] and the arguments made at the Hearing by counsel for the

Mikles Plaintiffs and by Mr. Catanzarite on behalf of himself. For the reasons that

follow, the Court grants the Motion in part, and awards compensatory sanctions

against Mr. Catanzarite[5] and in favor of the Mikles Plaintiffs and Chapter 7 Trustee

Chad S. Paiva.

## PROCEDURAL BACKGROUND

I.    The Daymark Bankruptcy

On November 4, 2018, Daymark Realty Advisors Inc. ("DRA"), Daymark

Residential Management Inc. ("DRM"), and Daymark Properties Realty Inc. ("DPR"

---

[1] The Mikles Plaintiffs include Todd A. Mikles, Etienne Locoh, Sovereign Capital Management Group, Inc., Sovereign Strategic Mortgage Fund, LLC, Infinity Urban Century, LLC, and GCL, LLC.

[2] The Plaintiffs filed a *Request for Judicial Notice* (ECF No. 96), which the Court granted.

[3] Although licensed only in California, Mr. Catanzarite was admitted in this Court *pro hac vice* by *Order* (Case No. 18-23750, ECF No. 29) dated December 7, 2018, with Todd Frankenthal, Esq. as designated local counsel. In his Affidavit attached as Exhibit 1 to the *Motion to Appear Pro Hac Vice* (Case No. 18-23750-SMG, ECF No. 27), Mr. Catanzarite affirmed that he is "familiar with and shall be governed by the local rules of this court, the rules of professional conduct, and all other requirements governing the professional behavior of members of the Florida Bar."

[4] The Carlson Defendants include Richard Carlson; Milton O. Brown; Tyrone Wynfield; Dennis Dierenfield; William B. Gilmer; NNN 1600 Barberry Lane 8, LLC; NNN 1600 Barberry Lane 9, LLC; NNN Plantations at Haywood 1, LLC; NNN Plantations at Haywood 2, LLC; NNN Plantations at Haywood 13, LLC; and NNN Plantations at Haywood 23, LLC.

[5] At the Hearing, counsel for the Plaintiffs informed the Court that they would not be proceeding against the Defendants' local counsel, Todd Frankenthal.

2

EXHIBIT #36: 034
22-CV-01616-BAS-DDL

Complaint Supplement #30-2020-01-14599B
Exhibit #5: 002                    Superior Court of California County of Orange
                                   ADA Complaint Exhibits 270

Case Case 3:22-cv-01616-BAS-DDL Document 1-30 Filed 05/15/23 PageID.305 Page 32 of 215
Case 3:22-cv-01616-BAS-DDL Document 10-37 Filed 01/09/23 PageID.1485 Page 35 of
Case 19-01291-SMG Doc 112 Filed 01/15/20 Page 3 of 15

and together with DRA and DRM, the "Debtors") each filed voluntary chapter 11 bankruptcy petitions. Later, the cases were substantively consolidated, and on April 2, 2019, the consolidated cases were converted to chapter 7. *See Order Granting Mot. to Convert Case* (Case No. 18-23750-SMG, ECF No. 248).

Before the Mikles Plaintiffs filed this adversary proceeding, the Carlson Defendants had each filed adversary complaints against the Debtors (the "Carlson Adversaries").[6] In the Carlson Adversaries, the Carlson Defendants allege that the Mikles Plaintiffs were alter egos, co-conspirators, and aiders and abettors of the Debtors. Thereafter, the Mikles Plaintiffs instituted this adversary proceeding seeking injunctive relief against the Carlson Defendants. *See Complaint* (ECF No. 1) (the "Injunction Adversary").

In the Injunction Adversary, the Mikles Plaintiffs seek injunctive relief enjoining the prosecution of various lawsuits and threatened lawsuits (the "Subject Lawsuits") during the pendency of the Debtors' bankruptcy cases. The Subject Lawsuits were each brought outside of bankruptcy by certain Carlson Defendants through their shared attorney, Mr. Catanzarite, against certain Mikles Plaintiffs and the Debtors. The Mikles Plaintiffs allege that an injunction is appropriate here because (1) the Subject Lawsuits are inextricably intertwined with actions asserted against the Debtors; (2) the common nexus between the Carlson Defendants and the Mikles Plaintiffs is through the Debtors; and (3) for any claims to be proven against

---

[6] *See* Case Numbers 19-1048-SMG (Carlson), 19-1049-SMG (Brown and NNN Congress Center, LLC), 19-1051-SMG (Wynfield and NNN Capital Fund I, LLC), 19-1052-SMG (the 1600 Barberry Lane entities), 19-1053-SMG (the Plantations at Haywood entities), and 19-1053-SMG (Dierenfield and Gilmer).

3

EXHIBIT #36: 035
22-CV-01616-BAS-DDL

Complaint Supplement #30: 2020-01-14 9998
Exhibit #5: 003

Superior Court of California County of Orange
ADA Complaint Exhibits 271

Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.306   Page 33 of 215
Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1486   Page 36 of
Case 19-01291-SMG   Doc 112   Filed 01/15/20   Page 4 of 15

the Mikles Plaintiffs, the Carlson Defendants must establish some basis for liability, or must prove claims, against the Debtors—who are not participating in the Subject Lawsuits due to the chapter 7 cases.

## II.   The Preliminary Injunction

On July 31, 2019, the Mikles Plaintiffs filed their first *Emergency Motion for Temporary Restraining Order and Preliminary Injunction* (ECF No. 2). After conducting a hearing, the Court entered an *Order* (ECF No. 18) on August 27, 2019 (the "First Preliminary Injunction Order") granting the Mikles Plaintiffs' Motion and providing that:

> Plaintiffs are hereby granted a preliminary injunction for a period of sixty (60) days effective as of the Hearing, enjoining continuation of the Subject Lawsuits or the commencement of any further actions under same or similar facts or circumstances to the Subject Lawsuits, by these Defendants.

First Prelim. Inj. Order at 3.

On October 18, 2019, the Mikles Plaintiffs filed a *Motion to Extend the Preliminary Restraining Order* (ECF No. 49), seeking an extension of the preliminary injunction for 75 days to maintain the status quo while allowing the Court to consider approval of the settlement reached in the Debtors' consolidated chapter 7 cases, which – if approved – would be dispositive of the Subject Lawsuits. After conducting a hearing on the Motion, the Court entered an *Order* (ECF No. 61) on October 23, 2019 (the "Second Preliminary Injunction Order"), granting the Motion to Extend the Preliminary Restraining Order and ordering that:

> The preliminary injunction is extended for an additional period through and including December 11, 2019, effective as of the Hearing, enjoining continued prosecution of the Subject Lawsuits or the commencement of

4

EXHIBIT #36: 036
22-CV-01616-BAS-DDL

Complaint Supplement #30-20200104 Superior Court of California County of Orange
Exhibit #5: 004                        Back to Superior Court of California County of Orange
                                       ADA Complaint Exhibits 272

any further actions under same or similar facts or circumstances to the subject lawsuits by these Defendants.

Second Prelim. Inj. Order at 3. It was the Second Preliminary Injunction Order that was in effect on November 7, 2019—the date Mr. Catanzarite allegedly violated the preliminary injunction.

On November 8, 2019, the Mikles Plaintiffs filed a second *Motion to Extend the Preliminary Restraining Order* (ECF No. 65). Again, the Court conducted a hearing on the Motion and entered an *Order* (ECF No. 92) (the "Third Preliminary Injunction Order") on November 18, 2019, further extending the preliminary injunction through and including February 28, 2020, and "enjoining continued prosecution of the Subject Lawsuits or the commencement of any further actions under the same or similar facts or circumstances to the subject lawsuits by these Defendants." Third Prelim. Inj. Order at 3.

Mr. Catanzarite appeared telephonically and presented argument at all three preliminary injunction hearings.[7]

III.    The Motion to Enforce Preliminary Injunction

On November 19, 2019, the Mikles Plaintiffs filed the Motion to Enforce the Preliminary Injunction and for Sanctions against Defendants' Counsel now before the Court. The Mikles Plaintiffs contend that notwithstanding the preliminary injunction covering both the Subject Lawsuits and "the commencement of any further actions under the same or similar facts or circumstances to the subject lawsuits by these

---

[7] Todd Frankenthal, designated local counsel for Mr. Catanzarite, also appeared at all three preliminary injunction hearings.

5

EXHIBIT #36: 037
22-CV-01616-BAS-DDL

Complaint Supplement #30: 270
Exhibit #5: 005

Book # 30920 20.0.145 Superior Court of California County of Orange
ADA Complaint Exhibits 273

Case 3:22-cv-01616-BAS-DDL Document 130 Filed 05/15/23 PageID.308 Page 35 of 215
Case 3:22-cv-01616-BAS-DDL Document 10-37 Filed 01/09/23 PageID.2468 Page 38 of
Case 19-01291-SMG Doc 112 Filed 01/15/20 Page 6 of 15

Defendants," Mr. Catanzarite violated the injunction by initiating a new lawsuit on behalf of certain clients against Mr. Mikles and GCL, LLC[8] purportedly based on the same facts and circumstances as the Subject Lawsuits, and by filing a *lis pendens* against property owned by GCL, LLC (the "GCL Property").

Specifically, the Mikles Plaintiffs allege that on November 7, 2019, Mr. Catanzarite filed a Complaint in the Superior Court of California, San Diego County, on behalf of Edward Henkin, Jonmar Partnership, Katherine Looper, Pat McRoberts, Chicago Houston Partners, LLC, William E. Bump, Thomas F. Scheidt, Ellen B. Friedman, Lawrence F. Leventon, and Paul L. Cohen (the "Henkin-Looper Parties")[9] against Mr. Mikles, GCL, LLC, Global Lending Resources, LLC, and Does 1-100. *See* Case No. 37-2019-00059373 (the "Henkin-Looper Case"). In connection with the Henkin-Looper Case, Mr. Catanzarite filed the *lis pendens* at issue.[10]

The Henkin-Looper Complaint, attached to the *Request for Judicial Notice* (ECF No. 96) as Exhibit 7, alleges causes of action for avoidance and recovery of fraudulent transfers and conspiracy to defraud. The Henkin-Looper Parties allege that at all relevant times, they have had a claim against Mr. Mikles "which arises from his August 2011 acquisition of entities which owned Daymark Properties Realty, Inc. . . . , at the time the asset and property manager of [the Henkin-Looper Parties']

---

[8] Mr. Mikles and GCL, LLC are two of the Mikles Plaintiffs in the Injunction Adversary.

[9] All individuals and entities are named as plaintiffs in their capacities as successors in interest to various limited liability companies.

[10] According to Mr. Mikles' *Declaration* (ECF No. 97), on November 11, 2019, Mr. Mikles received from Catanzarite Law Corporation a copy of the *lis pendens* filed against the GCL Property in connection with the Henkin-Looper Case. A copy of the *lis pendens* is attached to the Declaration as Exhibit 1.

6

EXHIBIT #36: 038
22-CV-01616-BAS-DDL

Complaint Supplement #30 2020-01-14999
Exhibit #5: 006

Back # Superior Court of California County of Orange
ADA Complaint Exhibits 274

ownership of the real estate project commonly known as the Congress Center," an

office tower located in Chicago, Illinois (the "Congress Center Property"). Henkin-

Looper Compl., ¶ 26. Tellingly, the Henkin-Looper Parties allege that they "learned

for the first time of [Mr. Mikles'] fraudulent scheme . . . on November 1, 2019, from

review of a Motion for Approval of Settlement and Compromise filed by Chad S.

Paiva, as Chapter 7 Trustee . . . for the substantively consolidated bankruptcy estates

of the Debtors." Henkin-Looper Compl., ¶¶ 58, 73.

The Henkin-Looper Case involves nearly identical allegations and plaintiffs as

the adversary proceeding initiated by Mr. Catanzarite in this Court on March 4, 2019

(the "Looper Adversary). *See Looper v. Daymark Realty Advisors, Inc.*, Case No. 19-

1050-SMG). In that adversary, it is alleged that:

> This complaint is on behalf of [the Looper] Plaintiffs . . . who invested
> their Internal Revenue Code Section 1031 tax deferred exchange funds
> . . . to acquire membership interests in various Special Purpose Entities
> ("SPEs") . . . in order to purchase an aggregate 16.511% tenant in
> common ("TIC") interest in that certain "Congress Center Property" . . .
> , a commercial real estate project commonly known as the "Congress
> Center" a 524,784 square foot Class A office tower located in Chicago,
> Illinois.

Looper Adv. Compl. (Case No. 19-1050-SMG, ECF No. 1), ¶ 1.[11] The Looper Plaintiffs

also allege that Debtors DRA and DPR managed the Congress Center Property and

DRA and DPR, through Mr. Mikles, defrauded the Looper Plaintiffs. Looper Adv.

Compl., ¶¶ 21-22, 67-70.

Additionally, and particularly relevant to the Motion now before the Court,

Mr. Catanzarite filed a class action in the Superior Court of Orange County,

---

[11] The Looper Adversary Complaint is also attached to the Request for Judicial Notice as Exhibit 2.

7

EXHIBIT #36: 039
22-CV-01616-BAS-DDL

Complaint Supplement #30: 02 Superior Court of California County of Orange
Exhibit #5: 007                    ADA Complaint Exhibits 275

Case 8:22-cv-01616-BAS-DDL Document 1-20 Filed 05/15/23 PageID.310 Page 37 of 215
Case 8:23-cv-00821-GLS-DDL Document 10-37 Filed 01/09/23 PageID.1490 Page 40 of
Case 19-01291-SMG Doc 112 Filed 01/15/20 Page 8 of 15

California, Case No. 30-2018-00982195 (the "Carlson Class Action"), on behalf of Richard Carlson as beneficiary of G REIT Liquidating Trust (the "G REIT Trust"), and all other similarly situated individuals, against Mr. Mikles, Etienne Locoh, DPR, and several other individuals and entities, alleging breach of fiduciary duty and fraudulent transfer claims. *See* Second Am. Class Action Compl. (filed March 23, 2018), Req. for Judicial Notice, Ex. 3. The plaintiffs in the Carlson Class Action alleged that the G REIT Trust owned an interest in the Congress Center Property; that the Debtors, through Mr. Mikles and Mr. Locoh, breached their fiduciary duties with respect to the Congress Center Property; and that the Debtors, Mr. Mikles, and Mr. Locoh are alter egos of each other. *See generally,* Second Am. Class Action Compl. ¶¶ 67-115. The Carlson Class Action—one of the matters explicitly enjoined by the Second Preliminary Injunction Order—is primarily based upon tenant in common ("TIC") ownership interests in the Congress Center Property, precisely the same TIC ownership interests held by the Henkin-Looper Parties that form the basis of the Henkin-Looper Case. The NNN Congress Center case, Case No. 30-2018-01015717 (the "NNN Congress Center Case"), filed by Mr. Catanzarite in the Superior Court of Orange County, California on behalf of different plaintiffs[12] also contains the same allegations regarding TIC ownership interests in the Congress Center Property as the Carlson Class Action and as the Henkin-Looper Case. *See* First Am. Compl., Req. for Judicial Notice, Ex. 5. Like the Carlson Class Action, the NNN Congress Center

---

[12] The NNN Congress Center Case involves defendants who are all defendants in the Carlson Class Action.

8

EXHIBIT #36: 040
22-CV-01616-BAS-DDL

Complaint Supplement #30: 2020-01-14
Exhibit #5: 008

Bank of George in County of California County of Orange
ADA Complaint Exhibits 276

Case is one of the matters explicitly enjoined by the Second Preliminary Injunction Order.

<div align="center"><u>CONCLUSIONS OF LAW</u></div>

I.   <u>Mr. Catanzarite Violated the Court's Preliminary Injunction Order</u>

For the reasons that follow, the Court finds that the filing of the Henkin-Looper Case and the associated *lis pendens* by Mr. Catanzarite constitutes "the commencement of any further actions under same or similar facts or circumstances to the subject lawsuits by these Defendants," which violates the Court's preliminary injunction that was in effect on November 7, 2019—the date the Henkin-Looper Case was filed. *See* Second Prelim. Inj. Order.

The Court has the power to issue sanctions for civil contempt pursuant to both its inherent powers and § 105 of the Bankruptcy Code, and the statutory power of bankruptcy courts to issue contempt sanctions is particularly broad. *See In re Tate*, 521 B.R. 427, 439 (Bankr. S.D. Ga. 2014). Indeed, § 105(a) grants bankruptcy courts statutory authority to "issue any order, process, or judgment that is necessary and appropriate to carry out the provisions of this title," and the Eleventh Circuit has noted that "Congress expressly grants [courts] independent statutory powers in bankruptcy proceedings to 'carry out the provisions of' the Bankruptcy Code through 'any order, process, or judgment that is necessary or appropriate.'" *Jove Eng'g, Inc. v. I.R.S.*, 92 F.3d 1539, 1553 (11th Cir. 1996).

"In a civil contempt proceeding, the petitioning party bears the burden of establishing by 'clear and convincing' proof that the underlying order was violated."

<div align="center">9</div>

<div align="right">EXHIBIT #36: 041<br>22-CV-01616-BAS-DDL</div>

Complaint Supplement #30-29 ~ Superior Court of California County of Orange
Exhibit #5: 009
Back #302920200114599B
ADA Complaint Exhibits 277

*PlayNation Play Sys., Inc. v. Velex Corp.*, 939 F.3d 1205, 1212 (11th Cir. 2019) (quoting *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990)). The Court's focus "is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue." *Id.* at 1212–13 (citation omitted). This standard is an objective one. *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1802 (2019).

The Second Preliminary Injunction Order prohibits the Carlson Defendants from prosecuting or commencing "any further actions under same *or similar facts or circumstances* to the subject lawsuits by these Defendants." (emphasis added). To begin with, the filing of the Henkin-Looper Case constitutes the commencement of an action "under the same or similar facts and circumstances to the Subject Lawsuits." As discussed in the preceding section, the Carlson Class Action and the NNN Congress Center Case—two of the matters explicitly enjoined by the Second Preliminary Injunction Order—are largely based upon TIC ownership interests in the Congress Center Property, precisely the same TIC ownership interests held by the Henkin-Looper Parties that form the basis of the Henkin-Looper Case. It is thus clear that the Henkin-Looper Case and the *lis pendens* filed in connection with the Henkin-Looper Case are actions based on the same or similar facts or circumstances as some, if not all, of the Subject Lawsuits.

Mr. Catanzarite points out, and it is not disputed, that none of the Henkin-Looper Parties are specifically included with the Carlson Defendants and thus are not enjoined on the face of the Second Preliminary Injunction Order. Based on their

10

EXHIBIT #36: 042
22-CV-01616-BAS-DDL

Case 8:23-bk-00001-SMG Doc 10-37 Filed 05/15/23 PageID.313 Page 40 of 215
Case 8:22-bk-01616-BAS-DDL Document 1-20 Filed 01/09/23 PageID.1493 Page 43 of
Case 19-01291-SMG Doc 112-00 Filed 01/15/20 Page 11 of 15

own allegations, however, the Henkin-Looper Parties and the Carlson Defendants are all TIC owners with similar complaints against the Debtors and the Mikles Plaintiffs arising from a common nucleus of facts. More importantly, the Henkin-Looper Parties and the Carlson Defendants all share the same attorney—Mr. Catanzarite. Indeed, Mr. Catanzarite is attempting to gain class certification with respect to the claims common to the Henkin-Looper Parties, the Carlson Defendants, and other similarly situated parties.

Rule 65(d)(2) of the Federal Rules of Civil Procedure[13] provides that an order granting an injunction or a restraining order binds not only the parties specifically named in the order, but also the parties' officers, agents, servants, employees, and attorneys and any other persons who are in active concert or participation with the named parties or their officers, agents, servants, employees, and attorneys. *See* Rule 65(d)(2)(B) and (C).

Mr. Catanzarite is the attorney for the Carlson Defendants—the parties specifically enjoined in the Second Preliminary Injunction Order. He is thus prohibited under Rule 65(d)(2)(B) from engaging in conduct in which the Carlson Defendants themselves could not engage. Moreover, it cannot be reasonably disputed that Mr. Catanzarite, the Henkin-Looper Parties, and the Carlson Defendants are in active participation with each other through Mr. Catanzarite—the attorney and the driving force behind these lawsuits he hopes to have certified as a class action. Mr. Catanzarite and the Henkin-Looper Parties are thus enjoined under Rule 65(d)(2)(C)

---

[13] Rule 65 is made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7065.

EXHIBIT #36: 043
22-CV-01616-BAS-DDL

Complaint Supplement #30: 2020-01143908
Exhibit #5: 011

Bank #3 Superior Court of California County of Orange
ADA Complaint Exhibits 279

Case 3:22-cv-01616-BAS-DDL Document 30-37 Filed 05/15/23 PageID.314 Page 41 of 215
Case 3:23-cv-00882-AGS-DDL Document 30-37 Filed 01/09/23 PageID.1494 Page 44 of 100
Case 19-01291-SMG Doc 112 Filed 01/15/20 Page 12 of 15

just as the Carlson Defendants are enjoined on the face of the Second Preliminary Injunction Order.

Having determined that the commencement of the Henkin-Looper Case along with the filing of the *lis pendens* constitute the commencement of actions "under the same or similar facts and circumstances to the Subject Lawsuits" and that Mr. Catanzarite is subject to the Second Preliminary Injunction Order pursuant to subsections (B) and (C) of Rule 65(d)(2), the Court finds that Mr. Catanzarite violated the Second Preliminary Injunction Order by filing the Henkin-Looper Case and the associated *lis pendens*.[14]

II.  Sanctions

Once a court determines that its order has been violated, the court has broad discretion to fashion an appropriate sanction. *See In re Fatsis*, 405 B.R. 1, 10 (B.A.P. 1st Cir. 2009) (sanctions are reviewed for abuse of discretion); *In re Kooyomjian*, No. 11-43408-CJP, 2018 WL 6920219, at *7 (Bankr. D. Mass. Dec. 31, 2018). "Sanctions in civil contempt proceedings may be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *In re McLean*, 794 F.3d 1313, 1323 (11th Cir. 2015) (citation omitted). Monetary sanctions assessed for the purpose of compensating for losses sustained are particularly appropriate in civil contempt proceedings. *In re*

---

[14] This is not the first time this Court has had to sanction Mr. Catanzarite. On April 4, 2019, this Court entered an *Order Granting Debtors' Motion for an Injunction Against False and Misleading Statements by Catanzarite Law Corporation and Sanctions for Violation of 11 U.S.C. §§1121 and 1125* (Case No. 18-23750-SMG, ECF No. 251).

EXHIBIT #36: 044
22-CV-01616-BAS-DDL

Complaint Supplement #30 2020-01-14599JB
Exhibit #5: 012

Back # Superior Court of California County of Orange
ADA Complaint Exhibits 280

Case 3:23-cv-00002-BAS-DDL Document 1-30 Filed 05/15/23 PageID.315 Page 42 of 215
Case 19-01291-SMG Doc 112 Filed 01/15/20 Page 13 of 15
Case 3:22-cv-01616-BAS-DDL Document 10-37 Filed 01/09/23 PageID.1495 Page 45 of 100

*Fatsis*, 405 B.R. at 10 (noting that "'make-whole relief' is a commonplace sanction for civil contempt"). Like any monetary sanction that is remedial in nature, "the amount of such a sanction must be established by competent evidence, and must bear a reasonable relationship to the actual losses sustained by the injured party." *Id.*; *see also, In re TLFO, LLC*, 571 B.R. 880, 886 (Bankr. S.D. Fla. 2017).

Here, the Court finds that compensatory sanctions are appropriate in order to compensate the Mikles Plaintiffs and Trustee Paiva[15] for any actual attorneys' fees and expenses incurred in connection with the filing of the Henkin-Looper Case, including the fees and expenses, if any, incurred in responding to the Henkin-Looper Complaint and filing and prosecuting this Motion to Enforce the Preliminary Injunction and for Sanctions.

## ORDER

Based on the foregoing, it is **ORDERED** that:

1.  The Motion to Enforce Preliminary Injunction and for Sanctions is **GRANTED** in part, with respect to the relief sought against Mr. Catanzarite.

2.  Pursuant to counsel's stipulation at the Hearing, the Motion to Enforce Preliminary Injunction and for Sanctions is denied with respect to the relief sought against Mr. Frankenthal.

---

[15] Although Trustee Paiva is not a party to this particular adversary proceeding, in light of the pending settlement motion in the main bankruptcy case and the intent of the injunctive relief in this adversary proceeding – to maintain the status quo pending the hearing to consider approval of that settlement – the Court finds it appropriate to compensate the bankruptcy estate, in addition to the Mikles Plaintiffs, for any attorneys' fees and expenses incurred in connection with this matter.

13

EXHIBIT #36: 045
22-CV-01616-BAS-DDL

Complaint Supplement #30: 202
Exhibit #5: 013

Bank # Superior Court of California County of Orange
ADA Complaint Exhibits 281

Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1486   Page 46 of
Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.318   Page 43 of 215
Case 19-01291-SMG   Doc 112-00   Filed 01/15/20   Page 14 of 15

3.      The filing of the Henkin-Looper Case and the associated *lis pendens* violated the Court's Second Preliminary Injunction Order.

4.      Any further prosecution of the Henkin-Looper Case by Mr. Catanzarite or by the Henkin-Looper Parties is enjoined by the Third Preliminary Injunction Order and by any order continuing the preliminary injunction issued by this Court.

5.      Within 7 days of the entry of this Order, Mr. Catanzarite is directed to file a copy of this Order in the Henkin-Looper Case.

6.      Within 7 days of the entry of this Order, Mr. Catanzarite is directed to cause the *lis pendens* to be removed from the San Diego County property records and to file a copy of this Order in the San Diego County property records.

7.      Mr. Catanzarite must file proof of compliance with paragraphs 5 and 6 above within 7 days of the entry of this Order.

8.      The Mikles Plaintiffs and Trustee Paiva are awarded compensatory sanctions, to be paid by Mr. Catanzarite, for attorneys' fees and expenses incurred in connection with responding to the Henkin-Looper Complaint and filing and prosecuting this Motion to Enforce the Preliminary Injunction and for Sanctions.

9.      Within 14 days of the entry of this Order, the Mikles Plaintiffs and Trustee Paiva must each file an affidavit, including redacted time records, as to the fees and expenses, if any, that they are seeking as compensatory sanctions.

10.     Any objections to the affidavits described in paragraph 9 must be filed within 7 days after the filing of the affidavits.

14

EXHIBIT #36: 046
22-CV-01616-BAS-DDL

Complaint Supplement #30 2020-01-14599B
Exhibit #5: 014

Book #30 Superior Court of California County of Orange
ADA Complaint Exhibits 282

Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1497   Page 47 of
Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.317   Page 44 of 215
Case 19-01291-SMG   Doc 112-00   Filed 01/15/20   Page 15 of 15

11.     Any further violations of this Court's Orders, the Bankruptcy Code,

Bankruptcy Rules, or the Local Rules will result in an order requiring Mr.

Catanzarite to show cause why his *pro hac vice* status should not be revoked.

### ###

Copies furnished to:

*Thomas M. Messana, Esq., who shall serve a copy of this Order on all interested parties, including Trustee Chad S. Paiva and his counsel, and file a certificate of service pursuant to the Bankruptcy Rules and this Court's Local Rules.*

15

EXHIBIT #36: 047
22-CV-01616-BAS-DDL

Complaint Supplement #30 2020-01 1145908
Exhibit #5: 015

Back # Superior Court of California County of Orange
ADA Complaint Exhibits 283

EXHIBIT 6



ORDERED in the Southern District of Florida on May 8, 2020.

Scott M. Grossman, Judge
United States Bankruptcy Court

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

In re:                                    Chapter 7

Daymark Realty Advisors, Inc., *et al.*,        Case No. 18-23750-SMG
                                          (substantively consolidated)
         Debtors.
_____/

### ORDER TO SHOW CAUSE
### WHY ATTORNEY KENNETH CATANZARITE, ESQ.'S
### *PRO HACE VICE* STATUS SHOULD NOT BE REVOKED

This matter came before the Court for a hearing on March 5, 2020 upon the

*Motion for Order to Show Cause as to Why Attorney Kenneth Catanzarite, Esq.'s Pro*

*Hac Vice Status Should Not Be Revoked* (the "Motion for Order to Show Cause")[1] filed

_____

[1] ECF No. 377. Several parties in interest joined in the Motion for Order to Show Cause and filed supporting declarations. *See Joinder* (ECF No. 378) (the "Northwood Joinder") filed by Northwood Investors, LLC; NW Congress Center Owner, LLC; NW Congress Center, LLC; Northwood Employees, LP; Northwood Real Estate Partners TE LP; and Northwood Real Estate Partners LP (collectively, the "Northwood Entities"); *Joinder* (ECF No. 381) filed by Sovereign Capital Management Group, Inc.; Sovereign Strategic Mortgage Fund, LLC; GCL, LLC ("GCL"); Infinity Urban Century, LLC; Todd Mikles; and Etienne Locoh (collectively, the "Sovereign Group"); *Notice of Filing Decl. of Todd A. Mikles filed in Support of the Joinder* (ECF No. 382) filed by the Sovereign Group; *Notice of Filing*

EXHIBIT #36: 048
22-CV-01616-BAS-DDL

Complaint Supplement #30: 2020-01413998
Exhibit #6: 001

Bank v. Superior Court of California County of Orange
ADA Complaint Exhibits 285

by Chapter 7 Trustee Chad S. Paiva (the "Trustee") and the *Opposition to Trustee's Motion for Order to Show Cause* (the "Response in Opposition")[2] filed by Attorney Kenneth J. Catanzarite.

Despite sufficient notice[3] and an opportunity to appear and be heard in person at a hearing as serious and consequential as this one, Mr. Catanzarite decided to appear by telephone at the March 5, 2020 hearing. His local counsel, Todd S. Frankenthal, Esq., however, did appear in person at the hearing. For the reasons set forth in detail below, the Court will grant the Motion for Order to Show Cause and give Mr. Catanzarite one last opportunity to show cause, in writing, why his *pro hac vice* privileges should not be revoked.

## I.    BACKGROUND.

Daymark Realty Advisors Inc., Daymark Residential Management Inc., and Daymark Properties Realty Inc. each filed voluntary chapter 11 bankruptcy petitions on November 4, 2018.[4] Shortly thereafter, Mr. Frankenthal filed a *Motion to Appear Pro Hac Vice*[5] on behalf of Mr. Catanzarite, seeking his admission *pro hac vice* in this bankruptcy case (the "Daymark Case") and related adversary proceedings, with Mr.

---

*Decl. of Adam T. Kent filed in Support of the Joinder* (ECF No. 383) (the "Kent Declaration") filed by the Sovereign Group; *Suppl. to Joinder* (ECF No. 415) filed by the Sovereign Group; and *Suppl. to the Northwood Joinder* (ECF No. 424) filed by the Northwood Entities.

[2] ECF No. 417. The Court has also considered the *Objection to Joinders by Northwood Entities and Sovereign Group* (ECF No. 418) (the "Objection to Joinders") and the *Declaration of Kenneth J. Catanzarite* (ECF No. 419) (the "Catanzarite Declaration") filed by Mr. Catanzarite.

[3] ECF No. 380.

[4] The cases were later substantively consolidated, and then – upon motion by the Objecting Creditors – the consolidated cases were converted to chapter 7 on April 2, 2019. *See Order Granting Mot. to Convert Case* (ECF No. 248).

[5] ECF No. 27.

2

EXHIBIT #36: 049
22-CV-01616-BAS-DDL

Complaint Supplement #36: 020
Exhibit #6: 002

Book # 30: 021 Superior Court of California County of Orange
ADA Complaint Exhibits 286

Case 3:22-cv-01616-BAS-DDL Document 40-27 Filed 04/09/23 PageID.2506 Page 48 of 215
Case 3:23-cv-00882-AGS-DDL Document 1-30 Filed 05/15/23 PageID.1506 Page 50 of
Case 18-23750-SMG Doc 477 Filed 05/08/20 Page 3 of 18

Frankenthal acting as his designated local counsel, on behalf of twenty-three clients listed in the motion.[6] In the notarized Affidavit of Proposed Visiting Attorney, signed by Mr. Catanzarite attached to the Motion to Appear Pro Hac Vice, Mr. Catanzarite made the following certifications:[7]

- "I certify that I have never been disbarred, that I am not currently suspended from the practice of law in the State of Florida or any other state, and that I am not currently suspended from the practice of law before any United States Court Of Appeals, United States District Court, or United States Bankruptcy Court."

---

[6] Since this case has progressed, Mr. Catanzarite and Mr. Frankenthal have referred to some or all of their clients at various times and in various capacities as "objecting creditors." For purposes of the pending Settlement Motion (see note 10, infra) that is the main dispute in the Daymark Case, clients of Mr. Catanzarite and Mr. Frankenthal have filed three objections (ECF Nos. 416, 421 and 423).

(a) in ECF No. 416, the following clients have objected: Richard Carlson as Beneficiary of G REIT Liquidating Trust, a terminated trust, on behalf of himself and all others similarly situated; NNN Congress Center, LLC and the Tenant In Common Owners of the Congress Center Property described in *Edward Henkin, et al. v. Todd A. Mikles et al.*, Superior Court of California, San Diego County, Case No. 37- 2019-00059873-CU-OR-CTL;

(b) in ECF No. 421, the following client objected: NNN Capital Fund I, LLC, a Delaware limited liability company derivatively and through its liquidating trustee Mary Jo Saul; and

(c) in ECF No. 423, the following clients have objected: 1600 Barberry Lane 8, LLC and 1600 Barberry Lane 9, LLC; Plantations at Haywood 1, LLC, Plantations at Haywood 2, LLC, Plantations at Haywood 13, LLC, and Plantations at Haywood 23, LLC; and Dennis Dierenfield, William B. Gilmer, NNN 1818 Market Street 13, LLC, a Delaware Limited Liability Company; and Mary Jo Saul as successor in interest to Tye Wynfield and all other [sic] similarly situated.

In the Response in Opposition, however, Mr. Catanzarite defined the "Objecting Creditors" as only the following six clients:

Richard Carlson; NNN Capital Fund I, LLC; NNN Congress Center, LLC; 1600 Barberry Lane 9, LC; Plantations at Haywood 1, LLC; and NNN 1818 Market Street 13, LLC.

But then in the Objection to Joinders, Mr. Catanzarite defined the Objecting Creditors as:

Richard Carlson as Beneficiary of GREIT Liquidating Trust and terminated trust on behalf of himself and all others similarly situated; Tyrone Wynfield derivatively on behalf of and as liquidating trustee for NNN Capital Fund I, LLC; Milton O. Brown as liquidating trustee for NNN Congress Center, LLC; Dennis Dierenfield, individually and in his capacity as trustee of the Dennis Dierenfield Living Trust; 350 Seventh Avenue Associates, L.P. and co-plaintiffs, Willowbrook Apartments, LLC and co-plaintiffs, Plantations at Haywood 1, LLC and co-plaintiffs, 1600 Barberry Lane 8, LLC and co-plaintiff, Dennis Dierenfield and co-plaintiffs.

While Mr. Catanzarite has filed several putative class actions in various venues, no class has been certified by any court to date.

[7] ECF No. 27, Ex. 1, ¶¶ 1, 3.

EXHIBIT #36: 050
22-CV-01616-BAS-DDL

Complaint Supplement #30: 2020-01-14999B
Exhibit #6: 003

Bank of America of California County of Orange
ADA Complaint Exhibits 287

Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 11/29/23   PageID.1501   Page 51 of
Case 3:23-cv-00882-AGS-DDL   Document 30-3   Filed 05/09/23   PageID.322   Page 49 of 215
Case 18-23750-SMG   Doc 477   Filed 05/08/20   Page 4 of 18

- "I certify that I am familiar with and shall be governed by the local rules of this court, the rules of professional conduct, and all other requirements governing the professional behavior of members of the Florida Bar."

The Court granted the Motion and admitted Mr. Catanzarite *pro hac vice* on December 7, 2018.[8]

On November 1, 2019, the Trustee filed a motion to approve settlement agreements with the Sovereign Group, the Cottonwood Entities,[9] and the Northwood Entities, which included a request for entry of bar orders (the "Settlement Motion").[10] Anticipating that the Settlement Motion would be contested, the Trustee also filed a motion to establish procedures for notice and service of the Settlement Motion and to set a final hearing on the Settlement Motion (the "Procedures Motion").[11] The Objecting Creditors objected to the Procedures Motion and, among other relief, sought to have the Court apply the class action procedures of Federal Rule of Civil Procedure 23 to litigation of this contested matter.

The Court conducted a preliminary hearing on the Procedures Motion on November 13, 2019, at which the Court declined the Objecting Creditors' request to apply class action procedures to a bankruptcy settlement approval motion. By Order entered on November 15, 2019,[12] the Court took the Procedures Motion under

---

[8] ECF No. 29.

[9] The Cottonwood Entities are Cottonwood Residential, O.P., LP; Cottonwood Capital Property Management II, LLC; Cottonwood Capital Management, Inc.; and Daniel Shaeffer.
[10] ECF No. 319.

[11] ECF No. 321.

[12] ECF No. 325.

4

EXHIBIT #36: 051
22-CV-01616-BAS-DDL

Complaint Supplement #30 2020-01-14 Group
Exhibit #6: 004

Bank Superior Court of California County of Orange
ADA Complaint Exhibits 288

advisement and directed the Trustee and the Objecting Creditors to meet and confer on the proposed notice procedures, a discovery plan for litigation of the Settlement Motion, and potential dates for an evidentiary hearing on the Settlement Motion in January or February of 2020.

The parties were unable to agree on proposed notice procedures, a discovery plan or dates for an evidentiary hearing, so the Court resolved those issues on its own. On December 10, 2019, the Court entered an order[13] approving notice procedures with respect to the Settlement Motion, and on December 11, 2019, the Court issued a scheduling order for litigation of the Settlement Motion (the "Scheduling Order").[14] In the Scheduling Order, the Court scheduled an evidentiary hearing for March 18-19, 2020, and set various deadlines for discovery and other pretrial matters leading up to that evidentiary hearing. The Court also implemented an expedited procedure to hear discovery disputes on shortened notice, in order to keep this contested matter moving along in a timely and efficient manner.[15]

## II.   MR. CATANZARITE'S MULTIPLE TRANSGRESSIONS.

Throughout the course of the Daymark Case and its related adversary proceedings,[16] Mr. Catanzarite has acted contrary to the norms of accepted practice

---

[13] ECF No. 344.

[14] ECF No. 347.

[15] Unfortunately, due to the COVID-19 pandemic, the Court had to cancel the March 18-19 evidentiary hearing (ECF No. 449). It has since been rescheduled for August 31-September 2, 2020 (ECF No. 472).

[16] In addition to their representation of the Objecting Creditors in the main bankruptcy case, Mr. Catanzarite and Mr. Frankenthal have filed seven related adversary proceedings as plaintiffs' counsel, and they represent the defendants in an eighth pending adversary proceeding (the Mikles Adversary Proceeding, see note 24, infra.).

5

EXHIBIT #36: 052
22-CV-01616-BAS-DDL

Complaint Supplement #30-2020-01145998    Superior Court of California County of Orange
Exhibit #6: 005                                         ADA Complaint Exhibits 289

in this District, has committed numerous transgressions, and has been sanctioned on multiple occasions, as detailed below.

    A.    <u>False Affidavit of Proposed Visiting Attorney</u>.

To begin, Mr. Catanzarite submitted a false certification of good standing in his Affidavit of Proposed Visiting Attorney. While he certified that he was not suspended from the practice of law in any state, it has been alleged – and Mr. Catanzarite has not disputed – that he was indeed suspended from practice by the state of New York[17] at the time he sought *pro hac vice* admission in this Court. His explanation – that his suspension was due to "failure to pay fees"[18] – does not render the certification in his affidavit any less false.

It is also clear from his subsequent conduct (as discussed in more detail below) that Mr. Catanzarite is *not* familiar with – and refuses to be governed by – "the local rules of this court, the rules of professional conduct, and all other requirements governing the professional behavior of members of the Florida Bar," as he certified in his affidavit.

    B.    <u>Sanctions for Unauthorized and Misleading Website</u>.

Then, about four months after he was granted the privilege of appearing in this Court, on April 5, 2019, the Court entered an *Order* sanctioning Mr. Catanzarite for creating a website (the "Catanzarite Website")[19] that contained misleading information related to the Daymark Case, improperly sought to solicit objections to

---

[17] Transcript of March 5, 2020 hearing (ECF No. 468) at 76:17-77:2; *see also* ECF No. 416 at 6.

[18] *Id.*

[19] The Court also ordered Mr. Catanzarite to take down the website— www.daymarkbankruptcy.com.

6

EXHIBIT #36: 053
22-CV-01616-BAS-DDL

Complaint Supplement #30 2020-01145908
Exhibit #6: 006

Bank #: Superior Court of California County of Orange
ADA Complaint Exhibits 290

confirmation of the debtors' chapter 11 plan, was confusingly similar to the official notice website in the Daymark Case, and otherwise sought to undermine the bankruptcy process.[20]

### C.   Numerous Discovery Violations and Sanctions.

Shortly after the Court took the Procedures Motion under advisement, Mr. Catanzarite filed a *Notice of Service of Special Interrogatories*[21] and a *First Set of Requests for Production of Documents to Chad S. Paiva, as Chapter 7 Trustee*[22] on the docket in violation of Local Rule 7026-1(C), which provides that discovery, including written interrogatories and requests for production of documents, "shall not be filed with the court, nor shall proof of service be filed, unless upon order of the court." On November 25, 2019, the Court entered an order striking these filings, stating that "[t]he Court did not order the parties to file discovery with the Court, and in fact *specially directed the parties not to do so* at the hearing conducted on November 13, 2019."[23] (emphasis added).

---

[20] ECF No. 251. The April 5, 2019 Order was entered by Judge Ray prior to his retirement.

[21] ECF No. 328. The Court further notes that "Special Interrogatories" are not a recognized form of discovery in Federal Court.

[22] ECF No. 336.

[23] ECF No. 339.

7

EXHIBIT #36: 054
22-CV-01616-BAS-DDL

Similarly, in the Mikles Adversary Proceeding,[24] Mr. Catanzarite filed thirteen *Notices of Deposition*[25] on the docket in violation of both Local Rule 7026-1(C) and Federal Rule of Civil Procedure 5(d)(1)(A), made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7005. The Court entered an *Order* striking these filings as well.[26]

The Court also sanctioned Mr. Catanzarite, pursuant to Federal Rule of Civil Procedure 26(g)(3), in connection with contested matter discovery related to the Settlement Motion, for issuing discovery to both the Cottonwood Entities and the Northwood Entities that grossly exceeded the permissible scope of discovery under Rule 26(b)(1).[27] In addition (and consistent with the Court's procedure for hearing and resolving discovery disputes in an expedited matter), the Court heard and resolved three other discovery disputes, each time ruling against Mr. Catanzarite and the Objecting Creditors.[28]

---

[24] *Mikles, et al. v. Carlson, et al.*, Adv. No. 19-1291-SMG (the "Mikles Adversary Proceeding"). In the Mikles Adversary Proceeding, plaintiffs Todd A. Mikles; Etienne Locoh; Sovereign Capital Management Group, Inc.; Sovereign Strategic Mortgage Fund, LLC; Infinity Urban Century, LLC; and GCL (collectively, the "Mikles Plaintiffs") are seeking injunctive relief against certain of the "Objecting Creditors," specifically Richard Carlson; Milton O. Brown; Tyrone Wynfield; Dennis Dierenfield; William B. Gilmer; NNN 1600 Barberry Lane 8, LLC; NNN 1600 Barberry Lane 9, LLC; NNN Plantations at Haywood 1, LLC; NNN Plantations at Haywood 2, LLC; NNN Plantations at Haywood 13, LLC; and NNN Plantations at Haywood 23, LLC.

[25] Mikles Adv. Pro. ECF Nos. 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, and 94.

[26] Mikles Adv. Pro. ECF No. 103.

[27] ECF No. 395. By Order entered on May 8, 2020, the Court liquidated those sanctions in the amount of $15,253.43 (ECF No. 476).

[28] ECF Nos. 363, 392, 393.

8

EXHIBIT #36: 055
22-CV-01616-BAS-DDL

Complaint Supplement #30-2020-01-145998
Exhibit #6: 008

Book # Superior Court of California County of Orange
ADA Complaint Exhibits 292

D.   <u>Unilaterally Noticing Depositions at an Inconsiderate and Inconvenient Time and Place.</u>

At a hearing on December 5, 2019, it was disclosed to the Court that Mr. Catanzarite had unilaterally noticed depositions of representatives of the Northwood Entities for the days immediately before and immediately after Christmas – December 24 and 26, 2019 – in New York.[29] The Court promptly admonished Mr. Catanzarite that it did not look kindly on these litigation tactics, which attorneys regularly practicing in this Court generally do not employ.[30]

The Trustee, the Northwood Entities, and the Sovereign Group, also allege that Mr. Catanzarite has since continued to engage in a "pattern of noncooperation, abuse of discovery rules, and violating both the actual rules of procedure and the norms of practicing in the Southern District of Florida," particularly with respect to noticing of depositions.[31] For example, it is alleged that on January 30, 2020, Mr. Catanzarite unilaterally noticed the deposition of Steven Kries to take place on February 20, 2020 in Aurora, Colorado.[32] Mr. Kries is former general counsel to the debtors and former counsel to the Sovereign Group. Despite this, Mr. Kent – counsel for the Sovereign Group in the Daymark Case and a related adversary proceeding – asserts that Mr. Catanzarite made no effort to meet and confer with him regarding

---

[29] Transcript of December 5, 2019 Hearing (ECF No. 399) at 21:8-12, 43:15-44:5.

[30] *Id.*

[31] *See* Mot. for Order to Show Cause, ¶¶ 16-30.

[32] *See* Kent Decl., ¶ 6.

9

EXHIBIT #36: 056
22-CV-01616-BAS-DDL

Complaint Supplement #30-2020-01145998
Exhibit #6: 009

Bank # Superior Court of California County of Orange
ADA Complaint Exhibits 293

noticing Mr. Kries' deposition so that Mr. Kent "could attend and assert the appropriate privilege objection[s] on behalf of the Sovereign Group[.]"[33]

     Additionally, according to the Northwood Entities, Mr. Catanzarite served subpoenas duces tecum under Federal Rule of Civil Procedure 45 on each of the six non-party Northwood Entities. Each subpoena included 54 separate requests for production of documents.[34] The Northwood Entities timely served detailed written objections and responses to each request and agreed to produce certain responsive documents upon the entry of a protective order.[35] Despite this, the Northwood Entities allege that Mr. Catanzarite failed to meet and confer with respect to their objections and responses to the subpoenas and failed to obtain or even propose a protective order.[36] Instead, on December 31, 2019, Mr. Catanzarite served each of the Northwood Entities with 17 interrogatories and 55 document requests under Rules 33 and 34 of the Federal Rules of Civil Procedure "as if they were parties to these bankruptcy proceedings."[37] According to the Northwood Entities, these document requests were nearly identical to the Rule 45 subpoenas Mr. Catanzarite previously served on the Northwood Entities.[38] Mr. Catanzarite then filed an "emergency" motion to deem the Northwood Entities, among others, as "parties" to the contested

---

[33] *Id.*

[34] Northwood Joinder at 1.

[35] *Id.* at 2.

[36] *Id.* at 3.

[37] *Id.*

[38] *Id.* The only additional request was for all documents identified in the "special interrogatories," which he concurrently served on the Northwood Entities.

EXHIBIT #36: 057
22-CV-01616-BAS-DDL

Complaint Supplement #30-2020-01145998
Exhibit #6: 010

Bank of Superior Court of California County of Orange
ADA Complaint Exhibits 294

matter created by the Settlement Motion.[39] The Court denied the motion[40] after conducting a hearing on an expedited basis, and cautioned all parties that discovery must be proportionately and narrowly tailed to the Settlement Motion. Mr. Catanzarite then served yet another set of Rule 45 subpoenas on the Northwood Entities requesting the same documents he sought in the previous two requests, despite – according to the Northwood Entities – already having received objections and responses to these subpoenas upon which he failed to follow up.[41]

E.   Violation of Preliminary Injunction.

On November 19, 2019, the Mikles Plaintiffs filed a *Motion to Enforce the Preliminary Injunction and for Sanctions* (the "Motion to Enforce Injunction")[42] in the Mikles Adversary Proceeding. The Mikles Plaintiffs asserted that Mr. Catanzarite violated the preliminary injunction issued in that adversary proceeding[43] by initiating a new state court lawsuit on behalf of certain clients against Mr. Mikles and GCL[44] based on the same facts and circumstances as the enjoined lawsuits, and by filing a *lis pendens* against property owned by GCL. After conducting a hearing on

---

[39] ECF No. 352.

[40] ECF No. 363.

[41] Northwood Joinder at 3-4.

[42] Mikles Adv. Pro., ECF No. 95.

[43] Judge Ray entered the first preliminary injunction on August 27, 2019, in which he temporarily enjoined prosecution of several pending lawsuits and arbitrations, and the commencement of any further actions under the same or similar facts or circumstances. (Mikles Adv. Pro., ECF No. 18). The Court subsequently extended the preliminary injunction three separate times on October 23, 2019, November 18, 2019, and March 2, 2020, pending a final hearing on approval of the Settlement Motion. (Mikles Adv. Pro., ECF Nos. 61, 92, 152).

[44] Mr. Mikles and GCL are two of the Mikles Plaintiffs in the Mikles Adversary Proceeding.

11

EXHIBIT #36: 058
22-CV-01616-BAS-DDL

Complaint Supplement #30-2020-01145998
Exhibit #6: 011

Back to Superior Court of California County of Orange
ADA Complaint Exhibits 295

the Motion to Enforce Injunction on December 5, 2019,[45] the Court entered an *Order*

finding that Mr. Catanzarite violated the Court's preliminary injunction, sanctioning

him for doing so,[46] and cautioning that "[a]ny further violations of this Court's Orders,

the Bankruptcy Code, Bankruptcy Rules, or the Local Rules will result in an order

requiring Mr. Catanzarite to show cause why his *pro hac vice* status should not be

revoked."[47]

F.    Underline Underline False Emergency.

Most recently, on the afternoon of April 7, 2020, Mr. Catanzarite filed an

emergency *Motion to Modify Temporary Restraining Order and Preliminary

Injunction*[48] in the Mikles Adversary Proceeding, seeking a hearing on or before April

9, 2020.[49] Not only was this motion completely meritless as the Court had made its

---

[45] Mr. Catanzarite did not appear in person at this hearing, instead opting to participate by telephone.

[46] The Court has since liquidated those sanctions in the total amount of $60,659.75 (Mikles Adv. Pro., ECF No. 182), after Mr. Catanzarite failed to timely object to the affidavits of attorneys' fees and costs filed by the Mikles Plaintiffs and the Trustee. In yet another example of Mr. Catanzarite's complete disregard of our Local Rules, after his deadline to object had passed, Mr. Catanzarite tried to file a tardy objection attached to a Notice of Late Filing of Paper Pursuant to Local Rule 5005-1(F)(2). (Mikles Adv. Pro., ECF No. 146.) As noted by the Court at a hearing in this matter on March 5, 2020, however, Local Rule 5005-1(F)(2) governs submission of papers in matters *already* set for hearing and has absolutely no applicability to a deadline to file an objection set by a court order. Accordingly, the Court did not consider his tardy objection in liquidating this sanctions award.

[47] Mikles Adv. Pro., ECF No. 112, at 15. Mr. Catanzarite appealed that Order (Mikles Adv. Pro., ECF No. 116), but that appeal was dismissed because he failed to timely file a designation of record or statement of issues (Mikles Adv. Pro., ECF No. 130). Mr. Catanzarite then moved to vacate that dismissal because he – once again in violation of applicable rules – filed his designation and statement in the wrong court (the District Court) (Mikles Adv. Pro., ECF No. 139). After considering the excusable neglect standard set forth in *Pioneer Inv. Servs. v. Brunswick Assocs.*, 507 U.S. 380 (1993), as applied by the Eleventh Circuit in *Chege v. Georgia Department of Juvenile Justice*, 787 F. App'x 595, 598–99 (11th Cir. 2019), the Court granted the motion to vacate based primarily on the absence of prejudice to the nonmoving party. That appeal is now pending before the District Court.

[48] Mikles Adv. Pro., ECF No. 173.

[49] At the April 9, 2020 hearing, the Court noted that there was no reason for Mr. Catanzarite to have waited until the last minute to file this emergency motion, when the auction at issue — scheduled to take place from April 7 through 9, 2020 — was undoubtedly set sometime before April 7, 2020.

12

EXHIBIT #36: 059
22-CV-01616-BAS-DDL

Complaint Supplement #30-2020-01145998   Bank of County of Orange
Exhibit #6: 012                              Superior Court of California
                                             ADA Complaint Exhibits 296

position on the matter abundantly clear in earlier rulings,[50] but it was filed without the Local Rule 9075-1(B) certification[51] on an expedited basis in the midst of the global COVID-19 pandemic – in which court operations throughout the country have been disrupted – and during the week of both Passover and Easter. After conducting a telephonic hearing on April 9, 2020, the Court denied the emergency motion.[52]

## III.   GOVERNING LAW.

"The ability to appear pro hac vice is a privilege, not a right, and may be revoked by the Court upon a finding of misconduct."[53] Where an attorney has already been admitted to appear *pro hac vice*, the standards governing revocation of that privilege differ, depending on the circumstances.[54] For conduct that threatens disruption of the court proceedings or is a deliberate challenge to the Court's authority, the Court is given great deference to disqualify the recalcitrant attorney.[55] "If, however, the conduct at issue does not threaten the orderly administration of justice but is allegedly unethical," the Court must rest its "disqualification decisions on the violation of specific Rules of Professional Conduct, not on some 'transcendental

---

[50] The Court also noted at the April 9, 2020 hearing that it had twice before considered and dismissed the argument Mr. Catanzarite raised in his Emergency Motion to Modify Injunction.

[51] Local Rule 9075-1(B) requires "a certification that the proponent has made a bona fide effort to resolve the matter without hearing."

[52] Mikles Adv. Pro., ECF No. 180.

[53] *Blitz Telecom Consulting, LLC v. Peerless Network, Inc.*, Case No. 6:14-cv-307-Orl-40GJK, 2016 WL 6125585, at *2 (M.D. Fla. Oct. 20, 2016); *cf. Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) ("[A] federal court has the power to control admission to its bar and to discipline attorneys who appear before it.").

[54] *Schlumberger Techs., Inc. v. Wiley*, 113 F.3d 1553, 1561 (11th Cir. 1997).

[55] *Id.*

13

EXHIBIT #36: 060
22-CV-01616-BAS-DDL

Complaint Supplement #30-2020-01145998
Exhibit #6: 013

Bank v. Superior Court of California, County of Orange
ADA Complaint Exhibits 297

Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1511   Page 61 of
Case 18-23750-SMG   Doc 473-00   Filed 05/03/20   Page 14 of 18
Case 3:23-cv-00882-ACS-DSL   Document 1-730   Filed 05/03/23   PageID.132   Page 59 of 215

code of conduct . . . that . . . exist[s] only in the subjective opinion of the court.'"[56] Except in certain circumstances not present here, an attorney's *pro hac vice* privileges may not be revoked "without notice of the charge against him or an opportunity to explain."[57]

The Florida Rules of Professional Conduct provide that a lawyer must not "knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists."[58] It is also improper for an attorney to, "in pretrial procedure, make a frivolous discovery request."[59] The Florida Bar Guidelines for Professional Conduct further provide that "[a]ttorneys must, except in extraordinary circumstances, communicate with opposing counsel before scheduling depositions . . . to schedule them at times that are mutually convenient for all interested persons."[60] The Guidelines go on to state that "[w]hen scheduling depositions, reasonable consideration should be given to accommodating schedules of opposing counsel and deponents, when it is possible to do so without prejudicing the client's rights."[61]

---

[56] *Id.* (quoting *In re Finkelstein*, 901 F.2d 1560, 1565 (11th Cir. 1990)).

[57] *Kirkland v. Nat'l Mortg. Network, Inc.*, 884 F.2d 1367, 1371 (11th Cir. 1989) (quoting *Kleiner v. First Nat'l Bank*, 751 F.2d 1193, 1211 (11th Cir. 1985)).

[58] FL ST BAR Rule 4-3.4(c).

[59] FL ST BAR Rule 4-3.4(d).

[60] Florida Bar Guidelines for Professional Conduct, Section B(1).

[61] *Id.*, Section F(2).

14

EXHIBIT #36: 061
22-CV-01616-BAS-DDL

Complaint Supplement #30  2020-01 145998 County of Orange
Exhibit #6: 014   Superior Court of California
ADA Complaint Exhibits 298

Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1512   Page 62 of
Case 3:23-cv-00882-AGS-DDL   Document 1-300   Filed 05/15/23   PageID.333   Page 60 of 215
Case 8:23-50-SMG   Doc 477   Filed 05/08/20   Page 16 of 18

## IV.   ANALYSIS.

As this Court has previously found, Mr. Catanzarite deliberately violated this Court's preliminary injunction entered in the Mikles Adversary Proceeding. The Court sanctioned Mr. Catanzarite for this misconduct and warned him that further transgressions would result in an order to show cause why his *pro hac vice* status should not be revoked. He clearly did not heed the message and continues to deliberately challenge this Court's authority. After being admonished orally and in writing, and being sanctioned several times, Mr. Catanzarite continues to disobey local rules, federal rules, and court orders warning him that further misconduct will bring about the consequences now before the Court. Accordingly, his repeated violation of this Court's local rules and orders constitute deliberate challenges to this Court's authority, warranting revocation of his *pro hac vice* privileges.

Moreover, Mr. Catanzarite's violation of the preliminary injunction was also a violation of FL ST BAR Rule 4-3.4(c), and his numerous discovery transgressions – all of which resulted in rulings against him and his clients – violated FL ST BAR Rule 4-3.4(d). Additionally, his noticing of depositions – particularly the Northwood Entities' depositions that he unilaterally noticed for December 24 and 26 in New York – violated Florida Bar Guidelines for Professional Conduct, Sections B(1) and F(2).

## V.   CONCLUSION.

Mr. Catanzarite has abused his privilege to appear *pro hac vice* in this Court. This Court expects the attorneys who practice and appear before it to be civil, courteous, and cooperative. All attorneys licensed to practice law in Florida are required to swear an oath to "maintain the respect due to courts of justice and judicial

15

EXHIBIT #36: 062
22-CV-01616-BAS-DDL

Complaint Supplement #30-20-2040-0143-0000 Superior Court of California County of Orange
ADA Complaint Exhibits 299
Exhibit #6: 015

Case 3:22-cv-01616-BAS-DDL  Document 10-37  Filed 01/09/23  PageID.1513  Page 63 of
Case 3:23-cv-00888-AGS-DDL  Document 1-300  Filed 05/15/23  PageID.334  Page 61 of 215
Case 18-23750-SMC  Doc 4770  Filed 05/08/20  Page 16 of 18

officers," and "to opposing parties and their counsel, [to] pledge fairness, integrity, and civility, not only in court, but also in all written and oral communications."[62] As a visiting attorney granted the privilege to practice in this Court, Mr. Catanzarite was expected to abide by these principles. His actions in the Daymark Case, however, have been inconsistent with these principles.[63] An attorney whose *pro hac vice* application was false when filed, who has thrice been sanctioned, who has repeatedly ignored our Local Rules, and who has continually failed to grasp the concept that discovery is a tool, not a weapon[64] will forfeit the privilege of appearing in this Court.

If – after giving Mr. Catanzarite a final opportunity to respond to the charges against him – the Court decides to immediately revoke his *pro hac vice* privileges, the Court still intends to proceed with the August 31-September 2, 2020 evidentiary hearing on the Settlement Motion.[65] Mr. Frankenthal, as Local Counsel to the Objecting Creditors, is certainly capable of trying this matter without Mr. Catanzarite, as he has been involved in the case from the outset. Thus, the revocation

---

[62] The Oath of Admission to the Florida Bar was amended September 12, 2011 to add this civility pledge.

[63] Mr. Catanzarite's behavior has also been inconsistent with Rule 1001 of the Federal Rules of Bankruptcy Procedure, which provides that the Rules should be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every case and proceeding." Mr. Catanzarite's tactics and behavior during this case have been contrary to this mandate.

[64] Discovery must also be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

[65] Public health and safety conditions permitting, of course.

16

EXHIBIT #36: 063
22-CV-01616-BAS-DDL

Complaint Supplement #30-2020-01145908
Exhibit #6: 016

Bankruptcy Court of California County of Orange
ADA Complaint Exhibits 300

Case 3:22-cv-01616-BAS-DDL   Document 10-37   Filed 01/09/23   PageID.1514   Page 64 of
Case 3:23-cv-00882-AGS-DDL   Document 17-00   Filed 05/15/23   PageID.235   Page 62 of 215
Case 8:20-50-SMC   Doc 477   Filed 05/08/20   Page 17 of 18

of Mr. Catanzarite's *pro hac vice* privileges will not serve as a basis for any continuance of the hearing.

Accordingly, upon consideration of the Motion for Order to Show Cause, the Response in Opposition, the Joinders, the Objection to Joinders, the Catanzarite Declaration, the Kent Declaration, the arguments made at the March 5, 2020 hearing, and the record in the Daymark Case and its related adversary proceedings, it is

**ORDERED** that:

1.      The Trustee's Motion for Order to Show Cause is **GRANTED**.

2.      Attorney Kenneth J. Catanzarite is directed to show cause why his *pro hac vice* privileges should not immediately be revoked.

3.      Mr. Catanzarite must file a written response to this Order to Show Cause **on or before May 29, 2020**. His response must include any legal citations, citations to the record, and affidavits or declarations Mr. Catanzarite would like the Court to consider in deciding whether to revoke his *pro hac vice* privileges.[66]

4.      Failure to file a written response on or before May 29, 2020, will result in the immediate revocation of Mr. Catanzarite's *pro hac vice* privileges without further notice or hearing.

---

[66] In light of the extensive briefing on the Motion for Order to Show Cause and all related filings, including Mr. Catanzarite's Response in Opposition, Objection to Joinders and his Declaration, and the extensive arguments at the March 5, 2020 hearing (which Mr. Catanzarite elected to attend by telephone), and the final opportunity afforded to Mr. Catanzarite by this Order to file another written response, affidavit or declaration, the Court finds that a further hearing on this matter is unnecessary and intends to rule on the papers. Mr. Catanzarite has had more than ample notice of the charges against him and multiple opportunities to respond and appear in person before the Court.

17

**EXHIBIT #36: 064**
**22-CV-01616-BAS-DDL**

Complaint Supplement #30: 2020-01-145999
Exhibit #6: 017

Superior Court of California County of Orange
ADA Complaint Exhibits 301

5.      Any interested party wishing to reply to Mr. Catanzarite's response must file a reply **on or before June 12, 2020**. Any reply must likewise include any legal citations, citations to the record, and affidavits or declarations the party would like the Court to consider.

<div align="center">###</div>

Copies furnished to:

*Barry P. Gruher, Esq., who must serve a copy of this Order on all interested parties and file a certificate of service thereof.*

18

EXHIBIT #36: 065
22-CV-01616-BAS-DDL

Complaint Supplement #30-2020-01145995
Exhibit #6: 018

Book #: Superior Court of California County of Orange
ADA Complaint Exhibits 302

EXHIBIT 7

No. 21-12766
United States Court of Appeals, Eleventh Circuit

# Catanzarite v. GCL, LLC (In re Daymark Realty Advisors, Inc.)

Decided Mar 9, 2022

21-12766

03-09-2022

In re: DAYMARK REALTY ADVISORS, INC., DAYMARK PROPERTIES REALTY, INC., DAYMARK RESIDENTIAL MANAGEMENT, INC., Debtors. v. GCL, LLC, INFINITY URBANCENTURY, LLC, ETIENNE LOCOH, TODD A. MIKLES, SOVEREIGN CAPITAL MANAGEMENT GROUP, LLC, et al., Defendants-Appellees.   KENNETH J. CATANZARITE, Plaintiff-Appellant,

PER CURIAM.

2    DO NOT PUBLISH *2

Appeal from the United States District Court for the Southern District of Florida D.C. Docket No. 0:20-cv-61032-RS

Before William Pryor, Chief Judge, Luck, and Lagoa, Circuit Judges.

PER CURIAM.

Kenneth Catanzarite appeals the denial of relief from a judgment of the bankruptcy court. The district court affirmed the award of sanctions against Catanzarite for violating a preliminary injunction that barred "the commencement of any further actions under the same or similar facts or circumstances to" lawsuits he had filed against bankruptcy creditors. The district court also ruled that Catanzarite forfeited his opportunity to object to the amount of sanctions imposed. We affirm.

In 2018, Daymark Realty Advisors, Incorporated, Daymark Properties Realty, Incorporated, and Daymark Residential Management, Incorporated, filed separate petitions for bankruptcy *3 under Chapter 11 of the Bankruptcy Code, which the bankruptcy court consolidated. Catanzarite, an attorney licensed in California and admitted to appear *pro hac vice* in the bankruptcy court, filed adversary complaints against the Daymark companies for Richard Carlson and eleven other plaintiffs (the Carlson plaintiffs) and for Katherine Looper and six other plaintiffs. Those plaintiffs complained of breach of fiduciary duties and other wrongdoing in handling their investments in several properties, including their interests as tenants-in-common in the Congress Center, an office tower in Chicago, Illinois. Later, Catanzarite moved successfully to convert the bankruptcy petition to an action under Chapter 7 of the Bankruptcy Code.

3

Catanzarite also sued Daymark creditors, including Todd Mikles, Etienne Locoh, GCL, LLC, and other entities related to the Daymark companies (the Mikles creditors). Catanzarite filed nine putative class action complaints for the Carlson plaintiffs in California and Utah courts against various combinations of the Mikles creditors. The complaints alleged that the creditors were alter egos of and shared common control of and culpability for the Daymark companies' mishandling of investments in the Congress Center and other properties.

caextext

The Mikles creditors entered an agreement to settle their claims with the bankruptcy trustee, Chad Paiva, and obtained an injunction that stayed the nine lawsuits. *See* 11 U.S.C. § 105(a); Fed.R.Bankr.P. 7001(7). After a hearing attended by Catanzarite, the creditors, and the Trustee on August 27, 2019, the bankruptcy *4 court issued an order that "enjoin[ed] continuation of the [nine] Subject Lawsuits or the commencement of any further actions under [the] same or similar facts or circumstances to the Subject Lawsuits" for 60 days. On the Mikles creditors' motion, and after a second hearing, the bankruptcy court issued a second preliminary injunction that extended the stay to December 11, 2019.

On November 7, 2019, Catanzarite, as counsel for Katherine Looper and nine other plaintiffs (the Looper plaintiffs), filed in a California court a complaint alleging that Mikles and GCL assisted the Daymark companies to defraud investors in connection with the Congress Center and another property. Catanzarite also filed a notice of lis pendens on GCL property.

The Mikles creditors moved to enforce the injunction and to impose sanctions. The bankruptcy court held a hearing on the motion attended by the creditors, Catanzarite, and the Trustee. The Trustee testified about Catanzarite's actions, the effect on the stay, and maintaining control of the property of the estate.

The bankruptcy court granted the motion and sanctioned Catanzarite. The bankruptcy court ruled that Catanzarite, as counsel for and in active concert with the Carlson plaintiffs, *see* Fed. R. Civ. P. 65(d)(2)(B), violated the injunction by filing a civil action and lis pendens for the Looper plaintiffs "based upon TIC ownership interests in the Congress Center," which was the same subject "matter[] explicitly enjoined by the Second Preliminary Injunction Order." And the bankruptcy court stated that it earlier had sanctioned Catanzarite for creating a website

containing false and *5 misleading statements about the Daymark bankruptcy. The bankruptcy court stayed the Looper action and ordered Catanzarite to reimburse the Mikles creditors and "Trustee Paiva for any actual attorneys' fees and expenses incurred in connection with" the Looper action. Although the Trustee was not a party to the motion, the bankruptcy court found "it appropriate to compensate the bankruptcy estate . . . in light of the pending settlement motion in the main bankruptcy case and the intent of the injunctive relief in this adversary proceeding-to maintain the status quo pending the hearing to consider approval of that settlement . . . ."

As directed by the bankruptcy court, the Mikles creditors and the Trustee timely filed affidavits for and redacted time records of the fees and expenses they sought as compensatory sanctions. On January 29, 2020, the Mikles creditors requested $49,020.50 in attorneys' fees, and on February 5, 2020, the Trustee requested $13,333 for similar expenses. On February 25, 2020, almost three weeks after the expiration of the seven-day deadline imposed by the bankruptcy court, Catanzarite objected to the affidavits.

The bankruptcy court denied Catanzarite's objection to the affidavits as untimely. The bankruptcy court found that Catanzarite "failed to timely object to either affidavit" or "to timely move for an extension of time to object" and that his notice of late filing "offered a variety of excuses for missing the deadline, none of which [rose] to the level of excusable neglect." The bankruptcy court awarded the full amount of attorneys' fees that the Mikles creditors requested as "incurred in connection with responding to *6 the [Looper action] and prosecuting the [motion to enforce], and . . . not excessive." As to the Trustee, the bankruptcy court found that "certain time entries include time for both main case issues as well as the pertinent issues in this adversary proceeding" and, being "unable to determine which portion of [specific] entries [were]

casetext

Complaint Supplement #30-2020-01143565 Superior Court of California County of Orange
Exhibit #7: 002
ADA Complaint Exhibits 305

2

attributable to the [Looper action] and the [motion to enforce], . . . [it] exercise[d] its discretion and award[ed] only 50% of the fees billed" on four days in December 2019. The bankruptcy court awarded the Trustee $11,639.25 in attorneys' fees.

The district court affirmed the imposition of sanctions and the fee awards. The district court ruled that, "under the plain language of Rule 65(d) (2)(B), [Catanzarite], as the attorney for the enjoined Carlson [plaintiffs], was bound by the Preliminary Injunction" and violated it by filing an action "based on similar ownership interests and the same or similar facts or circumstances." The district court rejected Catanzarite's argument that he could engage in prohibited conduct for another client. The district court ruled that Catanzarite's "failure to object to the fee affidavit[s] and his conclusory and vague challenges to the reasonableness of the fees . . . [were] fatal to his argument" challenging the accuracy and veracity of the affidavits. The district court also ruled that the bankruptcy court did not abuse its discretion in determining the fee awards after carefully reviewing the affidavits and time records that the Mikles creditors and the Trustee submitted. The district court rejected as refuted by the record Catanzarite's argument that awarding sanctions to the Trustee violated his right to due process. *7

*7 "[A]s [the] second court of review," we "examine[] independently the factual and legal determinations of the bankruptcy court and employ[] the same standard of review as the district court." *In re Ocean Warrior, Inc.*, 835 F.3d 1310, 1315 (11th Cir. 2016) (quoting *In re Fisher Island Invs., Inc.*, 778 F.3d 1172, 1189 (11th Cir. 2015)). We review the imposition of sanctions for abuse of discretion and related findings of fact for clear error. *Id.* Under the abuse-of-discretion standard, we must affirm "unless the [bankruptcy] court made a clear error of judgment, or has applied the wrong legal standard." *Id.* (internal quotation marks omitted). So the bankruptcy court enjoys a "a range of choice within which we will

not reverse . . . even if we might have reached a different decision." *Schiavo ex. rel. Schindler v. Schiavo*, 403 F.3d 1223, 1226 (11th Cir. 2005).

The bankruptcy court did not err in determining that Catanzarite was bound by the injunction. Federal Rule of Civil Procedure 65 binds three categories of persons to comply with an injunction: "the parties; the parties' . . . attorneys; and other persons who are in active concert or participation" with persons in the first two categories. Fed.R.Civ.P. 65(d)(2)(B). The Rule binds an attorney to an injunction to the same extent as a party. So, as the bankruptcy court explained, Catanzarite could not "engag[e] in conduct in which [the parties, ] the Carlson [plaintiffs, ] themselves could not engage."

Catanzarite misinterprets Rule 65(d)(2)(B) as prohibiting attorneys only "from engaging in enjoined conduct *on behalf of an* *8 *enjoined party*." "We are not at liberty to add terms or posit an interpretation that differs from the explicit language of" a federal rule of procedure. *United States v. Orozco*, 160 F.3d 1309, 1316 (11th Cir. 1998). Rule 65(d)(2)(B) plainly bars a party's attorney from engaging in enjoined conduct regardless of his client's situation. Because Catanzarite was bound to obey the injunction, we need not address his argument that the bankruptcy court erred by ruling, in the alternative, that he was bound to the injunction by acting in concert with his clients under Rule 65(d)(2)(C).

Catanzarite violated the injunction. The injunction expressly prohibited "the commencement of any further actions under same or similar facts or circumstances to the Subject Lawsuits." Two of the subject lawsuits involved Mikles creditors mishandling investors' tenancy-in-common interests in the Congress Center. In the complaint and lis pendens, Catanzarite repeated many of the facts and legal arguments made in the subject lawsuits.

casetext

Complaint Supplement #30-2020-01145998
Exhibit #7: 003
Back #: Superior Court of California County of Orange
ADA Complaint Exhibits 306

The bankruptcy court did not abuse its discretion. "Congress has empowered bankruptcy courts broadly to issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code, 11 U.S.C. § 105(a), including sanctions to enforce . . . [an] injunction." *In re McLean*, 794 F.3d 1313, 1319 (11th Cir. 2015). The bankruptcy court sanctioned Catanzarite for the permissible purpose of compensating the Trustee and the Mikles creditors for losses caused by Catanzarite's noncompliance. *See Local 28, Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 443 (1986). The Trustee was

9   entitled to compensation *9 even though he did not move to enforce the injunction or join the Mikles creditors' motion. The Trustee was a party in the bankruptcy case in which the injunction issued for the purpose of maintaining the status quo pending the resolution of a proposed settlement between the estate and the Mikles creditors. *See E.E.O.C. v. Guardian Pools, Inc.*, 828 F.2d 1507, 1514-15 (11th Cir. 1987). Catanzarite's violation of the injunction interrupted the progress of the bankruptcy case and required the Trustee and the Mikles creditors to incur expenses related to the Looper action and to the enforcement of the injunction.

Catanzarite argues that he was denied due process with respect to the award to the Trustee, but he was "given fair notice that his conduct may warrant sanctions and the reasons why" as well as "an opportunity to respond . . . and to justify his actions," *In re Mroz*, 65 F.3d 1567, 1575-76 (11th Cir. 1995). The motion to enforce outlined Catanzarite's willful disobedience of the injunction. During the hearing on the motion, the Trustee testified about the effect that Catanzarite's

noncompliance had on the bankruptcy proceedings, and Catanzarite presented a defense. As the district court stated, Catanzarite "was on notice that the bankruptcy court was . . . considering whether and how [his] actions may have affected the Trustee and the estate and whether that should give rise to sanctions." And the bankruptcy court afforded Catanzarite the opportunity to object to the Trustee's affidavit and time records, but Catanzarite delayed filing a response. This process was sufficient to satisfy

10  due process. *10

The bankruptcy court also did not abuse its discretion in determining the fee awards. The bankruptcy court ensured that its awards were "calibrated to the damages caused by" Catanzarite's noncompliance by limiting the award to "cover[ing] the legal bills that the litigation abuse occasioned." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S.Ct. 1178, 1186 (2017) (internal quotation marks omitted and alterations adopted). The bankruptcy court "carefully reviewed the Affidavits and time records" the Trustee and the Mikles creditors submitted and found that the fees were "incurred in connection with responding to the [Looper action] and in prosecuting" the motion to enforce the injunction. The bankruptcy court noticed an inadvertent duplication of fees by the Trustee and adjusted the amount requested to account for the error. Catanzarite contests the amounts of the awards, but he forfeited the opportunity to challenge those amounts by failing timely to object to the affidavits, *see Green v. Graham*, 906 F.3d 955, 963 (11th Cir. 2018).

We **AFFIRM** the sanctions against Catanzarite.

casetext

Book # Superior Court of California County of Orange
ADA Complaint Exhibits 307

4

Complaint Supplement #30-2020-01149905
Exhibit #7: 005

Back # Superior Court of California County of Orange
ADA Complaint Exhibits 308

EXHIBIT 8

# The State Bar
# of California

**OFFICE OF CHIEF TRIAL COUNSEL**

845 S. Figueroa Street, Los Angeles, CA 90017     213-765-1000     ctc.cpra@calbar.ca.gov

*Via e-mail only* - justintimesd@gmail.com

June 14, 2022

Justin S. Beck

RE:     Request for State Bar Records

Dear Mr. Beck:

This letter is an additional response to your Public Records Act request dated May 7, 2022, addressed to Assistant General Counsel Carissa Andresen and received by the State Bar of California on May 12, 2022.  You requested the following:

- Per BPC 6086.10: (c) Notwithstanding the confidentiality of investigations, the State Bar shall disclose to any member of the public so inquiring, any information reasonably available to it pursuant to subdivision (o) of Section 6068, and to Sections 6086.7, 6086.8, and 6101, concerning a licensee of the State Bar that is otherwise a matter of public record, including civil or criminal filings and dispositions."

    Please send me "any information [from State Bar, from courts in any jurisdiction, from State Bar licensees on mandatory reporting, from insurers on mandatory reporting] reasonably available to [public entity State Bar and its public employees] pursuant to subdivision (o) of Section 6068, and to Sections 6086.7, 6086.8, and 6101, concerning a licensee of the State Bar [see below] that is otherwise a matter of public record, including all judgments, orders, civil or criminal filings and dispositions related to the following:

    1) Kenneth Joseph Catanzarite

Please be advised that State Bar disciplinary complaints and investigatory records are confidential and not subject to disclosure.  (Gov. Code, § 6254 subd. (f) [Investigatory files

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 S. Figueroa Street
Los Angeles, CA 90017

Complaint Supplement #30-2020-01145908 County of Orange
ADA Complaint Exhibits 310
Exhibit #8: 001

Beck v. Superior Court of California County of Orange

Exhibit #35: 002
22-CV-01616-BAS-DDL

Justin S. Beck
June 14, 2022
Page 2

compiled by a state agency for licensing purposes are not subject to disclosure under the California Public Records Act]; Bus. & Prof. Code, § 6086.1 subd. (b) ["[D]isciplinary investigations ... shall not be disclosed pursuant to any state law, including, but not limited to, the California Public Records Act."].)

Without waiving said exemptions, please see the enclosed records.

    7) Drexel Bradshaw

State Bar disciplinary complaints and investigatory records are confidential and not subject to disclosure.  (Gov. Code, § 6254 subd. (f); Bus. & Prof. Code, § 6086.1 subd. (b).)

Without waiving said exemptions, the State Bar has conducted a diligent search of its records and has located no documents responsive to your request.  The State Bar reserves the right to determine whether the requested records are exempt from disclosure pursuant to the California Public Records Act should we later locate responsive documents.

If you wish to discuss this matter further, I can be reached at the telephone number above.

Best regards,

Alex Hackert
Senior Trial Counsel

# 1. SANCTIONS AGAINST KENNETH CATANZARITE

## (See Attached Cases)

- ### Edwards v. Noroski (2013) $14,000 sanction + $1,200-see Order (11/28/12)

In this case that is ongoing, the Court punished Catanzarite for saying one thing, then switching his story. The court stated that Catanzarite's case was a "sham." First, Catanzarite claimed that the dental practice run by Dr. Noroski and Dr. Schneider should give back money to patients who had been treated at the dental office, but did not say anything was wrong with the dentistry. Then, Catanzarite realized he had no case, because the plaintiffs who were former patients had their depositions and said they were happy with Dr. Noroski and happy with Dr. Schneider. (See attached.) The plaintiffs dropped out and Catanzarite had no case. Catanzarite asked to file an amended complaint that now said that the dental services were bad. The Court punished Catanzarite by sanctioning him $14,000 for wasting everybody's time.

- ### Alexandros v. Cole (2011) $10,000 sanction

Catanzarite violated court rules by making statements to the court without any proof. The court said: "But here plaintiffs [Catanzarite] admit they violated several rules. They also continued to cite the excluded evidence in their reply brief even after defendants noted the error in their briefs." The Court pointed out that Catanzarite's brief made 39 unsupported factual statements, and paragraphs lacking references. Some statements were completely incorrect. Catanzarite does not care about the truth in making statements to the Court. The Court said "Kenneth J. Catanzarite and Laurence M. Rosen are ordered to pay defendants the $10,000 sanctions award…"

- ### In Re Perrine (2007) $30,000 or refund of fees

Catanzarite did not tell the Court that his client, who was declaring bankruptcy, deeded his home to Catanzarite. In bankruptcy, the person declaring bankruptcy cannot sell or give away without telling the Court. Catanzarite took the property to pay for his fees, but did not tell the Court about this, violating this strict rule. The Court took away all of Catanzarite's fees: "Given the gravity of Catanzarite's non-disclosure, the court will deny all fees to Catanzarite for legal services rendered to Perrine to the petition date due to its failure to comply with Section 329(a) and Rule 2016(b). Catanzarite was ordered to give back either his fees, or the property he took. (p. 586)

| 3 | 11-510638<br>Edwards vs.<br>Noroski | 1. Plt., Edwards and Gans, Motion for Leave to File Fifth Amended Complaint --- Granted; Despite serious reservations as to the sham nature of the pleading at least as to FPS, the court applies the rule of allowing liberal amendments to pleadings.<br>The court finds that it is in the interests of justice for the Plt. to pay monetary compensation to Def.s for the time they spent in the preparation of the summary judgment motions currently pending. The court finds that the delay in filing the amended complaint has caused injustice to the Def. by their filing a motion for summary judgment that Plt. knew would be brought yet Plt. delayed the filing of their request for leave to amend until 1 week before the motion for summary judgment is to be heard.<br>In furtherance of justice the court orders that the ruling granting leave to amend is predicated on the condition that payment by Plt. to Def. the amount of $11,374.85 is to be made for the costs and fees Def. incurred in preparing and filing the summary judgment. CCP 473(a)(1). Plt. delayed filing this motion for leave to amend until after Def.'s filed their motion for summary judgment even though Plt. had knowledge that Def. intended to file such a motion and the cost such a motion would be to Def. Def., Noroski, request for reimbursement for prior investigation and discovery in the amount of $17,915 is denied. This discovery is still useable in this action.<br>All discovery is ordered "stayed" except that discovery related to the Doherty standing issue. The court would like Counsel to submit a time line for briefing schedule |
|---|---|---|

as to MSJ re standing of Doherty. Counsel should meet and confer regarding any issues and the amount of discovery needed relating to the Doherty standing. When can Plt. be ready for a motion to certify and what discovery is needed for that motion?

**FINAL RULING:**

Tentative ruling is final. In addition, Plt. is to pay to Def., Noroski the amount of $2500 for the depositions/discovery for the Edwards and Gans depositions.



ELECTRONICALLY RECEIV
Superior Court of California,
County of Orange
**11/20/2012 at 10:30:48 AM**
Clerk of the Superior Court
By Irma Cook, Deputy Clerk

ALAN CARLSON, Clerk of the Court

L. LABRADOR

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ORANGE – CIVIL COMPLEX CENTER

| | |
|---|---|
| JUDITH L. EDWARDS and SCOTT C. GANS, individually and on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>DANIEL NOROSKI, D.D.S., an individual; DANIEL A. NOROSKI, D.D.S., INC., A PROFESSIONAL DENTAL CORPORATION, a California Corporation; FIRST PACIFIC CORPORATION, an Oregon corporation; and DOES 1 through 100, inclusive,<br><br>Defendants.<br><br>AND RELATED CROSS-ACTION. | CASE NO.: 30-2011-00510638-CU-MC-CXC ASSIGNED TO HON. STEVEN L. PERK, DEPT. CX102<br><br>UNLIMITED JURISDICTION<br><br>AMENDED [PROPOSED] ORDER GRANTING DEFENDANT DANIEL NOROSKI, D.D.S., INC.'S MOTION TO COMPEL DEPOSITIONS OF PLAINTIFF JUDITH L. EDWARDS AND PLAINTIFF SCOTT C. GANS AND TO PRODUCE RESPONSIVE DOCUMENTS TO DEPOSITION DOCUMENT DEMANDS; AND FOR SANCTIONS IN THE AMOUNT OF $1,200<br><br>FILE DATE:          September 23, 2011<br>TRIAL DATE SET:  No Date Set |

On November 16, 2012 at 10:30 a.m. in Department CX102 of the above-entitled court, located at 751 Civic Center Drive West, Santa Ana, California, 92701, defendant Daniel A. Noroski, D.D.S., Inc. ("Noroski APC") motion to compel depositions of Plaintiffs Judith Edwards and Scott Gans came on for a regularly noticed hearing.

After considering the moving papers, opposing papers, reply papers and oral argument, the Court orders as follows:

3470481.1

AMENDED [PROP.] ORDER ON DEFENDANTS NOROSKI'S MOT. TO COMPEL AND PROD. DOCS.

RECEIVED IN DEPT CX 102 ON 11/28/12
AT 8:60 AM/PM

1.    That Plaintiff Judith Edwards and Plaintiff Scott Gans must attend their depositions at Daniel A. Noroski, D.D.S., Inc.'s counsel's office located at 895 Dove Street, 5th Floor, Newport Beach, California by no later than <u>December 10, 2012</u>.

2.    <u>By no later than November 26, 2012</u>, both Plaintiff Judith Edwards and Scott Gans are to produce all responsive documents to Request Nos. 1-34 with respect to the deposition document demands that are attached to the notices of deposition of plaintiffs. If a protective order is needed, Defendants' counsel will prepare a draft protective order and circulate the same to all and file it with the Court. Plaintiff will have five days from receipt of the protective order to submit any objections.

3.    The Court awards sanctions in the amount of $1,200 to Daniel Noroski, D.D.S., Inc. against Plaintiffs' Judith Edwards and Scott Gans, jointly and severally. The sanctions shall be paid in full on or before December 7, 2012 to Daniel Noroski, D.D.S. Inc., to be made payable to Newmeyer & Dillion, LLP. The Court finds that there was no substantial justification presented for the objections raised by Plaintiffs. There is no authority supporting Plaintiffs theory of "priority" setting of depositions. *Young vs. Rosenthal*, 212 Cal. App. 3d 96 does not stand for the proposition cited by Plaintiffs in their opposing papers. *Young* involved a priority established by express agreement which is lacking in this case. Nothing in this case triggers the application of the "priority" contemplated in *Weil and Brown* either. The objections to these depositions and documents production are not well taken and are stricken.

4.    Defendants' counsel is to give notice.

Dated: _____11/28/2012_____

_____
JUDGE OF SUPERIOR COURT

**STEVEN L. PERK**

NEWMEYER & DILLION LLP

3470481.1

- 2 -

[AMENDED PROP.] ORDER ON DEFENDANTS NOROSKI'S MOT. TO COMPEL DEPOSITIONS AND PROD. DOCS.

## PROOF OF SERVICE

*Judith L. Edwards, et al. v. Daniel Noroski, D.D.S., et al.*
OCSC Case No. 30-2011-00510638-CU-MC-CXC

STATE OF CALIFORNIA )
                     ) ss.
COUNTY OF ORANGE     )

I, DEE NOVOA, declare:

I am a citizen of the United States and employed in Orange County, California. I am over the age of eighteen years and not a party to the within-entitled action. My business address is 895 Dove Street, 5th Floor, Newport Beach, California 92660. On November 20, 2012, I served a copy of the within document(s):

~~AMENDED~~
[PROPOSED] ORDER GRANTING DEFENDANT DANIEL NOROSKI, D.D.S., INC.'S MOTION TO COMPEL DEPOSITIONS OF PLAINTIFF JUDITH L. EDWARDS AND PLAINTIFF SCOTT C. GANS AND TO PRODUCE RESPONSIVE DOCUMENTS TO DEPOSITION DOCUMENT DEMANDS; AND FOR SANCTIONS IN THE AMOUNT OF $1,200

☐ by transmitting via facsimile the document(s) listed above to the fax number(s) set forth below on this date before 5:00 p.m.

☒ by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at Newport Beach, California addressed as set forth below.

☐ by placing the document(s) listed above in a sealed NORCO OVERNITE/FEDERAL EXPRESS envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a NORCO OVERNITE/FEDERAL EXPRESS agent for delivery.

☐ by transmitting via e-mail or electronic transmission the document(s) listed above to the person(s) at the e-mail address(es) set forth below.

### PLEASE SEE ATTACHED SERVICE LIST

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on November 20, 2012, at Newport Beach, California.

_Dee Novoa_
DEE NOVOA

3290397.1

- 1 -

PROOF OF SERVICE

NEWMEYER & DILLION LLP

Complaint Supplement #30-2011-005106380
Exhibit #8: 007
Superior Court of California County of Orange
ADA Complaint Exhibits 316
Exhibit #35: 008
22-CV-01616-BAS-DDL

<u>SERVICE LIST</u>

*Judith L. Edwards, et al. v. Daniel Noroski, D.D.S., et al.*
OCSC Case No. 30-2011-00510638-CU-MC-CXC

Kenneth J. Catanzarite, Esq.
Nicole Catanzarite-Woodward, Esq.
CATANZARITE LAW CORPORATION
2331 West Lincoln Ave.
Anaheim, CA 92801

Tel: (714) 520-5544
Fax: (714) 520-0680
Email: kcatanzarite@catanzarite.com
Email: ncatanzarite@catanzarite.com
**[PLAINTIFFS]**

Robert L. Kenny, Esq.
Law Office of Robert L. Kenny
501 West Broadway, Ste. 1370
San Diego, CA 92101

Tel: (619) 234-1616
Fax: (619) 233-1969
Email: rkenny@kennylaw.net
**[FIRST PACIFIC CORPORATION]**

3290397.1

\- 2 -

SERVICE LIST

Complaint Supplement #30-22-CV-01616-BAS-DDL
Exhibit #8: 008

Back # Superior Court of California County of Orange
ADA Complaint Exhibits 317

Exhibit #35: 009
22-CV-01616-BAS-DDL

NEWMEYER & DILLION LLP

This Document is Provided by Leagle.com

# IN RE PERRINE

## *369 B.R. 571 (2007)*

### In re Eugene H. PERRINE, Jr., Debtor.

### No. RS 05-13979 PC.

### United States Bankruptcy Court, C.D. California, Riverside Division.

### April 13, 2007.

Kenneth J. Catanzarite, Anaheim, CA, for Debtor.

Thomas H. Casey, Rancho Santa Margarita, CA, for Chapter 7 Trustee.

---

## AMENDED MEMORANDUM DECISION

 The v

PETER H. CARROLL, Bankruptcy Judge.

Steven M. Speier, Chapter 7 Trustee ("Speier") seeks an order compelling Kenneth J. Catanzarite, Richard Vergel de Dios and the Catanzarite Law Corporation (collectively, "Catanzarite"), attorneys for Debtor, Eugene H. Perrine, Jr. ("Perrine") to disgorge undisclosed fees received by Catanzarite within one year before the filing of Perrine's bankruptcy petition allegedly "in contemplation of or in connection with" his bankruptcy case. Catanzarite objects to the disgorgement of the fees, claiming that the compensation was not received for services rendered either "in contemplation of or in connection with" Perrine's bankruptcy case. At the continued hearing, Kathleen Goldberg appeared for Speier and Richard Vergel de Dios appeared for Catanzarite and Perrine. The court, having considered Speier's motion and the opposition of Catanzarite and Perrine thereto, the evidentiary record, and arguments of counsel, makes the following findings of fact and conclusions of law[1] pursuant to Fed.R.Civ.P. 52, as incorporated into Fed. R. Bankr.P. 7052 and made applicable to contested matters by Fed. R. Bankr.P. 9014 (c).

## I. STATEMENT OF FACTS

Prior to August 8, 2003, Perrine owned as his separate property a 30.32 acre tract of land located in Klamath Falls, Oregon ("Oregon Property"). On August 8, 2003, Perrine transferred the Oregon Property to the Eugene H. Perrine and Vicki L Perrine Family Trust dated August 8, 2003 ("Perrine Trust") by Trust Transfer Grant Deed recorded on August 22, 2003, at Volume M03, Page 61460, Real Property Records, Klamath County, Oregon.

The Perrine Trust is an *intervivos* revocable trust established in the name of Perrine and his wife, Vicki. Perrine is the trustor, co-trustee and beneficiary of the Perrine Trust. In addition to the Oregon Property, the assets of the Perrine Trust ostensibly included at its inception the following marital property:

*Community Property:* "All items of tangible personal property, including, but not limited to, furniture and furnishings, silverware, clothing, books, collections of tangible personal property, and

[ 369 B.R. 575 ]

other tangible personal property usually kept at the Trustor's residence."[2]

*Perrine's Separate Property:* (a) Real property and improvements located at 285 West Skyline Drive, La Habra Heights, California ("La Habra Property"), transferred into the Trust by Trust Transfer Grant Deed recorded on September 26, 2003, as Instrument No. 03-2864459, Official Records, Los Angeles County, California; (b) 50 shares of stock in Perrine Electric Company, Inc. and (c) a pension at Schwab & Company, Inc.[3]

Section 1.02 of the Perrine Trust states, in pertinent part:

"All property now or hereafter conveyed or transferred to the [Trust] . . . shall remain, respectively, community property, quasi-community property, or the separate property of the Trustor transferring such property to the Trustee."

Perrine is also the president of Perrine Electric Company, Inc. ("Perrine Electric"). On April 29, 2004, Perrine was sued by AAA Electrical Supply, Inc. ("AAA") in Case No. BC 324665, styled *AAA Electrical Supply, Inc. v. Perrine Electric Company, Inc. and Eugene H. Perrine, Jr.,* in the Superior Court of Los Angeles County, for the sum of $71,167.05, plus attorneys fees and costs, based upon his personal guaranty of the debts of Perrine Electric. Catanzarite was the attorney of record for Perrine and Perrine Electric in the state court action.

On January 11, 2005, Perrine and Vicki Perrine, individually and as trustee, executed a document entitled "Retainer Agreement and Application of In Kind Payment" agreeing to transfer the Oregon Property to Catanzarite at a stipulated value of $30,000 for payment of accrued attorneys fees and costs and as a credit for future attorneys fees and costs to be incurred by Perrine and Vicki Perrine. The Retainer Agreement states specifically that the payment is "for the purpose of securing the continued representation of the Trust and the individuals in future litigation including without limitation, with creditors and to protect the home equity of Vicki and the pension of Eugene." On January 13, 2005, Perrine and Vicki Perrine, as Co-Trustees of the Trust, executed a Statutory Bargain and Sale Deed conveying the Oregon Property to Kenneth J. Catanzarite for $30,000. The deed was recorded on January 14, 2005, at Volume M05, Page 03482, Real Property Records, Klamath County, Oregon. Ten days later, Perrine stipulated to entry of a judgment in the state court action in favor of AAA in the amount of $76,767.

On April 21, 2005, Perrine filed his voluntary petition under chapter 7 of the Bankruptcy Code.[4] Speier was appointed as trustee. In his schedules filed on May 6, 2005, Perrine disclosed assets valued at $415,740 and liabilities in excess of $174,073.[5] According to Schedule A, Perrine

[ 369 B.R.
576 ]

did not own an interest in any real property on the petition date. Perrine's assets, as disclosed in Schedule B, consisted of cash, clothing, two vehicles, and his interest in a profit sharing plan valued at $400,000. Perrine declared under penalty of perjury that he neither owned stock or an interest in a business at the time of bankruptcy[6] nor any interest in a trust on the petition date.[7]

In his Statement of Financial Affairs filed on May 6, 2005, Perrine declared under penalty of perjury that he had not made any payments to creditors within 90 days preceding the commencement of the case[8] nor transferred any property (other than in the ordinary course of business or financial affairs of the debtor) within one year preceding the date of bankruptcy.[9] In response to Question # 9 of the Statement of Financial Affairs, Perrine disclosed that he had paid the sum of $3,000 to Catanzarite on January 14, 2005, for debt counseling or bankruptcy.

On May 6, 2005, Catanzarite filed a document entitled "Disclosure of Compensation of Attorney for Debtor" ("Rule 2016(b) Statement") signed by Richard Vergel de Dios on behalf of Catanzarite, stating:

Pursuant to 11 U.S.C. § 329(a) and Fed. Bankr.P.2016(b), I certify that I am the attorney for the above-named debtor(s) and that compensation paid to me within one year before the filing of the petition in

bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

```
For legal services, I have agreed to
  accept                                    $3,000.00
Prior to the filing of this statement I
  have received                             $3,000.00
Balance Due                                 $    0.00
```

Mr. de Dios further certified that Catanzarite had agreed to accept $3,000 for the following legal services in the case:

a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;

b. Preparation and filing of any petition, schedules, statements of affairs and plan which may be required;

c. Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof; [and]

d. Representation of the debtor in adversary proceedings and other contested bankruptcy matters.[10]

Mr. de Dios's signature on the Rule 2016(b) Statement appears beneath the following certification:

I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceedings.[11]

On May 23, 2005, Perrine appeared and was examined by Speier under oath at a meeting of creditors conducted pursuant to § 341(a).[12] Based upon the examination

[ 369 B.R.
577 ]

and his investigation of Perrine's actions before bankruptcy, Speier filed a complaint in Adversary No. RS-05-01243 PC, styled *Steven M. Speier, Chapter 7 Trustee v. Vicki L. Perrine, et. al.,* on June 15, 2005, seeking, in part, to recover as a fraudulent conveyance funds received by Perrine from the sale of the La Habra Property prior to bankruptcy, which were then transferred to Vicki and used to purchase, as her separate property, certain real property located at 4025 Prarie Dunes Drive, Corona, California.

On July 15, 2005, Perrine filed a motion to dismiss his case pursuant to § 707(a), alleging that Speier's fraudulent conveyance claims were unfounded and that the unsecured non-priority creditors holding claims in excess of $174,000 would not suffer significant legal prejudice by a dismissal of the case.[13] Perrine's dismissal motion was opposed by Speier and Perrine's largest creditor, AAA.[14] On August 15, 2005, the court denied Perrine's motion to dismiss finding that dismissal of the case would be prejudicial to creditors.[15] An Order Denying Debtor's Motion for Voluntary Dismissal of Case was entered on September 20, 2005. Shortly thereafter, Speier filed a complaint in Adversary No. RS 05-01473 PC, styled *Steven M. Speier, Chapter 7 Trustee v. Eugene H. Perrine, Jr.,* objecting to Perrine's discharge pursuant to § 727(a)(2)(A), (a)(3), (a)(4)(A) and (a)(5).

On November 2, 2006, Speier filed a motion seeking an order compelling Catanzarite to amend its Rule 2016(b) Statement to disclose the transfer of the Oregon Property claiming that the property was received for services "in contemplation of or in connection with" Perrine's bankruptcy case. Perrine and Catanzarite opposed the motion, asserting that the fees incurred "in contemplation of or in connection with" the bankruptcy case were limited to the $3,000 disclosed in the Rule 2016(b) Statement on May 6, 2005, and that the Oregon Property was transferred to Catanzarite primarily for non-bankruptcy services. Catanzarite explained that there

was an outstanding balance of $12,000 due the Catanzarite firm when it received the Oregon Property on January 14, 2005. After payment of the outstanding balance, the $18,000 credit was used to pay $3,000 in fees for preparation of the bankruptcy petition and "the remaining amount was used to pay fees incurred pre-bankruptcy related to the AAA Electric

[ 369 B.R. 578 ]

litigation."[16]

At a hearing on December 4, 2006, the court determined that Perrine's transfer of the Oregon Property to Catanzarite on January 14, 2005, within 97 days prior to the filing of Perrine's bankruptcy petition, was made "in contemplation of or in connection with" Perrine's bankruptcy case. Catanzarite was ordered to amend its Rule 2016(b) Statement to disclose all facts concerning its receipt of the Oregon Property. A hearing on the issue of disgorgement was continued to February 26, 2007.

On December 15, 2006, Catanzarite filed an Amended Disclosure of Compensation of Attorney for Debtor ("Amended Rule 2016(b) Statement"). Catanzarite's Amended Rule 2016(b) Statement did not mention the Oregon Property nor explain the method used by Catanzarite and Perrine to arrive at the $30,000 "stipulated" value. Catanzarite's Amended Rule 2016(b) Statement stated only that "payments and credits received from the Debtor in the amount of $30,000 were paid on behalf of the following categories: $21,000 in defense of the AAA Electrical litigation; $3,000 with regard to the dispute with MBNA, $3,000 for pension work and $3,000 for preparation of bankruptcy petition and schedules."[17] Prior to the continued hearing, Speier and Catanzarite filed supplemental memorandums of points and authorities on the issue of disgorgement. At the continued hearing on February 26, 2007, the matter was taken under submission.

## II. DISCUSSION

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(b) and 1334(b). This matter is a core proceeding under 28 U.S.C.

[ 369 B.R. 579 ]

§ 157(b)(2)(A), (B), (E) and (O). Venue is appropriate in this court. 28 U.S.C. § 1409(a).

A. *Strict Duty of Disclosure*

Section 329(a) requires a debtor's attorney to disclose to the court the amount of compensation paid or promised for services rendered "in contemplation of or in connection with the case."[18] Section 329(a) is implemented by Rule 2016(b) which requires the filing of the statement required by § 329(a) not later than 15 days after the order for relief.[19] Rule 2016(b) imposes a continuing duty on debtor's counsel to supplement the original statement pursuant to § 329(a).[20] The disclosure requirements of § 329(a) apply "whether or not the attorney ever applies for compensation" *Consumer Seven Corp. v. United States Trustee (In re Fraga),* 210 B.R. 812, 822 (9th Cir. BAP 1997).

Rule 2017(a) directs the court to determine, either *sua sponte* or upon motion by a party in interest, whether any payment or transfer of property to an attorney "in contemplation of" the filing of the bankruptcy petition is excessive.[21] Taken together, § 329(a) and Rule 2017(a) "furnish the court with express power to review payments to attorneys for excessiveness and to restore the status quo when assets have improvidently been bartered for legal services[.]" *In re Martin,* 817 F.2d 175, 180 (1st Cir.1987).

Complaint Supplement Superior Court of California County of Orange
Exhibit #8: 012

http://www.leagle.com/PrintDocument.aspx?ADA Complaint Exhibits 321

Book # 369979 Page 01 of 14 Pages

Exhibit #35: 013
22-CV-01616-BAS-DDL

Section 329's disclosure requirements are "'mandatory, not permissive.'" *Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.),*4 F.3d 1556, 1565 (10th Cir.1993) (quoting *In re Bennett,*133 B.R. 374, 378 (Bankr. N.D.Tex.1991)); *In re Keller Fin. Servs. of Fla., Inc.,*248 B.R. 859, 883 (Bankr. M.D.Fla.2000). Section 329(a), which is derived from § 60(d) of the Bankruptcy Act of 1898,[22] seeks to prevent over-reaching

[ 369 B.R. 580 ]

by debtor's attorneys and serves to counteract the temptation of a failing debtor to deal too liberally with his property in employing counsel to protect him in view of financial reverses and probable failure.'" *Conrad, Rubin & Lesser,* 289 U.S. at 477-78, 53 S.Ct. 703 (quoting *In re Wood,*210 U.S. 246, 28 S.Ct. 621, 52 L.Ed. 1046 (1908)). Section 329(a) demands that an attorney be forthright in disclosing "the precise nature of the fee arrangement" with the debtor. *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park — Helena Corp.),*63 F.3d 877, 881 (9th Cir.1995) (quoting *In re. Glenn Elec. Sales Corp.,*99 B.R. 596, 600 (D.N.J.1988)). "Counsel's fee revelations must be direct and comprehensive. Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient." *In re Saturley,*131 B.R. 509, 517 (Bankr.D.Me.1991).

Congress intended to permit bankruptcy courts to reexamine the reasonableness of fees within the one-year look back period, irrespective of the nature of the services rendered. *See Keller Fin. Servs.,* 248 B.R. at 878 (concluding that § 329 permits the court to review fees paid for services "performed at a time when the debtor was contemplating bankruptcy," regardless of the nature of the services (internal quotations omitted)); *Wootton v. Ravkind (In re Dixon),*143 B.R. 671, 678 (Bankr.N.D.Tex.1992) (stating that § 329 "imposes no restriction on the nature of the services rendered . . ."); *Rheuban,* 121 B.R. at 378 (observing that § 329 does not limit the nature of the legal services that are subject to reexamination). Absent complete disclosure, the court is unable to make an informed judgment regarding the nature and amount of compensation paid or promised by the debtor for legal services in contemplation of bankruptcy.

The failure to satisfy the disclosure requirements of § 329(a) and Rule 2016(b) may result in sanctions, "even if proper disclosure would have shown that the attorney had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule." *Park-Helena Corp.,* 63 F.3d at 880; *Fraga,* 210 B.R. at 822. An attorney who violates § 329(a) and Rule 2016(b)

[ 369 B.R. 581 ]

forfeits any right to receive compensation for services rendered on behalf of the debtor and may be ordered to disgorge fees already received. *See, e.g., Law Offices of Nicholas A. Franke v. Tiffany (In re Lewis),*113 F.3d 1040, 1045 (9th Cir. 1997) (concluding that "[a]n attorney's failure to obey the disclosure and reporting requirements of the Bankruptcy Code and Rules gives the bankruptcy court the discretion to order disgorgement of attorney's fees"); *Park-Helena Corp.,* 63 F.3d at 882 ("Even a negligent or inadvertent failure to disclose fully relevant information [in a Rule 2016 statement] may result in a denial of all fees."); *Jensen v. U.S. Trustee (In re Smitty's Truck Stop, Inc.),*210 B.R. 844, 849 (10th Cir. BAP 1997) (stating that an attorney's failure to disclose a retainer in his Rule 2016(b) statement is sufficient to deny all fees, even if the non-disclosure was negligent or inadvertent); *Fraga,* 210 B.R. at 822 ("The consequences of an attorney's violation of the disclosure requirements regarding fees include denial of all fees requested.").

B. *Services "In Contemplation of" the Bankruptcy Case*

Courts broadly apply a *subjective test* to determine whether attorneys fee payments were made "in contemplation of" bankruptcy. *Dixon,* 143 B.R. at 675 n. 3 (observing that "[a] subjective and not an objective test applies in determining whether payments to attorneys were

http://www.leagle.com/PrintDocument.aspx

Complaint Supplement #8 Superior Court of California County of Orange
Exhibit #8: 013
ADA Complaint Exhibits 322

Exhibit #35: 014
3/8/2013
22-CV-01616-BAS-DDL

made 'in contemplation of bankruptcy.'"); *Rheuban,* 121 B.R. at 378 (stating that a *"subjective review* [is] embodied in the 'in contemplation of' language of § 329 and its predecessors, § 60(d) and Bankruptcy Rule 220"). The subjective inquiry is "whether the debtor was influenced by the possibility or imminence of a bankruptcy proceeding in making the transfer." *Brown v. Luker (In re Zepecki),*258 B.R. 719, 724 (8th Cir. BAP 2001), aff'd,277 F.3d 1041 (8th Cir.2002); *see Dixon,* 143 B.R. at 675 n. 3 (articulating the standard as "whether, in making the transfer, the debtor is influenced by the possibility or imminence of a bankruptcy proceeding"). The "controlling question," as ·the Supreme Court explained in *Conrad, Rubin & Lesser,* "is with respect to the state of mind of the debtor and whether the thought of bankruptcy was the impelling cause of the transaction." 289 U.S. at 477, 53 S.Ct. 703.

> If the payment or transfer was thus motivated, it may be re-examined and its reasonableness be determined. Undoubtedly, while the question thus relates to the debtor's motive, the nature of the services which he seeks and for which he pays may be taken into consideration as it may throw light upon his motive. It is not impossible that the services may have been so wholly separate from any exigency of bankruptcy as to indicate that the thought of bankruptcy was in no sense controlling. But, given the fact that the payment or transfer was in contemplation of bankruptcy, the inducement of the transaction affords, from the standpoint of the statute, sufficient ground for authorizing a summary inquiry into its reasonableness. The manifest purpose of the provision is to safeguard the assets of those who are acting in contemplation of bankruptcy, so that these assets may be brought quickly and without unnecessary expense into the hands of the trustee, and to provide a restraint upon opportunities to make an unreasonable disposition of property through arrangement for excessive payments for prospective legal services.

*Id.*

Services aimed at the *prevention* of bankruptcy likewise necessarily contemplate bankruptcy, and compensation received

[ 369 B.R. 582 ]

for such services falls within the ambit of § 329(a). See, e.g., *Conrad, Rubin & Lesser,* 289 U.S. at 479, 53 S.Ct. 703 (holding that the court had jurisdiction to review fees paid to an attorney retained by debtor to negotiate a 50% cash settlement with creditors prior to bankruptcy, and opining that "[a] man is usually very much in contemplation of a result which he employs counsel to avoid"); *Matter of Prudhomme,*43 F.3d 1000, 1004 (5th Cir. 1995) (holding that evidence suggesting that the debtors, who in desperate financial straits, consulted an attorney for representation to restructure debt and resolve disputes with their largest creditor supported a finding that the fee was paid in contemplation of or in connection with the case); *In re Greco,*246 B.R. 226, 231 (Bankr.E.D.Pa.2000) (holding that a $2,200 payment to an attorney two months before bankruptcy for legal research concerning the effect of bankruptcy on the debtor's student loans was "in contemplation of" bankruptcy); *Rheuban,* 121 B.R. at 379 (finding that debtor acted "in contemplation of bankruptcy" upon entering into a fee agreement with a firm to represent him in connection with investigation and litigation of possible criminal and regulatory matters arising out of debtor's business relationship with a savings & loan); *GIC Gov't Sec.,* 92 B.R. at 533 (concluding that payments made to attorneys retained on the eve of bankruptcy to resist efforts by the State of Florida to revoke the debtor's securities registration were "in contemplation of" bankruptcy). Those cases in which a debtor's counsel has received undisclosed non-exempt assets shortly before bankruptcy as compensation primarily for future services have merited particularly close scrutiny by bankruptcy courts.

In *Dixon,* an attorney, William H. Ravkind ("Ravkind") was employed by Don Ray Dixon ("Dixon") in November 1986, to represent him in criminal matters arising out of his association with Dondi Financial Corporation and Vernon Savings & Loan Association for a flat fee of $450,000. 143 B.R. at 673. Ravkind ultimately received $200,000 in cash and certain artwork valued at $100,000 as payment in full. *Id.* at 674. The cash and artwork, which were Dixon's non-exempt assets, were paid for future services to be rendered by Ravkind. *See id.* At the time he

received the transfer, Ravkind was aware that Dixon was considering bankruptcy. *Id.* Ravkind and Dixon were concerned that the federal government was planning to seize Dixon's assets pursuant to the Racketeer Influenced and Corrupt Organizations Act.[23] *Id.* Ravkind immediately deposited the $200,000 cash in his operating account and used the funds to pay business expenses. *Id.* Ravkind then sold most of the artwork for less than $25,000. *Id.* at 675.

On April 22, 1987, Dixon filed a voluntary petition under chapter 11 of the Code. *Id.* at 673. Ravkind was not Dixon's general counsel in the bankruptcy case, but continued to represent him on criminal matters after the petition date. *Id.* at 674. Dixon disclosed the $300,000 transfer to Ravkind in his statement of financial affairs. *See id.* at 675. However, Ravkind failed to timely disclose the $300,000 fee and his agreement with Dixon pursuant to § 329(a) and Rule 2016(b). *Id.* Furthermore, Ravkind neither sought authorization to act as special counsel for Dixon under § 327(e) nor authorization to use any unearned portion of the $300,000 retainer in his possession. *Id.*

On October 14, 1987, Dale Wooten, as chapter 11 trustee, filed a complaint seeking to recover the $300,000 fee from Ravkind as a fraudulent transfer under

[ 369 B.R.
583 ]

§ 548(a). *Id.* at 673. It was undisputed that at all material times, Dixon was insolvent within the meaning of § 548(a). *See id.* at 674. Ravkind had not kept time records, but the evidence supported a finding that he had earned approximately $35,000 for legal services rendered to Dixon prior to bankruptcy. *Id.* It was also undisputed that the reasonable value of Ravkind's post-petition criminal defense work, which accounted for the majority of his services to Dixon, exceeded the amount that he had been paid. *Id.*

Although relief was sought by the trustee under § 548(a), the bankruptcy court concluded that "the more appropriate standard" for review of Ravkind's fee arrangement with Dixon was § 329(a) and § 330. *Id.* at 673. Applying a subjective test, the bankruptcy court found that Dixon's $300,000 transfer to Ravkind was made in contemplation of bankruptcy, stating:

> Prior to the filing of the bankruptcy proceedings, Dixon was the target of several major criminal investigations, and had received national media attention as an alleged central figure in the savings and loan scandal. At the time [Ravkind] received the money and art as a payment from Dixon, both he and Dixon were concerned that Dixon's assets might be seized under a RICO seizure. Bankruptcy counsel had already been retained for the Debtors in California, and Debtors were insolvent. From the testimony adduced at trial, it was clear the cash payment and art represented part of the last liquid and available assets of the Debtors. At the time [Ravkind] was engaged, he undertook representation of Dixon in several criminal investigations, and related civil suits with the Federal Deposit Insurance Corporation (the "FDIC"). In addition, he participated with Dixon's California bankruptcy lawyers in some bankruptcy planning. At the time [Ravkind] received the transfers of Dixon's money and property, Dixon's general counsel Simmons was parceling out funds and property for retainers. The Court finds that the transfers were received by [Ravkind] within a year of the filing of bankruptcy, in contemplation of a bankruptcy proceeding, and that, therefore, [Ravkind's] fee arrangement is subject to review under § 329 of the Code.

*Id.* at 675 n. 3. The court then ordered Ravkind to disgorge all but $35,000 of the payment received from Dixon, *i.e.,* the remaining art on hand, $160,000 of the cash received, and $90,000 representing the value of the artwork disposed of, finding that the fee arrangement was excessive and violated § 329 and § 330. *Id.* at 679. The court also determined that Ravkind's failure to disclose the $300,000 fee and agreement with Dixon pursuant to § 329(a) and Rule 2016(b) constituted "an independent and alternative basis" for disgorgement of the fees. *Id.* at 680. In ordering the disgorgement, the court concluded that Ravkind's criminal defense work was personal to Dixon and resulted in no benefit to creditors or the estate, stating "the only thing the transfers to [Ravkind] achieved was to further deplete the assets of the bankruptcy estate." *Id.* at 679.

Complaint Supplement #30: 020801 - 4939 500 County of Orange
http://www.feagle.com/PrintDocument.aspx?DA Complaint Exhibits 324
Exhibit #8: 015
Exhibit #35: 016
7/8/2013
22-CV-01616-BAS-DDL

In *Zepecki*, Robert Zepecki ("Zepecki") filed a voluntary chapter 7 petition on February 7, 1996. 277 F.3d at 1043. Three months earlier, Zepecki's attorney, Steven C.R. Brown ("Brown") had received the net proceeds of $102,989 from the sale of certain real property owned by Zepecki in Illinois pursuant to a "1031 Exchange of Property Escrow Agreement."[24] *Id.* at 1044. Acting as escrow agent under the

[ 369 B.R. 584 ]

agreement, Brown disbursed the sum of $65,000 to the bank account of a third party, Ted Holder ("Holder") prior to Zepecki's bankruptcy. *Id.* The balance was disbursed by Brown to Holder shortly after the petition date. *Id.* Brown received $40,000 in attorneys fees as part of the transaction, $20,000 following each payment to Holder. *Id.*

Zepecki failed to disclose in his schedules and statements either the sale of the Illinois property or the transfer of the sale proceeds to Brown. *Id.* at 1043. The bankruptcy court denied Zepecki's discharge under § 727(a)(4), and *sua sponte* ordered Brown to account for the $40,000 fee received under the agreement. *Id.* at 1043-44. Brown documented attorneys fees and expenses totaling $7,160 incurred prior to Zepecki's bankruptcy in conjunction with the tax-free exchange. *Id.* at 1044. Ultimately, the bankruptcy court determined that the $40,000 fee was paid to Brown in contemplation of or in connection with Zepecki's bankruptcy. *Id.* at 1046. Brown was ordered to disgorge fees of $32,840 to the estate, representing the entire post-petition fee of $20,000 and $12,840 of the $20,000 fee, received prior to the petition date. *Id.* at 1044. Brown appealed and the Bankruptcy Appellate Panel for the Eighth Circuit affirmed. *Zepecki,* 258 B.R. at 726. The Eighth Circuit then affirmed the judgment of the Bankruptcy Appellate Panel, holding:

> We also find no clear error in the bankruptcy court's finding that Brown's representation was in connection with or in contemplation of the possibility or imminence of a bankruptcy proceeding. The Illinois land transaction occurred within one month after Zepecki's divorce from Ms. Kania, who was Zepecki's largest creditor, and within four months prior to the bankruptcy filing. The proceeds of the land sale constituted Zepecki's largest asset with which to satisfy Ms. Kania's judgment. The bankruptcy court found that the land transaction was a sham and was performed in an effort to prevent the asset from becoming property of Zepecki's bankruptcy estate and prevent his ex-wife from recovering on her judgment. Zepecki lost his right to a bankruptcy discharge because he failed to identify the transaction or its proceeds on his bankruptcy schedules, which further supports the court's conclusion that Zepecki was trying to keep the asset from his wife. These facts support the bankruptcy court's conclusion that Zepecki was contemplating bankruptcy when he transferred the Illinois property and when Brown assisted in the attempted section 1031 transfer of that same property.

*Zepecki,* 277 F.3d at 1046.

### C. Perrine Transferred the Oregon Property to Catanzarite In Contemplation of Bankruptcy.

As the Supreme Court explained in *Conrad, Rubin & Lesser,* the test for determining if a payment or transfer was made "in contemplation of bankruptcy hinges upon the debtor's state of mind and, more precisely, "whether the thought of bankruptcy was the impelling cause of the transaction." 289 U.S. at 477, 53 S.Ct. 703. Four months prior to bankruptcy, Perrine was embroiled in a lawsuit with AAA, his largest creditor. On the eve of trial, Perrine transferred the Oregon Property from the Perrine Trust to his attorney, Catanzarite. The Perrine Trust specifically provided that the Oregon Property remained Perrine's separate property,

[ 369 B.R. 585 ]

notwithstanding its inclusion in the trust. The Oregon Property was Perrine's last and most significant non-exempt asset. At the time of the transfer, Catanzarite and Perrine had to have been concerned that the Oregon Property would be seized by AAA to satisfy any judgment that might be entered against Perrine in the state court action. Catanzarite concedes that once it received the Oregon Property, there was "no property remaining in the trust to satisfy

http://www.leagle.com/PrintDocument.aspxADA Complaint Exhibits 325
Complaint Supplement # Superior Court of California County of Orange
Exhibit #8: 016
Book # Superior Court of California
Exhibit #35: 017
5/8/2013
22-CV-01616-BAS-DDL

creditors."[25] With the Oregon Property in the hands of Catanzarite, Perrine stipulated to a judgment with AAA ten days later.

Moreover, the language of Catanzarite's retainer agreement belies any notion that the Oregon Property was not transferred in contemplation of bankruptcy. Like *Dixon*, the transfer was intended to barter non-exempt assets primarily for future legal services to be rendered by Catanzarite. Perrine transferred the Oregon Property to Catanzarite 97 days prior to his bankruptcy, after exhausting efforts to litigate with his largest creditor, and for the stated purpose of "securing the continued representation of the Trust and the individuals in future litigation including without limitation, with creditors and to protect the home equity of Vicki and the pension of Eugene."[26] The Oregon Property was given a "stipulated" value of $30,000 by Perrine to Catanzarite, but Catanzarite was owed only $12,000 at the time of the transfer. As in *Dixon*, the effect of the transfer was to further deplete the assets of the estate.

Catanzarite argues that Perrine did not contemplate or intend to file bankruptcy at the time he was sued by AAA on April 29, 2004.[27] The critical date, however, is the date of the transfer of the Oregon Property. The only direct evidence of Perrine's state of mind on January 14, 2005, is Perrine's deposition testimony that he "never really wanted to declare bankruptcy" and, in response to a question as to whether he was thinking about filing bankruptcy in January 2005, Debtor responded "I don't know." Even Perrine's deposition testimony lacks credibility when weighed against the facts as they existed 97 days prior to bankruptcy.

At the hearing on December 4, 2006, Catanzarite conceded that Perrine "wanted to avoid bankruptcy." Catanzarite explained that Perrine's business "operated from one large job to another," and that his client had been "down in the hole before" but he would receive "the golden phone call . . . where it was a big job would come in and it, pull his company out of its abyss, financial abyss." Taken together, these facts support a finding that Perrine was contemplating the possibility or imminence of bankruptcy when he transferred the Oregon Property to Catanzarite on January 14, 2005, and that the transfer is subject to review under § 329(a) and Rule 2017(a).

D. *Catanzarite Failed to Disclose Property Transferred to Catanzarite in Payment for Legal Services Rendered, or To Be Rendered, in Contemplation of Perrine's Bankruptcy Case*

Section 329(a) and Rule 2016(b) required that Catanzarite's disclosures be

[ 369 B.R.
586 ]

full, candid and complete. Catanzarite timely filed a Rule 2016(b) Statement in this case, but failed to disclose fully and candidly in its Rule 2016(b) Statement the precise nature of its fee agreement with Perrine. Catanzarite's failure to disclose its complete relationship with Perrine was neither negligent nor inadvertent. Notwithstanding its receipt of the Oregon Property pursuant to its retainer agreement with Perrine, Catanzarite made a purposeful calculation of the amount that it chose to disclose in its Rule 2016(b) Statement. Catanzarite did not receive the sum of $3,000 from Perrine for legal services, as certified in its Rule 2016(b) Statement. On the contrary, Catanzarite received a transfer of the Oregon Property from the Perrine Trust on January 14, 2005, with a stipulated value of $30,000. Catanzarite then apportioned a value of $3,000 from the $30,000 transfer for legal services ostensibly rendered to Perrine in contemplation of or in connection with his bankruptcy case. No facts concerning Catanzarite's retainer agreement nor its receipt of the Oregon Property 97 days prior to bankruptcy were disclosed in either the Rule 2016(b) Statement or the Amended Rule 2016(b) Statement. Nor did Catanzarite disclose the method used to calculate the $30,000 "stipulated" value of the Oregon Property. Neither the retainer agreement nor the transfer of the Oregon Property to Catanzarite were disclosed by Perrine in the statement of financial affairs prepared by Catanzarite and filed with the court.

http://www.leagle.com/PrintDocument.aspx...

Complaint Supplement Book #30 - Superior Court of California County of Orange
Exhibit #8: 017
ADA Complaint Exhibits 326

Exhibit #35: 018
22-CV-01616-BAS-DDL

This Document is Provided by Leagle.com

An attorney who neglects to satisfy the disclosure requirements of § 329(a) and Rule 2016 (b), whether willfully or inadvertently, forfeits any right to receive compensation for services rendered on behalf of the debtor and may be ordered to return fees already received. *See Keller Fin. Servs.*, 248 B.R. at 885 (stating that "[t]here are no measurable damages which result from the non-disclosure of compensation required by § 329"). Given the gravity of Catanzarite's non-disclosure, the court will deny all fees to Catanzarite for legal services rendered to Perrine to the petition date due to its failure to comply with § 329(a) and Rule 2016(b).[28] Catanzarite will be ordered to disgorge and turn over to Speier either the Oregon Property or its stipulated value of $30,000, at the election of the trustee, for the benefit of the estate.

### III. CONCLUSION

Ninety-seven days prior to bankruptcy, Perrine transferred the Oregon Property to Catanzarite for legal services rendered, or to be rendered, in contemplation of his bankruptcy case. Catanzarite's failure to disclose both its retainer agreement with Perrine and its receipt of the Oregon

[ 369 B.R. 587 ]

Property pursuant to such retainer agreement, as mandated by § 329(a) and Rule 2016(b), warrants disgorgement of the Oregon Property and denial of fees.

A separate order will be entered consistent with this opinion.

## Footnotes

1. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. On March 30, 2007, Perrine filed a Notice of Request for Debtor's Counsel for Additional Findings of Fact and Conclusions of Law Re: Memorandum Decision Filed and Entered March 23, 2007 ("Notice"). The court has supplemented its findings of fact in this Amended Memorandum Decision in response to the Notice to clarify the factual basis for the court's decision. Insofar as the additional findings of fact and conclusions of law set forth in the Notice have not been incorporated into this Amended Memorandum Decision, Perrine's request is denied.

**Back to Reference**

2. The Eugene H. Perrine Jr. and Vicki L. Perrine Family Trust Declaration of Trust, Schedule A.

**Back to Reference**

3. *See* The Eugene H. Perrine Jr. and Vicki L. Perrine Family Trust Declaration of Trust, Schedule B.

**Back to Reference**

4. Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330 prior to its amendment by the Bankruptcy Abuse and Consumer Prevention Act of 2005, Pub.L. 109-8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr.P."), which make applicable certain Federal Rules of Civil Procedure ("Fed. R. Civ.P.").

**Back to Reference**

5. In Schedule F, Perrine listed 9 creditors holding unsecured non-priority claims totaling $174,073.53. According to Schedules D and E, Perrine did not have any secured creditors or unsecured priority creditors on the petition date.

**Back to Reference**

6. Schedule B, # 12.

**Back to Reference**

7. Schedule B, # 19.

**Back to Reference**

Complaint Supplement #30 — Superior Court of California County of Orange ADA Complaint Exhibits 327

Exhibit #8: 018

Exhibit #35: 019

22-CV-01616-BAS-DDL

http://www.leagle.com/PrintDocument.aspx

5/8/2013

This Document is Provided by Leagle.com
Page 11 of 13
Case 3:23-cv-00882-AGS-DDL   Document 1-30   Filed 05/15/23   PageID.362   Page 89 of 215

8. Statement of Financial Affairs, Question # 3.
**Back to Reference**

9. Statement of Financial Affairs, Question # 10.
**Back to Reference**

10. Rule 2016(b) Statement, p. 1.
**Back to Reference**

11. Rule 2016(b) Statement, p: 2.
**Back to Reference**

12. The Code requires a debtor to appear and submit to examination under oath at a meeting of creditors. 11 U.S.C. § 343; Fed. R. Bankr.P.2003. The examination focuses on the debtor's acts, conduct, property, liabilities and financial condition, as well as any matter which might affect the administration of the bankruptcy estate and the debtor's right to a discharge. Fed. R. Bankr.P.2004(b).
**Back to Reference**

13. In fact, Perrine's unsecured debt was substantially in excess of the amount disclosed in Schedule F. On January 13, 2006, Perrine filed an Amended Schedule F disclosing 12 holders of unsecured non-priority claims totaling $202,277.65.
**Back to Reference**

14. On November 29, 2005, AAA filed a proof of claim in the amount of $76,767 based upon the Stipulation for Entry of Judgment entered in the state court action.
**Back to Reference**

15. A debtor has no absolute right to dismiss a chapter 7 case. *Bartee v. Ainsworth (In re Bartee),*317 B.R. 362, 366 (9th Cir. BAP 2004); *Leach v. U.S. (In re Leach),*130 B.R. 855, 857 n. 5 (9th Cir. BAP 1991). In the Ninth Circuit, "a voluntary Chapter 7 debtor is entitled to dismissal of his case so long as such dismissal will cause no 'legal prejudice' to interested parties." *Leach,* 130 B.R. at 857. The debtor bears the burden of proving that dismissal will not prejudice creditors. *Bartee,* 317 B.R. at 366. In this case, Speier anticipated that there would be funds available to pay unsecured creditors, at least in part. Dismissal would have resulted in prejudice to creditors because there was no guarantee that Perrine would have paid their claims outside of bankruptcy. *Id.*
**Back to Reference**

16. Catanzarite's Opposition to Trustee's Motion to Compel Disclosure of Compensation and Disgorgement of Compensation for Failure to Disclose on Statement 2016, p. 3, 1.6-10. In a letter to Speier's attorney, Thomas H. Casey dated December 15, 2005, Catanzarite enclosed a document entitled "Client Ledger Report" reflecting amounts billed to Perrine for legal services rendered by Catanzarite for the period from May 3, 2004 through April 26, 2005. In the letter, Catanzarite explained that the ledger report demonstrated that

> "[A]s of December 22, 2004, the sum of $11,857.91 was due. After receipt and credit of the land transfer amount on January 13, 2005 for $30,000, there was an $18,000 credit balance. However, fees incurred pre-bankruptcy related to the then pending litigation, as through the statement dated April 26, 2005, consumed all but $1,040.44. The statement dated April 26, 2005 did not cover the services for the period of April 15, 2005 through April 20, 2005. . . . the total amount accrued pre-petition was the sum of $2,615."

> As such, on the date of petition, there was no credit balance. In fact, Perrine actually owed the firm approximately $1,600 at that point in time.

Trustee's Motion to Compel Disgorgement of Compensation for Failure to Disclose on Statement 2016, Ex. 10. In his statement of financial affairs, Perrine stated under penalty of perjury that he paid the $3,000 fee to Catanzarite on January 14, 2005. The Client Ledger Report does not contain a specific billing entry for the $3,000 fee disclosed in the Rule 2016(b) Statement nor is the absence of the entry explained in Catanzarite's letter of December 15, 2005.
**Back to Reference**

17. Amended Rule 2016(b) Statement, p. 3, 1.14-18. Catanzarite actually received payments and credits totaling $33,616.50 between April 22, 2004 and April 21, 2005, for legal services rendered and costs advanced on behalf of Perrine. This amount included the sum of $3,616.50 received by Catanzarite on August 18, 2004, for services rendered in conjunction with certain accounting and compliance issues that arose under a stipulated order concerning the division of a qualified retirement plan previously entered in Perrine's divorce case. At the hearing on December 4,

2006, the court determined that the sum of $3,616.50 was not paid to Catanzarite on August 18, 2004, in contemplation of Perrine's bankruptcy case.

**Back to Reference**

18. Section 329(a) states:

> Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

11 U.S.C. § 329(a).

**Back to Reference**

19. Rule 2016(b) provides:

> Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 15 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 15 days after any payment or agreement not previously disclosed.

Fed. R. Bankr.P.2016(b).

**Back to Reference**

20. *Id.*

**Back to Reference**

21. Rule 2017(a) states, in pertinent part:

> On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or *any transfer of property by the debtor*, made directly or indirectly *and in contemplation of the filing of a petition under the Code* by or against the debtor or before entry of the order for relief in an involuntary case, *to an attorney for services rendered or to be rendered is excessive.*

Fed. R. Bankr.P.2017(a) (emphasis added).

**Back to Reference**

22. Section 60(d) of the Bankruptcy Act of 1898 provided:

> If a debtor shall, directly or indirectly, in contemplation of the filing of a petition by or against him, pay money or transfer property to an attorney and counselor at law, solicitor in equity, or proctor in admiralty for services to be rendered, the transaction shall be reexamined by the court on petition of the trustee or any creditor, and shall only be held valid to the extent of a reasonable amount to be determined by the court, and the excess may be recovered by the trustee for the benefit of the estate.

Bankruptcy Act of 1898, ch. 541, 30 Stat. 544, § 60(d), *superceded by* Bankruptcy Reform Act of 1978, Pub.L.No. 95-598, 11 U.S.C. § 329. In *Conrad, Rubin & Lesser v. Pender*, the Supreme Court discussed the scope of § 60 (d), explaining:

> It contains no intimation of an intention to limit the jurisdiction to re-examine to a particular sort of legal services for the payment of which the debtor has disposed of his property. The point of the provision conferring jurisdiction for a summary reexamination is not the specific nature of the legal services to be rendered, but that the payment or transfer to provide for them is made "in contemplation of" bankruptcy. The purpose is shown by the sweeping description of payments or transfers "to an attorney and counselor at law, solicitor in equity, or proctor in admiralty."

289 U.S. 472, 476-77, 53 S.Ct. 703, 77 L.Ed. 1327 (1933) (quoting Bankruptcy Act of 1898, § 60(d)). This broad scope of review survives in the language of Rule 2017(a). *See In re Rheuban*,121 B.R. 368, 376 (Bankr.C.D.Cal. 1990) (concluding that "decisions interpreting and applying predecessors of § 329 and Bankruptcy Rule 2017(a) remain persuasive and, in certain instances, are controlling. . . ."); *rev'd in Part on other grounds*,124 B.R. 301 (C.D.Cal.1990), *on remand*,128 B.R. 551 (Bankr.C.D.Cal.1991); *In re GIC Gov't Sec., Inc.*,92 B.R. 525, 530 (Bankr.M.D.Fla. 1988) (stating that "the principles enunciated by pre-Code cases interpreting § 60(d) of the Bankruptcy Act of 1898 are still controlling").

**Back to Reference**

23. 18 U.S.C. § 1961, *et. seq.*

**Back to Reference**

4. Zepecki sought avoid capital gains on the sale of the Illinois property by effectuating a tax-free exchange of property under § 1031 of the Internal Revenue Code. 26 U.S.C. § 1031. The parties to the 1031 Exchange of Property scrow Agreement drafted by Brown included *Zepecki, B & B Diversified* Resources, Inc., Zepecki's closely held :orporation, Brown, and the purchaser of the real estate identified as James Burch. *Zepecki*, 277 F.3d at 1044.

Back to Reference

5. Reply in Support of Supplemental Memorandum of Points and Authorities in Support of Reasonableness of Fees curred By Catanzarite Law Corporation, p. 3, 1.19-20.

lack to Reference

26. Retainer Agreement and Application of In Kind Payment, executed on January 11, 2005, Eugene H. Perrine and Vicki L. Perrine, Individually and as Trustee and Kenneth J. Catanzarite, Individually and as President of Catanzarite Law Corporation.

Back to Reference

27. Opposition to Trustee's Motion to Compel Disclosure of Compensation and Disgorgement of Compensation for Failure to Disclose on Statement 2016, p. 2, 23-24.

Back to Reference

28. In reaching its conclusion, the court makes no finding as to the reasonableness of the fees sought by Catanzarite for legal services rendered on behalf of Perrine prior to bankruptcy. *See Lewis*, 113 F.3d at 1046 (holding that where non-disclosure results in an order for disgorgement of all fees, an inquiry into the appropriate amount of the fee is not required). The court notes, however, that the bulk of Catanzarite's pre-petition fees were incurred defending Perrine in the AAA litigation for which Catanzarite ultimately disclosed a fee of $21,077.93. Under § 329(b), Catanzarite bore the burden of establishing the reasonableness of its fees. *Hale v. United States Trustee (In re Basham),* 208 B.R. 926, 931 32 (9th Cir. BAP 1997) (stating that "[t]he burden is on the applicant to demonstrate that the fees are reasonable"). he court questions the reasonableness of Catanzarite's fee for the AAA litigation, particularly in light of the results btained. AAA sued Perrine for $71,167.05, plus interest, attorneys fees and costs. The AAA litigation was concluded, vith a stipulated judgment for $75,000-10 days after Catanzarite received the Oregon Property. Moreover, Catanzarite dmitted that, at the time of the transfer, fees attributable to the AAA litigation were only $12,000.

Back to Reference

Complaint Supplement #3, Superior Court of California County of Orange    Exhibit #35: 022
www.leagle.com/PrintDocument.aspx ADA Complaint Exhibits 330                22-CV-01616-BAS-DDL
Exhibit #8: 021

 LexisNexis®

1 of 4 DOCUMENTS

Warning
As of: Feb 15, 2013

**MIKE ALEXANDROS et al., Plaintiffs and Appellants, v. JAMES A. COLE et al., Defendants and Respondents.**

**G043715 (Consol. with G044362)**

**COURT OF APPEAL OF CALIFORNIA, FOURTH APPELLATE DISTRICT, DIVISION THREE**

*2011 Cal. App. Unpub. LEXIS 9984*

**December 30, 2011, Filed**

**NOTICE:** NOT TO BE PUBLISHED IN OFFICIAL REPORTS. *CALIFORNIA RULES OF COURT, RULE 8.1115(a)*, PROHIBITS COURTS AND PARTIES FROM CITING OR RELYING ON OPINIONS NOT CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED, EXCEPT AS SPECIFIED BY *RULE 8.1115(b)*. THIS OPINION HAS NOT BEEN CERTIFIED FOR PUBLICATION OR ORDERED PUBLISHED FOR THE PURPOSES OF *RULE 8.1115*.

**PRIOR HISTORY:** [*1]
Appeal from a judgment of the Superior Court of Orange County. Super. Ct. No. 06CC07881. Gary L. Taylor, Temporary Judge. (Pursuant to *Cal. Const., art. VI, § 21*.).

**DISPOSITION:** Motion for sanctions. Judgment affirmed. Motion granted.

**COUNSEL:** The Rosen Law Firm, Laurence M. Rosen; Catanzarite Law Corporation and Kenneth J. Catanzarite for Plaintiffs and Appellants.

Foley & Lardner, Sonia Salinas, Roger A. Lane, and Courtney Worcester for Defendants and Respondents New Enterprise Associates IV, L.P. and Spectra Enterprise Associates, L.P.

DLA Piper, Robert Brownlie, Gerard A. Trippitelli, David F. Gross, and Francesca Cicero for Defendants and Respondents James A. Cole, Kevin M. Carnino, Albert

Jicha, Eugene Hovanec, Gregory T. George, Robert Kohler and KOR Electronics.

**JUDGES:** RYLAARSDAM, ACTING P. J.; BEDSWORTH, J., O'LEARY, J. concurred.

**OPINION BY:** RYLAARSDAM

**OPINION**

Plaintiffs Mike Alexandros, Richard Damon, Mike Maridakis, Rick Jensen, Vincent Battaglia, James Struble, Douglas Dwyer, David Schwartz, Mike Thielen, Howard Arnold Lefevre, Dean Groce, Susan Lovern Kahaunaele, Young Lu, Charles D. Cartledge, and David Conrad are minority shareholders owning common stock in defendant KOR Electronics (KOR), a privately held company. In 2006 [*2] they sued defendants New Enterprise Associates IV, L.P. (NEA IV), Spectra Enterprise Associates, L.P. (Spectra), and KOR's directors James Cole, Kevin Carnino, Albert Jicha, Eugene Havanec, Gregory George, and Robert Kohler for breach of fiduciary duty and related claims.

Following a bench trial, the court entered judgment in favor of defendants. It also awarded costs to defendants as the prevailing party under *Code of Civil Procedure section 1032*.

Plaintiffs appeal from both the judgment and the order awarding costs. We consolidated the appeals. (Conrad separately appeals from the order awarding attorney

Complaint Supplement #30-202001149
Exhibit #8: 022

Superior Court of California County of Orange
ADA Complaint Exhibits 331

Exhibit #35: 023
22-CV-01616-BAS-DDL

2011 Cal. App. Unpub. LEXIS 9984, *

fees and the denial of his motion to vacate that order in consolidated case Nos. G044682 and G044457.)

Plaintiffs contend the court erred in (1) applying the business judgment rule to two interested directors (Cole and Carnino), (2) finding the independent directors were properly informed and acted in good faith, (3) requiring plaintiffs to show "control and abuse of that control" by the controlling shareholders, and (4) failing to rule on Carnino's claim for breach of fiduciary duty as KOR's CEO and the issues of inherent unfairness, gross mis-management, waste of corporate assets, and [*3] unjust enrichment. They also assert the court may have errone-ously relied on Delaware law, California's public policy in "protect[ing] the public from fraud and deception in securities transactions" supports reversal, and if the un-derlying judgment is reversed so should the award of costs. Finding no error, we affirm the judgment and the award of costs.

Defendants filed a joint motion for sanctions based on plaintiffs' numerous violations of the California Rules of Court (all further rule references are to these rules) governing appendices and record citations. We grant the motion.

FACTS

Plaintiffs rely on "the undisputed facts and the [s]uperior court's factual findings." Accordingly, the facts are taken from the statement of decision, the joint list of uncontroverted issues, and trial testimony. We construe any disputed facts and all reasonable inferences in the light most favorable to defendants as the prevailing parties. (*Cuiellette v. City of Los Angeles (2011) 194 Cal.App.4th 757, 765.*)

Between 1987 and 1999, "NEA IV and Spectra made venture capital investments in KOR . . . and re-ceived convertible participating preferred stock[, which among other things,] had demand registration [*4] rights, permitting it to require KOR to undertake a public offering." "[I]n late 2005, NEA IV advised [KOR's] board [it] would exercise its demand registration rights or negotiate a KOR recapitalization to buy out NEA IV." "To respond to NEA IV's proposal, KOR's board appointed a Special Committee (Committee) of four directors [George, Jicha, Kohler, and Havanec] who owned no preferred stock, but held KOR common stock or options for common stock."

Because Carnino and Spectra both owned preferred stock, and Cole was affiliated with Spectra, neither Car-nino nor Cole was a member of the Committee. Never-theless, Carnino, with his knowledge, background, and document access as KOR's CEO, carried out certain tasks for the Committee, such as preparing financial analyses

and negotiating with third parties. Carnino did not par-ticipate in the Committee's decisions.

"In early 2006, on the recommendation of the . . . Committee to KOR's board of directors, KOR recapital-ized by repurchasing all the shares of its preferred stock for $40.3 million cash and $9 million in promissory notes, and selling new preferred stock at $40.3 million to new NEA venture capital investment groups" (transac-tion). Carnino [*5] and Cole abstained from voting. In a shareholder vote, a majority of KOR's preferred stock-holders and common stockholders with no preferred stock voted to approve the transaction.

Plaintiffs sued defendants, asserting direct claims for breach of fiduciary duty against KOR's board of direc-tors, breach of fiduciary duty against NEA IV, Spectra, Cole, and Carnino in their capacities as "controlling shareholders," and constructive fraud against all defend-ants, as well as derivative claims on KOR's behalf (not at issue in this appeal). During trial, plaintiffs voluntarily dismissed the constructive fraud count.

The court ruled in favor of defendants on all causes of action. In its statement of decision, it noted plaintiffs' claims were all premised on the same factual basis in-volving breach of fiduciary duty in approving the trans-action. Applying the business judgment rule, it found "the evidence shows no conflict of interest, fraud, bad faith, or gross overreaching contaminated the . . . Com-mittee's decision. On the contrary, the evidence shows the Committee members acted appropriately, using a process that was rational and used in a good faith effort to advance corporate interests."

"Faced [*6] with NEA IV's decision to conclude its investment by exercising its demand registration rights if KOR did not take it out by recapitalization, the KOR board of directors was compelled to study the alterna-tives and make what then appeared to be in the best business decision on what to do. This was a delicate and controversial issue because different interests would be impacted adversely, and there were different views about the best long-range plan."

"Considering all factors, the evidence shows the . . . Committee acted diligently and independently, and its members acted in good faith. Their testimony revealed a sincere and earnest interest in seeking to do the right thing for the long-term interests of the company and the common shareholders. At first, they disliked the NEA IV proposal. They viewed their task as a negotiation to buy NEA IV's demand registration rights and keep the com-pany unsold and private, which they viewed as the best long range course. The evidence shows, and the Court finds, the . . . Committee and its members performed their task with due care and without negligence, they made reasonable inquiry into the facts and alternatives,

Complaint Supplement #30-2020-01143392
Exhibit #8: 023

Back #1 Superior Court of California County of Orange
ADA Complaint Exhibits 332

Exhibit #35: 024
22-CV-01616-BAS-DDL

and they weighed the advantages [*7] and disadvantages. They rejected [a] proposal alternative for what they found to be good and sufficient reasons. The evidence did not show that alternatives were ignored or brushed aside, and there was no evidence of a purpose or plan to give a special deal to favored persons."

"Carnino was an interested party, being a preferred shareholder, but he was the person most familiar with the details of the business. He was not a . . . Committee member, but he was used by the Committee to look for other options, provide data, and act as Committee secretary. Although there might have been a better choice than to have him connected to the . . . Committee, there is no evidence his involvement tainted the Committee's work or decision. He was the CEO with connections to possible alternatives. His stocks interests would probably have benefited from any alternative that was selected, and he was not a decision-maker on the Committee. To use him was within the range of reason."

" . . . Cole had interests which would have disqualified him from sitting on the independent . . . Committee. But, there is no evidence he improperly influenced the Committee."

As to plaintiffs' breach of fiduciary duty claim against [*8] "controlling shareholders," the court ruled that "[t]o establish . . . liability, control and abuse of that control must be shown." Assuming without deciding "the preferred shareholders were a controlling shareholder group, in the sense that they had the power to control certain aspects of the corporation's life," including "the lawful power to exercise 'veto' power and negotiation leverage because of the preferred shareholder rights they had" "the evidence does not show they abused that power. The evidence does not support a finding that they abused their relationship with the . . . Committee, tainted its work, or improperly used their corporate rights. On the contrary, the evidence shows the . . . Committee made its own independent decision about what to do."

The court concluded the Committee's decision to have KOR pay "a premium rate to retire NEA IV and chart its new course . . . had an immediate stock value disadvantage to the common shareholders, but the . . . Committee and full board concluded it was in the best long range interest of the company and the common stockholders. The decision making process used, and the decision that was made, were rational, in good faith, and within [*9] the range of reason. [¶] In addition to the rulings already made, the [c]ourt finds that, for the same reasons, the evidence does not support [p]laintiffs on the theories of gross mismanagement, waste of corporate assets, or unjust enrichment."

DISCUSSION

1. Plaintiffs' Appeal

a. Erroneous Application of Business Judgment Rule

(1) General Legal Principles

The business judgment rule "'establishes a presumption that directors' decisions are based on sound business judgment, and it prohibits courts from interfering in business decisions made by the directors in good faith and in the absence of a conflict of interest. [Citations.]' [Citation.]" (Berg & Berg Enterprises, LLC v. Boyle (2009) 178 Cal.App.4th 1020, 1045.) "'"A hallmark of the business judgment rule is that a court will not substitute its judgment for that of the board if the latter's decision can be "attributed to any rational business purpose.' [Citation.]"' [Citation.]" (Ibid.)

"An exception to the presumption afforded by the business judgment rule . . . exists in 'circumstances which inherently raise an inference of conflict of interest' and the rule 'does not shield actions taken without reasonable inquiry, with improper motives, [*10] or as a result of a conflict of interest.' [Citations.] But . . . more is needed than 'conclusory allegations of improper motives and conflict of interest. Neither is it sufficient to generally allege the failure to conduct an active investigation, in the absence of (1) allegations of facts which would reasonably call for such an investigation, or (2) allegations of facts which would have been discovered by a reasonable investigation and would have been material to the questioned exercise of business judgment.' [Citation.] In most cases, 'the presumption created by the business judgment rule can be rebutted only by affirmative allegations of facts which, if proven, would establish fraud, bad faith, overreaching or an unreasonable failure to investigate material facts. [Citation.] Interference with the discretion of directors is not warranted in doubtful cases.' [Citation.]" (Berg & Berg Enterprises, LLC v. Boyle, supra, 178 Cal.App.4th at p. 1045.) "Once it is shown a director received a personal benefit from the transaction, . . . the burden shifts to the director to demonstrate not only the transaction was entered in good faith, but also to show its inherent fairness from the viewpoint [*11] of the corporation and those interested therein. [Citations.]" (Heckmann v. Ahmanson (1985) 168 Cal.App.3d 119, 128.)

(2) Cole and Carnino

Plaintiffs contend the business judgment rule should not have been applied to Carnino and Cole because they "voted with the full board to approve the transaction" and "also participated in the negotiating process, even though they stood on both sides of the transaction." But plaintiffs' failure to provide any supporting citations to the

Complaint Supplement #30 2020-01145063
Exhibit #8: 024

Book # Superior Court of California County of Orange
ADA Complaint Exhibits 333

Exhibit #35: 025
22-CV-01616-BAS-DDL

record forfeits the argument. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246 [argument not supported by record citations treated as waived]; *City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239, fn. 16 [record citations in statement of facts do not cure lack of citations in argument].) Even if not waived, the contention lacks merit.

Contrary to plaintiffs' claim, the record affirmatively shows Carnino and Cole abstained from voting on the transaction. Accordingly, they "are not subject to liability on the ground of having approved the [subject] agreement[]." (*Gaillard v. Natomas* (1989) 208 Cal.App.3d 1250, 1268.)

Plaintiffs acknowledge this but argue that under *Gaillard*, Carnino and Cole were not entitled [*12] to rely on the business judgment rule because of their participation in the negotiation process. But *Gaillard* reversed the summary judgment in the defendant's favor because there were issues of fact regarding "the nature and extent of [one defendant's] participation in the events" leading to the subject agreement's adoption, which "raise[d] . . . the inference that the agreement was not in the [corporation's] best interests . . . at the time of its adoption." (*Gaillard v. Natomas, supra, 208 Cal.App.3d at p. 1268*.) The judgment here, in contrast, occurred after a 12-day trial following which the court specifically found "no evidence [Carnino's] involvement tainted the Committee's work or decision" or that Cole "improperly influenced the Committee." Plaintiffs have not challenged these findings.

Plaintiffs maintain *Jones v. H. F. Ahmanson & Co.* (1969) 1 Cal.3d 93 required Carnino and Cole, "as conflicted directors, . . . to prove . . . their transaction with KOR was inherently fair." But that rule only applies to "[m]ajority shareholders . . . [who] use their power to control corporate activities to benefit themselves alone or in manner detrimental to the minority. Any use to which they [*13] put the corporation or their power to control the corporation must benefit all shareholders proportionately and must not conflict with the proper conduct of the corporation's business. [Citations.]" (*Id. at p. 108*.) In that event, "the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein.'" [Citation.]" (*Ibid.*)

At trial, plaintiffs' counsel conceded this standard does not apply unless interested directors "exercise control in connection with the transaction" or "use their position in connection with assisting that transaction to come to fruition." In this case, it was unnecessary to reach the question of inherent fairness given the court's determination neither defendant had used any power or

control in a manner that affected the Committee's ultimate decision to approve the transaction.

For the same reason, *Tenzer v. Superscope, Inc.* (1985) 39 Cal.3d 18 does not aid plaintiffs. There, Tenzer, a member of Superscope's board of directors, helped secure a purchaser for the corporation's property and requested a 10 percent finder's fee. Tushinsky, [*14] Superscope's president, orally agreed but after the deal was consummated the board denied Tenzer a finder's fee. The Supreme Court reversed the summary judgment granted in favor of Superscope.

Among other things, Superscope argued that given Tenzer's fiduciary duties as a board member any reliance on Tushinsky's promise was unreasonable. Although the Court agreed Tenzer owed fiduciary duties, it concluded triable issues of material fact precluded summary judgment: "As a corporate director, Tenzer is charged with the knowledge that any contract he entered into with his own corporation, even if valid and enforceable in all other respects, could be avoided at the corporation's option if it were determined to be unfair or unreasonable to the corporation. Thus, in order to prove that his reliance upon Tushinsky's promise was justifiable, Tenzer will be required to prove that the arrangement was fair and reasonable to the corporation. [¶] Establishing whether Tenzer's agreement with Superscope was fair and reasonable involves determination of the particular factual circumstances of the agreement, and application of the standards of fairness and good faith required of a fiduciary to these [*15] facts. These are functions mainly for the trier of facts. [Citations.]" (*Tenzer v. Superscope, Inc., supra, 39 Cal.3d at p. 32*.)

Here, in contrast, because. the trier of fact determined Cole and Carnino did not participate in the transaction in any manner that affected the Committee's decision, it had no occasion to determine whether their conduct was fair and reasonable. Plaintiffs maintain that under *Tenzer*, Cole and Carnino's "fiduciary duties imposed on them a duty not to use [their additional bargaining] leverage in a way that was not inherently fair." But the court's finding shows they did not do that.

### (3) Directors on Committee

Plaintiffs argue the directors on the Committee were not entitled to the business judgment presumption because they were "not properly informed and not acting in good faith." (Underscoring omitted.) They assert "[t]he directors on the [C]ommittee wrongfully abdicated their duty to inform themselves by relying on Carnino, who, as a directly interested, conflicted, preferred stockholder, was not . . . someone whom any director could 'believe[] to be reliable.'" We are not persuaded, given the findings the Committee members "performed their task with due

Complaint Supplement #30: 2020-01-14500B
Exhibit #8: 025

Bankruptcy Superior Court of California County of Orange
ADA Complaint Exhibits 334

Exhibit #35: 026
22-CV-01616-BAS-DDL

2011 Cal. App. Unpub. LEXIS 9984, *

care [*16] and without negligence, . . . ma[king] reasonable inquiry into the facts and alternatives, and . . . weigh[ing] the advantages and disadvantages," and that Carnino's actions in "look[ing] for other options, provid[ing] data, and act[ing] as Committee secretary" did not affect their evaluation.

Nor does the case plaintiffs cite, *Everest Investors 8 v. McNeil Partners (2003) 114 Cal.App.4th 411, 430*, support their claim it was "unreasonable as a matter of law" for the Committee to have Carnino assist them. Rather, as plaintiffs' acknowledge, that case merely held the business judgment rule "does not shield actions taken without reasonable inquiry . . . ." *(Ibid.)*

As to the good faith requirement, plaintiffs contend the court applied the wrong standard by limiting it "to an 'effort to advance corporate interests'" when in fact "directors, officers, and controlling shareholders owe a duty of good faith to all shareholders." (Underscoring omitted.) But none of the cases on which they rely--*Small v. Fritz Companies, Inc. (2003) 30 Cal.4th 167; Kennerson v. Burbank Amusement Co. (1953) 120 Cal.App.2d 157, and Remillard Brick Co. v. Remillard-Dandini Co. (1952) 109 Cal.App.2d 405*--involve application [*17] of the business judgment rule.

The argument further lacks merit in that the court specifically found the Committee members had "a sincere and earnest interest in seeking to do the right thing for[, and based its decision on,] the long-term interests of the company *and the common shareholder*" (italics added), despite its "immediate stock value disadvantage to the" latter. Plaintiffs cite certain evidence to purportedly show the Committee members "knowingly acted in bad faith in approving a transaction that they knew was not fair to the common shareholders . . . ." Such resolutions of fact were for the trial court and we will not reweigh the evidence. *(Cuiellette v. City of Los Angeles, supra, 194 Cal.App.4th at p. 765.)*

Plaintiffs also argue the court applied the wrong burden of proof in finding the Committee members "us[ed] a process that was rational and used in a good faith effort to advance corporate interests." They reason that after the directors carry their "initial burden of proving . . . the business judgment rule affirmatively applies (i.e., that the director[s have] no conflict of interest)" and plaintiffs rebut that "presumption by proving any one of the four bases for rebuttal," [*18] "the burden shifts back to the director[s] to prove inherent fairness." In their view, "the court reversed the burden of proof . . . [by] plac[ing] the burden on [p]laintiffs to prove . . . the process used was not 'rational.'" It did no such thing.

To the contrary, the court determined plaintiffs had failed to carry their burden of rebutting the business judgment presumption in "that the evidence shows no

conflict of interest, fraud, bad faith, or gross overreaching contaminated the . . . Committee's . . . decision." Although it could have ended its analysis there, it went on to find "the evidence shows the Committee members acted appropriately, using a process that was rational and used in a good faith effort to advance corporate interests." In other words, defendants affirmatively showed they used a rational process, as plaintiffs contend they were obligated to do. But in no event did the court require plaintiffs to prove the process was not rational.

### b. NEA IV and Spectra

As to NEA IV and Spectra, plaintiffs assert that because the business judgment rule does not apply to shareholders, and the court found NEA IV and Spectra were controlling shareholders and "the transaction disadvantaged [*19] the common shareholders," the court erred in requiring plaintiffs to prove "'control and abuse of that control.'" Rather, they claim, once they proved control, the burden shifted to the controlling shareholders to prove "the transaction is inherently fair to the minority shareholders." We disagree.

The court assumed NEA IV and Spectra "were a controlling shareholder group, in the sense . . . they had the power to control certain aspects of [KOR's] life[,] . . . includ[ing] the lawful power to exercise 'veto' power and negotiation leverage." Even so, it found the "Committee made its own independent decision about what to do" and there is no evidence NEA IV and Spectra "abused that power [or] . . . their relationship with the . . . Committee, tainted its work, or improperly used their corporate rights." Thus, as in the case of Carnino and Cole, there was no need to establish inherent fairness because any use by NEA IV and Spectra of their asserted powers as controlling shareholders did not influence the Committee's decision. Because the court did not err in declining to reach the issue of inherent fairness as plaintiffs contend, we reject their claim the case should be remanded for a [*20] trial on damages for that reason.

### c. Failure to Address Carnino's Breach of Fiduciary Duties as CEO

Plaintiffs argue the court erred in failing to analyze Carnino's breach of fiduciary duties in his capacity as CEO, separate from his capacity as a director and preferred stockholder, as alleged in their first cause of action for breach of fiduciary duty against KOR's officers and directors. But if there was error plaintiffs invited it by failing to litigate the issue at trial or identifying it to the court during opening or closing arguments. *(Portola Hills Community Assn. v. James (1992) 4 Cal.App.4th 289, 294,* disapproved of on other grounds in *Nahrstedt v. Lakeside Village Condominium Assn. (1994) 8 Cal.4th 361, 386* [error, if any, in not addressing issue invited

Complaint Supplement #30-2021-01745598
Exhibit #8: 026

Superior Court of California, County of Orange
ADA Complaint Exhibits 335

Exhibit #35: 027
22-CV-01616-BAS-DDL

where "subject . . . was not included in the stipulated facts or plaintiff's trial brief and was not presented orally during the evidentiary phase or argued to the court"].) As such, they are "'estopped from asserting it as a ground for reversal' on appeal. [Citation.]" (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403.)

Moreover, plaintiffs' failure to either request a statement of decision on this issue, or specifically note, [*21] in their objections to the proposed statement of decision, the court's omission of the issue, "absolutely forecloses any consideration of it now [citation]." (*Portola Hills Community Assn. v. James, supra,* 4 Cal.App.4th at p. 294; *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1138 ["It is clearly unproductive to deprive a trial court of the opportunity to correct such a purported defect by allowing a litigant to raise the claimed error for the first time on appeal"].)

Plaintiffs maintain Camino is liable as a matter of law for breach of fiduciary duty in his capacity as CEO based on the court's undisputed factual findings he was the CEO and "an interested party" who was "used by the Committee to look for other options, provide data, and act as Committee secretary." From this, plaintiffs jump to the conclusion "Camino violated his fiduciary duties to the common shareholder . . . ." But at most these demonstrate Camino owed fiduciary duties as CEO. They do not prove breach of those duties or proximate damages. (*Pierce v. Lyman* (1991) 1 Cal.App.4th 1093, 1101 [absence of damage proximately caused by breach defeats claim for breach of fiduciary duty].) Nor do plaintiffs cite any [*22] evidence showing Camino proximately caused their damages by breaching his fiduciary duties as CEO.

### d. Remaining Issues

We reject plaintiffs' remaining claims. First, as to their contention the court erroneously "relied on Delaware law of special committees," they failed to show the court actually did so, as no out of state authority was referenced in its statement of decision. Their own reliance upon Delaware law and the fact plaintiffs never claimed California does not recognize special committees in the trial court also precludes them from asserting it for the first time on appeal. (*Portola Hills Community Assn. v. James, supra,* 4 Cal.App.4th at p. 294.)

Second, plaintiffs cite "California's policy . . . to protect the public from fraud and deception in security transactions." (*Hall v. Superior Court* (1983) 150 Cal.App.3d 411, 417.) But they voluntarily dismissed their constructive fraud claim and have not shown the court's findings were inconsistent with public policy.

Third, plaintiffs assert the court committed reversible error in "failing to reach [their] claims for gross

mismanagement, waste of corporate assets, and unjust enrichment." (Capitalization, bold and underscoring omitted.) [*23] This is belied by the statement of decision's express ruling those claims failed on the same grounds as the breach of fiduciary duty causes of action.

Plaintiffs' final argument is that if the underlying judgment is reversed so should the award of costs. We affirm both the judgment and the costs award.

### 2. Defendants' Motion for Sanctions

Defendants filed a combined motion for sanctions on the grounds plaintiffs failed to comply with various Rules of Court by including in their appendix documents never admitted at trial and documents unnecessary to the appeal, the majority of which was not referenced in their briefs, and by failing to include record references for many factual statements. Plaintiffs acknowledge their "technical rule violations" but claim they "did not cause the degree of prejudice, confusion or additional work for the clerk's office or for [defendants] as to warrant the imposition of sanctions." We disagree.

### a. Appendix

Under rule 8.124(b)(3), "[a]n appendix must not: [¶] (A) Contain documents or portions of documents filed in superior court that are unnecessary for proper consideration of the issues." Including in an "appendix . . . all of the parties' proposed trial exhibits, [*24] without any accompanying indication as to which exhibits were actually admitted in evidence" violates this rule (*Kreutzer v. City and County of San Francisco* (2008) 166 Cal.App.4th 306, 319, fn. 8, italics omitted), as does including "documents never referenced by plaintiffs" and those that are "not necessary to our determination of the issues" (*Evans v. Centerstone Development Co.* (2005) 134 Cal.App.4th 151, 167).

Here, plaintiffs included 76 documents in their 12-volume appendix, consisting of 2,958 pages, but only cited to 16 in their opening brief and 12 in their reply. Of those 76 documents, 39 were not admitted at trial.

Plaintiffs concede neither those 39 nonadmitted documents nor the volumes of foreign authorities lodged in the trial court were necessary to the appeal and should not have been included in the appendix, and that "they should have exercised more discretion and selected a smaller number of documents . . . ." But they ask sanctions not be imposed because although sanctions may be imposed for filing a faulty appendix (rule 8.124(g)), the Advisory Comment states such "sanctions do not depend on the degree of culpability of the filing party—i.e., on whether the party's [*25] conduct was willful or negligent—but on the nature of the inaccuracies and the importance of the documents they affect." (Advisory Com.

Complaint Supplement #30-2020-01145908
Exhibit #8: 027

Back # Superior Court of California County of Orange
ADA Complaint Exhibits 336

Exhibit #35: 028
22-CV-01616-BAS-DDL

2011 Cal. App. Unpub. LEXIS 9984, *

com., 23 pt. 2 West's Ann. Codes, Rules (2006 ed.) foll. rule 8.124, p. 552.)

Plaintiffs conclusorily assert "the nature of the over-inclusiveness, while regrettably contributing to the bulk of papers filed, did not substantially hamper the [c]ourt or [defendants]," there were no inaccuracies that affected important documents, and that defendants' authorities suggest their "technical violations" were not "so egregious that sanctions should be imposed." They are correct *Evans v. Centerstone Development Co., supra, 134 Cal.App.4th 151* is the only case cited by defendants in which sanctions were awarded. They seek to distinguish *Evans* on the basis it involved violations of many rules and the prosecution of a frivolous appeal, whereas this case was meritorious and the "12-[volume] . . . [a]ppendix, though excessive, should not have hampered or caused confusion . . . ."

But here plaintiffs admit they violated several rules. They also continued to cite the excluded evidence in their reply brief even after defendants noted the error in their briefs. As for [*26] hampering, defense counsel's declarations supporting the sanctions motion state plaintiffs' deficient appendix required them to "review[] all documents submitted . . . to determine which documents were admitted trial exhibits, which documents were actually cited by [a]ppellants[] in their briefs, what additional admitted exhibits were necessary to the issues on appeal, and the selection of additional documents to be included in [r]espondents' [j]oint [a]ppendix." This is sufficient to support an award, especially given plaintiffs failure to cite any contrary evidence.

*b. Plaintiffs' Briefs*

Rule 8.204(a)(1)(C) requires parties to "[s]upport any reference to a matter in the record by a citation to the volume and page number of the record where the matter appears." Rule8.204(a)(2)(C) also requires appellants to "[p]rovide a summary of the significant facts limited to matters in the record."

Plaintiffs' opening brief makes 39 unsupported factual statements, including full paragraphs lacking record references. Some assertions are contradicted by the record. The reply brief similarly contains 34 statements, and full paragraphs, without citations to the record.

Plaintiffs' counsel Laurence M. [*27] Rosen acknowledges noncompliance with these rules but claims "[t]he factual assertions in all material respects were accurate and can be supported by proper citations to the record." Because he "will be mindful of the [r]ules . . . in the future" and the violations were neither unintentional nor misleading, he states "there is no need for an imposition of monetary or other sanctions . . . ." According to him, the infractions were the fault of his "overwrought"

associate who made some mistakes and the hampering of his supervision by two serious emergencies—his mother's admission to the hospital and subsequent death, and his emergency back surgery to repair two herniated discs. He asserts the reply brief "supplies a better, more focused summary and substantial additional citations to the record" and goes on to address each of the unsupported factual statements identified by defendants. These efforts "at this point [were] too little, too late. Although we are not required to plow through mounds of appendices, at times we did, and we have no doubt defendants had to expend substantial additional and unnecessary time because of this violation." (*Evans v. CenterStone Development Co., supra, 134 Cal.App.4th at p. 167.*) [*28] We thus deny his request for leniency.

Plaintiffs maintain that because they "challenge[d] . . . the sufficiency of the evidence" the court's obligation to review the entire record "reduce[d] somewhat the otherwise burdensome efforts of [the] violations. But although plaintiffs assert "[t]he [statement of d]ecision is riddled with demonstrably false factual findings," the opening brief never actually claimed the evidence was insufficient to support the judgment. Even if they had, the burdens of their violations would not have been decreased.

*c. Sanctions Amount*

The repeated violation of appellate rules, compounded by the failure to correct the infractions in the reply brief after respondents brought the deficiencies to his attention, justifies imposition of sanctions in this case. (*Pierotti v. Torian* (2000) 81 Cal.App.4th 17, 30-31 [sanctions warranted for "unreasonable infraction of the rules" made worse by further violations in reply brief after respondents pointed out violations].) Defendants request $30,000 in monetary sanctions. Plaintiffs contend this amount is "grossly inflated" (bold and capitalization omitted) because defendants double billed for the same tasks, erroneously included [*29] time spent to prepare the respondents' appendix, needlessly "spent time in determining which factual statements were supported by admitted evidence and which documents were admitted trial documents" and "spent an inordinate amount of time preparing charts and their motion for sanctions . . . ."

Attorney fees are a common measure of sanctions payable to an opposing party. (See, e.g., *Periotti v. Torian, supra, 81 Cal.App.4th at p. 33.*) Of the $30,000 in sanctions requested by defendants, only $10,000 appears to be for attorney fees. The remaining $20,000 is for "[a] portion of the costs incurred" by defendants. We conclude a sanction of in the amount of $10,000 is appropriate in this case to compensate defendants for additional burdens imposed on it and to deter similar conduct in the future.

Complaint Supplement #30: 2020-01145338
Exhibit #8: 028

Bank of Superior Court of California County of Orange
ADA Complaint Exhibits 337

Exhibit #35: 029
22-CV-01616-BAS-DDL

2011 Cal. App. Unpub. LEXIS 9984, *

Defendants request the sanctions be payable by plaintiffs, their counsel, or both. Plaintiffs' attorneys should be held liable for the sanctions, as they were the ones who failed to comply with the rules of the appellate court. (See *Pierotti v. Torian, supra, 81 Cal.App.4th at pp. 36-37*.) The $10,000 sanctions award shall be payable joint and severally by plaintiffs' attorneys, Kenneth J. Catanzarite [*30] and Laurence M. Rosen, to defendants. Although we could order the sanctions be paid instead to this court, or impose additional sanctions, to defray the extra cost to taxpayers to process the appeal (*Alicia T. v. County of Los Angeles (1990) 222 Cal.App.3d 869, 885*), we decline to do so. Because we did not rely on any documents that were not admitted at trial or any of the unsupported factual statements in the opening or reply briefs, we deny defendants' request to strike these items.

DISPOSITION

The judgment is affirmed. The motion for sanctions is granted in the amount of $10,000. Counsel for plaintiffs, Kenneth J. Catanzarite and Laurence M. Rosen, are ordered to pay defendants the $10,000 sanctions award jointly and severally individually without contribution from plaintiffs, within 30 days of the filing of the remittitur. They shall provide this court with an affidavit stating they have not and will not bill their clients for any portion of the sanctions and are ordered to report the sanctions to the State Bar. (*Bus. & Prof. Code, § 6068, subd. (o)(3)*.) The clerk of this court is directed to forward a copy of this opinion to the State Bar. (*Bus. & Prof. Code, § 6086.7, subd. (a)(3)*.) [*31] Defendants shall recover their costs on appeal.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

BEDSWORTH, J.

O'LEARY, J.

Complaint Supplement #30-2020-01145598
Exhibit #8: 029
Superior Court of California County of Orange
ADA Complaint Exhibits 338
Exhibit #35: 030
22-CV-01616-BAS-DDL

EXHIBIT 9

# FTC Staff Guidance on Active Supervision of State Regulatory Boards Controlled by Market Participants[*]

## I.     Introduction

States craft regulatory policy through a variety of actors, including state legislatures, courts, agencies, and regulatory boards. While most regulatory actions taken by state actors will not implicate antitrust concerns, some will. Notably, states have created a large number of regulatory boards with the authority to determine who may engage in an occupation (*e.g.*, by issuing or withholding a license), and also to set the rules and regulations governing that occupation. Licensing, once limited to a few learned professions such as doctors and lawyers, is now required for over 800 occupations including (in some states) locksmiths, beekeepers, auctioneers, interior designers, fortune tellers, tour guides, and shampooers.[1]

In general, a state may avoid all conflict with the federal antitrust laws by creating regulatory boards that serve only in an advisory capacity, or by staffing a regulatory board exclusively with persons who have no financial interest in the occupation that is being regulated. However, across the United States, "licensing boards are largely dominated by active members of their respective industries . . ."[2] That is, doctors commonly regulate doctors, beekeepers commonly regulate beekeepers, and tour guides commonly regulate tour guides.

Earlier this year, the U.S. Supreme Court upheld the Federal Trade Commission's determination that the North Carolina State Board of Dental Examiners ("NC Board") violated the federal antitrust laws by preventing non-dentists from providing teeth whitening services in competition with the state's licensed dentists. *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101 (2015). NC Board is a state agency established under North Carolina law and charged with administering and enforcing a licensing system for dentists. A majority of the members of this state agency are themselves practicing dentists, and thus they have a private incentive to limit

---

[*] This document sets out the views of the Staff of the Bureau of Competition. The Federal Trade Commission is not bound by this Staff guidance and reserves the right to rescind it at a later date. In addition, FTC Staff reserves the right to reconsider the views expressed herein, and to modify, rescind, or revoke this Staff guidance if such action would be in the public interest.

[1] Aaron Edlin & Rebecca Haw, *Cartels By Another Name: Should Licensed Occupations Face Antitrust Scrutiny*, 162 U. PA. L. REV. 1093, 1096 (2014).

[2] *Id.* at 1095.

Complaint Supplement #30-2020-01145998
Exhibit #9: 001

Back # Superior Court of California County of Orange
ADA Complaint Exhibits 340

competition from non-dentist providers of teeth whitening services. NC Board argued that, because it is a state agency, it is exempt from liability under the federal antitrust laws. That is, the NC Board sought to invoke what is commonly referred to as the "state action exemption" or the "state action defense." The Supreme Court rejected this contention and affirmed the FTC's finding of antitrust liability.

In this decision, the Supreme Court clarified the applicability of the antitrust state action defense to state regulatory boards controlled by market participants:

> "The Court holds today that a state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates must satisfy *Midcal's* [*Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980)] active supervision requirement in order to invoke state-action antitrust immunity." *N.C. Dental*, 135 S. Ct. at 1114.

In the wake of this Supreme Court decision, state officials have requested advice from the Federal Trade Commission regarding antitrust compliance for state boards responsible for regulating occupations. This outline provides FTC Staff guidance on two questions. *First*, when does a state regulatory board require active supervision in order to invoke the state action defense? *Second*, what factors are relevant to determining whether the active supervision requirement is satisfied?

Our answers to these questions come with the following caveats.

➤ Vigorous competition among sellers in an open marketplace generally provides consumers with important benefits, including lower prices, higher quality services, greater access to services, and increased innovation. For this reason, a state legislature should empower a regulatory board to restrict competition only when necessary to protect against a credible risk of harm, such as health and safety risks to consumers. The Federal Trade Commission and its staff have frequently advocated that states avoid unneeded and burdensome regulation of service providers.[3]

➤ Federal antitrust law does <u>not</u> require that a state legislature provide for active supervision of any state regulatory board. A state legislature may, and generally should, prefer that a regulatory board be subject to the requirements of the federal antitrust

---

[3] *See, e.g.*, Fed. Trade Comm'n Staff Policy Paper, *Policy Perspectives: Competition and the Regulation of Advanced Practice Registered Nurses* (Mar. 2014), https://www.ftc.gov/system/files/documents/reports/policy-perspectives-competition-regulation-advanced-practice-nurses/140307aprnpolicypaper.pdf; Fed. Trade Comm'n & U.S. Dept. of Justice, Comment before the South Carolina Supreme Court Concerning Proposed Guidelines for Residential and Commercial Real Estate Closings (Apr. 2008), https://www.ftc.gov/news-events/press-releases/2008/04/ftcdoj-submit-letter-supreme-court-south-carolina-proposed.

Complaint Supplement #30 2020-01-14-9998
Exhibit #9: 002
Bank of Superior Court of California County of Orange
ADA Complaint Exhibits 341

laws. If the state legislature determines that a regulatory board should be subject to antitrust oversight, then the state legislature need not provide for active supervision.

➢      Antitrust analysis – including the applicability of the state action defense – is fact-specific and context-dependent. The purpose of this document is to identify certain overarching legal principles governing when and how a state may provide active supervision for a regulatory board. We are not suggesting a mandatory or one-size-fits-all approach to active supervision. Instead, we urge each state regulatory board to consult with the Office of the Attorney General for its state for customized advice on how best to comply with the antitrust laws.

➢      This FTC Staff guidance addresses only the active supervision prong of the state action defense. In order successfully to invoke the state action defense, a state regulatory board controlled by market participants must also satisfy the clear articulation prong, as described briefly in Section II. below.

➢      This document contains guidance developed by the staff of the Federal Trade Commission. Deviation from this guidance does not necessarily mean that the state action defense is inapplicable, or that a violation of the antitrust laws has occurred.

Complaint Supplement #30-2020-01459996
Exhibit #9: 003

Bank of Superior Court of California County of Orange
ADA Complaint Exhibits 342

## II.      Overview of the Antitrust State Action Defense

"Federal antitrust law is a central safeguard for the Nation's free market structures  . . . . The antitrust laws declare a considered and decisive prohibition by the Federal Government of cartels, price fixing, and other combinations or practices that undermine the free market." *N.C. Dental*, 135 S. Ct. at 1109.

Under principles of federalism, "the States possess a significant measure of sovereignty." *N.C. Dental*, 135 S. Ct. at 1110 (*quoting Community Communications Co. v. Boulder*, 455 U.S. 40, 53 (1982)). In enacting the antitrust laws, Congress did not intend to prevent the States from limiting competition in order to promote other goals that are valued by their citizens. Thus, the Supreme Court has concluded that the federal antitrust laws do not reach anticompetitive conduct engaged in by a State that is acting in its sovereign capacity. *Parker v. Brown*, 317 U.S. 341, 351-52 (1943). For example, a state legislature may "impose restrictions on occupations, confer exclusive or shared rights to dominate a market, or otherwise limit competition to achieve public objectives." *N.C. Dental*, 135 S. Ct. at 1109.

Are the actions of a state regulatory board, like the actions of a state legislature, exempt from the application of the federal antitrust laws? In *North Carolina State Board of Dental Examiners*, the Supreme Court reaffirmed that a state regulatory board is not the sovereign. Accordingly, a state regulatory board is not necessarily exempt from federal antitrust liability.

More specifically, the Court determined that "a state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates" may invoke the state action defense only when two requirements are satisfied: first, the challenged restraint must be clearly articulated and affirmatively expressed as state policy; and second, the policy must be actively supervised by a state official (or state agency) that is not a participant in the market that is being regulated. *N.C. Dental*, 135 S. Ct. at 1114.

➢      The Supreme Court addressed the clear articulation requirement most recently in *FTC v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003 (2013). The clear articulation requirement is satisfied "where the displacement of competition [is] the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature. In that scenario, the State must have foreseen and implicitly endorsed the anticompetitive effects as consistent with its policy goals." *Id.* at 1013.

➢      The State's clear articulation of the intent to displace competition is not alone sufficient to trigger the state action exemption. The state legislature's clearly-articulated delegation of authority to a state regulatory board to displace competition may be "defined at so high a level of generality as to leave open critical questions about how

October 2015                                                                                                      4

Bank # 30-2020-01145998 of California County of Orange
ADA Complaint Exhibits 343

and to what extent the market should be regulated." There is then a danger that this delegated discretion will be used by active market participants to pursue private interests in restraining trade, in lieu of implementing the State's policy goals. *N.C. Dental*, 135 S. Ct. at 1112.

> The active supervision requirement "seeks to avoid this harm by requiring the State to review and approve interstitial policies made by the entity claiming [antitrust] immunity." *Id.*

Where the state action defense does not apply, the actions of a state regulatory board controlled by active market participants may be subject to antitrust scrutiny. Antitrust issues may arise where an unsupervised board takes actions that restrict market entry or restrain rivalry. The following are some scenarios that have raised antitrust concerns:

> A regulatory board controlled by dentists excludes non-dentists from competing with dentists in the provision of teeth whitening services. *Cf. N.C. Dental,* 135 S. Ct. 1101.

> A regulatory board controlled by accountants determines that only a small and fixed number of new licenses to practice the profession shall be issued by the state each year. *Cf. Hoover v. Ronwin*, 466 U.S. 558 (1984).

> A regulatory board controlled by attorneys adopts a regulation (or a code of ethics) that prohibits attorney advertising, or that deters attorneys from engaging in price competition. *Cf. Bates v. State Bar of Ariz.*, 433 U.S. 350 (1977); *Goldfarb v. Va. State Bar*, 421 U.S. 773 (1975).

Book #30 Superior Court of California County of Orange
ADA Complaint Exhibits 344

## III.      Scope of FTC Staff Guidance

A. This Staff guidance addresses the applicability of the state action defense under the federal antitrust laws. Concluding that the state action defense is inapplicable does <u>not</u> mean that the conduct of the regulatory board necessarily violates the federal antitrust laws. A regulatory board may assert defenses ordinarily available to an antitrust defendant.

1. **Reasonable restraints on competition do not violate the antitrust laws, even where the economic interests of a competitor have been injured.**

   Example 1: A regulatory board may prohibit members of the occupation from engaging in fraudulent business practices without raising antitrust concerns. A regulatory board also may prohibit members of the occupation from engaging in untruthful or deceptive advertising. *Cf. Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999).

   Example 2: Suppose a market with several hundred licensed electricians. If a regulatory board suspends the license of one electrician for substandard work, such action likely does not unreasonably harm competition. *Cf. Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696 (4th Cir. 1991) (en banc).

2. **The ministerial (non-discretionary) acts of a regulatory board engaged in good faith implementation of an anticompetitive statutory regime do not give rise to antitrust liability. See 324 Liquor Corp. v. Duffy, 479 U.S. 335, 344 n. 6 (1987).**

   Example 3: A state statute requires that an applicant for a chauffeur's license submit to the regulatory board, among other things, a copy of the applicant's diploma and a certified check for $500. An applicant fails to submit the required materials. If for this reason the regulatory board declines to issue a chauffeur's license to the applicant, such action would not be considered an unreasonable restraint. In the circumstances described, the denial of a license is a ministerial or non-discretionary act of the regulatory board.

3. **In general, the initiation and prosecution of a lawsuit by a regulatory board does not give rise to antitrust liability unless it falls within the "sham exception." Professional Real Estate Investors v. Columbia Pictures Industries, 508 U.S. 49 (1993); California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972).**

   Example 4: A state statute authorizes the state's dental board to maintain an action in state court to enjoin an unlicensed person from practicing dentistry. The members of the dental board have a basis to believe that a particular individual is practicing dentistry but does not hold a valid license. If the dental board files a lawsuit against that individual, such action would not constitute a violation of the federal antitrust laws.

---

October 2015

B. Below, FTC Staff describes when active supervision of a state regulatory board is required in order successfully to invoke the state action defense, and what factors are relevant to determining whether the active supervision requirement has been satisfied.

1. **When is active state supervision of a state regulatory board required in order to invoke the state action defense?**

*General Standard*: "[A] state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates must satisfy *Midcal*'s active supervision requirement in order to invoke state-action antitrust immunity." *N.C. Dental*, 135 S. Ct. at 1114.

*Active Market Participants*: A member of a state regulatory board will be considered to be an active market participant in the occupation the board regulates if such person (i) is licensed by the board or (ii) provides any service that is subject to the regulatory authority of the board.

> ➤ If a board member participates in any professional or occupational sub-specialty that is regulated by the board, then that board member is an active market participant for purposes of evaluating the active supervision requirement.

> ➤ It is no defense to antitrust scrutiny, therefore, that the board members themselves are not directly or personally affected by the challenged restraint. For example, even if the members of the NC Dental Board were orthodontists who do not perform teeth whitening services (as a matter of law or fact or tradition), their control of the dental board would nevertheless trigger the requirement for active state supervision. This is because these orthodontists are licensed by, and their services regulated by, the NC Dental Board.

> ➤ A person who temporarily suspends her active participation in an occupation for the purpose of serving on a state board that regulates her former (and intended future) occupation will be considered to be an active market participant.

*Method of Selection*: The method by which a person is selected to serve on a state regulatory board is not determinative of whether that person is an active market participant in the occupation that the board regulates. For example, a licensed dentist is deemed to be an active market participant regardless of whether the dentist (i) is appointed to the state dental board by the governor or (ii) is elected to the state dental board by the state's licensed dentists.

---

Complaint Supplement #30-2020-01145998 of California County of Orange
Exhibit #9: 007
ADA Complaint Exhibits 346

***A Controlling Number, Not Necessarily a Majority, of Actual Decisionmakers:***

> ➤ Active market participants need not constitute a numerical majority of the members of a state regulatory board in order to trigger the requirement of active supervision. A decision that is controlled, either as a matter of law, procedure, or fact, by active participants in the regulated market (*e.g.*, through veto power, tradition, or practice) must be actively supervised to be eligible for the state action defense.

> ➤ Whether a particular restraint has been imposed by a "controlling number of decisionmakers [who] are active market participants" is a fact-bound inquiry that must be made on a case-by-case basis. FTC Staff will evaluate a number of factors, including:

>> ✓ The structure of the regulatory board (including the number of board members who are/are not active market participants) and the rules governing the exercise of the board's authority.

>> ✓ Whether the board members who are active market participants have veto power over the board's regulatory decisions.

**Example 5:** The state board of electricians consists of four non-electrician members and three practicing electricians. Under state law, new regulations require the approval of five board members. Thus, no regulation may become effective without the assent of at least one electrician member of the board. In this scenario, the active market participants effectively have veto power over the board's regulatory authority. The active supervision requirement is therefore applicable.

>> ✓ The level of participation, engagement, and authority of the non-market participant members in the business of the board – generally and with regard to the particular restraint at issue.

>> ✓ Whether the participation, engagement, and authority of the non-market participant board members in the business of the board differs from that of board members who are active market participants – generally and with regard to the particular restraint at issue.

>> ✓ Whether the active market participants have in fact exercised, controlled, or usurped the decisionmaking power of the board.

**Example 6:** The state board of electricians consists of four non-electrician members and three practicing electricians. Under state law, new regulations require the approval of a majority of board members. When voting on proposed regulations, the non-electrician members routinely defer to the preferences of the electrician members. Minutes of

---

Complaint Supplement #30-2020-01149599
Exhibit #9: 008
Bank of Superior Court of California County of Orange
ADA Complaint Exhibits 347

board meetings show that the non-electrician members generally are not informed or knowledgeable concerning board business – and that they were not well informed concerning the particular restraint at issue. In this scenario, FTC Staff may determine that the active market participants have exercised the decisionmaking power of the board, and that the active supervision requirement is applicable.

**Example 7:** The state board of electricians consists of four non-electrician members and three practicing electricians. Documents show that the electrician members frequently meet and discuss board business separately from the non-electrician members. On one such occasion, the electrician members arranged for the issuance by the board of written orders to six construction contractors, directing such individuals to cease and desist from providing certain services. The non-electrician members of the board were not aware of the issuance of these orders and did not approve the issuance of these orders. In this scenario, FTC Staff may determine that the active market participants have exercised the decisionmaking power of the board, and that the active supervision requirement is applicable.

### 2.  What constitutes active supervision?

FTC Staff will be guided by the following principles:

➢    "[T]he purpose of the active supervision inquiry . . . is to determine whether the State has exercised sufficient independent judgment and control" such that the details of the regulatory scheme "have been established as a product of deliberate state intervention" and not simply by agreement among the members of the state board. "Much as in causation inquiries, the analysis asks whether the State has played a substantial role in determining the specifics of the economic policy." The State is not obliged to "[meet] some normative standard, such as efficiency, in its regulatory practices." *Ticor*, 504 U.S. at 634-35. "The question is not how well state regulation works but whether the anticompetitive scheme is the State's own." *Id.* at 635.

➢    It is necessary "to ensure the States accept political accountability for anticompetitive conduct they permit and control." *N.C. Dental*, 135 S. Ct. at 1111. *See also Ticor*, 504 U.S. at 636.

➢    "The Court has identified only a few constant requirements of active supervision: The supervisor must review the substance of the anticompetitive decision, not merely the procedures followed to produce it; the supervisor must have the power to veto or modify particular decisions to ensure they accord with state policy; and the 'mere potential for state supervision is not an adequate substitute for a decision by the State.' Further, the state supervisor may not itself be an active market participant." *N.C. Dental*, 135 S. Ct. at 1116–17 (citations omitted).

---

October 2015                                                                                          9

Bank #30: Superior Court of California County of Orange
ADA Complaint Exhibits 348

➢ The active supervision must precede implementation of the allegedly anticompetitive restraint.

➢ "[T]he inquiry regarding active supervision is flexible and context-dependent." "[T]he adequacy of supervision . . . will depend on all the circumstances of a case." *N.C. Dental*, 135 S. Ct. at 1116–17. Accordingly, FTC Staff will evaluate each case in light of its own facts, and will apply the applicable case law and the principles embodied in this guidance reasonably and flexibly.

### 3. What factors are relevant to determining whether the active supervision requirement has been satisfied?

FTC Staff will consider the presence or absence of the following factors in determining whether the active supervision prong of the state action defense is satisfied.

➢ The supervisor has obtained the information necessary for a proper evaluation of the action recommended by the regulatory board. As applicable, the supervisor has ascertained relevant facts, collected data, conducted public hearings, invited and received public comments, investigated market conditions, conducted studies, and reviewed documentary evidence.

✓ The information-gathering obligations of the supervisor depend in part upon the scope of inquiry previously conducted by the regulatory board. For example, if the regulatory board has conducted a suitable public hearing and collected the relevant information and data, then it may be unnecessary for the supervisor to repeat these tasks. Instead, the supervisor may utilize the materials assembled by the regulatory board.

➢ The supervisor has evaluated the substantive merits of the recommended action and assessed whether the recommended action comports with the standards established by the state legislature.

➢ The supervisor has issued a written decision approving, modifying, or disapproving the recommended action, and explaining the reasons and rationale for such decision.

✓ A written decision serves an evidentiary function, demonstrating that the supervisor has undertaken the required meaningful review of the merits of the state board's action.

✓ A written decision is also a means by which the State accepts political accountability for the restraint being authorized.

Complaint Supplement #30: 2020 0114500
Exhibit #9: 010
Bank Superior Court of California County of Orange
ADA Complaint Exhibits 349

**Scenario 1: Example of satisfactory active supervision of a state board regulation designating teeth whitening as a service that may be provided only by a licensed dentist, where state policy is to protect the health and welfare of citizens and to promote competition.**

➢      The state legislature designated an executive agency to review regulations recommended by the state regulatory board. Recommended regulations become effective only following the approval of the agency.

➢      The agency provided notice of (i) the recommended regulation and (ii) an opportunity to be heard, to dentists, to non-dentist providers of teeth whitening, to the public (in a newspaper of general circulation in the affected areas), and to other interested and affected persons, including persons that have previously identified themselves to the agency as interested in, or affected by, dentist scope of practice issues.

➢      The agency took the steps necessary for a proper evaluation of the recommended regulation. The agency:

✓      Obtained the recommendation of the state regulatory board and supporting materials, including the identity of any interested parties and the full evidentiary record compiled by the regulatory board.

✓      Solicited and accepted written submissions from sources other than the regulatory board.

✓      Obtained published studies addressing (i) the health and safety risks relating to teeth whitening and (ii) the training, skill, knowledge, and equipment reasonably required in order to safely and responsibly provide teeth whitening services (if not contained in submission from the regulatory board).

✓      Obtained information concerning the historic and current cost, price, and availability of teeth whitening services from dentists and non-dentists (if not contained in submission from the regulatory board). Such information was verified (or audited) by the Agency as appropriate.

✓      Held public hearing(s) that included testimony from interested persons (including dentists and non-dentists). The public hearing provided the agency with an opportunity (i) to hear from and to question providers, affected customers, and experts and (ii) to supplement the evidentiary record compiled by the state board. (As noted above, if the state regulatory board has previously conducted a suitable public hearing, then it may be unnecessary for the supervising agency to repeat this procedure.)

➢      The agency assessed all of the information to determine whether the recommended regulation comports with the State's goal to protect the health and

October 2015

11

welfare of citizens and to promote competition.

➤ The agency issued a written decision accepting, rejecting, or modifying the scope of practice regulation recommended by the state regulatory board, and explaining the rationale for the agency's action.

## Scenario 2: Example of satisfactory active supervision of a state regulatory board administering a disciplinary process.

A common function of state regulatory boards is to administer a disciplinary process for members of a regulated occupation. For example, the state regulatory board may adjudicate whether a licensee has violated standards of ethics, competency, conduct, or performance established by the state legislature.

Suppose that, acting in its adjudicatory capacity, a regulatory board controlled by active market participants determines that a licensee has violated a lawful and valid standard of ethics, competency, conduct, or performance, and for this reason, the regulatory board proposes that the licensee's license to practice in the state be revoked or suspended. In order to invoke the state action defense, the regulatory board would need to show both clear articulation and active supervision.

➤ In this context, active supervision may be provided by the administrator who oversees the regulatory board (*e.g.*, the secretary of health), the state attorney general, or another state official who is not an active market participant. The active supervision requirement of the state action defense will be satisfied if the supervisor: (i) reviews the evidentiary record created by the regulatory board; (ii) supplements this evidentiary record if and as appropriate; (iii) undertakes a de novo review of the substantive merits of the proposed disciplinary action, assessing whether the proposed disciplinary action comports with the policies and standards established by the state legislature; and (iv) issues a written decision that approves, modifies, or disapproves the disciplinary action proposed by the regulatory board.

Note that a disciplinary action taken by a regulatory board affecting a single licensee will typically have only a de minimis effect on competition. A pattern or program of disciplinary actions by a regulatory board affecting multiple licensees may have a substantial effect on competition.

Complaint Supplement #30-20 (11) of California County of Orange
Exhibit #9: 012
Book of Superior Court of California County of Orange
ADA Complaint Exhibits 351

**The following do not constitute active supervision of a state regulatory board that is controlled by active market participants:**

➤     The entity responsible for supervising the regulatory board is itself controlled by active market participants in the occupation that the board regulates. *See N.C. Dental*, 135 S. Ct. at 1113-14.

➤     A state official monitors the actions of the regulatory board and participates in deliberations, but lacks the authority to disapprove anticompetitive acts that fail to accord with state policy. *See Patrick v. Burget*, 486 U.S. 94, 101 (1988).

➤     A state official (*e.g.*, the secretary of health) serves ex officio as a member of the regulatory board with full voting rights. However, this state official is one of several members of the regulatory board and lacks the authority to disapprove anticompetitive acts that fail to accord with state policy.

➤     The state attorney general or another state official provides advice to the regulatory board on an ongoing basis.

➤     An independent state agency is staffed, funded, and empowered by law to evaluate, and then to veto or modify, particular recommendations of the regulatory board. However, in practice such recommendations are subject to only cursory review by the independent state agency. The independent state agency perfunctorily approves the recommendations of the regulatory board. *See Ticor*, 504 U.S. at 638.

➤     An independent state agency reviews the actions of the regulatory board and approves all actions that comply with the procedural requirements of the state administrative procedure act, without undertaking a substantive review of the actions of the regulatory board. *See Patrick*, 486 U.S. at 104-05.

October 2015

13

Superior Court of California County of Orange
ADA Complaint Exhibits 352

EXHIBIT 10



## The State Bar
## *of California*

**OFFICE OF GENERAL COUNSEL**

180 Howard Street, San Francisco, CA 94105

suzanne.grandt@calbar.ca.gov
415-538-2388

July 20, 2022

**Via U.S. Mail and email to: justintimesd@gmail.com**
Justin Beck
3501 Roselle Street
Oceanside, CA 92056

RE:     Your May 19 and July 12, 2022 Email to Chair of the State Bar Board of Trustees,
        Ruben Duran

Dear Mr. Beck:

This letter responds to your May 19 and July 12, 2022, emails to the Chair of the State Bar Board of Trustees, Ruben Duran. Mr. Duran has referred this matter to the Office of General Counsel for response.

Your May 19, 2022, letter is your second request to Mr. Duran regarding disciplinary matters involving the "Catanzarite Cases."[1] In your letter, you make five specific requests, which are addressed below.

First, you request "all publicly available information regarding certain licensees, and their own reporting of misconduct in CA or any jurisdiction as mandated by BPC/CRPC." As you were informed by letter of May 13, 2022, this request was forwarded to the State Bar's California Public Records Act (CPRA) coordinator. Per your email of June 1, 2022, you acknowledged that the Office of Chief Trial Counsel "was diligent in preparing my public records request, and I granted them another period of time to finish."

Second, you request that Mr. Duran waive confidentiality with respect to the "Catanzarite Cases." You included the following non-exhaustive list of cases:

- 21-O-12371 (Kenneth Catanzarite)
- 21-O-05698 (Nicole Catanzarite-Woodward)
- 21-O-11976 (Jim Travis Tice)

---

[1] "Catanzarite Cases" is defined in your First Amended Complaint filed in *Beck v. State Bar, et al.*, Orange County Superior Court case number 30-2021-01237499-CU-PN-CJC and specifically includes six disciplinary complaints you filed against five attorneys.

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

<div style="writing-mode: vertical;">Document received by the CA Supreme Court.</div>

Complaint Supplement #30-2021-01237499 State Bar of California County of Orange
Exhibit #10: 001

ADA Complaint Exhibits 354

Exhibit #26: 002
22-CV-01616-BAS-DDL

Justin Beck
July 20, 2022
Page 2

- 21-O-01012 (Kenneth Catanzarite)
- 20-O-01013 (Brandon Woodward)
- 20-O-01014 (Tim James O'Keefe)

Pursuant to section 6086.1(b)(2) of the Business and Professions Code, the Chair of the Board may waive confidentiality, "but only when warranted for protection of the public." As Chair of the Board of Trustees, Mr. Duran declines to waive confidentiality with respect to the "Catanzarite Cases," on the basis that such waiver is not warranted for protection of the public. In this regard, we note that your claims regarding attorney misconduct in the Catanzarite Cases have been heavily litigated in public court proceedings that have given rise to two public (though unpublished) Court of Appeal decisions, and you have a pending lawsuit against the State Bar in which you repeat your claims regarding attorney misconduct in yet another public court proceeding.

Third, you requested "the summary of responses from attorneys in the foregoing specific Catanzarite Cases." Pursuant to section 6093.5 of the Business and Professions Code, the State Bar shall provide a complainant with "a written summary of any response by the attorney to his or her complaint if the response was the basis for dismissal of the complaint."

With respect to Case Numbers 21-O-01012, 21-O-01013, and 21-O-01014, these matters were not closed on the basis of any response by the attorney. With respect to Case Numbers 21-O-12371 and 21-O-05698, these matters were abated and have not been closed (i.e., dismissed). Therefore, as to these matters, there is no written summary required under section 6093.5.

With respect to Case Number 21-O-11976, that matter was closed on December 13, 2021. The Office of Chief Trial Counsel explained the basis for its determination to close the complaint in its December 13, 2021, letter to you. That letter referred to the attorney's response to the extent it formed the basis for dismissal of the complaint. As such, the State Bar has provided the written summary required under section 6093.5.

Fourth, you requested a status update from the Complaint Review Unit regarding the two matters in abatement (Case Nos. 21-O-12371 and 21-O-05698). The Complaint Review Unit does not have a record of receiving a request for review in those matters. Importantly, those matters have been abated and as such, have not been closed. They remain as open matters within the Office of Chief Trial Counsel. Pursuant to Rule 2603(b) of the State Bar Rules of Procedure, the Complaint Review Unit only has authority to "review closures of inquiries, investigations and complaints upon request by complainant." Accordingly, because these matters have not been closed, the Complaint Review Unit does not have authority and is unable to review the abated matters. Review will be available in the event the Office of Chief Trial Counsel closes these matters in the future.  In the meantime, as the Office of Chief Trial Counsel explained to you in its November 22, 2021, letter, it has abated and will take no further action on these matters until resolution of the related pending civil matters because those matters "involve substantially the same misconduct that is at issue in the State Bar matters," "the harm

Complaint Supplement #30-2021-01213595

Exhibit #10: 002

Beck v. State Bar of California County of Orange
ADA Complaint Exhibits 355

Exhibit #26: 003
22-CV-01616-BAS-DDL

Document received by the CA Supreme Court.

Justin Beck
July 20, 2022
Page 3

caused by Mr. Catanzarite's violation of the conflict rules, as well as his other alleged misconduct, is an issue in pending litigation," and as a result, resolution of the pending civil matters will substantially assist the Office of Chief Trial Counsel in its investigation as well as in determining the harm caused by any misconduct.

With respect to Case Number 21-O-11976 (Jim Travis Tice), the Complaint Review Unit received your request for review on January 24, 2022. Review of that matter is still pending. That office will contact you in writing to inform you of its determination.

Fifth, you request information regarding "any prior cases that were brought to the Supreme Court under *In Re Walker*, and the circumstances/outcome of those cases." Such matters, known as accusations, are filed with the California Supreme Court, and not the State Bar. To the extent the State Bar may be in possession of records relevant to your request, you may submit a public records request. Information regarding that process is available at the State Bar's website at: https://www.calbar.ca.gov/About-Us/Our-Mission/Protecting-the-Public/Public-Records.

Sincerely,

*/s/ Suzanne C. Grandt*

Suzanne C. Grandt
Attorney V

Document received by the CA Supreme Court.

Complaint Supplement #30
Exhibit #10: 003

Beck #30-2020-01145998
Superior Court of California County of Orange
ADA Complaint Exhibits 356

Exhibit #26: 004
22-CV-01616-BAS-DDL

EXHIBIT 11



**The State Bar**
*of California*

**OFFICE OF GENERAL COUNSEL**

180 Howard Street, San Francisco, CA 94105

ellin.davtyan@calbar.ca.gov
415-538-2000

December 15, 2022

**Via U.S. Mail and Email: justintimesd@gmail.com**
Justin S. Beck
3501 Roselle Street
Oceanside CA 92056

Dear Mr. Beck:

As we have already informed you, on December 12, 2022 at approximately 9:56 a.m., you received an email containing communication that is confidential and privileged, pursuant to and without limitation Business and Professions Code section 6086.1(b), and attorney-work product and attorney-client privileges. The forwarding of this email was inadvertent and should not be construed as a waiver of state confidentiality laws.

You assert that the State Bar's internal communications with its counsel are not privileged because of your mistaken belief that the State Bar performing its public function differently than you believe it should constitutes a "fraud." Setting aside the fact that your mischaracterizations do not control the application of the privilege, the crime-fraud exception you cite only applies where the specific communication was made for the purpose of aiding a crime or fraud. On its face, the communication you were inadvertently sent related to whether to grant *your* request to waive confidentiality as to certain complaints you have made against various attorneys. The State Bar's consideration of your request that it exercise its discretion in such a manner is neither a crime nor a fraud.

We reiterate that you have no right to share or retain the State Bar's privileged communications, and request that you identify all persons to whom you have distributed the communication and destroy any copies in your possession.

Thank you for your anticipated cooperation.

Sincerely,

Ellin Davtyan
General Counsel

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

Complaint Supplement #30-2023-01298800 Superior Court of California County of Orange
Exhibit #11: 001
ADA Complaint Exhibits 358

EXHIBIT 12



***ROB BONTA***
***Attorney General***

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550
Public: (916) 445-9555
Telephone: (916) 210-6183
E-Mail: PublicRecords@doj.ca.gov

December 29, 2022

***Via E-mail to:***
Justin Beck
3501 Roselle Street
Oceanside, CA 92056
justintimesd@gmail.com

RE:   Public Records Act Request; DOJ PRA 2022-02717

Dear Mr. Beck:

This correspondence is in response to your online request form submission dated December 8, 2022, which was received by the California Department of Justice (the Department) on the same date, in which you sought records pursuant to the Public Records Act (PRA) as set forth in Government Code section 6250 et seq.

Specifically, you requested:

*1) When was Justin S. Beck v. State of California et al. (OCSC Case No. 30-2021-01237499) first disclosed to the DOJ, how, and by whom?*

*2) When was Justin S. Beck v. State of California et al. (OCSC Case No. 30-2020-01145998) first disclosed to the DOJ, how, and by whom?*

*3) When was Justin S. Beck v. The Superior Court of Orange County et al. (4DCA Original Writ Proceedings G061896) first disclosed to the DOJ, how, and by whom?*

*4) When was Justin S. Beck v. Catanzarite Law Corporation et al. (U.S. Southern District of California 22-CV-01616-BAS-DDL) first disclosed to the DOJ, how, and by whom?*

*5) Other than The State Bar of California, what other state agencies require Government Claims Act claim presentation to an entity other than the Department of General Services?*

*6) Has the Judicial Council reported my new claim for ratification and RICO against Orange County Superior Court to DOJ related to these matters? If so, when did it get reported and by whom?*

Justin Beck
December 29, 2022
Page 2

*7) Why does the draft audit from MGO in April 2022 presented by The State Bar of California lack disclosure of the materiality of my government claims?*

*8) When was the California State Auditor notified of the materiality of my claims -- which could result in an award of monetary judgment exceeding $1B based on evidence presented, unobjected?*

*9) Who manages claims act litigation for the Department of Justice -- who has a duty to resolve claims act litigation and satisfaction of judgments?*

*10) Does the DOJ require me to file a new government claim related to these matters in order that DGS be joined to these cases?*

*11) I just experienced what I allege to be fraud and concealment by California Supreme Court clerk Jorge Navarette after the Office of General Counsel for The State Bar of California filed a fraudulent antitrust petition on my behalf without my authorization in CSC. Given the conflict, am I correct to assume the new claim should be presented to DGS or DOJ and not Mr. Navarette and CSC?*

*12) When the State of California is liable under the Government Claims Act, why is the DOJ not managing claim presentations and denials for The State Bar of California? "Investigation" of claims, denial, and legal representation of themselves for claims filed by the public violate California Rules of Professional Conduct 1.7(d)(3) and 15 U.S.C. Section 1.*

*13) Why does the DOJ allow the Board of Trustees for The State Bar of California, controlled by active market participant lawyers, to make decisions on behalf of itself after N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n, 574 U.S. 494, (2015) and its references to Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315?*

*14) Who is legal counsel for the claims act litigation for DOJ?*

*15) Who is representing LEGISLATURE in OCSC Case No. 30-2021-01237499 and G061896, and how will DOJ prevent unconstitutional use of State Bar Court from impeding or obstructing state and federal proceedings? 16) Why does DOJ allow The State Bar of California to use Office of General Counsel to defend tort claims against itself and its lawyers?*

For the reasons set forth below, the Department is extending the date for responding to your request. Agencies are permitted to extend the date for responding to a public records request for fourteen days beyond the original 10-day deadline for responding under specified circumstances (Gov. Code, § 6253, subd. (c)). As your request was received by this office on December 8, 2022, the time established for the original response was December 19, 2022. Fourteen days beyond that date is January 2, 2023. Due to the state holiday on January 2, the Department's response will be due on January 3, 2023.

Complaint Supplement #30-2020-01145998
Exhibit #12: 002

Beck v. Superior Court of California, County of Orange
ADA Complaint Exhibits 361

Justin Beck
December 29, 2022
Page 3

Agencies may invoke the extension for several reasons, which may be summarized as follows:

1. The need to search for and collect records from field offices or other facilities that are separate from the office processing the request.
2. The need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request.
3. The need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject matter interest therein.

In this instance, an extension is needed to consult with multiple components of the Department's with a substantial interest in the records requested.

Sincerely,

/s/ Public Records Coordinator

Public Records Coordinator

For    ROB BONTA
       Attorney General

EXHIBIT 13

M Gmail                                                          Justin Beck <justintimesd@gm.

## Call with attorney Matt Kinley

**Steven A. Haskins** <sah@mccunewright.com>                    Wed, Jan 13, 2021 at 10:25 AM
To: Justin Beck <justintimesd@gmail.com>
Cc: "Richard D. McCune" <rdm@mccunewright.com>, "Jessica L. Becerra" <jb@mccunewright.com>, "Sandy G. Gonzalez"
<sgg@mccunewright.com>

Justin,

I had a phone call today with a lawyer named Matt Kinley out of Long Beach which I think will interest you.  Since 2015,
he has represented a client that has been sued by Catanzarite in a manner very similar to the way that Catanzarite has
operated in this situation.  In particular, that case involved a partnership dispute, and like here, Catanzarite starting filing
lawsuits and papers claiming to represent the partnership.  Catanzarite was disqualified in that case as well.  What is
most interesting is that the Bar has taken investigatory steps on that case, interviewed Matt's clients and such, and so the
wheels of bureaucracy are already in motion there.  Though we need to think through some of the privilege issues, I think
it would be a good idea to coordinate with Matt and that may be a better way in to get your complaints put before the bar.
Let me know what you think.

Also, the notice of appeal deadline for Scudder and Aroha is coming up next week.  I know that we have previously
discussed not appealing that particular order, but just want to confirm as the deadline approaches.  Otherwise, we are
working on the response to the fee motion and coordinating with insurance counsel on the stay and designation motions.

Thanks.  Talk to you soon.

Steve

Steven A. Haskins

**Partner**

 

McCUNE  WRIGHT  AREVALO, LLP
P: 909.551.4521  |  F: 909.557.1275  |  3281 East Guasti Road, Suite 100  |  Ontario, CA 91761  |  **McCuneWright.com**



Complaint Supplement #30- 2020-O-13998
Exhibit #13: 001

EXHIBIT 14



**The State Bar**
*of California*

**OFFICE OF GENERAL COUNSEL**

180 Howard Street, San Francisco, CA 94105

suzanne.grandt@calbar.ca.gov
415-538-2388

July 29, 2022

**Via Email: justintimesd@gmail.com**
Justin Beck
3501 Roselle Street
Oceanside, CA 92056

RE:     *Justin S. Beck v. State Bar of California, et al.*
        Orange County Superior Court Case No. 30-2021-01237499-CU-PN-CJC

Dear Mr. Beck:

On July 27, 2022, the State Bar Defendants filed and served the attached Special Motion to Strike your First Amended Complaint pursuant to the California Code of Civil Procedure section 425.16 (commonly referred to as an "anti-SLAPP motion"). Subsection (g) provides for an automatic stay of discovery upon filing of this motion, with the stay to remain in effect until notice of entry of order ruling on such motion.

As such, the State Bar has no obligation to respond to your July 26, 2022 deposition subpoena and will not be making a witness available for deposition on September 9, 2022. The State Bar will also not be responding to your pending Interrogatories, Request for Admissions, or Requests for Production of Documents until after our motion to strike is ruled upon.

Lastly, please be advised that if the Court grants our anti-SLAPP motion, you will be liable for the State Bar's attorney's fees and costs incurred in bringing the motion. (Cal. Code Civ. Proc.§ 425.16(c).) For the reasons outlined in the attached motion and our pending demurrer, your lawsuit is barred on a number of well-established legal grounds and we expect to prevail on our anti-SLAPP motion. Accordingly, I encourage you to dismiss your case now and avoid potential payment of attorney's fees and costs down the road.

Sincerely,

*/s/ Suzanne C. Grandt*

Suzanne C. Grandt
Assistant General Counsel

cc: Carissa N. Andresen
Enclosures

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

Complaint Supplement #30-2020-01145998
Exhibit #14: 001

Superior Court of California County of Orange
ADA Complaint Exhibits 366

EXHIBIT 15

 Gmail                                    Justin Beck <justintimesd@gmail.com>

---

## COM-03242023-00824; Ruben Duran, The State Bar of California

**Laura Mandler** <lmandler@fppc.ca.gov>                    Tue, Mar 28, 2023 at 4:39 PM
To: Justin Beck <justintimesd@gmail.com>

Good Afternoon Mr. Beck,


It appears that if there is a potential conflict of interest regarding members of the Board of Trustees, the State Bar may appoint a Special Deputy Trial Counsel to investigate the allegations. As far as I am aware, that is the only oversight avenue.


Sincerely,


## Laura Mandler

Enforcement Division - Political Reform Consultant

Fair Political Practices Commission

1102 Q Street #3000

Sacramento, CA 95811





**From:** Justin Beck <justintimesd@gmail.com>
**Sent:** Tuesday, March 28, 2023 2:30 PM
**To:** Laura Mandler <lmandler@fppc.ca.gov>
**Subject:** Re: COM-03242023-00824; Ruben Duran, The State Bar of California


☐**EXTERNAL EMAIL**

[Quoted text hidden]

Complaint Supplement #30 2020-01145008        Beck v. Superior Court of California County of Orange
Exhibit #15: 001                              State Complaints Exhibits 368

EXHIBIT 16

 The State Bar *of California*

### Rule 5.1 Responsibilities of Managerial and Supervisory Lawyers
### (Rule Approved by the Supreme Court, Effective November 1, 2018)

(a)    A lawyer who individually or together with other lawyers possesses managerial authority in a law firm,* shall make reasonable* efforts to ensure that the firm* has in effect measures giving reasonable* assurance that all lawyers in the firm* comply with these rules and the State Bar Act.

(b)    A lawyer having direct supervisory authority over another lawyer, whether or not a member or employee of the same law firm,* shall make reasonable* efforts to ensure that the other lawyer complies with these rules and the State Bar Act.

(c)    A lawyer shall be responsible for another lawyer's violation of these rules and the State Bar Act if:

    (1)    the lawyer orders or, with knowledge of the relevant facts and of the specific conduct, ratifies the conduct involved; or

    (2)    the lawyer, individually or together with other lawyers, possesses managerial authority in the law firm* in which the other lawyer practices, or has direct supervisory authority over the other lawyer, whether or not a member or employee of the same law firm,* and knows* of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable* remedial action.

**Comment**

*Paragraph (a) – Duties Of Managerial Lawyers To Reasonably\* Assure Compliance with the Rules*

[1]    Paragraph (a) requires lawyers with managerial authority within a law firm* to make reasonable* efforts to establish internal policies and procedures designed, for example, to detect and resolve conflicts of interest, identify dates by which actions must be taken in pending matters, account for client funds and property, and ensure that inexperienced lawyers are properly supervised.

[2]    Whether particular measures or efforts satisfy the requirements of paragraph (a) might depend upon the law firm's structure and the nature of its practice, including the size of the law firm,* whether it has more than one office location or practices in more than one jurisdiction, or whether the firm* or its partners* engage in any ancillary business.

[3]    A partner,* shareholder or other lawyer in a law firm* who has intermediate managerial responsibilities satisfies paragraph (a) if the law firm* has a designated managing lawyer charged with that responsibility, or a management committee or other body that has appropriate managerial authority and is charged with that responsibility. For example, the managing lawyer of an office of a multi-office law firm* would not necessarily be required to promulgate firm-wide policies intended to reasonably* assure that the law firm's lawyers comply with the rules or State Bar Act. However, a lawyer

1

remains responsible to take corrective steps if the lawyer knows* or reasonably should know* that the delegated body or person* is not providing or implementing measures as required by this rule.

[4]     Paragraph (a) also requires managerial lawyers to make reasonable* efforts to assure that other lawyers in an agency or department comply with these rules and the State Bar Act.  This rule contemplates, for example, the creation and implementation of reasonable* guidelines relating to the assignment of cases and the distribution of workload among lawyers in a public sector legal agency or other legal department. (See, e.g., State Bar of California, Guidelines on Indigent Defense Services Delivery Systems (2006).)

*Paragraph (b) – Duties of Supervisory Lawyers*

[5]     Whether a lawyer has direct supervisory authority over another lawyer in particular circumstances is a question of fact.

*Paragraph (c) – Responsibility for Another's Lawyer's Violation*

[6]     The appropriateness of remedial action under paragraph (c)(2) would depend on the nature and seriousness of the misconduct and the nature and immediacy of its harm.    A managerial or supervisory lawyer must intervene to prevent avoidable consequences of misconduct if the lawyer knows* that the misconduct occurred.

[7]     A supervisory lawyer violates paragraph (b) by failing to make the efforts required under that paragraph, even if the lawyer does not violate paragraph (c) by knowingly* directing or ratifying the conduct, or where feasible, failing to take reasonable* remedial action.

[8]     Paragraphs (a), (b), and (c) create independent bases for discipline. This rule does not impose vicarious responsibility on a lawyer for the acts of another lawyer who is in or outside the law firm.*  Apart from paragraph (c) of this rule and rule 8.4(a), a lawyer does not have disciplinary liability for the conduct of a partner,* associate, or subordinate lawyer.  The question of whether a lawyer can be liable civilly or criminally for another lawyer's conduct is beyond the scope of these rules.

2

**NEW RULE OF PROFESSIONAL CONDUCT 5.1**
**(See Former Rule 3-110 Discussion)**
**Responsibilities of Managerial and Supervisory Lawyers**

**EXECUTIVE SUMMARY**

In connection with consideration of current rule 3-110 (Failing to Act Competently), the Commission for the Revision of the Rules of Professional Conduct ("Commission") has reviewed and evaluated ABA Model Rules 5.1 (Responsibilities of Partners, Managers, and Supervisory Lawyers), 5.2 (Responsibilities of a Subordinate Lawyer), and 5.3 (Responsibilities Regarding Nonlawyer Assistants). The Commission also reviewed relevant California statutes, rules, and case law relating to the issues addressed by the proposed rules. The evaluation was made with a focus on the function of the rules as disciplinary standards, and with the understanding that the rule comments should be included only when necessary to explain a rule and not for providing aspirational guidance. Although these proposed rules have no direct counterpart in the current California rules, the concept of the duty to supervise is found in the first Discussion paragraph to current rule 3-110, which states: "The duties set forth in rule 3-110 include the duty to supervise the work of subordinate attorney and non-attorney employees or agents."[1] The result of this evaluation is proposed rules 5.1 (Responsibilities of Managerial and Supervisory Lawyers), 5.2 (Responsibilities of a Subordinate Lawyer), and 5.3 (Responsibilities Regarding Nonlawyer Assistants).

**Rule As Issued For 90-day Public Comment**

The main issue considered when evaluating a lawyer's duty to supervise was whether to adopt versions of ABA Model Rules 5.1, 5.2, and 5.3, or retain the duty to supervise only as an element of the duty of competence. The Commission concluded that adopting these proposed rules provides important public protection and critical guidance to lawyers possessing managerial authority by more specifically describing a lawyer's duty to supervise other lawyers (proposed rule 5.1) and non-lawyer personnel (proposed rule 5.3). Proposed rules 5.1 and 5.3 extend beyond the duty to supervise that is implicit in current rule 3-110 and include a duty on firm managers to have procedures and practices that foster ethical conduct within a law firm. Current rule 3-110 includes a duty to supervise but says nothing about the subordinate lawyer's duties. Proposed rule 5.2 addresses this omission by stating that a subordinate lawyer generally cannot defend a disciplinary charge by blaming the supervisor. Although California's current rules have no equivalent to proposed rule 5.2, there appears to be no conflict with the proposed rule and current California law in that there is no known California authority that permits a subordinate lawyer to defend a disciplinary charge based on clearly improper directions from a senior lawyer.

---

[1]   The first Discussion paragraph to current rule 3-110 provides:

The duties set forth in rule 3-110 include the duty to supervise the work of subordinate attorney and non-attorney employees or agents. (See, e.g., *Waysman v. State Bar* (1986) 41 Cal.3d 452; *Trousil v. State Bar* (1985) 38 Cal.3d 337, 342 [211 Cal.Rptr. 525]; *Palomo v. State Bar* (1984) 36 Cal.3d 785 [205 Cal.Rptr. 834]; *Crane v. State Bar* (1981) 30 Cal.3d 117, 122; *Black v. State Bar* (1972) 7 Cal.3d 676, 692 [103 Cal.Rptr. 288; 499 P.2d 968]; *Vaughn v. State Bar* (1972) 6 Cal.3d 847, 857-858 [100 Cal.Rptr. 713; 494 P.2d 1257]; *Moore v. State Bar* (1964) 62 Cal.2d 74, 81 [41 Cal.Rptr. 161; 396 P.2d 577].)

1

Book #30 Superior Court of California County of Orange
ADA Complaint Exhibits 372

The following is a summary of proposed rule 5.1 (Responsibilities of Managerial and Supervisory Lawyers).[2]

Proposed rule 5.1 incorporates the substance of ABA Model Rule 5.1. Paragraph (a) requires that managing lawyers make "reasonable efforts to ensure" the law firm has measures that provide reasonable assurance that all lawyers in the firm comply with the Rules of Professional Conduct and the State Bar Act. Paragraph (b) requires that a lawyer who directly supervises another lawyer make "reasonable efforts to ensure" the other lawyer complies with the Rules of Professional Conduct and the State Bar Act, whether or not the other lawyer is a member or employee of the same firm. Neither provision imposes vicarious liability. However, a lawyer will be responsible for a subordinate's violation of a rule under paragraph (c) if a lawyer either ordered or, with knowledge of the relevant facts and specific conduct, ratifies the conduct of the subordinate, ((c)(1)), or knowing of the misconduct, failed to take remedial action when there was still time to avoid or mitigate the consequences, ((c)(2)).

As initially circulated for 90-day public comment, there were nine comments to the rule. Comments [1] – [4] describe the duties of managerial lawyers to reasonably assure compliance with the rules under paragraph (a). Comment [5] states that whether a lawyer has direct supervisory authority over another lawyer in a specific instance is a question of fact. Comments [6] – [9] clarify when a supervisory lawyer is responsible for another lawyer's violation.

### National Background – Adoption of Model Rule 5.1

As California does not presently have a direct counterpart to Model Rule 5.1, this section reports on the adoption of the Model Rule in United States' jurisdictions.  The ABA Comparison Chart, entitled "Variations of the ABA Model Rules of Professional Conduct, Rule 5.1: Responsibilities of Partners, Managers, and Supervisory Lawyers," revised May 5, 2015, is available at:

- http://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/mrpc_5_1.pdf

Thirty-one states have adopted Model Rule 5.1 verbatim.  Fourteen jurisdictions have adopted a slightly modified version of Model Rule 5.1. Five states have adopted a version of the rule that is substantially different to Model Rule 5.1. One state has not adopted a version Model Rule 5.1.[3]

### Revisions Following 90-Day Public Comment Period

After consideration of comments received in response to the initial 90-day public comment period, the Commission added Comment [6], the concept of which is derived from proposed rule 5.2(b). In addition, the Commission modified Comment [3] for clarity and deleted Comment [9] as unnecessary.

With these changes, the Board authorized an additional 45-day public comment period on the revised proposed rule.

---

[2]   The executive summaries for proposed rules 5.2 and 5.3 are provided separately.

[3]   The one state is California.

Complaint Supplement #30-2020 (14991 Superior Court of California County of Orange
Exhibit #16: 004
ADA Complaint Exhibits 373

**Final Commission Action on the Proposed Rule Following 45-Day Public Comment Period**

After consideration of comments received in response to the additional 45-day public comment period, the Commission made no changes to the proposed rule and voted to recommend that the Board adopt the proposed rule.

The Board adopted proposed rule 5.1 at its March 9, 2017 meeting.

**Supreme Court Action (May 10, 2018)**

The Supreme Court approved the rule as modified by the Court to be effective November 1, 2018. Comment [6] was deleted in its entirety and subsequent Comments were renumbered accordingly.

Book # 30-2020-01145998 Superior Court of California County of Orange
ADA Complaint Exhibits 374

Complaint Supplement #30
Exhibit #16: 005

**Rule 5.1 Responsibilities of ~~a Partner or~~Managerial and Supervisory ~~Lawyer~~Lawyers**
**(Redline Comparison to the ABA Model Rule)**

(a)     A ~~partner in a law firm, and a~~ lawyer who individually or together with other lawyers possesses ~~comparable~~ managerial authority in a law firm,* shall make reasonable* efforts to ensure that the firm* has in effect measures giving reasonable* assurance that all lawyers in the firm ~~conform to the Rules of Professional Conduct*~~ comply with these rules and the State Bar Act.

(b)     A lawyer having direct supervisory authority over another lawyer, whether or not a member or employee of the same law firm,* shall make reasonable* efforts to ensure that the other lawyer ~~conforms to the Rules of Professional Conduct~~complies with these rules and the State Bar Act.

(c)     A lawyer shall be responsible for another ~~lawyer's~~lawyer's violation of ~~the Rules of Professional Conduct~~these rules and the State Bar Act if:

  (1)     the lawyer orders or, with knowledge of the relevant facts and of the specific conduct, ratifies the conduct involved; or

  (2)     the lawyer ~~is a partner or has comparable~~, individually or together with other lawyers, possesses managerial authority in the law firm* in which the other lawyer practices, or has direct supervisory authority over the other lawyer, whether or not a member or employee of the same law firm,* and knows* of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable* remedial action.

**Comment**

[1] *Paragraph (a)* ~~applies to lawyers who have managerial authority over the professional work of a firm. See Rule 1.0(c). This includes members of a partnership, the shareholders in a law firm organized as a professional corporation, and members of other associations authorized to practice law; lawyers having comparable managerial authority in a legal services organization or a law department of an enterprise or government agency; and lawyers who have intermediate managerial responsibilities in a firm. Paragraph (b) applies to lawyers who have supervisory authority over the work of other lawyers in a firm.~~ *Duties Of Managerial Lawyers To Reasonably\* Assure Compliance with the Rules*

[2~~1~~]     Paragraph (a) requires lawyers with managerial authority within a law firm* to make reasonable* efforts to establish internal policies and procedures designed ~~to provide reasonable assurance that all lawyers in the firm will conform to the Rules of Professional Conduct. Such policies and procedures include those designed~~, for example, to detect and resolve conflicts of interest, identify dates by which actions must be taken in pending matters, account for client funds and property, and ensure that inexperienced lawyers are properly supervised.

1

Bank of America Superior Court of California County of Orange
ADA Complaint Exhibits 375

[2]     Whether particular measures or efforts satisfy the requirements of paragraph (a) might depend upon the law firm's structure and the nature of its practice, including the size of the law firm,* whether it has more than one office location or practices in more than one jurisdiction, or whether the firm* or its partners* engage in any ancillary business.

[3]     ~~Other measures that may be required to fulfill the responsibility prescribed in paragraph (a) can depend on the firm's structure and the nature of its practice. In a small firm of experienced lawyers, informal supervision and periodic review of compliance with the required systems ordinarily will suffice. In a large firm, or in practice situations in which difficult ethical problems frequently arise, more elaborate measures may be necessary. Some firms, for example, have a procedure whereby junior lawyers can make confidential referral of ethical problems directly to a designated senior partner or special committee. See Rule 5.2. Firms, whether large or small, may also rely on continuing legal education in professional ethics. In any event, the ethical atmosphere of a firm can influence the conduct of all its members and the partners may not assume that all lawyers associated with the firm will inevitably conform to the Rules.~~

[3]     A partner,* shareholder or other lawyer in a law firm* who has intermediate managerial responsibilities satisfies paragraph (a) if the law firm* has a designated managing lawyer charged with that responsibility, or a management committee or other body that has appropriate managerial authority and is charged with that responsibility. For example, the managing lawyer of an office of a multi-office law firm* would not necessarily be required to promulgate firm-wide policies intended to reasonably* assure that the law firm's lawyers comply with the rules or State Bar Act.  However, a lawyer remains responsible to take corrective steps if the lawyer knows* or reasonably should know* that the delegated body or person* is not providing or implementing measures as required by this rule.

[4]     Paragraph ~~(c) expresses a general principle of personal responsibility for acts of another. See also Rule 8.4(a).~~ a) also requires managerial lawyers to make reasonable* efforts to assure that other lawyers in an agency or department comply with these rules and the State Bar Act.  This rule contemplates, for example, the creation and implementation of reasonable* guidelines relating to the assignment of cases and the distribution of workload among lawyers in a public sector legal agency or other legal department.  (See, e.g., State Bar of California, Guidelines on Indigent Defense Services Delivery Systems (2006).)

*Paragraph (b) – Duties of Supervisory Lawyers*

[5]     ~~Paragraph (c)(2) defines the duty of a partner or other lawyer having comparable managerial authority in a law firm, as well as~~Whether a lawyer ~~who~~ has direct supervisory authority over ~~performance of specific legal work by~~ another lawyer~~.~~ ~~Whether a lawyer has supervisory authority~~ in particular circumstances is a question of fact. ~~Partners and lawyers with comparable authority have at least indirect responsibility for all work being done by the firm, while a partner or manager in charge~~

2

of a particular matter ordinarily also has supervisory responsibility for the work of other firm lawyers engaged in the matter. Appropriate remedial action by a partner or managing lawyer

*Paragraph (c) – Responsibility for Another's Lawyer's Violation*

[6]    The appropriateness of remedial action under paragraph (c)(2) would depend on the immediacy of that lawyer's involvement and the nature and seriousness of the misconduct. A supervisor is required to and the nature and immediacy of its harm.  A managerial or supervisory lawyer must intervene to prevent avoidable consequences of misconduct if the supervisor knows lawyer knows* that the misconduct occurred. Thus, if a supervising lawyer knows that a subordinate misrepresented a matter to an opposing party in negotiation, the supervisor as well as the subordinate has a duty to correct the resulting misapprehension.

[6]    Professional misconduct by a lawyer under supervision could reveal a violation of paragraph (b) on the part of the supervisory lawyer even though it does not entail a violation of paragraph (c) because there was no direction, ratification or knowledge of the violation.

[7]    Apart from this Rule and Rule 8.4(a), a lawyer does not have disciplinary liability for the conduct of a partner, associate or subordinate. Whether a lawyer may be liable civilly or criminally for another lawyer's conduct is a question of law beyond the scope of these Rules. A supervisory lawyer violates paragraph (b) by failing to make the efforts required under that paragraph, even if the lawyer does not violate paragraph (c) by knowingly* directing or ratifying the conduct, or where feasible, failing to take reasonable* remedial action.

[8]    The duties imposed by this Rule on managing and supervising lawyers do not alter the personal duty of each lawyer in a firm to abide by the Rules of Professional Conduct.  See Rule 5.2(a). the Rules of Professional Conduct.  See Rule 5.2(a). Paragraphs (a), (b), and (c) create independent bases for discipline. This rule does not impose vicarious responsibility on a lawyer for the acts of another lawyer who is in or outside the law firm.*  Apart from paragraph (c) of this rule and rule 8.4(a), a lawyer does not have disciplinary liability for the conduct of a partner,* associate, or subordinate lawyer.  The question of whether a lawyer can be liable civilly or criminally for another lawyer's conduct is beyond the scope of these rules.

Book #30  2020-01-14996
ADA Complaint Exhibits 377

Complaint Supplement #30
Exhibit #16: 008

EXHIBIT 17



## The State Bar
## of California

## INSTRUCTIONS FOR SERVICE OF LEGAL PROCESS

(This notice does not apply to filings in the State Bar Court.  If you are filing such a document, please proceed to the State Bar Court filing window.)

## THE STATE BAR OF CALIFORNIA IS CURRENTLY ACCEPTING SERVICE OF LEGAL PROCESS (SUMMONSES, COMPLAINTS, AND SUBPOENAS) BY EMAIL INSTEAD OF PERSONAL SERVICE. [1]

➢ **PLEASE SERVE YOUR DOCUMENT(S) BY EMAILING THEM TO SERVICEOFPROCESS@CALBAR.CA.GOV.**

➢ **DO NOT LEAVE ANY DOCUMENTS WITH SECURITY IN THE LOBBY OR ELSEWHERE, AS THEY WILL NOT BE ACCEPTED.**

➢ **IF YOU ARE ATTEMPTING TO TENDER WITNESS FEES, PLEASE INDICATE THAT IN YOUR EMAIL MESSAGE AND YOU WILL RECEIVE FURTHER INSTRUCTIONS FOR DELIVERY OF THOSE FEES.**

---

[1] The State Bar will only accept legal documents naming the State Bar (or its employees and officers for matters in connection with their official duties).  The State Bar is not authorized to accept service of process on behalf of its employees and officers regarding matters outside the scope of their official duties.  By receiving your document(s), the State Bar and its employees and officers do not waive any right to object to the validity of service.  Your document will be reviewed after receipt and you will be notified if service is rejected due to a defect.

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 S. Figueroa Street
Los Angeles, CA 90017

Complaint Supplement #30-2020-01413330
Superior Court of California County of Orange
ADA Complaint Exhibits 379
Exhibit #17: 001

EXHIBIT 18

Kevin J. Lane, Clerk/Executive Officer
Electronically FILED on 7/13/2022 by M. Castaneda, Deputy Clerk

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| JUSTIN S. BECK, | |
| Plaintiff and Appellant, | G059766 |
| v. | (Super. Ct. No. 30-2020-01145998) |
| CATANZARITE LAW CORPORATION et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from orders of the Superior Court of Orange County, Deborah C. Servino, Judge.  Affirmed in part and  reversed in part.  Motions to disqualify and for sanctions denied.  Request for judicial notice granted.  Motion to augment granted.

Justin S. Beck, in pro. per., for Plaintiff and Appellant.

Catanzarite Law Corporation, Kenneth J. Catanzarite and Nicole M. Catanzarite-Woodward for Defendants and Respondents.

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 381

Justin S. Beck filed a malicious prosecution action against Catanzarite Law Corporation, its attorneys Kenneth J. Catanzarite, Brandon Woodward, Tim James O'Keefe (collectively Catanzarite unless the context requires otherwise) and the firm's clients (Amy Jeanette Cooper, Cliff Higgerson, and Mohammed Zakhireh).[1] He alleged some of these defendants were also liable for unfair business practices, slander of title, and intentional infliction of emotional distress (IIED). The trial court granted four special motions to strike (anti-SLAPP motion) (Code Civ. Proc., § 425.16).[2] On appeal, Beck asserts most of his claims are not based on petitioning activity and he would be successful on the merits of his malicious prosecution action. We conclude his contentions have merit and reverse the court's orders.[3]

## HISTORY PRIOR APPEALS

Catanzarite filed multiple but similar lawsuits within a one-year period, all of which arise from a dispute between shareholders of MFS and Cultivation Technologies, Inc. (CTI). We incorporate by reference a detailed description of these cases from our opinion *FinCanna Capital Corp. v. Cultivation Technologies, Inc.* (June 28, 2021, G058700) [nonpub. opn.] (*FinCanna*) [for consistency we will continue to refer to these superior court cases as the Pinkerton Action, the MFS Action, the Mesa Action, the Cooper Action, the FinCanna Action, and the Scottsdale Action].)

---

[1]     The lawsuit included other defendants who are not parties to this appeal, including Mobile Farming Systems (MFS), Richard Francis O'Connor, Jr., Tony Scudder, James Duffy, TGAP Holdings (owned by Cooper/O'Connor), and Aroha Holdings (owned by Scudder).

[2]     All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

[3]     In this lawsuit, Catanzarite filed a cross-complaint on behalf of MFS against Beck and CTI's attorneys Horwitz + Armstrong. In a case filed concurrently with this appeal, we considered Catanzarite's appeal of the ruling granting Horwitz's anti-SLAPP motion. (*Mobile Farming Systems, Inc. v. Horwitz + Armstrong et al.* (July 13, 2022, G060315) [nonpub. opn.] (*Mobile Farming Systems*).) We reversed the order.

2

Earlier this year we considered three consolidated appeals concerning CTI's motion to disqualify Catanzarite in four of the six cases mentioned above. (*FinCanna, supra,* G058700.) As will be described in more detail below, we affirmed the trial court's determination Catanzarite could not represent CTI in any manner (including its prosecution of the FinCanna Action). We also concluded neither Catanzarite nor its attorneys could continue advocating for a group of shareholders bringing a derivative lawsuit against CTI and its board members in the Mesa Action. (*Ibid.*) We held in *FinCanna,* "The undisputed nature of the lawsuits, involving parties with conflicting interests, and a corporation with adversarial directors, supported mandatory disqualification as a matter of law." (*Ibid.*)

As for the remaining two cases (the Pinkerton and MFS Actions), we did not review the ruling denying disqualification because neither CTI nor the affected clients filed a notice of appeal challenging those rulings. In the *FinCanna* opinion, we noted a group of defendants in the Pinkerton Action and MFS Action attempted to join in CTI's disqualification motion. However, the trial court rejected the joinder motions as untimely and, alternatively, determined the moving parties lacked standing. The moving parties (Beck, Miguel Motta, Robert Bernheimer, Robert Kamm, and Irving Einhorn) did not appeal this ruling and, accordingly, we did not review it in the *FinCanna* opinion.

Following Catanzarite's disqualification, CTI and Beck filed lawsuits against Catanzarite and some of the firm's clients. Recently, we considered two appeals arising from anti-SLAPP rulings made in CTI's lawsuit. (*Cultivation Technologies, Inc., v. Duffy* (Nov. 12, 2021, G059457) [nonpub. opn.] (*Cultivation*).) We considered and found meritless Catanzarite's appeal of the order denying its anti-SLAPP motion. (*Ibid.*) We also affirmed the trial court's orders denying Cooper and Duffy's anti-SLAPP motion regarding breach of fiduciary claims. (*Ibid.*) We reversed orders granting Cooper and Duffy's anti-SLAPP motion on the remaining claims, concluding they qualified as mixed causes of action that required a claim by claim approach as discussed in *Bonni v. St.*

3

Complaint Supplement #35-2020-01145998
Exhibit #18: 003

*Joseph Health System* (2021) 11 Cal.5th 995, 1010 (*Bonni*).  (*Cultivation, supra,*
G059457.)

<div align="center">BACKGROUND FACTS[4]</div>

As set forth in Beck's complaint, the history of this case begins in 2015
when a failing corporation sought a new business opportunity in the cultivation and use
of cannabis products.  MFS's board members, O'Connor, Cooper, and Richard J. Probst
formed CTI and appointed themselves to CTI's board of directors.  Initially, the directors
told MFS shareholders that CTI would become MFS's subsidiary, but their plans changed
and they created a separate entity.  Beck asserts this was due to the board's concern CTI
would be burdened by MFS's previous business failures.  The board hired Beck, who was
experienced in the cannabis industry and with transitioning small investor-based start-up
companies through "an exit or a public merger."  Eventually, Beck joined CTI's board of
directors and became the president and chief executive officer (CEO) of the company.

In June 2015, O'Connor, Probst, and Cooper executed a document titled,
"unanimous written consent of directors of [CTI] [¶] amended organizational acts &
resolutions" (hereafter Amended Acts).  The Amended Acts stated the original
organization consent of CTI's board (Organizational Consent) executed at the end of
March 2015 was "made in error" and needed to be amended regarding the issuance of
securities.  Specifically, the Organization Consent authorized the issuance of 28,000,000
shares of CTI's common stock to MFS in exchange for the contribution of certain assets
and cash consideration.  The Amended Acts stated MFS failed to provide consideration

---

[4]    Our factual summary is a compilation of allegations of the operative
complaint, declarations, and other evidence submitted in support of the anti-SLAPP
motion.  (*Ralphs Grocery Co. v. Victory Consultants, Inc.* (2017) 17 Cal.App.5th 245,
249.)  It should go without saying, these are not litigated facts nor findings, and we imply
no view on what actually happened in this case.
          For ease of reading, some formatting (such as boldface, underlining, or
capitalization) has been omitted from our quotations from the complaint, documentary
evidence, and briefing.

<div align="center">4</div>

and the board determined it was in CTI's "best interests" to sell the stock to its founding shareholders "the 'Founders'" pursuant to a purchase agreement attached as an exhibit. The Amended Acts listed the following Founders:  (1) O'Connor; (2) Probst; (3) Cooper; (4) TGAP Holdings (owned by Cooper/O'Connor); (5) I'm Rad (RAD) and EM2 Strategies (EM2) (owned by Beck); (6) Higgerson; (7) Aroha Holdings (owned by Scudder); and (8) Scott Unfug.

Cooper's father, Higgerson, was named one of CTI's Founders because at the time CTI was formed, MFS's "few remaining major liabilities was a $500,000 unpaid loan" owed to Higgerson.  The board members of MFS/CTI negotiated a deal whereby Higgerson relinquished payment on the loan and in exchange he acquired 1,000,000 CTI Founder shares for a mere $1,000.

Beck explained Aroha acquired 1,000,000 CTI Founder shares due to Scudder's personal and professional relationship with O'Connor.  Beck asserted in his complaint that the Amended Acts essentially granted all MFS shareholders the opportunity to purchase stock in CTI.

One shareholder at the time was Jolly Roger, Inc., owned by Roger Root. Beck alleged Root was contacted about whether Jolly Roger was interested in investing in CTI but Root stated he did not have the capital to pay $4,500 for 450,000 common CTI shares.  Beck noted Root "expressed to Scudder that he 'supported' the structure under which CTI was being created."

Beck's complaint alleged CTI complied with the federal law requirement of authorizing a private placement memorandum (PPM) regarding the sale of its securities. CTI was obligated to disclose shareholders owning or controlling more than five percent of CTI's capital stock.  MFS was not listed in the PPM.  Thereafter, the Founders sold their CTI shares to others.  Scudder acted as O'Connor's agent and earned commissions from selling O'Connor's shares.  Cooper and O'Connor retained a transfer agent to sell CTI stock to their company TGAP.  In October 2015, Duffy subscribed to buy CTI shares

through the PPM. Duffy often invested in the same projects as O'Connor. In March 2016, Zakhireh (O'Connor's plastic surgeon) also subscribed to buy CTI shares through the PPM. Thus, Duffy and Zakhireh received the PPM stating MFS was not a shareholder. In addition to the above mentioned new CTI shareholders, CTI issued stock certificates to approximately 70 new shareholders and MFS was not one of them.

Beck alleged that from 2015 until his resignation from CTI's board in May 2019, the company raised $3.5 million from private investors and approximately $5.9 million from a venture capital lender, FinCanna. Beck, who had initially been retained as a CTI's consultant, was appointed as a director and officer. He occupied various positions including chairman of the board, CEO, President, and chief strategy officer.

In his complaint, Beck asserted that soon after CTI adopted the Amended Acts, MFS stopped operating. The MFS board discussed shutting down the business. MFS's primary asset was a $676,000 executive loan O'Connor owed to MFS.

Beck asserted the rift between CTI board members started in October 2015, when Cooper "left CTI due to complications" arising from her extra-marital affair with O'Connor. Thereafter, in April 2016, CTI's board members asked O'Connor to resign. Beck explained O'Connor "had conducted himself in a manner contrary—and detrimental—to CTI's best interests, including not coming into the office, spending money irrationally, and other 'erratic behaviors.'" Beck believed O'Connor blamed him personally for his removal, and thereafter, began making threats of revenge.

The following year, CTI executed a $14 million funding agreement with FinCanna, which allowed the company to begin constructing manufacturing facilities in Southern California. Beck maintained CTI became "an attractive business opportunity for potential additional investors" which also made it a deep pocket target for those who "bore a grudge." Relevant to this appeal, O'Connor and Zakhireh each filed complaints against CTI. O'Connor's lawsuit asserted CTI breached its contract "related to payments associated with his 2016 settlement agreement." Zakhireh, on behalf of himself and other

6

CTI shareholders, filed a complaint challenging the board's decision to borrow money from FinCanna and disputing the issuance of "Preferred Series A shares." CTI settled these lawsuits. Zakhireh agreed to receive more CTI shares.

Beck produced evidence that after Cooper's resignation, she continued to work with CTI as an unpaid consultant. Beck recalled speaking with Cooper about Zakhireh's complaints and before he filed a lawsuit she agreed to speak with Zakhireh on CTI's behalf. Cooper told Beck that as a CTI shareholder she was not the only one who had a personal stake in the company's success, and the board was responsible for dozens of other CTI shareholders. In all their discussions about the duties of CTI leadership, Cooper never discussed MFS or that CTI was MFS's subsidiary.

Despite these setbacks due to the lawsuits, CTI pressed forward in the summer of 2018 with its business plan to build a $40 million cultivation and manufacturing facility. Beck maintained CTI engaged an investment bank to raise an additional $25 million and signed a letter of intent with Tidal Royalty for $5 million in financing. Meanwhile, CTI generated over $500,000 in revenue per month, and the board modified its business plan to shift away from cultivation and manufacturing to cannabis extraction. CTI entered several production and distribution agreements with retail cannabis companies and brands.

Beck's complaint alleged all was going well until Catanzarite filed a complaint in September 2018 for Denise Pinkerton. Pinkerton claimed to be acting as attorney in fact for Root, individually and as successor in interest to the claims of his deceased spouse (Sharon Root). The complaint alleged the Roots owned MFS common stock and that the lawsuit was also a shareholder derivative action on behalf of MFS.

The complaint alleged multiple causes of action against CTI, the original board members (O'Connor, Cooper, and Probst), Joseph R. Porche (MFS's securities salesperson), and all parties having a connection to CTI. This included Beck, as CTI's chief strategy officer and his two companies (RAD and EM2), which held CTI Founder's

7

stock. Similarly, the complaint named TGAP, Higgerson, Aroha, Scudder, and Unfug as defendants holding shares of CTI Founder's stock. The complaint included, Mobin, who held 250,000 shares of CTI stock, shared an office with Porche, and acted as vice president of shareholders relations of MFS and CTI. The complaint explained Bernheimer was included in the lawsuit because he was an attorney who worked with CTI's management team "since inception" and served as chief counsel since 2017. Another defendant, Einhorn, was an attorney and director of CTI. Finally, Motta was included due to his current role as CTI's CEO and a director.

The Roots alleged that in 2012 and 2013, MFS identified itself as an agricultural technology company that manufactured residential hydroponic growing systems. The Roots understood growing marijuana was the anticipated use of MFS's products. In 2014, they heard MFS's directors and Mobin discuss the business opportunities created by the anticipated legalization of marijuana. Root asserted the MFS shareholders were told about the formation of CTI and that it would become MFS's subsidiary. The complaint cited to CTI's Organizational Consent stating MFS would hold 28,000,000 CTI shares of common stock. The Roots claimed they received letters signed by Probst, O'Connor, Cooper, and Mobin about CTI's progress. The complaint also referred to CTI's Amended Acts, which stated the CTI "shares had not been transferred or provided" to MFS. The Roots quoted from the Amended Acts, explaining MFS's board members rescinded MFS's promised shares and instead issued 23,000,000 shares to the Founders. Specifically, the complaint noted O'Connor, Probst, Cooper, and TGAP spent a total of $15,500 to acquire 15,500,000 out of the 23,000,000 shares, giving them 67.3913 percent control of CTI. This percentage was "materially greater than their control ownership of MFS."

For the derivative claims, the Roots asserted Probst, O'Connor, and Cooper, while acting as MFS directors, worked against the interests of company by rescinding MFS's ownership of 100 percent of the outstanding shares of CTI "so that

8

Book # Superior Court of California County of Orange
ADA Complaint Exhibits 388

they, simultaneously acting as the sole directors of the CTI and MFS boards of directors, could capture the entire business opportunity which belonged to MFS for themselves and their co-conspirators." The derivative claims on behalf of MFS included causes of action for breach of fiduciary duty, constructive fraud, conversion, misappropriation of trade secrets, and unfair competition. They sought declaratory relief in the form of a court order that CTI, Probst, O'Connor, Cooper, Beck, Higgerson, and the other defendants "surrender the certificate (or certificates) in their names for cancellation and or reissuance, costs, and expenses incurred in bringing this action and such other relief as the court" deemed proper.

In the constructive fraud cause of action, the Roots asserted "MFS and Root" relied on their fiduciaries, Probst, O'Connor, Cooper, and Mobin. The Roots claimed they were deceived and defrauded by these four specific individuals. They alleged EM2, RAD, Higgerson, Aroha, Scudder, Unfug, Beck, and Bernheimer were liable because they aided and abetted in the fiduciaries' breach of their duties. Alternatively, they maintained Probst, O'Connor, Cooper, and Mobin conspired to breach their fiduciary duties to MFS, while Kamm, Bernheimer, Einhorn, and Motta agreed to cover up their misconduct "in order to maintain their board positions, stock ownership and options, and compensation."

The Roots raised several claims on their own behalf, based on the following factual circumstances: Probst, O'Connor, Cooper, Mobin, and Porche took advantage of frail, elderly, and unsophisticated investors. Starting in 2012, O'Connor, Porche, and Mobin met with 75-year-old Root and his 69-year-old wife. They unscrupulously convinced the Roots to invest virtually all their retirement savings ($437,500) for 1,537,500 shares of MFS common stock "at a price grossly above the true fair market value of said securities."

The Roots initially wire transferred two payments of $125,000 in December 2012. Thereafter, Probst, O'Connor, Cooper, Mobin, and Porche continued to call and

9

Superior Court of California County of Orange
ADA Complaint Exhibits 389

e-mail the Roots asking for more money at an increasing MFS stock price per share. Root sent seven more checks from February to May 2013 to purchase additional shares. The exploitation of the elder abuse cause of action specifically alleged Probst, O'Connor, Cooper, Mobin, and Porche stayed at the Roots' home as house guests.  It was alleged the group pretended to be friends with the Roots to gain their confidence and "reduce their guard and caution with the intent of deceiving and taking their retirement savings."  In addition to compensatory damages, the Roots sought attorney fees, punitive damages, exemplary damages, treble damages, and the return of all MFS's property.

Several causes of actions were based on the factual allegation Probst, O'Connor, Cooper, Mobin, and Porche received illegal commissions on the sale of MFS securities to the Roots.  These defendants were not licensed broker-dealers in California or Florida when they sold the shares.  These specific five defendants told the Roots the MFS shares were being sold pursuant to a PPM, and therefore, "purportedly exempt from registration under the federal and state securities laws" when in fact "MFS securities did not qualify as exempt private placements" and were sold in violation of the federal and state securities laws.  The Roots believed these individuals knew there were security law violations but rather than tell the Roots about their right to rescind the transactions, they concealed the illegal nature of the transactions.

The complaint alleged these specific individuals also misrepresented or failed to disclose the following material facts:  (1) the risks with investing in MFS; (2) their commissions from the stock sales; (3) they claimed to be taking minimal salary compensation when in fact they were receiving excessive compensation and paying personal expenses from the stock subscription money; and (4) Porche was the subject of SEC civil and administrative proceedings resulting in permanent injunctions such as barring him from associating with any brokers, dealers, or investment advisors.  Beck recalled that during a meeting with O'Connor and Cooper they revealed MFS's board directed a $340,000 commission payment using the Roots' investment funds.

Complaint Supplement #30-2020-01149998 County of Orange
Exhibit #18: 010
ADA Complaint Exhibits 390

Beck maintained the Pinkerton Action has several problems from the start. First, Jolly Roger, not the Roots, purchased MFS stocks. More importantly, Roger Root knew CTI was not MFS's subsidiary because he was invited (on Jolly Roger's behalf) to participate in CTI's stock offering but he had declined. Second, Beck submitted evidence showing Jolly Roger was a "defunct" corporation when the lawsuit was filed. The documents revealed Jolly Roger filed articles of dissolution in early 2015 and was not reinstated until January 17, 2019.

Another issue was the inherent inconsistency in the requested remedies. On one hand, the Roots were willing to settle their direct action for 10,000,000 CTI Founders shares and a seat on the CTI board. On the other hand, the Roots derivative claims sought cancellation of all CTI stock certificates because MFS allegedly owned 100 percent of CTI.

Despite these issues, Catanzarite diligently prosecuted the case by serving MFS's counsel (Anderson, McPharlin & Conners) with over 500 discovery requests. Cooper was assigned counsel under CTI's policy.

Beck declared CTI held a shareholder meeting in November 2018 (two months after the Pinkerton Action was filed). He noted Cooper and O'Connor at that time were acting as if CTI was a separate entity from MFS. They did not discuss MFS or whether MFS had a right to vote in CTI's corporate affairs. Rather, Cooper furnished a proxy to vote 4,900,000 shares of her CTI stock, which would not have been possible if MFS supposedly owned all of CTI's stock. Beck recalled hearing Probst, O'Connor, and Cooper discuss whether to settle the Pinkerton Action derivative claims with Root, without involving Catanzarite or its lawyers.

The gravamen of Beck's complaint is the theory that sometime between November 2018 and January 2019, Catanzarite and the O'Connor Faction struck a deal. Specifically, they set into motion a scheme to save members of the O'Connor Faction from liability in the Pinkerton Action. Beck provided evidence showing that around

11

January 2019 many Pinkerton Action defendants entered into settlement agreements with Catanzarite.  They agreed to "renounce" their CTI shares in favor of MFS and entered "into separate agreements to allege—now, for the first time—that CTI had been a subsidiary of MFS all along . . . ."  On December 13, 2018, Catanzarite dismissed Porche, and in early January it dismissed Mobin, two of the primary wrongdoers named in the Pinkerton Action.

While Catanzarite was negotiating agreements with other defendants, it continued litigating the Pinkerton Action.  Beck asserted the parties eventually designed a scheme that involved misusing the judicial process, publicizing unlawful CTI shareholder written consents, and sending e-mails intent on destabilizing CTI's operations by interfering in merger negotiations and other business prospects.  If this plan worked, MFS (controlled by the O'Connor Faction) would be able to regain control of CTI's business/profits and reallocate all the stock shares.  MFS shareholders (including the Roots) would likely also benefit from the shift in power.

January 2019 was a busy month for Catanzarite, setting in motion the group's corporate takeover scheme.  On January 4, 2019, it dismissed Scudder and Aroha from the Pinkerton Action.  On January 22, 2019, it dismissed O'Connor, TGAP, and Unfug.  The following day, Catanzarite dismissed Cooper and Higgerson.  Thereafter, O'Connor and Cooper used their MFS shareholder votes to reconstitute the MFS board of directors.  MFS hired Catanzarite as corporate counsel.

On January 23, 2019, O'Connor executed a "unanimous written consent of the sole shareholder of [CTI]" (2019 Consent), stating he was CEO of MFS and had authority to act by unanimous written consent without a meeting to adopt several resolutions.  The first resolution stated MFS was the sole shareholder of CTI and O'Connor, in his capacity as CEO, could issue the written consent stating MFS fully paid for 28,000,000 shares of CTI common stock in March 2015.  The next resolution stated the Amended Acts contained the false contention MFS "had not fully paid for all of its

stock [was] facilitated by the wrongful and self-serving conduct" of Probst and Beck. Accordingly, all actions, issuance of shares, and promisors were void or voidable acts.  In essence, the written consent sought to unwind three years of CTI's corporate acts.

In addition, the 2019 Consent "resolved" that the entire CTI board of directors was wrongly elected "by shareholders other than MFS" and they were immediately removed.  MFS rescinded all CTI's stocks and promissory notes.  It elected O'Connor, Zakhireh, and Murphy to serve as CTI's directors.  It terminated CTI's auditor and legal counsel.

Around this same time, Catanzarite sent CTI's largest secured creditor, FinCanna, an e-mail stating future modifications or agreements between them must be signed by the new CTI board members (O'Connor, Zakhireh, and Duffy).  (See *Cultivation, supra,* G059457 [detailed discussion of Catanzarite's damaging e-mails to CTI's business partners]).  Catanzarite also took steps to interfere with CTI's proposed merger with Western Troy Capital Resources, Inc, by writing an e-mail to the company stating the new CTI directors objected to the merger.  (*Ibid.*)

However, it was Catanzarite's misuse of the judicial process that formed the basis for Beck's malicious prosecution claims.  On January 28, 2019, Catanzarite filed the MFS Action.  The claims were brought "derivatively on behalf of its wholly owned subsidiary [n]ominal [d]efendant [CTI]."  It named as defendants CTI's board of directors (Probst, Beck, Kamm, and Motta), CTI attorneys (Einhorn and Bernheimer) and several entities (EM2, RAD, and Tow and Grow).[5]  CTI was named as a nominal defendant.  MFS raised nine causes of action and sought declaratory relief and a permanent injunction.  MFS asserted it was entitled to file a derivative action because it organized CTI and acquired 28,000,000 shares of CTI common stock, and therefore, CTI was its wholly owned subsidiary.

---

[5]        Tow and Grow is not a party to this appeal.  The complaint alleged CTI purchased this company, but it was for Probst's personal benefit.

13

Catanzarite drafted a complaint telling a remarkably different story from the one set forth in the Pinkerton Action. The lawsuit reflected an abrupt shift in allegiances. O'Connor and his allies turned against their former board members Probst and Beck. Indeed, the MFS Action did not allege O'Connor, Cooper, TGAP, Higgerson, Aroha, or Unfug took part in any wrongdoing while they were in control of CTI. Rather these parties were portrayed as "the good guys" who were victimized by Probst, Beck, and other parties who wrongfully sold and purchased CTI shares that belonged to MFS. We note Catanzarite filed the MFS Action acting as MFS's purported corporate counsel while still representing different a shareholder in a derivative action against both MFS and CTI (Pinkerton Action).

In the MFS Action, the complaint asserted Probst and Beck conspired with and were aided and abetted by other Founders to falsely claim CTI's shares were not transferred to MFS and wrongfully reissued those shares. With respect to the other CTI directors and shareholders, the complaint offered the following explanation: "O'Connor, Cooper, TGAP, . . . Higgerson, Aroha, [and] Unfug have agreed to renounce their Founders' Shares in favor of MFS." The complaint failed to explain why renouncing shares and forming an alliance with MFS absolved O'Connor and Cooper from their role in executing the Amended Acts. Nor did the complaint reveal O'Connor's authority to publicize the 2019 Consent, which rescinded the Amended Acts, ousted the board members, and fired CTI's legal counsel. O'Connor's 2019 Consent rescinded CTI shares he and others sold to third parties such as Zakhireh, Cooper, and Higgerson.

To further meddle in CTI's business operations, the MFS Action's complaint asserted CTI's current board of directors were violating Corporations Code section 1507 by "preparing, signing and circulating false minutes, issuing securities, transacting business with insiders, [and] borrowing money from insiders and records relating to CTI." MFS requested that the court enjoin the CTI's board from operating the company until the court held a Corporations Code section 709 hearing (709 hearing) "to

14

determine the rightful ownership of CTI, its appropriate [b]oard of [d]irectors, and executive structure." The court initially granted a temporary restraining order (TRO), which was highly disruptive to CTI's ability to operate its business.

The trial court (Judge Randall J. Sherman) dissolved the TRO in May 2019 after the 709 hearing. Catanzarite argued MFS had the right to vote in CTI's last board meeting when it elected new officers. The court examined the original Organizational Consent, the Amended Acts, the 2019 Consent, MFS loan documents, and other relevant evidence. It noted CTI's securities agreements, which are required to contain a list of issued shares, did not mention MFS was a shareholder. It found telling that O'Connor signed 50 subscription agreements to sell CTI stock directly to MFS shareholders and all but six of MFS's 59 shareholders purchased CTI stock. It considered an e-mail Probst sent to Cooper and O'Conner in 2017 that discussed closing MFS or declaring bankruptcy because the only asset was a note from CTI. And no one disagreed with Probst's failure to list CTI stock as another MFS asset. The court considered CTI's assertion that beginning in 2015 CTI's board raised over 3,000,000 from over 60 private investors and 6,000,000 in financing based on representations MFS did not own any shares of CTI stock. At the hearing, Catanzarite represented Cooper and O'Connor would testify they signed documents making CTI a separate entity but did not understand it meant they were rescinding the shares promised to MFS. Finally, the court questioned Catanzarite about the reasons for the long delay in bringing the motion, during which CTI and MFS operated as separate entities.

The court determined CTI's election was valid and stated that "every fiber of my being says that the facts are overwhelming against" Catanzarite's position. It stated there was a repudiation of an agreement (the Subsidiary Promise) by people who were the same principles in MFS and then there was evidence of repeated actions after the Amended Actions that were consistent with the notion MFS was not a stockholder. The court concluded the delay in bring this claim further supported the conclusion MFS

15

Bank #36-2020-01145992 Superior Court of California County of Orange
ADA Complaint Exhibits 395

"has been of the view that they are not a shareholder." "So the court concludes that the challenge [to CTI's] election is denied, and the court concludes that [MFS] is not a stockholder in CTI."

That same month, Beck resigned from CTI's board.  Meanwhile, Catanzarite resumed filing lawsuits to further the O'Connor Faction's and MFS's interests.  Each version represented a slight shift in trial tactics, but all were aimed at achieving the same result set forth in the MFS Action.  Beck claimed the litigation against CTI created a sense of instability with CTI's business partners and lenders causing the company to lose money.

For example, Catanzarite filed the Mesa Action in April 2019 for Richard Mesa and a *putative class* of MFS shareholders who also purchased CTI shares.  The complaint was framed as both a class action and a shareholder derivative action filed "on behalf of" CTI.  The complaint asserted the class of MFS/CTI shareholders wanted to consolidate their lawsuit with MFS's derivative action "and to among other relief, recognize the ownership and control of CTI" by MFS's ownership of 28,000,000 shares, 5,000,000 "Friends & Family CTI shares," and 3,000,000 CTI shares issued pursuant to the 2015 PPM.

This Mesa Action grouped the "'[d]irector [d]efendants'" separately from the "'[p]referred [s]hares [d]efendants."  The director defendants included members of the Probst Faction (Probst, Beck, Bernheimer, Kamm, Einhorn, and Motta).  Ten defendants holding CTI series A preferred stock were collectively referred to as the preferred shares defendants.  CTI was listed as a nominal defendant.

One month later, Catanzarite amended the Mesa Action complaint to add Cooper and Tom Mebane as plaintiffs and FinCanna as a defendant.  (See *FinCanna, supra,* G58700.)  Catanzarite also changed the nature of the action to focus on unraveling CTI's financial dealings with FinCanna and declare CTI's actions and contracts void.

16

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 396

The shareholder no longer wished to join the MFS Action or seek recognition of MFS's controlling stock shares over CTI. (*Ibid.*)

Thus, to briefly recap, at this point Catanzarite's concurrent and successive representation of adverse parties included the following: (1) Catanzarite was representing the Roots' elder abuse lawsuit against CTI and some of its Founders (the Probst Faction) as well as a derivative action against MFS; (2) Catanzarite had made a deal with a handful of CTI Founders to dismiss them from the Pinkerton Action; (3) it became MFS's counsel of record; (4) Catanzarite filed a derivative shareholder lawsuit for MFS, claiming 100 percent control and ownership of CTI, despite having lawsuits filed by other people claiming to be MFS shareholders; and (5) after filing two *derivative* shareholder lawsuits, Catanzarite filed a third derivative action (the Mesa Action) claiming to represent a different set of outsider shareholders, i.e., a class of derivative shareholders willing to join in the MFS Action but also independently seeking damages from CTI, its current shareholders, and board of directors.

At the end of May 2019, Catanzarite filed a lawsuit on behalf of Cooper and Mebane against CTI. The Cooper Action requested the court direct CTI to (1) hold a shareholder's meeting to elect a board of directors; (2) deliver an annual report; (3) appoint an accountant to conduct an audit; and (4) order CTI to pay the costs for an investigation, audit, and costs of the suit. CTI's corporate counsel filed an opposition, asserting a shareholder meeting was scheduled for August 2019. (See *FinCanna, supra,* G058700 [description of Catanzarite's six lawsuits].)

In July 2019, Catanzarite filed first amended complaints (FAC) in the Pinkerton Action and the MFS Action. It removed all derivative action claims made on

17

behalf of MFS and CTI.[6] Catanzarite claimed to be MFS's and CTI's corporate counsel. Catanzarite next filed two lawsuits as CTI's corporate counsel (the FinCanna Action and Scottsdale Action). The Scottsdale Action is noteworthy in that Catanzarite demanded that CTI's insurance company stop providing a defense or indemnify Beck and other Probst Faction defendants in the Mesa Action. (See *FinCanna, supra,* G058700 [description of Catanzarite's six lawsuits].)

In January 2020, the trial court disqualified Catanzarite and its attorneys from representing CTI and the Mesa Action plaintiffs. (*FinCanna, supra,* G058700.) What happened next is described in full detail in our *FinCanna* and *Cultivation* opinions. (*FinCanna, supra,* G058700; *Cultivation, supra,* G059457), which we incorporate by reference. Relevant to this appeal, on March 5, 2020, Catanzarite dismissed the Pinkerton Action and MFS Action.

Meanwhile, CTI filed a lawsuit against Cooper, Duffy, and Catanzarite for interfering in its business relationships, breaching fiduciary duties, legal malpractice and other allegations related to their misconduct. As discussed in *Cultivation, supra,* G059457, defendants anti-SLAPP motions (for the most part) failed.

Beck, represented by counsel, filed the case underlying this appeal. MFS filed a cross-complaint against Beck, Probst, Bernheimer, Horwitz + Armstrong, Horwitz, Armstrong and other entities (discussed in more detail in our concurrently filed opinion *Mobile Farming Systems, supra,* G060315).

Beck filed a demur to the cross-complaint, a motion to disqualify Catanzarite, and a request for judicial notice of documents supporting these motions. Out of the 13 defendants named in Beck's lawsuit, a handful filed anti-SLAPP motions. Beck

---

[6]       We note the Pinkerton Action FAC was deeply sanitized to remove all traces of accusations against the O'Connell Faction, Porche, Mobin, and TGAP. Where the original complaint specified four people (O'Connell, Probst, Porche, and Mobin) befriended the Roots to swindle the elderly couple out of their retirement funds, the FAC asserted Probst was acting alone.

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 398

opposed the anti-SLAPP motions and submitted declarations and a request for judicial notice.[7]

In his opposition to Cooper's motion, Beck asserted Cooper turned her back on CTI and Beck when she and O'Connor were asked to resign from CTI. Beck alleged Cooper, joined by her father Higgerson, had been harassing Beck and CTI for two years. He maintained they helped the other defendants in a two-prong scheme. "First, Cooper and Higgerson assisted [in] the creation of false shareholder consents and other corporate acts claiming that MFS was the 'sole shareholder' of CTI. [This was] a false statement that contradicted the fact that Cooper herself had facilitated sales of CTI shares to dozens of individual CTI shareholders. The MFS Action could not exist without their signatures and alleged collusion with [Catanzarite] and other [d]efendants, because Cooper as a major shareholder of MFS and as its largest debt-holder of MFS had to cooperate. Cooper's cooperation was needed to remove the existing MFS board and purportedly retain [Catanzarite] to file the MFS Action on facts known to be false. Second, both falsified testimony for the purpose of engaging in malicious litigation against Beck and CTI, a second track that [d]efendants hoped would give them the leverage to obtain through illicit means what they could not otherwise have." Beck argued his non-malicious prosecution causes of action did not arise from protected speech, but rather "from corporate actions aided and abetted by Cooper and Higgerson." Moreover, Cooper and Higgerson participated in defendants' malicious prosecution scheme by creating false testimony to support MFS's narrative it was CTI's sole shareholder.

---

[7]      Our appellate record is lengthy and disorganized. Appellant's appendix and Respondent's appendix contain only select parts of the record. As will be explained in further detail anon, we granted Beck's motion to augment the record with additional relevant exhibits, i.e., copies of his written oppositions and some of the anti-SLAPP motions. However, all the oppositions refer to Beck's 1,209-page request for judicial notice, which is not part of our record. On our own motion, we augment the record to include this document as it was considered by the trial court and necessary for our required de novo review.

19

Beck's opposition to Zakhireh's motion contained similar arguments. Beck acknowledged Zakhireh was not a plaintiff in any of Catanzarite's previous lawsuits. He argued the malicious prosecution claim could be based on Zakhireh's participation in the conspiracy to prosecute frivolous actions. In addition, "Zakhireh is liable for the other claims against him because he participated directly in various non-judicial actions that constituted corporate sabotage against CTI and Beck. Beck can offer evidence establishing a prima facie case for these claims, and Zakhireh acts as a corporate director or officer to sabotage CTI are not privileged under . . . Civil Code section 47."

Beck filed separate oppositions to Catanzarite's and the attorney's motions, but the arguments overlapped. He alleged anti-SLAPP should not apply when these defendants conspired to use MFS as a vehicle for corporate sabotage of CTI, and "engaged in a series of private, corporate acts to slander and destroy CTI and Beck." He added the basis for liability against the individual lawyers was their direct participation in "various non-judicial actions that constituted corporate sabotage against CTI and Beck."

On October 23, 2020, the trial court considered Zakhireh and Catanzarite's anti-SLAPP motions. It granted Zakhireh's motion as to all claims other than slander of title and granted Catanzarite's motion in full. On November 20, 2020, the court considered and granted Cooper and Higgerson's anti-SLAPP motions.

## MOTIONS ON APPEAL

### I. *Disqualification Motion*

Beck filed a motion to disqualify Catanzarite (and the firm's attorneys Kenneth Catanzarite (Kenneth), Nicole Marie Catanzarite-Woodward (Nicole), Brandon Woodward (Brandon), and O'Keefe) from this appeal.[8] He argues that for the same reasons this court upheld the disqualification orders regarding the Mesa Action shareholders (Cooper, Higgerson, and Duffy), we must now disqualify Catanzarite from

---

[8]   For the sake of clarity, we will refer to parties having the same last names by their first given names.

representing MFS/CTI shareholders in this appeal.  Specifically, he asserts Catanzarite's ongoing concurrent representation of clients with conflicting interests triggered mandatory disqualification.  (Citing *FinCanna, supra,* G058700.)  We disagree.

As explained in *FinCanna, supra,* G058700, at the same time the trial court granted CTI's disqualification motion, it denied Beck's motion seeking joinder for Catanzarite's disqualification in the Pinkerton and MFS Actions.  Beck filed a disqualification motion in his malicious prosecution action, but it appears from our record that the court did not rule on it before granting the defendants' anti-SLAPP motions.  Beck waited eight months after filing his notice of appeal to file a disqualification motion directed at the respondents' counsel.

The disqualification motion in this appeal was filed too late.  The trial court's order denying Beck's original disqualification motion was immediately appealable.  (*Meehan v. Hopps* (1955) 45 Cal.2d 213, 217 [order denying motion for disqualification "left nothing further of a judicial nature for a final determination of his rights regarding opposing counsel, [and] the order was final for purposes of appeal"]; *Apple Computer, Inc. v. Superior Court* (2005) 126 Cal.App.4th 1253, 1263-1264 [either writ petition or appeal may be filed following denial of motion to disqualify].)  In *FinCanna, supra,* G058700, we noted Catanzarite was the only party to appeal the court's disqualification rulings.  To consider Beck's current motion on appeal, we would essentially be reviewing an order from which a separate appeal should have been pursued.

"'Collateral estoppel precludes a party from relitigating in a second proceeding the matters litigated and determined in a prior proceeding.  The requirements for invoking collateral estoppel are the following:  (1) the issue necessarily decided in the previous proceeding is identical to the one that is sought to be relitigated; (2) the previous proceedings terminated with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party to or in privity with a party in the

21

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 401

previous proceeding.' [Citation.]  An order disqualifying an attorney, which was not appealed, has collateral estoppel effect in a subsequent action involving the same issue. [Citation.]" (*A.I. Credit Corp. Inc. v. Aguilar & Sebastinelli* (2003) 113 Cal.App.4th 1072, 1078.)  The disqualification issue in the previous proceeding is identical to the one sought to be relitigated.  The trial court determined Beck and his codefendants did not have standing to bring the motion, which qualifies as a judgment on the merits.  The third element is satisfied in that this malicious prosecution action involves the same parties as the previous proceeding.  Beck is collaterally estopped from relitigating the issue of Catanzarite's disqualification.

II. *Request for Judicial Notice (RJN)*

Our court's docket reflects that on August 19, 2021, this court rejected Beck's motion to augment the record with several documents because there was a problem with the pagination.  That same day, Beck filed a separate RJN with the following unhelpful caption: "Filed concurrently with index of exhibits and exhibits in support of motion to augment record on appeal."  This court filed the RJN and determined the matter would be decided in conjunction with the decision on appeal.

Defendants separately filed an opposition and evidentiary objections to the RJN.  They argued the motion was moot because this court rejected Beck's motion to augment.  Alternatively, they maintained the motion should be denied because Beck failed to show good cause for the delay and some of the matters were not admissible. These contentions are frivolous.  We were dismayed that the evidentiary objections simply repeated the meritless arguments raised in the opposition.  The only new argument alleged the documents listed in the RJN lacked relevance, which also turns out to be a frivolous argument.

The RJN includes copies of Beck's oppositions to three different anti-SLAPP motions considered by the trial court, but that were not included in either the appellant's appendix or respondent's appendix.  Because we review the trial court's

22

ruling on the anti-SLAPP motion de novo, these documents are highly relevant to resolving this appeal. Similarly, a copy of Beck's declaration supporting one of the oppositions was relevant for our de novo review. Finally, Beck sought judicial notice of our prior *FinCanna* opinion. As demonstrated above, we frequently refer to it and incorporate portions in this opinion. The opinion certainly was relevant to this appeal.

Contrary to defendants' assertion, appellate courts routinely take judicial notice of the records of their own cases under Evidence Code sections 452, subdivision (d) and 459.2. (See, e.g., *Rel v. Pacific Bell Mobile Services* (2019) 33 Cal.App.5th 882, 886 [on court's own motion, took judicial notice of two prior opinions in the same case as well as underlying appellate records]; *People v. Bilbrey* (2018) 25 Cal.App.5th 764, 769, fn. 7 [taking judicial notice of related appeal in writ proceeding]; *Eden Township Healthcare Dist. v. Eden Medical Center* (2013) 220 Cal.App.4th 418, 421 ["We quote at length from our discussion of the facts in our prior opinion"].)

As for the oppositions and declarations, the trial court considered these documents and we could, on our own motion, augment the record. However, we conclude it would be more time efficient to construe Becks RJN as a motion to augment the record on appeal. Thus, we will grant Beck's motion to augment the record with the exhibits attached to his RJN.

Beck also filed a motion for sanctions against Catanzarite and its attorneys for filing frivolous lawsuits below and baseless objections to his motions on appeal. While sanctions are tempting due to the repetitive and groundless objections, we conclude the opposition to the disqualification motion was at least partially correct. At this time, we deny Beck's motion for sanctions.

DISCUSSION

Section 425.16 authorizes a special motion to strike claims arising from any act "in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16,

23

subd. (b)(1).)  The purpose of the anti-SLAPP statute is to encourage participation in matters of public significance by allowing defendants "to request early judicial screening of legal claims targeting free speech or petitioning activities."  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 880-881.)

"Resolution of an anti-SLAPP motion involves two steps.  First, the defendant must establish that the challenged claim arises from activity protected by section 425.16, and if the defendant makes this showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success.  [Citation.]  On appeal, we review the trial court's ruling on the anti-SLAPP motion de novo.  [Citation.]"  (*Wittenberg v. Bornstein* (2020) 50 Cal.App.5th 303, 311-312 (*Wittenberg*).)

"To establish a probability of prevailing, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.' [Citations.]  For purposes of this inquiry, 'the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.' [Citation.]  In making this assessment it is 'the court's responsibility . . . to accept as true the evidence favorable to the plaintiff . . . .' [Citation.]  The plaintiff need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP.  [Citations.]"  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291-292 (*Soukup*).)  We will address each cause of action separately.

I. *Slander of Title*

Beck's complaint alleged, inter alia, that Zakhireh, Catanzarite, and Kenneth were liable for slander of title.  The complaint stated:  "Defendants effected, or

24

caused to be effected, certain shareholder consents of MFS and CTI which they knew to be false, stating that MFS was the sole shareholder of CTI. On the basis of these alleged consents, title to ownership by Plaintiff of CTI shares was thereby compromised. Indeed, such slander also prevented [Beck] from pursuing valuable business opportunities or growth capital on behalf of CTI." He alleged these defendants acted "with reckless regard in making statements that they knew were false. Defendants knew that other parties would rely upon their statements. Here, the slander of title by [d]efendants destroyed [Beck's] opportunity to sell shares in the public markets through a proposed merger with Troy, or other public offering as an alternative, each at times when public market valuations in 2019 were superior to current market conditions."

Thus, Beck's claim appears to be based on publication of the 2019 Consent, which was intended to reinstate MFS as CTI's primary shareholder and purportedly replaced CTI's board members. As pled, this conduct does not obviously relate to protected litigation-related activity, which the first prong of anti-SLAPP requires. Accordingly, we agree with the trial court's determination Zakhireh failed to meet his burden on the first prong and properly denied the motion as to this claim.

With respect to Catanzarite/Kenneth, the trial court concluded these moving parties met their burden on first prong because Beck "conceded" in his opposition the law firm "published" the 2019 Consent when drafting the MFS Action's complaint. Filing a complaint certainly falls under section 425.16 subdivision (e)(1) [writing made in judicial proceeding]. However, we read Beck's opposition differently. While he mentions Catanzarite's reference to the 2019 Consents in the complaint, he adamantly refuted the contention his slander of title claim was entirely based on protected activity. He asserted Catanzarite/Kenneth "was one of those responsible for the non-privileged publications that directly slandered Beck's title to CTI shares." He explained that *after* publishing the written consent in the MFS Action's complaint, Catanzarite/Kenneth and their "allies" changed tactics because the MFS Action and Pinkerton Action failed. Beck maintained

<div align="center">25</div>

Beck v Superior Court of California County of Orange
ADA Complaint Exhibits 405

the scheming defendants tried to take control of CTI through a shareholder vote with O'Connor holding the shareholders' proxies. Beck concluded the alleged actions of corporate sabotage outside of the courtroom were not protected actions. "[R]ecission of the Amended Acts through the issuance of the shareholder consent" were not dependent on the pursuit of litigation.

Beck's opposition revisited this line of argument when discussing the second prong of anti-SLAPP. He repeated the slander of title claim was not based "on acts that were made in any kind of 'judicial proceeding.'" He asserted, "the most damaging representations made regarding Beck's CTI shares were made completely separate from litigation, when [Catanzarite/Kenneth] and the individuals purporting to make up the MFS board issued the supposed consent that knowingly claimed false ownership of CTI." None of the above language suggests Beck conceded the basis of his slander of title claim was litigation-related conduct.

Because we read the complaint and Beck's opposition differently than the trial court, we reverse the decision to grant Catanzarite/Kenneth's anti-SLAPP motion with respect to the slander of title claim. Catanzarite did not meet its burden of showing this claim was based on protected activity. We conclude Beck's reference to allegations in the complaint merely served to provide context to the timing of the publication of the 2019 Consent and events amounting to acts of corporate sabotage following the lawsuits. "'Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute.' [Citation]" (*Bonni, supra,* 11 Cal.5th at p. 1012 [incidental or collateral assertions not subject to section 425.16].)

II. *Intentional Infliction of Emotional Distress (IIED)*

Beck's complaint contains a very short discussion of a factual basis for this cause of action. It alleged all the defendants caused him to suffer emotional distress, including those involved in "conducting their malicious prosecution scheme." He

26

asserted these defendants engaged in reckless disregard, knowing he "would be required to answer baseless claims made against him on the basis of knowingly false statements made by [d]efendants." We agree with the trial court's determination that to the extent this claim is dependent on the malicious prosecution claim, it satisfies the first prong of anti-SLAPP. (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 719 (*Lee*) ["every claim of malicious prosecution is a cause of action arising from protected activity, because every such claim necessarily depends upon written and oral statements in a prior judicial proceeding"].)

Beck's complaint also contains the broadly worded allegation the defendants "engaged in a pattern of despicable conduct, as set forth in the allegations described herein." As mentioned, the "pattern of despicable conduct" includes non-litigation claims, such as the publication of the 2019 Consent (supporting the slander of title cause of action). Because this cause of action refers to both protected conduct and non-litigation actions, it qualifies as a "mixed cause[] of action," a concept discussed at length in our prior opinion *Cultivation, supra,* G059457, which we incorporate by reference.

As discussed in more detail in our prior opinion, our Supreme Court has recently clarified that courts must take a claim by claim approach when considering each cause of action subject to an anti-SLAPP motion. (*Bonni, supra,* 11 Cal.5th at p. 1010; *Baral v. Schnitt* (2016) 1 Cal.5th 376, 382 (*Baral*).) "Section 425.16 is not concerned with how a complaint is framed, or how the primary right theory might define a cause of action. While an anti-SLAPP motion may challenge any claim for relief founded on allegations of protected activity, it does not reach claims based on unprotected activity." (*Baral, supra,* 1 Cal.5th at p. 382.) Accordingly, "'[C]ourts should analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected

27

Complaint Supplement #36
Exhibit #18: 027

and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion. [Citation.]'" (*Ibid.*)

In light of this case authority, we conclude the moving parties did not meet their burden of showing Beck's *entire* IIED claim rested on protected activity. Taking a claim by claim approach, it appears there were non-litigation allegations supporting the cause of action that cannot be stricken under anti-SLAPP. The claims relating to malicious prosecution satisfy the first prong, but as we will discuss in more detail below, Beck met his burden on the second prong, i.e., regarding probability of prevailing. Therefore, we must reverse the ruling on this cause of action.

III.  *Unfair Business Practices*

Like the IIED cause of action, we conclude the unfair business practices claims were a mixed cause of action. In addition to the moving parties' actions of filing frivolous lawsuits (the malicious prosecution allegations), this cause of action referred to unprotected acts of attorney malpractice (violations of the Rules of Professional Conduct), violation of Corporations Code section 1507 regarding the false publication of documents about a corporate entity (the 2019 Consent), and violation of Business and Professions Code section 6104 regarding an attorney appearing without authority.

The trial court viewed the attorney malpractice allegations as relating to protected conduct because Beck did not prove he was Catanzarite's client. It reasoned anti-SLAPP must apply when a non-client raises a professional negligence claim against an opponent's attorney. This ruling improperly conflates the first and second prongs of anti-SLAPP.

The existence or nonexistence of an attorney client relationship is a dispute that relates only to the second prong. "'The sole inquiry' under the first prong of the test is whether the plaintiff's claims arise from protected speech or petitioning activity. [Citation.] In making this determination, '[w]e do not consider the veracity of [the plaintiff's] allegations' [citation] nor do we consider '[m]erits based arguments.'

28

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 408

[Citations.]  If the defendant demonstrates the plaintiff's claims do arise from protected activity, we then review the potential merits of the plaintiff's claims in the second step of the analysis.  [Citation.] . . . Whether [plaintiff] actually shared an attorney-client relationship with defendants relates to the merits of [his] claims and is therefore not relevant to our first prong analysis.  Although defendants may ultimately defeat [Beck's] claims by proving the absence of an attorney-client relationship, that does not alter the substance of [his] claims.  [Citation.]"  (*Sprengel v. Zbylut* (2015) 241 Cal.App.4th 140, 156-158, fns. omitted.)

Beck's unfair business practices cause of action was also based on an alleged violation of Corporations Code section 1507.  In the briefing, the moving parties assert the acts giving rise to liability under the statute "are the lawsuits and related litigation activity concerning MFS's status as CTI's sole shareholder and the veracity of the CTI preferred stock issuance."  As aptly stated by Beck in his opposition, the moving parties "assume[]" this cause of action arises from protected activity because there was clear evidence of Catanzarite's "pattern of litigation abuse."  Beck explained, "Though this pattern exists and [was] discussed [by both parties regarding the malicious prosecution cause of action, Catanzarite] wrongly assumes that Beck's other causes of action arise from litigation acts.  To the contrary, they arise from non-expressive acts of what amounts to corporate sabotage of CTI and Beck.  These are not acts that the Legislature meant the anti-SLAPP statute to protect."  Beck asserts his causes of action were not based on protected activity, "but instead on the fact that [Catanzarite] willingly participated in MFS's use as a corporate shell to sabotage CTI and Beck.  [Catanzarite's] participation in this conspiracy, even if contemporaneous with its abuses of the judicial process, [should] not mean that Beck's claims arises from protected activity."

To support this argument, Beck referred to allegations in the complaint regarding several defendants (including Zakhireh) who "reconstituted the MFS board of directors" to sabotage CTI and Beck.  Beck asserts these defendants adopted corporate

29

documents to renounce the Amended Acts and attempted to remove CTI's board, none of which was protected litigation-related conduct. He alleged Catanzarite "was the hub of the [d]efendant's scheme" because it "arranged and maintained the agreements by which the [d]efendants asserted control of MFS and agreed to attack Beck and CTI, then divide the soils among themselves." We agree the factual basis for the Corporations Code violation allegations do not satisfy the first prong, and should not be stricken pursuant to the anti-SLAPP statute.

Finally, Beck's unfair business practices cause of action contained allegations Catanzarite/Kenneth (aided by Zakhireh) violated Business and Professions Code section 6104. The moving parties assert this cause of action relates to protected conduct because it includes the factual allegation Zakhireh aided MFS's attorneys by providing false supporting declarations for lawsuits. Supplying a written declaration for a lawsuit would qualify as protected activity, however, the complaint specifies a different factual basis for the claim. Specifically, Beck's complaint set forth the following three points: (1) Business and Professions Code section 6104 provided an attorney cannot appear for a party corruptly or without authority; (2) Catanzarite and its attorneys "were well aware that they lacked authority to appear on behalf of CTI and other parties" but they did so anyway; and (3) Zakhireh, O'Conner, and Duffy aided the other defendants in violating this statute.

We conclude the activity underlying the claim—Catanzarite's representation of CTI in the trial court—is constitutionally protected conduct. "[A]ll communicative acts performed by attorneys as part of their representation of a client in a judicial proceeding or other petitioning context are per se protected as petitioning activity by the anti-SLAPP statute. [Citation.]" (*Cabral v. Martins* (2009) 177 Cal.App.4th 471, 479-480.) Thus, the moving parties established the first prong of the SLAPP analysis.

Turning to the second prong, we conclude Beck cannot show minimal merit on this sub-claim of the unfair business practices cause of action. Violations of Business

Complaint Supplement #30-2020-01143998
Exhibit #18: 030
Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 410

and Professions Code section 6104 does not authorize Beck to sue or recover damages from Catanzarite or its aider and abettors.  Violation of a disciplinary rule allows the Supreme Court to suspend or disbar an attorney.  (Bus. & Prof. Code, § 6100.)  It does not give "'an antagonist in a collateral proceeding or transaction . . . standing to seek enforcement of the rule.'  [Citation.]" (*Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 303.)  Beck cannot prevail on this claim and it must be stricken from the cause of action.

IV. *Malicious Prosecution*

   Beck alleged all the defendants were liable for malicious prosecution because the Pinkerton Action, MFS Action, and Scottsdale Action were initiated and prosecuted without probable cause and with malice.  He maintained the first two lawsuits were "rooted on the fraudulent assertion of MFS's ownership of CTI," which each defendant knew was untrue.  He added Catanzarite filed the Scottsdale Action without any authorization from CTI's board, and therefore knew it also lacked probable cause.

   The first step of the anti-SLAPP inquiry, whether defendants made a threshold showing the malicious prosecution claim arose from protected activity, is not disputed here.  "The plain language of the anti-SLAPP statute dictates that every claim of malicious prosecution is a cause of action arising from protected activity, because every such claim necessarily depends upon written and oral statements in a prior judicial proceeding.  [Citation.]  Accordingly, our inquiry shifts to whether [Beck] satisfied [his] burden[] to demonstrate a probability of prevailing on the merits of [his] claims for malicious prosecution.  [Citations.]" (*Lee, supra,* 41 Cal.App.5th at p. 719.)

   "To prevail on a malicious prosecution claim, the plaintiff must show that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination favorable to the plaintiff; (2) was brought without probable cause; and (3) was initiated with malice.  [Citation.]" (*Soukup, supra,* 39 Cal.4th at p. 292.)

Complaint Supplement #30-2020-01145908
Exhibit #18: 031

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 411

A. *Favorable Termination*

It is undisputed Catanzarite voluntarily dismissed the Root Action and the MFS Action on March 5, 2020. It dismissed the Scottsdale Action on November 18, 2019. "[A] voluntary dismissal is presumed to be a favorable termination on the merits[.] [Citation.]" (*Lee, supra,* 41 Cal.App.5th at p. 720.)

In its briefing, Catanzarite notes the trial court questioned whether Beck satisfied his burden of showing there were favorable dismissals. The court opined Catanzarite likely dismissed the action after it received the ruling at the Corporations Code section 709 hearing that MFS was not a shareholder (and therefore lacked standing to bring the derivative action). The court added a dismissal for this kind of technical reason would not indicate Beck was innocent of wrongdoing, especially when he was still a defendant in the ongoing Mesa Action. We disagree with this analysis.

"It is not essential to maintenance of an action for malicious prosecution that the prior proceeding was favorably terminated following trial on the merits." (*Lackner v. LaCroix* (1979) 25 Cal.3d 747, 750 (*Lackner*).) "'The fact that such legal termination would not be a bar to another civil suit or criminal prosecution founded on the same alleged cause is no defense to the action for malicious prosecution; otherwise a party might be continuously harassed by one suit after another, each dismissed before any opportunity for a trial on the merits.' [Citation.]" (*Kennedy v. Byrum* (1962) 201 Cal.App.2d 474, 480.) Thus, Beck's status as a defendant in a different action has little relevance.

We appreciate the trial court's concern that "termination must *reflect* on the merits of the underlying action. [Citation.]" (*Lackner, supra,* 25 Cal.3d at p. 750.) "To determine 'whether there was a favorable termination,' we 'look at the judgment as a whole in the prior action . . . .' [Citation.]" (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 341.) "[C]ourt[s] must examine the reasons for termination to see if the disposition reflects the opinion of the court or the prosecuting party that the action would

32

not succeed." (*Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1149.) Dismissals that result from negotiation, settlement or consent are generally considered not to be a favorable termination, because such a dismissal "reflects ambiguously on the merits of the action . . . ." (*Minasian v. Sapse* (1978) 80 Cal.App.3d 823, 827 fn. 4 (*Minasian*).) Likewise, a dismissal based upon the statute of limitations is not a favorable termination, because it is technical or procedural termination rather than one on the merits. (*Lackner, supra,* 25 Cal.3d at p. 751.)

In contrast, a dismissal for failure to prosecute is "not a dismissal on technical grounds" but rather reflects on the merits based upon "the natural assumption that one does not simply abandon a meritorious action once instituted." (*Minasian, supra*, 80 Cal.App.3d at p. 827.) A voluntary dismissal not based upon the parties' settlement or consent, even where it is made without prejudice, is generally considered to be a favorable termination to support a malicious prosecution action. (*Fuentes v. Berry* (1995) 38 Cal.App.4th 1800, 1808; *Villa v. Cole* (1992) 4 Cal.App.4th 1327, 1335.) In the *Sycamore Ridge Apartment* case, the court held that a voluntary dismissal is presumed to be a favorable termination, unless proved to the contrary by the party who prosecuted the underlying action and dismissed it. (*Sycamore Ridge Apartments, LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1400 (*Sycamore*).)

In this case, Catanzarite dismissed two complaints on the same day, March 5, 2020. There was no evidence these dismissals occurred as a result of a settlement between Beck and plaintiffs. The trial court reasoned the dismissals were likely due to the previous Corporations Code section 709 ruling, holding MFS was not one of CTI's shareholders. However, the record shows that when Catanzarite learned MFS lacked standing to bring a derivative suit on CTI's behalf, it did not dismiss the lawsuits. Catanzarite filed FACs instead.

The record shows that three months after the court ruled MFS was not CTI's shareholder, Catanzarite amended the complaints in the Pinkerton Action and MFS

33

Action by deleting the derivative causes of action.  Catanzarite transformed both lawsuits into direct actions against Probst, Beck, and other CTI-related entities.  Thus, the record does not support the court's conclusion Catanzarite dismissed the lawsuits for the mere technical reason MFS was not a shareholder.  The complaints were amended to purportedly reflect this correction.

It is more likely Catanzarite's voluntary dismissal of the two lawsuits was related to a later disqualification ruling and the lack of tenable claims.  The dismissals took place just a few months after the court disqualified Catanzarite and its attorneys from representing CTI and the Mesa Action plaintiffs (the class action shareholder derivative lawsuit).  Given Catanzarite's zeal for filing multiple lawsuits against the same defendants, we can assume it would not abandon a meritorious action already initiated.  Thus, we conclude the voluntary dismissal in this case should be regarded as a favorable termination of the two lawsuits (Pinkerton Action and MFS Action).

There is very little information in our record about the Scottsdale Action.  Beck submitted a document filed in the United States District Court, Central District, showing Catanzarite filed the Scottsdale Action claiming to be CTI's authorized corporate counsel.  The document reflected that on November 18, 2019, CTI dismissed the action against CTI's insurance company "in its entirety."  As noted in our prior opinion, on November 15, 2019, the court granted the motion disqualifying Catanzarite from representing CTI.  (*FinCanna, supra,* G058700.)  In making its ruling, the court noted Catanzarite could not represent two client adversaries and in the Scottsdale Action CTI claimed to be representing the corporation and at the same time sought to invalidate a defense and indemnity for CTI directors under CTI's insurance policy.  (*Ibid.*)  The court stated a denial of coverage could put CTI "'on the hook for the individuals' costs of defense and/or liability.'"  In other words, the court recognized Catanzarite was improperly using the Scottsdale Action for an improper purpose, i.e., to help his clients in the Mesa Action.  Accordingly, this dismissal was a favorable termination on the merits.

34

B. *Commencement of Action*

As for the issue of commencement, the parties do not dispute Catanzarite and Attorneys were responsible for filing the lawsuits at issue in this case.

Zakhireh asserts he was not a party to the lawsuits at issue and cannot be held liable. We disagree. While he did not direct the commencement of the Pinkerton Action, there was evidence supporting the conclusion he was instrumental in the MFS Action. As mentioned, the complaint alleged that after O'Connor and Cooper secured their dismissals from the Pinkerton Action, they used the near-bankrupt MFS as a litigation tool to raise untenable claims against their former business partners (Probst and Beck). Beck presented evidence showing O'Connor (on behalf of MFS) selected Zakhireh to be CTI's treasurer and chief financial officer. Beck alleged Zakhireh, at the same time, was part of MFS's new board comprised of O'Connor's allies. In his newfound position with MFS, Zakhireh would have the duty of discussing litigation plans with MFS's corporate counsel Catanzarite and the other MFS board members. How could MFS have filed the MFS Action without the approval of its board members?

We conclude Zakhireh's position as both an MFS and CTI director raises a strong inference he aided the O'Connor Faction and MFS's corporate counsel (Catanzarite) with the group's plans for an illegal corporate takeover. As noted by Beck, a person who aids and abets a malicious prosecution can be held liable. (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1131, fn. 11 ["A person who is injured by groundless litigation may seek compensation from any person who procures or is actively instrumental in putting the litigation in motion or participates after the institution of the action"].)

As for Cooper and Higgerson, they were not responsible for commencing the Pinkerton Action because they were the defendants. However, one can reasonably infer Cooper and Higgerson, like O'Connor, made a deal with Catanzarite in exchange for their dismissal from the Pinkerton Action. Beck alleged Cooper and Higgerson were

35

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 415

instrumental in assisting MFS and its shareholders in their efforts to take over CTI. These dismissed defendants helped by agreeing to testify in support of MFS's new allegedly fabricated claim to own 100 percent of CTI. Cooper's participation was further demonstrated by Beck's evidence her vote was needed before MFS's corporate counsel (Catanzarite) could file the lawsuit, because she held five million MFS shares. Cooper did not refute this evidence.

C. *Probable Cause*

"An action is deemed to have been pursued without probable cause if it was not legally tenable when viewed in an objective manner as of the time the action was initiated or while it was being prosecuted. The court must 'determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable.' [Citation.] 'The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted. [Citation.]' [Citation.] The test the court is to apply is whether 'any reasonable attorney would have thought the claim tenable . . . .' [Citation.] The tort of malicious prosecution also includes the act of 'continuing to prosecute a lawsuit discovered to lack probable cause.' [Citation.] In determining the probable cause issue, the same standard applies 'to the continuation as to the initiation of a suit.' [Citation.]" (*Sycamore, supra,* 157 Cal.App.4th at p. 1402.)

"'Continuing an action one discovers to be baseless harms the defendant and burdens the court system just as much as initiating an action known to be baseless from the outset.' [Citation.] 'A person who had no part in the commencement of the action, but who participated in it at a later time, may be held liable for malicious prosecution.' [Citations.]" (*Sycamore, supra*, 157 Cal.App.4th at p. 1398.) "A claim for malicious prosecution may also apply to a defendant who has brought an action charging multiple grounds of liability when some, but not all, of the grounds were asserted without probable cause and with malice. [Citations.]" (*Id.* at p. 1399.)

"In analyzing the issue of probable cause in a malicious prosecution context, the trial court must consider both the factual circumstances established by the evidence and the legal theory upon which relief is sought. A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a legal theory which is untenable under the facts known to him." (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 164-165.) "In making its determination whether the prior action was legally tenable, the trial court must construe the allegations of the underlying complaint liberally in a light most favorable to the malicious prosecution defendant. [Citation.]" (*Id.* at p. 165.)

We conclude Beck met the low burden of proving his claim had minimal merit with respect to Catanzarite. Unlike the trial court, we find it relevant Catanzarite initiated the Pinkerton Action, a shareholder derivative action on behalf of MFS, without first verifying the Roots owned shares in MFS. Beck presented evidence they did not. He submitted stock certificates showing the Roots' corporation, Jolly Roger, invested in MFS, but this entity lost its corporate status between 2015 to 2019. Thus, both the Roots and Jolly Roger lacked standing to bring a shareholder derivative lawsuit. Before agreeing to become an attorney of record in a case, an attorney should, at a minimum, be familiar with the client's claims as a purported shareholder, and should have made a preliminary determination about whether probable cause existed to support the asserted claims.

Here, Catanzarite filed a shareholder derivative lawsuit on behalf of clients who were not actually shareholders. The basic nature of a shareholder derivative action is to *permit shareholders* to "'bring a derivative suit to enforce the corporation's rights and redress its injuries when the board of directors fails or refuses to do so.' [Citation.]" (*Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995, 1003.) There are stock ownership requirements for standing to pursue a shareholder's derivative suit. (See Corp. Code, § 800.)

37

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 417

Catanzarite also drafted a complaint seeking recovery upon two legal theories which were untenable under the facts known to the firm's attorneys. The Pinkerton Action's derivative shareholder claims all related to the following factual circumstances: In 2015, MFS board of directors (Probst, O'Connor, and Cooper) promised its shareholders MFS owned 100 percent of the CTI's outstanding shares (a total of 28,000,000 CTI common stock) (hereafter referred to as the Subsidiary Promise). MFS's board of directors became CTI's board of directors and "captured the entire business opportunity" for themselves, reneging on the Subsidiary Promise. And thereafter, CTI entered into agreements with third parties to implement its marijuana business plan and sold shares to investors. The MFS board members' recission of the Subsidiary Promise was the basis for the following shareholder derivative claims: constructive fraud; breach of fiduciary duty; misappropriation of trade secrets; and unfair competition.

The Roots' direct claims related to misconduct by the MFS board members but the Roots indicated they were willing to settle the case in exchange for a large quantity of CTI Founder shares and a seat on CTI's board. The Roots inexplicably did not want to be on MFS's board, despite their allegations about the Subsidiary Promise and decision to raise claims on MFS's behalf. The complaint's internal inconsistency and standing issues certainly raise red flags.

Given the Roots' settlement request for CTI shares, it is reasonable to infer Catanzarite and his clients knew only those shares had value and also understood those shares were available because MFS did not own 100 percent of CTI. Under these circumstances, a reasonable attorney may not have found the Pinkerton Action claims tenable. Moreover, when the factual allegations of the Pinkerton Action and the MFS Action are compared in an objective manner, no reasonable attorney would conclude both had merit. Simply stated, one action was based on the factual premise CTI's board members improperly renounced the Subsidiary Promise, leaving MFS *without any* CTI

38

shares, and the other was based on the factual premise MFS *currently owned* 100 percent of CTI's shares, rendering any other CTI stock certificates worthless.

The lack of probable cause for maintaining the two lawsuits was further demonstrated by evidence Catanzarite filed multiple lawsuits while unethically representing clients with conflicting interests. For good reason, it is difficult to apply the "reasonable attorney" test when there is evidence the attorneys initiating the cases violated multiple rules of professional conduct. For example, no reasonable attorney would agree to act as corporate counsel of MFS while at the same time representing shareholders in a derivative lawsuit against that corporation. Yet this is exactly what happened when Catanzarite filed the MFS Action while also litigating the Pinkerton Action. We conclude the concurrent representation of directly adverse parties creates a strong inference the attorneys and litigants knew the claims in one or both lawsuits were untenable.

Beck also presented evidence Catanzarite and the O'Conner Faction created a mutually beneficial alliance. In exchange for their dismissal from the Pinkerton Action, these former defendants agreed to help opposing counsel file a different lawsuit against CTI and the Probst Faction (which included Beck). Beck's evidence suggested these CTI shareholders agreed to create and support a false story about MFS's ownership of CTI, revive MFS by reconfiguring its board of directors, and then use MFS as a litigation tool to sabotage CTI and its board members. In addition to providing testimony that MFS owned CTI, the O'Connor Faction members publicly renounced their CTI stock shares. O'Connor executed the 2019 Consent, without objection from his cohorts, which rendered worthless all their CTI stocks. As pointed out by Beck, all of this anti-CTI activity, following their dismissals from the Pinkerton Action, was highly suspect especially when one considers their actions and business dealings as CTI board members and shareholders from 2015 to 2019.

39

As discussed in more detail in our factual summary, after the formation of an alliance between Catanzarite and the O'Conner Faction, Catanzarite embarked on a spectacularly relentless mission (inside and outside of the courtroom) to replace CTI's board members with members of the O'Connor Faction. MFS/Catanzarite could not have initiated the MFS Action without the evidence and testimony provided by members of the O'Connor Faction. Accordingly, there was enough evidentiary support for Beck's claim Cooper, Higgerson, and Zakhireh, who were O'Connor's loyal allies, were instrumental in the maintenance of MFS Action knowing it lacked probable cause. We conclude Beck submitted enough evidence to satisfy his low burden at this stage of the proceedings with respect to the element of probable cause as to all the moving parties.

D.  *Malice*

The above evidence also lends support to the malice requirement of anti-SLAPP. "'Malice "may range anywhere from open hostility to indifference." [Citations.]' [Citation.] While the mere absence of probable cause, without more, 'is not sufficient to demonstrate malice' [citation] '"[m]alice may also be inferred from the facts establishing lack of probable cause." [Citation.]' [Citation.] . . . '[T]he extent of a defendant attorney's investigation and research may be relevant to the further question of whether or not the attorney acted with malice.' [Citation.]" (*Sycamore, supra,* 157 Cal.App.4th at p. 1409.)

It appears the complaints were filed by plaintiffs lacking standing and/or included untenable claims. If Catanzarite knew the relevant facts, and only dismissed the O'Conner Faction and not the entire CTI board, we can infer the continued prosecution of those claims was motivated by malicious intent. If Catanzarite was not aware of the plaintiffs' lack of standing because it failed to adequately familiarize itself with the case before filing the lawsuit, this too would indicate indifference, and therefore also, the inference of malice.

Beck v Superior Court of California County of Orange
ADA Complaint Exhibits 420

Malice can also be inferred from evidence the MFS Action was initiated and maintained as part of a larger scheme to replace CTI's board with MFS shareholders, i.e., a hostile corporate takeover. The MFS Action complaint included a request for declaratory relief in the form of a court order declaring MFS owed 100 percent of CTI's stock, replacement of CTI's board, and confirmation CTI's business deals were invalidated. Catanzarite also separately filed a motion under Corporations Code section 709, asking the court to confirm MFS was a shareholder and must be permitted a vote in CTI's board elections. After losing the motion and hearing the court rule MFS was not CTI's shareholder, the parties did not immediately dismiss the lawsuit. Instead, Catanzarite filed more lawsuits and began acting as corporate counsel of both MFS and CTI. It can be inferred O'Connor, Cooper, Higgerson, and Zakhireh continued to authorize and support Catanzarite's efforts to reallocate CTI's shares to MFS and oust the Probst Faction from CTI's board.

In light of all of the above, we conclude Beck submitted enough evidence to satisfy his burden with respect to the element of malice. "'[T]he defendant's motivation is a question of fact to be determined by the jury.' [Citation] 'Because direct evidence of malice is rarely available, "malice is usually proven by circumstantial evidence and inferences drawn from the evidence." [Citation.]' [Citation.]" (*Citizens of Human., LLC v. Hass* (2020) 46 Cal.App.5th 589, 607.) We conclude the evidence supports a reasonable inference Catanzarite, O'Connor, Cooper, Higgerson, and Zakhireh were working together and pursuing litigation lacking probable cause against Beck with an improper purpose.

## DISPOSITION

We affirm the court's orders granting the moving party's anti-SLAPP motion regarding paragraph 124 of the complaint, regarding violation of Business and Professions Code section 6104.

41

We affirm the court's order denying Zakhireh's anti-SLAPP motion regarding the slander of title cause of action.

We reverse the court's orders granting the moving party's anti-SLAPP motion regarding Beck's causes of action for malicious prosecution, unfair business practices, slander of title, and intentional infliction of emotional distress. The matter is remanded for further proceedings.

We treat Beck's request for judicial notice as a motion to augment and grant it. We deny all requests for sanctions on appeal. We deny Beck's disqualification motion. On our own motion, we augment the record with the request for judicial notice Beck filed with his oppositions to the anti-SLAPP motions. In the interests of justice, each party shall bear their own costs on appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


SANCHEZ, J.

42

EXHIBIT 19

Beck v. Superior Court of California, County of Orange
ADA Complaint Exhibits 423

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Executive Officer
Electronically FILED on 6/28/2021 by Lilian De La Torre, Deputy Clerk

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| FINCANNA CAPITAL CORP., <br><br> Plaintiff and Cross-defendant, <br><br> v. <br><br> CULTIVATION TECHNOLOGIES, INC., et al., <br><br> Defendants, Cross-complainants, and Respondents. <br><br> CATANZARITE LAW CORPORATION, <br><br> Objector and Appellant. | G058700 consol. w/ G058942 & G058931 <br><br> (Super. Ct. Nos. 30-2019-01072088 & 30-2019-01064267) <br><br> O P I N I O N |
| RICHARD MESA et al., <br><br> Plaintiffs, <br><br> v. <br><br> CULTIVATION TECHNOLOGIES, INC., <br><br> Defendant and Respondent. <br><br> CATANZARITE LAW CORPORATION, <br><br> Objector and Appellant. | |

Appeal from orders of the Superior Court of Orange County, Randall J. Sherman. Affirmed.

Catanzarite Law Corporation, Kenneth J. Catanzarite and Nicole M. Catanzarite-Woodward for Objector and Appellant.

Horwitz + Armstrong, John R. Armstrong and Alexander Avakian for Defendant, Cross-complainant, and Respondent.

\* \* \*

These three consolidated appeals concern Cultivation Technologies, Inc.'s (CTI) motion to disqualify its own legal counsel, the Catanzarite Law Corporation (Catanzarite), in related cases. The trial court granted CTI's disqualification motion relating to two lawsuits, deciding Catanzarite could not represent the following parties (1) CTI; (2) three CTI subsidiaries (Coachella Manufacturing, LLC, Coachella Distributors, LLC, and DS Gen, LLC, hereafter collectively referred to as CTI Subsidiaries); and (3) a group of CTI shareholders bringing a derivative lawsuit. We conclude the trial court was correct and we affirm its disqualification orders.

## FACTS

The appellate briefing in this case does not provide any background facts to give context to the current attorney disqualification dispute. We have pieced together the story by reviewing the multiple complaints and the parties' declarations related to six separate lawsuits. The keystone of each lawsuit (and this appeal) is a battle between two groups of shareholders over who controls CTI. Thus, it is helpful to understand the underlying dispute before jumping into a factual summary of the disqualification motion.

I. *Background Facts*

In 2012, Richard Probst and Richard O'Connor were the controlling shareholders and directors of Mobile Farming Systems, Inc., (MFS), an agricultural technology company selling hydroponic growing systems. Anticipating MFS's products and technology would be in high demand during the expected "medical marijuana boom"

2

the corporation convinced new investors to purchase MFS common stock. In 2015, the MFS board reported to investors that MFS intended to form a subsidiary, CTI, to purchase several acres of land and build a 100,000 square foot building in Coachella, California, to process marijuana and gain "up to $10,000,000 of high margin annual revenues." The MFS shareholders (who invested over $3 million) believed MFS acquired 28,000,000 shares of CTI common stock and the new corporation would be a wholly owned subsidiary of MFS.

As promised, Probst and O'Connor incorporated CTI, and these two MFS directors, and along with Amy Cooper, became CTI's appointed board of directors. However, for reasons that are unclear, CTI did not become MFS's subsidiary, angering MFS's shareholders. In addition, CTI not only refused to acknowledge MFS's 28,000,000 shares but also issued 23,000,000 shares of common stock to CTI's "Founders." The "'CTI Founders Common Stock'" shares were held by Probst, O'Connor, Cooper, TGAP Holdings, LLC, EM2 Strategies LLC, I'm Rad LLC, Cliff Higgerson, Aroha Holdings Inc., and Scott Unfug. Soon thereafter, CTI's board members began fighting amongst themselves.

In October 2015, Cooper resigned as president, secretary, and board member of CTI. In February 2016, CTI's remaining board members removed O'Connor from the board. This was the starting point of the rift between CTI shareholders, creating two factions, the O'Connor Faction (comprised of O'Connor, Cooper, and a group of CTI/MFS shareholders) and the Probst Faction (Probst and the remaining CTI directors). These two groups became locked in a struggle for control over the corporation.

The Probst Faction issued additional shares, gaining more votes for themselves plus more investors. In 2016, the Probst Faction, which included CTI's controlling board of directors, entered into several agreements with FinCanna Capital Corp. (FinCanna), a Canadian royalty corporation. Over the next two years, FinCanna loaned CTI nearly $6 million dollars to develop cannabis cultivation, distribution, and

3

extraction operations in California. In 2018, CTI was unable to make its loan payments to FinCanna and several CTI directors resigned.

Meanwhile, the O'Connor Faction and some disgruntled MFS shareholders hired Catanzarite. In total, Catanzarite filed six lawsuits within a one-year period as follows:

(1) The Pinkerton Action. *Denise Pinkerton v. Cultivation Technologies, Inc., et al.,* OCSC No. 30-2018-01018922.

Catanzarite filed this lawsuit on September 14, 2018, on behalf of an elderly woman (via an attorney in fact) who invested all her retirement savings in MFS shares. This shareholder, individually and derivatively on behalf of MFS, asserted CTI, Probst, O'Connor, Cooper, and others involved with CTI, engaged in fraud, conversion, breach of fiduciary duty, conspiracy, fraudulent concealment, and theft of trade secrets.

In addition to damages, this derivative action demanded the cancellation of CTI stock certificates, an injunction preventing the sale of CTI stock, an injunction forcing CTI to stop using MFS's trade secrets, and the payment of punitive damages and attorney fees. For this lawsuit, CTI attorney of record was Winget, Spadafora, Schwartzberg LLP (Winget).

On January 23, 2019, a few days before Catanzarite filed a shareholder derivative action involving CTI shareholders, Catanzarite dismissed several defendants from the Pinkerton Action, including CTI and members of the O'Connor Faction (O'Connor and Cooper). It also deleted causes of action for misappropriation of trade secrets, unfair competition, and declaratory relief against CTI. In August 2019, Catanzarite amended the complaint to remove all shareholder derivative causes of action on behalf of MFS. Thus, the only defendants remaining were members of the Probst Faction (Probst, Justin Beck, I'm Rad, LLC, Robert Kamm, Robert Bernheimer, Irving Einhorn, and Miguel Motta).

4

(2)  The MFS Action. *Mobile Farming Systems, Inc. v. Cultivation Technologies, Inc., et al.,* OCSC No. 30-2019-01046904.

Catanzarite filed this lawsuit in January 28, 2019, for MFS and "derivatively on behalf of its wholly owned subsidiary [n]ominal [d]efendant [CTI]." MFS asserted it was entitled to file a derivative action because it organized CTI and acquired 28,000,000 shares of CTI common stock, and therefore, CTI was its wholly owned subsidiary.  The complaint asserted MFS contributed assets to CTI (a seedling trailer and a shipping container) and paid start-up costs.  MFS sought cancellation of CTI's shares as well as any "insider loans and transactions."  It alleged CTI owed MFS "$75,007.24 plus accrued interest of $12,444.29" (MFS's start-up loan) and other damages to be proven at trial.  (Underline omitted.)  The complaint sought attorney fees, punitive damages, and interest.  The lawsuit was based on the premise that no CTI shareholders, other than MFS shareholders, had any valid stock or voting rights.

This complaint also asserted the Probst Faction violated Corporations Code section 1507[1] by "preparing, signing and circulating false minutes, issuing securities, transacting business with insiders, [and] borrowing money from insiders and records relating to CTI."  MFS requested that the court enjoin the Probst Faction from operating CTI until the court held a section 709 hearing "to determine the rightful ownership of CTI, its appropriate [b]oard of [d]irectors, and executive structure.[2]

The court initially granted a temporary restraining order (TRO).  According to Probst, the TRO was financially devastating for CTI because "CTI's operations ground

---

[1]    All further statutory references are to the Corporations Code, unless otherwise indicated.

[2]    Section 709 "'was intended to confer upon the superior court the power to determine in a summary proceeding whether or not a particular director or the entire board was or was not properly elected or appointed in order that the corporation can properly function.' [Citation.]" (*Morrical v. Rogers* (2013) 220 Cal.App.4th 438, 457.)

5

to a halt" for several months. Probst declared, "CTI did not have access to its working capital and . . . key customers became aware of the TRO and refused to continue to place orders and the cash flow began to severely suffer."[3] The court dissolved the TRO in May 2019, after holding a section 709 hearing. The court determined MFS was not a CTI shareholder and could not challenge the election of CTI's directors.

In August 2019, the same day Catanzarite amended the Pinkerton Action to be a direct rather than derivative action, Catanzarite also transformed the MFS Action into a direct action. The first amended complaint (FAC) omitted CTI as a party and alleged only direct claims against members of the Probst Faction for breach of fiduciary duty, conversion, misappropriation of trade secrets, and unfair competition.

(3) The Mesa Action. *Mesa, et al. v. Probst, et al.,* OCSC No. 30-2019-01064267.

Catanzarite filed this shareholder derivative class action on April 16, 2019. The complaint asserted the "nature of [the] action" was on behalf of shareholders owning both MFS and CTI shares seeking to "join MFS in a consolidated action with [the MFS Action] and to among other relief, recognize the ownership and control of CTI as held by" four groups of shareholders. (Capitalization and bold omitted.) These shareholder groups included MFS (holding 28,000,000 CTI shares), as well as any MFS shareholders who purchased CTI shares in various offerings. The complaint expressly excluded shares held by Probst Faction members, their attorneys, agents, or affiliates.

Richard Mesa initiated the lawsuit in three capacities: (1) individually as a "shareholder of both" MFS and CTI shares; (2) in a representative capacity on behalf of over 100 similarly situated shareholders; and (3) derivatively on behalf of CTI. The Mesa Action asserted nine causes of action against the Probst Faction and CTI as a nominal defendant. Identical to allegations in the MFS Action, the Mesa Action sought

---

[3]         This declaration was prepared in response to Catanzarite's later request for a section 709 hearing in a subsequent CTI shareholder derivative action.

Complaint Supplement #30-2020-01145998
Exhibit #19: 006
Book # Superior Court of California County of Orange
ADA Complaint Exhibits 429

to enjoin the Probst Faction from operating CTI until there could be an expedited section 709 hearing. In addition to damages, the class sought punitive damages and attorney fees.

One month later, Catanzarite amended the complaint to add Cooper and Tom Mebane as plaintiffs and FinCanna as a defendant. More significantly, the complaint's "nature of the action" changed. The class members no longer sought to join the MFS Action or seek recognition of MFS's controlling shares over CTI. Instead, the Mesa Action plaintiffs sought to declare the current CTI directors' meetings and actions void. In particular, the class sought to unravel CTI's financial dealings with FinCanna, who had just foreclosed on CTI's properties. The FAC included two new causes of action, as well as allegations the Probst Faction wrongfully liquidated CTI's assets and that FinCanna should not have initiated foreclosure proceedings. The FAC asserted FinCanna "claims ownership of the extraction facility and CTI's employees have effectively become [FinCanna] employees." Furthermore, it maintained CTI shareholders "have suffered a total loss of their share value of not less than $5,000,000 and millions more in business opportunities. . . ." CTI's attorney of record, Winget, filed an answer asserting the plaintiffs lacked standing or were not qualified to maintain a derivative lawsuit on CTI's behalf. In October 2019, the Mesa Action plaintiffs filed a motion requesting the court appoint a receiver for CTI.

(4) The Cooper Action. *Cooper, et al., v. Cultivation Technologies, Inc.,* OCSC No. 30-2019-01072443.

On May 23, 2019, Catanzarite filed an action directly against CTI on behalf of two CTI shareholders (Cooper and Mebane), who were members of the O'Connor Faction. The previous day, FinCanna had filed a breach of contract action against CTI and CTI Subsidiaries and requested a receivership. The Cooper Action requested the court direct CTI to (1) hold a shareholder's meeting to elect a board of directors; (2) deliver an annual report; (3) appoint an accountant to conduct an audit; and (4) order

7

CTI to pay the costs for an investigation, audit, and costs of the suit.  Winget, on behalf of CTI filed an opposition, asserting a shareholder meeting was scheduled for August 2019.[4]

(5) The FinCanna Action Cross-complaint.  *FinCanna v. Cultivation Technologies, Inc., et al.,* OCSC No. 30-2019-01072088.

As mentioned, in May 2019, FinCanna filed a breach of contract action against CTI and CTI Subsidiaries.  On July 2, 2019, Catanzarite filed a cross-complaint on behalf of CTI and CTI Subsidiaries against FinCanna and three of its directors.  Large sections of the cross-complaint appear to have been cut and pasted from the Mesa Action complaint.  Catanzarite purported to represent CTI and its subsidiaries.

In Probst's declaration, prepared to oppose the section 709 request in the Mesa Action, he explained Catanzarite's actions in the FinCanna Action created confusion and harm.  He noted Catanzarite filed a cross-complaint and propounded discovery against CTI's "primary secured lender" without telling CTI's board "and during a time when FinCanna has not yet served their complaint on CTI due to ongoing settlement negotiations."

(6) The Scottsdale Action.  *Cultivation Technologies, Inc., v. Scottsdale Insurance Company,* OCSC No. 30-2019-01096233.

On September 6, 2019, Catanzarite filed this declaratory relief action purporting to represent CTI.  In this lawsuit, CTI demanded that its insurance company, Scottsdale, stop providing a defense or indemnity to the Probst Faction defendants in the Mesa Action.  The complaint asserted Scottsdale "refused to communicate with the officers and directors elected by the common shareholders of CTI and who are of the position that only they and their elected officers and directors speak for CTI."  In the complaint, CTI sought the court's declaration of its rights under the insurance policy and

---

[4]　　　On our own motion, we took judicial notice of CTI's opposition filed in the Cooper Action.

orders forbidding Scottsdale from providing a defense "unless and until the vote of the disinterested common shareholders of CTI [was] obtained."

We note that immediately before filing the Scottsdale Action, Catanzarite amended the complaints in the first two derivative actions transforming them into direct actions against individuals who were part of the Probst Faction (the Pinkerton and MFS Actions). Additionally, after filing the Scottsdale Action, Catanzarite dismissed the Cooper Action on September 13, 2019.

## II. *The FinCanna Action*

Before discussing the disqualification motions, it is helpful to briefly summarize the FinCanna Action. The complaint alleged that in 2016, FinCanna loaned nearly $6 million dollars to CTI. FinCanna asserted it attempted to renegotiate the deal, but after several key CTI members resigned, CTI's "attention and resources [were] devoted to litigation" and "its management [was] in disarray, which pos[ed] further threat to FinCanna's chances of recovery." FinCanna asked the court to appoint a receiver to protect its interests in CTI and order an injunction to stop any interference in the receivership.

FinCanna's complaint specifically referred to the upheaval created by the MFS Action. It explained that in April 2019, it foreclosed on property used as collateral for some of the loan proceeds (recovering nearly $3.9 million). Thereafter, four board members and CTI's Chief Operating Officer (CEO) resigned, leaving two directors. FinCanna explained it filed the lawsuit because it believed that after these resignations, CTI's operations became impaired and the ability to recover the money owed (over $4 million due to owed interest) was "placed in serious risk."

## III. *Disqualification Motions*

## A. *First Disqualification Motion in the FinCanna Action*

Horwitz + Armstrong (Horwitz) filed a motion on behalf of CTI, the cross-complainant in the FinCanna Action, to recuse and/or disqualify the "purported attorneys

<div align="center">9</div>

of record." (Capitalization and bold omitted.)  Horwitz argued CTI did not retain
Catanzarite to represent it and there were unwaivable conflicts of interest.  In support of
the motion, Probst filed a declaration, "on behalf of [himself] and CTI's duly elected
[b]oard of [d]irectors, who have authorized the filing" of the disqualification motion.

Probst declared that at CTI's annual meeting, the shareholders elected
himself, Hank Casillas, Michael Burdick, James Lally and Cooper to CTI's board of
directors and there were no other shareholder meetings held to elect different officers.
Probst explained Catanzarite claimed it obtained "written shareholder consents" to
remove CTI's elected board and install different directors, who then hired Catanzarite to
represent CTI.  Probst submitted a copy of the "written consent promulgated by . . .
Catanzarite purportedly removing" all the board members on May 2019.  Catanzarite
initiated this legal maneuvering after the court ruled against its clients at the section 709
hearing and refused to overturn the board of directors election.

Probst explained, "Rather than holding a shareholder's meeting for the
purpose of electing a new [b]oard since Catanzarite knew his clients lacked a sufficient
number of shares necessary to win such an election, on May 14, 2019, he instead
unlawfully procured a purported 'Majority Written Consent' of CTI's shareholders that
removed the entire shareholder-elected and sitting CTI Board and subsequently elected a
new board consisting of Catanzarite's true clients who are a faction of CTI shareholders."
After providing several reasons why the written consent was "ineffective and unlawful,"
Probst noted the shareholders' election of O'Connor and Duffy to the board "by way of
unanimous written consent" was not effective, and therefore, they were not authorized to
act on behalf of CTI or retain Catanzarite as counsel.

In his declaration, Probst stated Catanzarite filed a cross-complaint and
answer in the underlying case "despite his having been opposing counsel against CTI
and/or its management in at least four other related cases, and despite his personal
participation in a proxy battle for control of CTI."  He explained Catanzarite recently

10

filed a lawsuit, on behalf of CTI, against the corporation's insurance carrier to withhold coverage.  He declared, "It is no coincidence that it is this insurance coverage which is financing the defense of the various parties Catanzarite is suing in the various other matters.  This is the essence of conflict of interest:  he is challenging insurance coverage for the benefit of one of his clients, which is being used to finance the defense of the multiple lawsuits he has filed."

Catanzarite, on behalf of CTI, filed an opposition and submitted declarations written by Kenneth J. Catanzarite, O'Connor, and several others.  Catanzarite also filed evidentiary objections to Probst's declaration.  The opposition asserted that removing the Probst Faction from the board and filing a cross-complaint and answer in the FinCanna Action were all "[v]alidly [a]uthorized" actions.  Catanzarite asserted its representation of other clients was not adverse to CTI.  For example, the Scottsdale Action would directly benefit CTI by preserving the "$3 million Business and Management Indemnity Policy from being depleted by Probst and others who failed and refuse to post the undertaking required by CTI's Bylaws and . . . section 317."  Similarly, in the derivative actions, CTI was named as a nominal defendant and the claims "are not asserted against it but instead for the benefit of CTI."  Moreover, Catanzarite maintained it requested the receivership to protect CTI's assets.

In its reply, Horwitz addressed Catanzarite's assertion its representation of other clients was not adverse to CTI.  "[Catanzarite] cannot ethically represent certain shareholders suing defendant/cross-complainant [CTI] in shareholder derivative actions, shareholder class actions, and making motions to appoint a receiver to control [CTI] *while at the same time* acting as legal/litigation counsel of record *for* CTI directly.  Rule of Professional Conduct, rule 1.7 expressly prohibits a lawyer from so representing clients with such direct and adverse interests at the same time.  When, as here, the lawyers' clients' interest are so directly adverse, the clients cannot even consent to such joint representation, because it makes the entire judicial machinery appear unfair."  On

11

Bank of Superior Court of California County of Orange
ADA Complaint Exhibits 434

CTI's behalf, Horwitz argued the drastic measure of seeking a receivership in the shareholder derivative Mesa Action was "adverse to the corporation's interests" due to the "extravagant costs." CTI argued the request was "similar to claiming 'we had to destroy the village in order to save it.'"

B. *November 2019 Disqualification Order*

On November 15, 2019, the court granted the motion but did not rule on the evidentiary objections on the grounds they were "not directed at evidence that the court considers material to its disposition of this motion." The court ruled as follows: "Catanzarite's simultaneous representation of CTI and interests adverse to CTI compel the firm's disqualification. In *Flatt v. Superior Court* (1994) 9 Cal.4th 275 (*Flatt*), the California Supreme Court held, 'Courts and ethical codes alike prohibit an attorney from simultaneously representing two client adversaries, even where the substance of the representations are unrelated.' [Citation.] The court added, 'Indeed, in all but a few instances, the rule of disqualification in simultaneous representation cases is a per se or automatic one.' [Citation.] Catanzarite is representing CTI in this case, but in the pending [Mesa Action] Catanzarite is representing one faction of CTI shareholders who have an upcoming motion scheduled seeking to impose a receiver on CTI, relief that would be adverse to CTI. In the pending [Scottsdale Action], Catanzarite represents CTI yet seeks to invalidate a defense and indemnity for CTI directors in the [Mesa Action] under an insurance policy issued on CTI's behalf. A denial of coverage could put CTI on the hook for the individuals' costs of defense and/or liability."

The court cited authority holding an attorney cannot avoid the disqualification rule by "unilaterally converting a present client into a former client before the hearing" on the disqualification motion. The court reached the following conclusions: "In the pending [Pinkerton Action], Catanzarite represents the plaintiffs, and the original [c]omplaint named CTI as a defendant, although the first amended complaint dropped CTI as a party. In the Cooper [Action], Catanzarite represented the

12

Complaint Supplement #30-2020-01145985
Exhibit #19: 012

petitioners, who sought to compel CTI to hold a shareholders meeting to elect directors. Petitioners dismissed that action on September 13, 2019. Catanzarite represents the plaintiffs in the [MFS Action], in which the original [c]omplaint alleged in [paragraph] 50 that CTI owes money to the plaintiff [referring to MFS start up loan totaling $87,451.53]. The [FAC] omitted that allegation. Thus, there are five lawsuits in which the Catanzarite firm is or was adverse to CTI, compelling the firm's disqualification."

Alternatively, the court determined disqualification was warranted because "corporate counsel's professional duties run to the corporation, [and] counsel must refrain from taking part in any controversies or factional differences among shareholders as to control of the corporation." It noted, "Catanzarite represents CTI's common stockholders, who are fighting with CTI's preferred stockholders in several lawsuits for CTI's control." Finally, the court explained that in light of the above rulings, "the court need not and will not reach the issue of whether Catanzarite was authorized to represent CTI in this action based on his shareholder faction allegedly being in control of CTI."

C. *Second Disqualification Motion in the FinCanna Action*

Less than a week later, Horwitz filed a motion to recuse and/or disqualify Catanzarite from representing the CTI Subsidiaries in the FinCanna Action. The motion asserted CTI and the CTI Subsidiaries should be treated as the same client for conflict purposes. Horwitz explained that after the court's disqualification ruling, it asked Catanzarite to voluntarily withdraw from representing the CTI Subsidiaries. Catanzarite refused, stating it intended to appeal the prior disqualification order.[5]

Catanzarite filed an opposition, confirming it intended to file an appeal. It argued Horwitz filed an "abusive disqualification motion[]" brought "solely for the improper and strategic purpose to leave the CTI Subsidiaries without their counsel of choice." The hearing was scheduled for January 2020.

---

[5]         Before the trial court considered CTI's second motion, Catanzarite, representing itself, filed a notice of appeal from the November disqualification order.

13

D. *Two Disqualification Motions in the Mesa Action*

      Catanzarite's appellant's appendix does not include one of the disqualification motions filed in the Mesa Action.  On our own motion, we augmented the record on appeal to include missing documents.[6]  (Cal. Rules of Court, rule 8.155(a)(1)(A).)  Horwitz filed a motion on behalf of CTI.  Several members of the Probst Faction, who were named defendants in the Mesa Action (Beck, Miguel Motta, Robert Bernheimer, Robert Kamm, Eric Mathur, Robert Schmidt, and Jason Pitkin, hereafter referred collectively and in the singular as Beck), filed a motion to "join in" CTI's motion.  Beck was represented by attorneys from O'Hagan Meyer LLC.

      Our record contains Catanzarite's oppositions to these motions, filed on behalf of the Mesa Action plaintiffs.  Catanzarite addressed the merits of CTI's motion.  However, Catanzarite argued Beck's motion was procedurally improper because the November disqualification order stayed all the lawsuits, and Beck did not ask for permission to file the joinder motion.  In addition, Catanzarite argued Beck's motion raised different issues from CTI and should be treated as a separate independent motion for disqualification.  It noted a separate motion would be untimely filed because the hearing on CTI's motion was scheduled for early January.

E. *January 2020 Disqualification Orders*

      On January 10, 2020, the court considered the two disqualification motions filed in the Mesa Action, as well as the CTI Subsidiaries' motion filed in the FinCanna Action.  It ruled as follows:  "The [m]otions to [d]isqualify [Catanzarite] in the four related cases are granted in [the Mesa Action and the FinCanna Action] and denied in

---

[6]      We caution counsel that it is not this court's responsibility to obtain the documents necessary to consider the arguments raised on appeal.  We have used our discretionary authority to take judicial notice of documents discussed by the parties and augment the record to assist us in reviewing the appeals on their merits.  But we are not required to do so.  (See *State Comp. Ins. Fund v. WallDesign Inc.* (2011) 199 Cal.App.4th 1525, 1529.)

14

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 437

[the Pinkerton Action and the MFS Action].  [¶] This court previously granted a motion to disqualify [Catanzarite] from representing CTI in the FinCanna [Action] because principles prohibiting dual representation prohibit [Catanzarite's] simultaneous representation of CTI and interests adverse to CTI.  In [the Mesa Action] Catanzarite is representing the plaintiffs in a derivative action on behalf of CTI, meaning that its representation is for the benefit of CTI.  Thus, the same principles that warranted Catanzarite's disqualification in the FinCanna [Action] apply to [the Mesa Action] and compel disqualification here."

As for the CTI subsidiaries, the court ruled as follows: "Here, the FinCanna plaintiff sued CTI and its three wholly-owned subsidiaries, alleging that plaintiff loaned CTI $5.9 million and that CTI still owes plaintiff about $4.7 million. Plaintiff's theory against the subs[idiaries] is that they owe CTI money . . . . Thus, the [three subsidiaries'] liability to plaintiff is dependent on CTI owing plaintiff money, and as a result all four defendants have a unity of interest in the case.  Catanzarite filed an [a]nswer and [c]ross-[c]omplaint on behalf of all four named defendants.  The [c]ross-[c]omplaint is based primarily on the relationship between FinCanna and CTI, with little reference to the subs[idiaries], and alleges all of its causes of action jointly on behalf of all four cross-complainants, without any distinction as to any of the allegations, or in any of the six causes of action or in the prayer as to which cross-complainants are seeking what relief.  Thus, all four of the defendants and cross-complainants have a unity of interest in the FinCanna [Action], warranting Catanzarite's disqualification from representing the subs[idiaries], on the heels of being disqualified from representing CTI."

The court denied the motion with respect to the Pinkerton Action.  It noted the case was originally a derivative action on behalf of MFS, but Catanzarite amended the complaint and CTI was no longer a party in this lawsuit.  The court concluded CTI, therefore, lacked standing to seek Catanzarite's disqualification from representing MFS

15

shareholders against defendants other than CTI "even if the allegations involve the world of CTI."

Likewise, the court determined CTI lacked standing in the MFS Action. Although the complaint "originally asserted derivative claims on behalf of CTI, and named CTI as a nominal defendant," the FAC omitted CTI as a party.  The court noted, "CTI (through other counsel) filed a cross-complaint against MFS which is still pending. Although MFS alleges it was and is CTI's sole shareholder, the court ruled at a [section] 709 hearing in April 2019 that MFS was not a CTI shareholder as of November 2018." The court concluded, "Although Catanzarite represents MFS as a cross-defendant, there is no dual representation involved, and Catanzarite's disqualification from representing MFS is not warranted."

The court denied Beck's joinder motion as being untimely filed.  It added, "The moving parties also lack standing to seek Catanzarite's disqualification from representing the parties that firm represents."  The court granted Catanzarite's requests for judicial notice and ruled on some of Catanzarite's evidentiary objections.  The court stayed the Mesa Action pending the appeal.  It vacated all future motions scheduled in the case including a motion to appoint a receiver.

IV. *Appellate Procedural History*

Catanzarite, representing itself, filed a notice of appeal from the November disqualification order (G058931 [the FinCanna Action]), and it filed two notices of appeal challenging the January order (G058700 [additional disqualification in FinCanna Action]; G058942 [disqualification in the Mesa Action]).  We granted Catanzarite's request to consolidate its two appeals related to the FinCanna Action (G058700 & G058942), and on our own motion consolidated Catanzarite's appeal from the disqualification order in the Mesa Action (G058931).  None of Catanzarite's clients filed appeals.  CTI filed its respondent's brief in support of the disqualification orders.

16

DISCUSSION

This case raises issues related to motions to disqualify Catanzarite, a law firm filing six lawsuits while simultaneously representing two corporations, three corporate subsidiaries, and a group of minority shareholders of both corporations. Specifically, the corporate entities are the following: (1) MFS, the plaintiff in the MFS Action, (2) CTI, the cross-complainant and defendant in the FinCanna Action, (3) CTI Subsidiaries, the cross-complainants and defendants in the FinCanna Action, and (4) CTI, the plaintiff in the Scottsdale Action. The minority shareholders groups include members of the O'Connor Faction as follows: (1) Pinkerton, a MFS shareholder and plaintiff in the Pinkerton Action; (2) Mesa, Cooper, Mebane and a class action of shareholders, all plaintiffs in the Mesa Action; (3) Cooper and Mebane, who are MFS/CTI shareholders and plaintiffs in the Cooper action.

No party appealed from the orders denying Catanzarite's disqualification in the MFS and Pinkerton Actions. Catanzarite, representing itself, seeks to reverse the disqualification orders regarding the firm's representation of CTI, CTI Subsidiaries, and the Mesa Action plaintiffs. Accordingly, this opinion will be limited to our review of the orders regarding those three concurrently represented clients.

I. *Applicable Law*

A. *Attorney Disqualification Generally*

"A trial court's authority to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto.' [Citations.]" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145 (*SpeeDee Oil*); Code Civ. Proc., § 128, subd. (a)(5).)

"Disqualification motions implicate competing considerations. On the one hand, these include clients' rights to be represented by their preferred counsel and

17

deterring costly and time-consuming gamesmanship by the other side. . . . [¶] Balanced against these are attorneys' duties of loyalty and confidentiality and maintaining public confidence in the integrity of the legal process. . . . [Citation.] 'The loyalty the attorney owes one client cannot be allowed to compromise the duty owed another.' [Citation.]" (*Banning Ranch Conservancy v. Superior Court* (2011) 193 Cal.App.4th 903, 911 (*Banning Ranch*).)[7]

B.  *Standard of Review*

"Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion.  [Citations.]  If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence.  [Citations.]  When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion.  [Citation.]  However, the trial court's discretion is limited by the applicable legal principles.  [Citation.]  Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law.  [Citation.]"  (*SpeeDee Oil, supra*, 20 Cal.4th at pp. 1143-1144.)

C.  *Successive vs. Concurrent Representation*

"There are different disqualification standards for attorneys who have conflicts with former clients and those who have conflicts with current clients.  As to conflicts involving successive representation with former clients, courts look to whether there is a 'substantial relationship' between the subjects of the current and the earlier

---

[7]     ""Normally, an attorney's conflict is imputed to the law firm as a whole on the rationale 'that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information.'" [Citation.]" (*Beachcomber Management Crystal Cove, LLC, v. Superior Court* (2017) 13 Cal.App.5th 1105, 1116 (*Beachcomber Management*).  Accordingly, the disqualification ruling made as to Catanzarite is binding on the associates of that firm.

18

proceedings. [Citations.] [¶] In contrast, there is a more stringent standard when an attorney simultaneously represents two current clients with conflicting interests. Disqualification . . . is *mandatory* in such circumstances even though the simultaneous matters may have nothing in common. (*Flatt, supra,* 9 Cal.4th at p. 284.) "'Something seems radically out of place if a lawyer sues one of the lawyer's own present clients on behalf of another client. Even if the representations have nothing to do with each other, so that no confidential information is apparently jeopardized, the client who is sued can obviously claim that the lawyer's sense of loyalty is askew.'" [Citation.]" (*Banning Ranch, supra,* 193 Cal.App.4th at pp. 911-912; see Rules Prof. Conduct rule 1.7(a) & (b) [attorney may not without informed written consent "represent a client if the representation is directly adverse to another client in the same or a separate matter" or "there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client"].)

  In summary, courts recognize the "chief fiduciary value jeopardized" in cases involving successive representation is client confidentiality. (*M'Guinness v. Johnson* (2015) 243 Cal.App.4th 602, 613.) Whereas in concurrent "representation of multiple clients resulting in a conflict of interest" the "'primary value at stake'" is the attorney's duty and "the client's legitimate expectation" of loyalty, not confidentiality.[8]

D. *Corporate Counsel*

  Corporate counsel's professional responsibilities and allegiances are owed to the corporate entity, not the officers, directors, or shareholders "and the individual shareholders or directors cannot presume that corporate counsel is protecting their interests. [Citations.]" (*La Jolla Cove Motel & Hotel Apartments, Inc. v. Superior Court* (2004) 121 Cal.App.4th 773, 784 (*La Jolla Cove*).) Generally, a lawyer representing a

---

[8]  This case involves issues related to concurrent representation, invoking the fiduciary duty of loyalty, rather than confidentiality. For this reason, we will not discuss any of Catanzarite's arguments about maintaining client confidentiality.

Complaint Supplement #30-2021-01229349<br>Exhibit #19: 019
Superior Court of California County of Orange<br>ADA Complaint Exhibits 442

corporation may also represent any of the corporation's officers or directors upon the clients' written consent.  (*Id.* at p. 785; see Rules Prof. Conduct rule 1.13(g).)

"Conflicts of interest between a corporation and its officers, directors and shareholders are particularly problematic for corporate counsel where . . . the corporation is a closely held one, with few shareholders.  [Citation.]  Corporate counsel may develop a fiduciary relationship with individual shareholders or directors.  However, even in that situation, the attorney's ultimate loyalty is to the corporation, not individual shareholders, officers or directors.  [Citation.]  Thus, where an adversarial setting presents itself, pitting the corporation against one or more of its officers, directors or shareholders, corporate counsel may still represent the corporation against those individuals, even though he or she may have received confidential information about them in the course of representing the corporation.  [Citations.]" (*La Jolla Cove, supra,* 121 Cal.App.4th at p. 785.)

However, "[O]nce a conflict has arisen between a corporation and one or more of its officers, directors or shareholders, corporate counsel may not simultaneously represent the corporation and the adverse officer, director or shareholder." (*La Jolla Cove, supra,* 121 Cal.App.4th at p. 785; see Rules Prof. Conduct rule 1.7.)  "Thus, where a shareholder has filed an action questioning [the corporation's] management or the actions of individual officers or directors, such as in a shareholder derivative or . . . dissolution action, corporate counsel cannot represent both the corporation and the officers, directors or shareholders with which the corporation has a conflict of interest.  [Citation.]" (*Id.* at pp. 785-786.)

Consequently, there can be no dual representation of a corporation and directors when the suit is brought by other shareholders.  "In an action by a shareholder alleging *harm to the corporation,* an attorney cannot represent both the corporation and defendant shareholders who are accused of wrongdoing or whose interests are otherwise adverse to the corporation.  This is so whether or not the suit is framed as a derivative action." (Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2021)

20

Superior Court of California, County of Orange
ADA Complaint Exhibits 443

¶ 1:11.2a; see *Ontiveros v. Constable* (2016) 245 Cal.App.4th 686, 696-699, [attorney could not represent both corporation and 60 percent shareholder in derivative action brought by 40 percent shareholder]; *Blue Water Sunset, LLC v. Markowitz* (2011) 192 Cal.4th 477, 488-489, [attorney could not represent both LLC and defendant member in derivative action brought by LLC's only other member]; *Gong v. RFG Oil, Inc.* (2008) 166 Cal.App.4th 209, 216 (*Gong*) [attorney cannot represent both 51 percent shareholder and corporation in suit by 49 percent shareholder alleging personal use of corporate funds and other claims showing harm to corporation].)

Of course, the case before us involves the opposite scenario. Not surprisingly, we found no cases (and Catanzarite cites to none) holding an attorney may simultaneously represent both the corporation and the *plaintiff shareholders* who are accusing the board of directors of wrongdoing. The lack of authority can be explained by the existence of well-settled legal authority holding a derivative plaintiffs' attorney does not ipso facto represent the corporation, but rather "the shareholder's attorney is acting *against* the corporation's wishes." (*Shen v. Miller* (2012) 212 Cal.App.4th 48, 57-60, italics added (*Shen*).) In order for a shareholder to have standing to bring a derivative action, counsel must plead the corporation refused to pursue the claim. (*Id.* at pp. 57-58.) For this reason, in a shareholder derivative suit the corporation is included as a nominal defendant because it is in conflict with the outsider shareholder about the advisability of suing. (*Id.* at p. 58.)

Moreover, "[T]he corporation that is the subject of the derivative claim is generally a nominal party only. "'Because the claims asserted and the relief sought in [the derivative] complaint would, if proven, advance rather than threaten the interests of the nominal defendant[], the nominal defendant[] must *remain neutral* in [the] action." [Citation.]' [Citation.]" (*Shen, supra,* 212 Cal.App.4th at p. 58, italics added.) Logically, if the derivative plaintiffs' attorney also represented the corporation, there would be no need for a derivative action because "the corporation itself would be

21

pursuing" the outside shareholder's claims.  (*Ibid.*)  An attorney representing plaintiff shareholders cannot both advocate those claims and remain neutral.  Concurrent representation of clients with such obvious conflicting interests is not permissible.

II.  *Analysis of Disqualification Order in the FinCanna Action*

To briefly summarize, the trial court disqualified Catanzarite from representing CTI on the grounds it was simultaneously representing "two client adversaries."[9]  It reasoned Catanzarite was representing CTI in the FinCanna Action but representing a faction of CTI shareholders in the Mesa Action.  Moreover, the court determined Catanzarite improperly took sides in a shareholder dispute by filing the Scottsdale Action to promote the interests of the O'Connor Faction by stopping CTI's insurance company from providing a defense or indemnity to the Probst Faction defendants in the Mesa Action.  On appeal, Catanzarite asserts the court abused its discretion in making this ruling because the moving party lacked standing and its clients did not have adversarial interests.  We address each contention separately, concluding both lack merit.

A.  *Standing*

Catanzarite's first and primary challenge to the trial court's ruling is that the party filing the disqualification motion lacked standing.  Catanzarite asserts the trial court could not possibly decide this issue without first resolving the parties' complicated dispute about which shareholder faction rightfully controlled CTI.  Catanzarite provides a lengthy argument supporting its theory the O'Connor Faction controlled CTI.  It argues the court abused its discretion by failing to consider and agree with its contentions.  Not

---

[9]       On appeal, Catanzarite does not challenge the trial court's conclusion CTI and CTI Subsidiaries had a unity of interest in the FinCanna Action.  Catanzarite, conceding that the same principles regarding its representation of CTI apply equally to CTI Subsidiaries, does not distinguish between them in its legal discussions.  We will do the same for purposes of this opinion; our discussion of CTI applies equally to CTI Subsidiaries unless otherwise indicated.

22

Bank # Superior Court of California County of Orange
ADA Complaint Exhibits 445

so. CTI had standing to file the motion because all the facts relevant to the issue of disqualification were undisputed. There was no need for the court to prematurely consider and resolve other factual disputes (rending many causes of action moot before trial).

   "A 'standing' requirement is implicit in disqualification motions. Generally, before the disqualification of an attorney is proper, the complaining party must have or must have had an attorney-client relationship with that attorney. [Citation.]" (*Great Lakes Construction, Inc. v. Burman* (2010) 186 Cal.App.4th 1347, 1356.)

   Catanzarite is in the awkward position of asserting it had an attorney-client relationship with CTI for purposes of filing complaints in the Scottsdale and FinCanna Actions, but not with CTI for purposes of a disqualification motion. To avoid this conundrum, Catanzarite frames its lack-of-standing argument on the premise there was never an attorney-client relationship between itself and members of the Probst Faction. We agree the Probst Faction never entered into an attorney-client relationship with Catanzarite. Instead, the Probst Faction, the directors purportedly controlling CTI, hired Horwitz to act as corporate counsel for CTI, i.e., the same corporate entity Catanzarite claims to represent. Catanzarite cannot avoid the undisputed fact it was not the only law firm representing the corporation in litigation. Indeed, Winget was CTI's attorney of record in the three derivative actions filed by Catanzarite.[10]

   The problem with Catanzarite's lack-of-standing argument is that it ignores the fact CTI is not an individual, but rather an inanimate corporate entity having a board of directors with authority to hire corporate counsel. Catanzarite's authority to represent CTI arose from its relationship with the O'Connor Faction. Yet, as discussed at length in

---

[10]  It is noteworthy that CTI's directors who were members of the Probst Faction hired Winget to defend CTI in the three shareholder derivative actions (the Pinkerton, MFS, and Mesa Actions). Catanzarite does not suggest these directors lacked authority to retain Winget as CTI's corporate counsel in these lawsuits. It offers no distinction between CTI's retention of Winget from the decision to hire Horwitz.

23

the briefs, and as evidenced by the pleadings in multiple lawsuits, the O'Connor Faction's control over CTI is a hotly contested issue. Thus, the O'Connor Faction's authority to hire Catanzarite and defend CTI's choice of counsel is necessarily the same legal rights afforded to the Probst Faction, who hired Horwitz to act as corporate counsel (and challenge Catanzarite). We conclude that because the chief fiduciary duty at stake is loyalty, CTI had standing to file the motion to disqualify one of its attorneys regardless of which shareholder faction *currently* claimed to control CTI.

We reject Catanzarite's argument the court was required to determine *before trial* the issue of which shareholder faction rightfully controlled CTI before ruling on CTI's disqualification motion. The trial court wisely understood the relevant facts pertaining to disqualification were undisputed. The parties agreed the two factions of shareholders were promoting very different agendas for CTI's operations. As mentioned, the O'Connor Faction sought to nullify actions taken by the prior board of directors (the Probst Faction). This included cancelling shares and voting rights, voiding contracts, repaying money owed to MFS, and changing CTI's business relationship with FinCanna. On the other hand, the Probst Faction was fighting to remain in control and maintain the status quo of voting rights, shares, financial obligations, and contracts with FinCanna. Due to the undisputed contentious nature of their dispute, it would be absurd to suggest the same attorney could simultaneously represent these two factions of shareholders. Similarly, there was no need to determine which faction controlled CTI to disqualify an attorney simultaneously purporting to act as corporate counsel while pursuing a derivative action filed against the corporation. If the interests of these two clients were in accord, there would be no need for a derivative action. (*Shen, supra,* 212 Cal.App.4th at p. 58.)

As mentioned earlier, although disqualification motions are generally reviewed for abuse of discretion, "where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.]"

<center>24</center>

(*SpeeDee Oil, supra,* 20 Cal.4th at p. 1144.)  Here, the trial court correctly determined *it need not* "reach the issue" of which shareholder faction rightfully controlled CTI.  We agree.  The undisputed nature of the lawsuits, involving parties with conflicting interests, and a corporation with adversarial directors, supported mandatory disqualification as a matter of law.

B. *Adverse Interests*

Catanzarite asserts the trial court exacerbated its abuse of discretion by finding it was representing interests adverse to CTI.  Catanzarite suggests its legal maneuverings, undertaken on behalf of the O'Connor Faction, actually benefitted the corporation.  For example, Catanzarite maintains the Mesa Action plaintiffs' receivership motion would prevent corporate waste.  This and similar contentions CTI benefitted from Catanzarite's legal tactics are disingenuous.  This is not a case where Catanzarite was comprised of neutral lawyers, hired by a cohesive board of directors.

The record plainly shows MFS shareholders (the O'Connor Faction) hired Catanzarite to regain shares and control of CTI through litigation and by removing and replacing the Probst Faction from CTI's then board of directors.  Indeed, it is undisputed that within six months, Catanzarite filed three separate shareholder derivative actions all designed to give its clients more control over CTI and to revoke business decisions made by directors from the Probst Faction.  Catanzarite's involvement in these derivative actions, in which a corporation must remain neutral, highlights critical issues regarding its fiduciary duty of loyalty.  Particularly troubling was Catanzarite's active role in helping its clients forcibly remove CTI's directors, after Catanzarite was unable to achieve this same result in the MFS Action's section 709 hearing.

Even if we assume the transition of power was executed correctly with written consents, the scheme clearly demonstrated an allegiance to one faction of shareholders and corporate counsel's professional responsibilities and allegiances are owed to the corporate entity, not the officers, directors, or shareholders.  (See *La Jolla*

25

*Cove, supra,* 121 Cal.App.4th at p. 784.)  As stated earlier, "[O]nce a conflict has arisen between a corporation and one or more of its officers, directors or shareholders, corporate counsel may not simultaneously represent the corporation and the adverse officer, director or shareholder." (*Id.* at p. 785; see Rules Prof. Conduct rule 1.7.)

We found other evidence of Catanzarite's conflicting loyalties after comparing the complaints Catanzarite prepared for the Mesa Action (a derivative lawsuit) with the one used for CTI in the FinCanna Action.  Large sections appear to have been cut and pasted from one to the other.  Perhaps Catanzarite believed the mirror complaints filed on behalf of different clients were appropriate due to its theory the derivative action, filed "on behalf of" CTI, would necessarily benefit the corporation.  This assertion demonstrates its misunderstanding of derivative actions and the limited role of counsel representing the outsider shareholder plaintiffs.  As mentioned earlier in this opinion, the *Shen* case is instructive on attorney client relationships arising from derivative actions. (*Shen, supra,* 212 Cal.App.4th at pp. 56-57.)  That case involved three related actions and concerned a dispute between 50/50 shareholders over control of a closely held corporation.  (*Id.* at p. 52.)  The trial court denied one co-president's (Miller) motion to disqualify the other co-president's (Shen) attorney.  (*Ibid.*)  Miller filed the motion after Shen filed a petition for court supervision of voluntary winding up proceedings, as well as a complaint derivatively on behalf of the company.  (*Id.* at pp. 52-53.)  Miller recognized Shen lacked a formal attorney-client relationship with the company, but he argued for automatic disqualification.  He reasoned disqualification was necessary due to the attorney's role in prosecuting the derivative action, which involved representing the interests of the corporation, while at the same time the attorney took an adverse position to the company in related litigation (winding up proceedings).  (*Id.* at pp. 56-57.)

The *Shen* court clarified the limited significance of the "on behalf of" language commonly utilized when referring to shareholder derivative lawsuits.  "[A] shareholder may only bring a derivative suit on behalf of the corporation if the

26

corporation has refused to pursue the claim.  In bringing the derivative action, the shareholder's attorney is acting *against* the corporation's wishes.  [¶] Nevertheless, should the shareholder prevail in the derivative action, the corporation is the ultimate beneficiary.  [Citation.]  Therefore, the corporation must be joined in the action . . . as a nominal defendant because of 'its refusal to join the action as a plaintiff.  [Citation.]' [Citation.]  In other words, in a shareholder derivative suit, "'[t]he corporation has traditionally been aligned as a defendant because it is in conflict with its stockholder about the advisability of bringing suit . . . ."  [Citation.]'  [Citation.]"  (*Shen, supra,* 212 Cal.App.4th at p. 58, italics added.)  The court cautioned the corporation that is the subject of a derivative action ""'must remain neutral in [the] action."  [Citation.]' [Citation.]"  (*Id.* at p. 58.)  Thus, Catanzarite's role in bringing the derivative action conflicts with the corporation's obligation to remain neutral in the action.  Filing the lawsuit was an act against the corporation's wishes.  Thus, Catanzarite's decision to reuse the same derivative type claims in a cross-complaint, filed directly by the corporation in a different lawsuit against a third party, was plainly disloyal to the corporation (regardless of whether the directors were recently replaced).

C.  *Waivers*

Catanzarite suggests we can ignore any conflicts arising from the concurrent representation of members of the O'Connor Faction and CTI because Pinkerton, Cooper, Mebane, Mesa, CTI and MFS waived any conflicts.  As pointed out by CTI's counsel on appeal, Catanzarite obtained these waivers in December 2019, after the trial court's November hearing/ruling disqualifying Catanzarite from representing CTI.  Catanzarite does not address this issue.  It fails to explain why it could file five lawsuits (for and against CTI) before obtaining the waivers.  Moreover, Catanzarite does not explain why these waivers would be relevant to a *mandatory* disqualification for ongoing concurrent representation of clients with conflicting interests.

27

Once again, Catanzarite ignores the problem with its dual representation in this case and that the O'Connor Faction cannot waive the conflict on behalf of the inanimate corporate entity, CTI. "[While] in some circumstances multiple representation may be permissible if both clients are fully informed of potential conflict and the parties consent to the representation. This consent rationale seems peculiarly inapplicable to a derivative suit, because the corporation must consent through the directors, who, as in the present case, are the individual defendants. [Citations.]" (*Forrest v. Baeza* (1997) 58 Cal.App.4th 65, 76-77 (*Forrest*).) The directors and the corporation cannot act independently of each other. (*Id.* at p. 76.)

Stated another way, "'[A]n inanimate corporate entity, which is run by directors who are themselves defendants in the derivative litigation, cannot effectively waive a conflict of interest as might an individual under applicable professional rules such as [rules] 3-600(E) and 3-310.' One commentator noted: 'But it would be meaningless in derivative litigation to allow the consent of the parties defendant to exculpate the practice of dual representation, for most often it would be the defendant directors and officers who would force the corporation's consent.' (Comment, Independent Representation for Corporate Defendants in Derivative Suits (1965) 74 Yale L.J. 524, 528.)" (*Forrest, supra,* 58 Cal.App.4th at p. 77, capitalization and italics omitted.)

Catanzarite appears to be arguing concurrent representation was possible because after the O'Connor Faction asserted control of the corporation, these shareholders effectively became insiders of the corporation. This is twisted logic. A shareholder only needs to file a derivative action, on the company's behalf, when the insiders who control the company refuse to do so. (*Beachcomber Management, supra,* 13 Cal.App.5th at p. 1118.) By filing the derivative action, Catanzarite implicitly acknowledged its clients are outsiders with interests adverse to CTI's directors. Having

28

sided with the O'Connor Faction early on, the appearance of impropriety compels disqualification.

If this case involved a deadlocked corporation, Catanzarite would have needed to secure written consent from all directors before continuing as corporate counsel. "An attorney who is asked by an officer/director to represent the corporation on a matter over which the board is deadlocked, or otherwise sharply divided, should obtain *each board member's* informed written consent to act as corporate counsel. If that consent cannot be obtained, the attorney must withdraw from representing the corporation: The attorney cannot purport to act as corporate counsel when in fact he or she is representing one faction of the board against another. [Citations.]" (Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2021) ¶ 1:11.1e.) The same principles apply in this case. For several years, the CTI board of directors, comprised of both O'Connor and Probst Faction members, have been sharply divided on many issues. Accordingly, an attorney wishing to become corporate counsel, but who has an existing client at odds with some of the corporation's directors, would need more than the existing client's written waivers to concurrently represent the corporation.

V. *The Mesa Action Plaintiffs*

Catanzarite maintains the trial court abused its discretion in disqualifying it as counsel for the Mesa Action plaintiffs. We note the Mesa Action plaintiffs did not file an appeal. We do not know if these shareholders agreed with the court's ruling and have retained new counsel. CTI's respondent's brief does not address the issue. In any event, we conclude the court's ruling was correct with respect to the Mesa Action plaintiffs.

In its ruling, the court concluded the same principles preventing Catanzarite from representing CTI in the FinCanna Action prevented it from representing "plaintiffs in the derivative action *on behalf of* CTI, meaning that its representation is for the benefit of CTI." (Italics added.) As discussed earlier in this opinion, the derivative action was filed *against* CTI's wishes. (*Shen, supra,* 212 Cal.App.4th at pp. 57-58.) The derivative

29

Back to Superior Court of California County of Orange
ADA Complaint Exhibits 452

action's "on behalf of" language signifies only a mere possibility the corporation may benefit from the litigation's outcome and should not be confused with which party holds an expectation of loyalty from Catanzarite.  Thus, we disagree with the notion Catanzarite was representing CTI in the Mesa Action.  Nevertheless, disqualification was appropriate.

In reaching this conclusion, we reject Catanzarite's argument the court abused its discretion by failing to determine whether the Probst Faction or the O'Connor Faction controlled CTI and had authority to retain counsel.  Disqualification in the Mesa Action was appropriate under either scenario.  If the O'Connor Faction gained control of CTI and hired Catanzarite, the firm still could not concurrently represent derivative shareholders at the same time it was representing a corporation experiencing conflict between those same derivative shareholders and others.  Prosecuting the derivative action also clearly conflicts with a corporate counsel's duty to remain neutral in the derivative action.  (*Shen, supra,* 212 Cal.App.4th at pp. 57-58.)  Similarly, if the Probst Faction never lost control of CTI, then there were certainly problems created by Catanzarite's unauthorized litigation on the corporation's behalf.  However, we consider the fact most relevant to CTI's disqualification motion in the Mesa Action, was CTI's newly created status as Catanzarite's former client (following the firm's disqualification in the FinCanna Action).  As a former client, CTI, a defendant in the Mesa Action, had standing to challenge the firm's representation of plaintiffs having adverse interests from CTI.  CTI, under the direction of the Probst Faction would certainly never give Catanzarite informed written consent to represent outsider shareholders suing the corporation and board members.  Catanzarite tainted all litigation involving CTI after purporting to represent the corporation and at the same time prosecuting a derivative shareholder action against CTI.

30

DISPOSITION

We affirm the court's orders disqualifying Catanzarite from representing CTI, CTI Subsidiaries, and the group of shareholder plaintiffs in the Mesa Action. Respondent shall recover its costs on appeal.

O'LEARY, P. J.

WE CONCUR:

BEDSWORTH, J.

FYBEL, J.

31