EXHIBIT 9

# FTC Staff Guidance on Active Supervision of State Regulatory Boards Controlled by Market Participants[*]

## I.    Introduction

States craft regulatory policy through a variety of actors, including state legislatures, courts, agencies, and regulatory boards. While most regulatory actions taken by state actors will not implicate antitrust concerns, some will. Notably, states have created a large number of regulatory boards with the authority to determine who may engage in an occupation (*e.g.*, by issuing or withholding a license), and also to set the rules and regulations governing that occupation. Licensing, once limited to a few learned professions such as doctors and lawyers, is now required for over 800 occupations including (in some states) locksmiths, beekeepers, auctioneers, interior designers, fortune tellers, tour guides, and shampooers.[1]

In general, a state may avoid all conflict with the federal antitrust laws by creating regulatory boards that serve only in an advisory capacity, or by staffing a regulatory board exclusively with persons who have no financial interest in the occupation that is being regulated. However, across the United States, "licensing boards are largely dominated by active members of their respective industries . . ."[2] That is, doctors commonly regulate doctors, beekeepers commonly regulate beekeepers, and tour guides commonly regulate tour guides.

Earlier this year, the U.S. Supreme Court upheld the Federal Trade Commission's determination that the North Carolina State Board of Dental Examiners ("NC Board") violated the federal antitrust laws by preventing non-dentists from providing teeth whitening services in competition with the state's licensed dentists. *N.C. State Bd. of Dental Exam'rs v. FTC*, 135 S. Ct. 1101 (2015). NC Board is a state agency established under North Carolina law and charged with administering and enforcing a licensing system for dentists. A majority of the members of this state agency are themselves practicing dentists, and thus they have a private incentive to limit

---

[*] This document sets out the views of the Staff of the Bureau of Competition. The Federal Trade Commission is not bound by this Staff guidance and reserves the right to rescind it at a later date. In addition, FTC Staff reserves the right to reconsider the views expressed herein, and to modify, rescind, or revoke this Staff guidance if such action would be in the public interest.

[1] Aaron Edlin & Rebecca Haw, *Cartels By Another Name: Should Licensed Occupations Face Antitrust Scrutiny*, 162 U. Pa. L. Rev. 1093, 1096 (2014).

[2] *Id.* at 1095.

Complaint Supplement #30-2020-01145998
Exhibit #9: 001
Bank - Superior Court of California County of Orange
ADA Complaint Exhibits 340

competition from non-dentist providers of teeth whitening services. NC Board argued that, because it is a state agency, it is exempt from liability under the federal antitrust laws. That is, the NC Board sought to invoke what is commonly referred to as the "state action exemption" or the "state action defense." The Supreme Court rejected this contention and affirmed the FTC's finding of antitrust liability.

In this decision, the Supreme Court clarified the applicability of the antitrust state action defense to state regulatory boards controlled by market participants:

> "The Court holds today that a state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates must satisfy *Midcal's* [*Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97 (1980)] active supervision requirement in order to invoke state-action antitrust immunity." *N.C. Dental*, 135 S. Ct. at 1114.

In the wake of this Supreme Court decision, state officials have requested advice from the Federal Trade Commission regarding antitrust compliance for state boards responsible for regulating occupations. This outline provides FTC Staff guidance on two questions. *First,* when does a state regulatory board require active supervision in order to invoke the state action defense? *Second,* what factors are relevant to determining whether the active supervision requirement is satisfied?

Our answers to these questions come with the following caveats.

➢   Vigorous competition among sellers in an open marketplace generally provides consumers with important benefits, including lower prices, higher quality services, greater access to services, and increased innovation. For this reason, a state legislature should empower a regulatory board to restrict competition only when necessary to protect against a credible risk of harm, such as health and safety risks to consumers. The Federal Trade Commission and its staff have frequently advocated that states avoid unneeded and burdensome regulation of service providers.[3]

➢   Federal antitrust law does <u>not</u> require that a state legislature provide for active supervision of any state regulatory board. A state legislature may, and generally should, prefer that a regulatory board be subject to the requirements of the federal antitrust

---

[3] *See, e.g.*, Fed. Trade Comm'n Staff Policy Paper, *Policy Perspectives: Competition and the Regulation of Advanced Practice Registered Nurses* (Mar. 2014), https://www.ftc.gov/system/files/documents/reports/policy-perspectives-competition-regulation-advanced-practice-nurses/140307aprnpolicypaper.pdf; Fed. Trade Comm'n & U.S. Dept. of Justice, Comment before the South Carolina Supreme Court Concerning Proposed Guidelines for Residential and Commercial Real Estate Closings (Apr. 2008), https://www.ftc.gov/news-events/press-releases/2008/04/ftcdoj-submit-letter-supreme-court-south-carolina-proposed.

Complaint Supplement #30 2020-01-14 9998
Exhibit #9: 002
Bank of Superior Court of California County of Orange
ADA Complaint Exhibits 341

laws. If the state legislature determines that a regulatory board should be subject to antitrust oversight, then the state legislature need not provide for active supervision.

➢    Antitrust analysis – including the applicability of the state action defense – is fact-specific and context-dependent. The purpose of this document is to identify certain overarching legal principles governing when and how a state may provide active supervision for a regulatory board. We are not suggesting a mandatory or one-size-fits-all approach to active supervision. Instead, we urge each state regulatory board to consult with the Office of the Attorney General for its state for customized advice on how best to comply with the antitrust laws.

➢    This FTC Staff guidance addresses only the active supervision prong of the state action defense. In order successfully to invoke the state action defense, a state regulatory board controlled by market participants must also satisfy the clear articulation prong, as described briefly in Section II. below.

➢    This document contains guidance developed by the staff of the Federal Trade Commission. Deviation from this guidance does not necessarily mean that the state action defense is inapplicable, or that a violation of the antitrust laws has occurred.

Complaint Supplement #30-2020-01459998
Exhibit #9: 003
Bank #: Superior Court of California County of Orange
ADA Complaint Exhibits 342

## II.      Overview of the Antitrust State Action Defense

"Federal antitrust law is a central safeguard for the Nation's free market structures . . . . The antitrust laws declare a considered and decisive prohibition by the Federal Government of cartels, price fixing, and other combinations or practices that undermine the free market." *N.C. Dental*, 135 S. Ct. at 1109.

Under principles of federalism, "the States possess a significant measure of sovereignty." *N.C. Dental*, 135 S. Ct. at 1110 (*quoting Community Communications Co. v. Boulder*, 455 U.S. 40, 53 (1982)). In enacting the antitrust laws, Congress did not intend to prevent the States from limiting competition in order to promote other goals that are valued by their citizens. Thus, the Supreme Court has concluded that the federal antitrust laws do not reach anticompetitive conduct engaged in by a State that is acting in its sovereign capacity. *Parker v. Brown*, 317 U.S. 341, 351-52 (1943). For example, a state legislature may "impose restrictions on occupations, confer exclusive or shared rights to dominate a market, or otherwise limit competition to achieve public objectives." *N.C. Dental*, 135 S. Ct. at 1109.

Are the actions of a state regulatory board, like the actions of a state legislature, exempt from the application of the federal antitrust laws? In *North Carolina State Board of Dental Examiners*, the Supreme Court reaffirmed that a state regulatory board is not the sovereign. Accordingly, a state regulatory board is not necessarily exempt from federal antitrust liability.

More specifically, the Court determined that "a state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates" may invoke the state action defense only when two requirements are satisfied: first, the challenged restraint must be clearly articulated and affirmatively expressed as state policy; and second, the policy must be actively supervised by a state official (or state agency) that is not a participant in the market that is being regulated. *N.C. Dental*, 135 S. Ct. at 1114.

➢      The Supreme Court addressed the clear articulation requirement most recently in *FTC v. Phoebe Putney Health Sys., Inc.*, 133 S. Ct. 1003 (2013). The clear articulation requirement is satisfied "where the displacement of competition [is] the inherent, logical, or ordinary result of the exercise of authority delegated by the state legislature. In that scenario, the State must have foreseen and implicitly endorsed the anticompetitive effects as consistent with its policy goals." *Id.* at 1013.

➢      The State's clear articulation of the intent to displace competition is not alone sufficient to trigger the state action exemption. The state legislature's clearly-articulated delegation of authority to a state regulatory board to displace competition may be "defined at so high a level of generality as to leave open critical questions about how

and to what extent the market should be regulated." There is then a danger that this delegated discretion will be used by active market participants to pursue private interests in restraining trade, in lieu of implementing the State's policy goals. *N.C. Dental*, 135 S. Ct. at 1112.

➤      The active supervision requirement "seeks to avoid this harm by requiring the State to review and approve interstitial policies made by the entity claiming [antitrust] immunity." *Id.*

Where the state action defense does not apply, the actions of a state regulatory board controlled by active market participants may be subject to antitrust scrutiny. Antitrust issues may arise where an unsupervised board takes actions that restrict market entry or restrain rivalry. The following are some scenarios that have raised antitrust concerns:

➤      A regulatory board controlled by dentists excludes non-dentists from competing with dentists in the provision of teeth whitening services. *Cf. N.C. Dental,* 135 S. Ct. 1101.

➤      A regulatory board controlled by accountants determines that only a small and fixed number of new licenses to practice the profession shall be issued by the state each year. *Cf. Hoover v. Ronwin*, 466 U.S. 558 (1984).

➤      A regulatory board controlled by attorneys adopts a regulation (or a code of ethics) that prohibits attorney advertising, or that deters attorneys from engaging in price competition. *Cf. Bates v. State Bar of Ariz.*, 433 U.S. 350 (1977); *Goldfarb v. Va. State Bar*, 421 U.S. 773 (1975).

Complaint Supplement #30-2020-01145998 Superior Court of California County of Orange
Exhibit #9: 005                                ADA Complaint Exhibits 344

## III.     Scope of FTC Staff Guidance

A. This Staff guidance addresses the applicability of the state action defense under the federal antitrust laws. Concluding that the state action defense is inapplicable does <u>not</u> mean that the conduct of the regulatory board necessarily violates the federal antitrust laws. A regulatory board may assert defenses ordinarily available to an antitrust defendant.

   1. **Reasonable restraints on competition do not violate the antitrust laws, even where the economic interests of a competitor have been injured.**

   Example 1: A regulatory board may prohibit members of the occupation from engaging in fraudulent business practices without raising antitrust concerns. A regulatory board also may prohibit members of the occupation from engaging in untruthful or deceptive advertising. *Cf. Cal. Dental Ass'n v. FTC*, 526 U.S. 756 (1999).

   Example 2: Suppose a market with several hundred licensed electricians. If a regulatory board suspends the license of one electrician for substandard work, such action likely does not unreasonably harm competition. *Cf. Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696 (4th Cir. 1991) (en banc).

   2. **The ministerial (non-discretionary) acts of a regulatory board engaged in good faith implementation of an anticompetitive statutory regime do not give rise to antitrust liability. See 324 Liquor Corp. v. Duffy, 479 U.S. 335, 344 n. 6 (1987).**

   Example 3: A state statute requires that an applicant for a chauffeur's license submit to the regulatory board, among other things, a copy of the applicant's diploma and a certified check for $500. An applicant fails to submit the required materials. If for this reason the regulatory board declines to issue a chauffeur's license to the applicant, such action would not be considered an unreasonable restraint. In the circumstances described, the denial of a license is a ministerial or non-discretionary act of the regulatory board.

   3. **In general, the initiation and prosecution of a lawsuit by a regulatory board does not give rise to antitrust liability unless it falls within the "sham exception." Professional Real Estate Investors v. Columbia Pictures Industries, 508 U.S. 49 (1993); California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508 (1972).**

   Example 4: A state statute authorizes the state's dental board to maintain an action in state court to enjoin an unlicensed person from practicing dentistry. The members of the dental board have a basis to believe that a particular individual is practicing dentistry but does not hold a valid license. If the dental board files a lawsuit against that individual, such action would not constitute a violation of the federal antitrust laws.

---

Complaint Supplement #30-2020-01143329 Superior Court of California County of Orange
Exhibit #9: 006                                            ADA Complaint Exhibits 345

B. Below, FTC Staff describes when active supervision of a state regulatory board is required in order successfully to invoke the state action defense, and what factors are relevant to determining whether the active supervision requirement has been satisfied.

1. **When is active state supervision of a state regulatory board required in order to invoke the state action defense?**

*General Standard*: "[A] state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates must satisfy *Midcal*'s active supervision requirement in order to invoke state-action antitrust immunity." *N.C. Dental*, 135 S. Ct. at 1114.

*Active Market Participants*: A member of a state regulatory board will be considered to be an active market participant in the occupation the board regulates if such person (i) is licensed by the board or (ii) provides any service that is subject to the regulatory authority of the board.

> ➢     If a board member participates in any professional or occupational sub-specialty that is regulated by the board, then that board member is an active market participant for purposes of evaluating the active supervision requirement.

> ➢     It is no defense to antitrust scrutiny, therefore, that the board members themselves are not directly or personally affected by the challenged restraint. For example, even if the members of the NC Dental Board were orthodontists who do not perform teeth whitening services (as a matter of law or fact or tradition), their control of the dental board would nevertheless trigger the requirement for active state supervision. This is because these orthodontists are licensed by, and their services regulated by, the NC Dental Board.

> ➢     A person who temporarily suspends her active participation in an occupation for the purpose of serving on a state board that regulates her former (and intended future) occupation will be considered to be an active market participant.

*Method of Selection*: The method by which a person is selected to serve on a state regulatory board is not determinative of whether that person is an active market participant in the occupation that the board regulates. For example, a licensed dentist is deemed to be an active market participant regardless of whether the dentist (i) is appointed to the state dental board by the governor or (ii) is elected to the state dental board by the state's licensed dentists.

---

Complaint Supplement #30: 2020-01145998
Exhibit #9: 007

Bank of Superior Court of California County of Orange
ADA Complaint Exhibits 346

***A Controlling Number, Not Necessarily a Majority, of Actual Decisionmakers:***

> ➤ Active market participants need not constitute a numerical majority of the members of a state regulatory board in order to trigger the requirement of active supervision. A decision that is controlled, either as a matter of law, procedure, or fact, by active participants in the regulated market (*e.g.*, through veto power, tradition, or practice) must be actively supervised to be eligible for the state action defense.

> ➤ Whether a particular restraint has been imposed by a "controlling number of decisionmakers [who] are active market participants" is a fact-bound inquiry that must be made on a case-by-case basis. FTC Staff will evaluate a number of factors, including:

>> ✓ The structure of the regulatory board (including the number of board members who are/are not active market participants) and the rules governing the exercise of the board's authority.

>> ✓ Whether the board members who are active market participants have veto power over the board's regulatory decisions.

**Example 5:** The state board of electricians consists of four non-electrician members and three practicing electricians. Under state law, new regulations require the approval of five board members. Thus, no regulation may become effective without the assent of at least one electrician member of the board. In this scenario, the active market participants effectively have veto power over the board's regulatory authority. The active supervision requirement is therefore applicable.

>> ✓ The level of participation, engagement, and authority of the non-market participant members in the business of the board – generally and with regard to the particular restraint at issue.

>> ✓ Whether the participation, engagement, and authority of the non-market participant board members in the business of the board differs from that of board members who are active market participants – generally and with regard to the particular restraint at issue.

>> ✓ Whether the active market participants have in fact exercised, controlled, or usurped the decisionmaking power of the board.

**Example 6:** The state board of electricians consists of four non-electrician members and three practicing electricians. Under state law, new regulations require the approval of a majority of board members. When voting on proposed regulations, the non-electrician members routinely defer to the preferences of the electrician members. Minutes of

---

Complaint Supplement #30-2022-01249558
Exhibit #9: 008

Bank v. Superior Court of California County of Orange
ADA Complaint Exhibits 347

board meetings show that the non-electrician members generally are not informed or knowledgeable concerning board business – and that they were not well informed concerning the particular restraint at issue. In this scenario, FTC Staff may determine that the active market participants have exercised the decisionmaking power of the board, and that the active supervision requirement is applicable.

**Example 7:** The state board of electricians consists of four non-electrician members and three practicing electricians. Documents show that the electrician members frequently meet and discuss board business separately from the non-electrician members. On one such occasion, the electrician members arranged for the issuance by the board of written orders to six construction contractors, directing such individuals to cease and desist from providing certain services. The non-electrician members of the board were not aware of the issuance of these orders and did not approve the issuance of these orders. In this scenario, FTC Staff may determine that the active market participants have exercised the decisionmaking power of the board, and that the active supervision requirement is applicable.

### 2.  What constitutes active supervision?

FTC Staff will be guided by the following principles:

➢   "[T]he purpose of the active supervision inquiry . . . is to determine whether the State has exercised sufficient independent judgment and control" such that the details of the regulatory scheme "have been established as a product of deliberate state intervention" and not simply by agreement among the members of the state board. "Much as in causation inquiries, the analysis asks whether the State has played a substantial role in determining the specifics of the economic policy." The State is not obliged to "[meet] some normative standard, such as efficiency, in its regulatory practices." *Ticor*, 504 U.S. at 634-35. "The question is not how well state regulation works but whether the anticompetitive scheme is the State's own." *Id.* at 635.

➢   It is necessary "to ensure the States accept political accountability for anticompetitive conduct they permit and control." *N.C. Dental*, 135 S. Ct. at 1111. *See also Ticor*, 504 U.S. at 636.

➢   "The Court has identified only a few constant requirements of active supervision: The supervisor must review the substance of the anticompetitive decision, not merely the procedures followed to produce it; the supervisor must have the power to veto or modify particular decisions to ensure they accord with state policy; and the 'mere potential for state supervision is not an adequate substitute for a decision by the State.' Further, the state supervisor may not itself be an active market participant." *N.C. Dental*, 135 S. Ct. at 1116–17 (citations omitted).

Complaint Supplement #30: 2020-01145998
Exhibit #9: 009
Superior Court of California County of Orange
ADA Complaint Exhibits 348

➤ The active supervision must precede implementation of the allegedly anticompetitive restraint.

➤ "[T]he inquiry regarding active supervision is flexible and context-dependent." "[T]he adequacy of supervision . . . will depend on all the circumstances of a case." *N.C. Dental*, 135 S. Ct. at 1116–17. Accordingly, FTC Staff will evaluate each case in light of its own facts, and will apply the applicable case law and the principles embodied in this guidance reasonably and flexibly.

3. **What factors are relevant to determining whether the active supervision requirement has been satisfied?**

FTC Staff will consider the presence or absence of the following factors in determining whether the active supervision prong of the state action defense is satisfied.

➤ The supervisor has obtained the information necessary for a proper evaluation of the action recommended by the regulatory board. As applicable, the supervisor has ascertained relevant facts, collected data, conducted public hearings, invited and received public comments, investigated market conditions, conducted studies, and reviewed documentary evidence.

✓ The information-gathering obligations of the supervisor depend in part upon the scope of inquiry previously conducted by the regulatory board. For example, if the regulatory board has conducted a suitable public hearing and collected the relevant information and data, then it may be unnecessary for the supervisor to repeat these tasks. Instead, the supervisor may utilize the materials assembled by the regulatory board.

➤ The supervisor has evaluated the substantive merits of the recommended action and assessed whether the recommended action comports with the standards established by the state legislature.

➤ The supervisor has issued a written decision approving, modifying, or disapproving the recommended action, and explaining the reasons and rationale for such decision.

✓ A written decision serves an evidentiary function, demonstrating that the supervisor has undertaken the required meaningful review of the merits of the state board's action.

✓ A written decision is also a means by which the State accepts political accountability for the restraint being authorized.

October 2015

10

**Scenario 1: Example of satisfactory active supervision of a state board regulation designating teeth whitening as a service that may be provided only by a licensed dentist, where state policy is to protect the health and welfare of citizens and to promote competition.**

➢ The state legislature designated an executive agency to review regulations recommended by the state regulatory board. Recommended regulations become effective only following the approval of the agency.

➢ The agency provided notice of (i) the recommended regulation and (ii) an opportunity to be heard, to dentists, to non-dentist providers of teeth whitening, to the public (in a newspaper of general circulation in the affected areas), and to other interested and affected persons, including persons that have previously identified themselves to the agency as interested in, or affected by, dentist scope of practice issues.

➢ The agency took the steps necessary for a proper evaluation of the recommended regulation. The agency:

  ✓ Obtained the recommendation of the state regulatory board and supporting materials, including the identity of any interested parties and the full evidentiary record compiled by the regulatory board.

  ✓ Solicited and accepted written submissions from sources other than the regulatory board.

  ✓ Obtained published studies addressing (i) the health and safety risks relating to teeth whitening and (ii) the training, skill, knowledge, and equipment reasonably required in order to safely and responsibly provide teeth whitening services (if not contained in submission from the regulatory board).

  ✓ Obtained information concerning the historic and current cost, price, and availability of teeth whitening services from dentists and non-dentists (if not contained in submission from the regulatory board). Such information was verified (or audited) by the Agency as appropriate.

  ✓ Held public hearing(s) that included testimony from interested persons (including dentists and non-dentists). The public hearing provided the agency with an opportunity (i) to hear from and to question providers, affected customers, and experts and (ii) to supplement the evidentiary record compiled by the state board. (As noted above, if the state regulatory board has previously conducted a suitable public hearing, then it may be unnecessary for the supervising agency to repeat this procedure.)

➢ The agency assessed all of the information to determine whether the recommended regulation comports with the State's goal to protect the health and

October 2015

Book # Superior Court of California County of Orange
ADA Complaint Exhibits 350

welfare of citizens and to promote competition.

➤      The agency issued a written decision accepting, rejecting, or modifying the scope of practice regulation recommended by the state regulatory board, and explaining the rationale for the agency's action.

**Scenario 2: Example of satisfactory active supervision of a state regulatory board administering a disciplinary process.**

A common function of state regulatory boards is to administer a disciplinary process for members of a regulated occupation. For example, the state regulatory board may adjudicate whether a licensee has violated standards of ethics, competency, conduct, or performance established by the state legislature.

Suppose that, acting in its adjudicatory capacity, a regulatory board controlled by active market participants determines that a licensee has violated a lawful and valid standard of ethics, competency, conduct, or performance, and for this reason, the regulatory board proposes that the licensee's license to practice in the state be revoked or suspended. In order to invoke the state action defense, the regulatory board would need to show both clear articulation and active supervision.

➤      In this context, active supervision may be provided by the administrator who oversees the regulatory board (*e.g.*, the secretary of health), the state attorney general, or another state official who is not an active market participant. The active supervision requirement of the state action defense will be satisfied if the supervisor: (i) reviews the evidentiary record created by the regulatory board; (ii) supplements this evidentiary record if and as appropriate; (iii) undertakes a de novo review of the substantive merits of the proposed disciplinary action, assessing whether the proposed disciplinary action comports with the policies and standards established by the state legislature; and (iv) issues a written decision that approves, modifies, or disapproves the disciplinary action proposed by the regulatory board.

Note that a disciplinary action taken by a regulatory board affecting a single licensee will typically have only a de minimis effect on competition. A pattern or program of disciplinary actions by a regulatory board affecting multiple licensees may have a substantial effect on competition.

Complaint Supplement #30-20 20-01 (4)-008 Superior Court of California County of Orange
Exhibit #9: 012                                    ADA Complaint Exhibits 351

**The following do not constitute active supervision of a state regulatory board that is controlled by active market participants:**

➢ The entity responsible for supervising the regulatory board is itself controlled by active market participants in the occupation that the board regulates. *See N.C. Dental,* 135 S. Ct. at 1113-14.

➢ A state official monitors the actions of the regulatory board and participates in deliberations, but lacks the authority to disapprove anticompetitive acts that fail to accord with state policy. *See Patrick v. Burget,* 486 U.S. 94, 101 (1988).

➢ A state official (*e.g.,* the secretary of health) serves ex officio as a member of the regulatory board with full voting rights. However, this state official is one of several members of the regulatory board and lacks the authority to disapprove anticompetitive acts that fail to accord with state policy.

➢ The state attorney general or another state official provides advice to the regulatory board on an ongoing basis.

➢ An independent state agency is staffed, funded, and empowered by law to evaluate, and then to veto or modify, particular recommendations of the regulatory board. However, in practice such recommendations are subject to only cursory review by the independent state agency. The independent state agency perfunctorily approves the recommendations of the regulatory board. *See Ticor,* 504 U.S. at 638.

➢ An independent state agency reviews the actions of the regulatory board and approves all actions that comply with the procedural requirements of the state administrative procedure act, without undertaking a substantive review of the actions of the regulatory board. *See Patrick,* 486 U.S. at 104-05.

Complaint Supplement #30: 2020-01-14990B
Exhibit #9: 013
Superior Court of California County of Orange
ADA Complaint Exhibits 352

EXHIBIT 10

Beck v. Superior Court of California, County of Orange
ADA Complaint Exhibits 353



## The State Bar
## *of California*

**OFFICE OF GENERAL COUNSEL**

180 Howard Street, San Francisco, CA 94105

suzanne.grandt@calbar.ca.gov
415-538-2388

July 20, 2022

**Via U.S. Mail and email to: justintimesd@gmail.com**
Justin Beck
3501 Roselle Street
Oceanside, CA 92056

RE:   Your May 19 and July 12, 2022 Email to Chair of the State Bar Board of Trustees, Ruben Duran

Dear Mr. Beck:

This letter responds to your May 19 and July 12, 2022, emails to the Chair of the State Bar Board of Trustees, Ruben Duran. Mr. Duran has referred this matter to the Office of General Counsel for response.

Your May 19, 2022, letter is your second request to Mr. Duran regarding disciplinary matters involving the "Catanzarite Cases."[1] In your letter, you make five specific requests, which are addressed below.

First, you request "all publicly available information regarding certain licensees, and their own reporting of misconduct in CA or any jurisdiction as mandated by BPC/CRPC." As you were informed by letter of May 13, 2022, this request was forwarded to the State Bar's California Public Records Act (CPRA) coordinator. Per your email of June 1, 2022, you acknowledged that the Office of Chief Trial Counsel "was diligent in preparing my public records request, and I granted them another period of time to finish."

Second, you request that Mr. Duran waive confidentiality with respect to the "Catanzarite Cases." You included the following non-exhaustive list of cases:

- 21-O-12371 (Kenneth Catanzarite)
- 21-O-05698 (Nicole Catanzarite-Woodward)
- 21-O-11976 (Jim Travis Tice)

---

[1] "Catanzarite Cases" is defined in your First Amended Complaint filed in *Beck v. State Bar, et al.*, Orange County Superior Court case number 30-2021-01237499-CU-PN-CJC and specifically includes six disciplinary complaints you filed against five attorneys.

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

Document received by the CA Supreme Court.

Complaint Supplement #30-2021-01 of California County of Orange
Exhibit #10: 001
ADA Complaint Exhibits 354

Exhibit #26: 002
22-CV-01616-BAS-DDL

Justin Beck
July 20, 2022
Page 2

- 21-O-01012 (Kenneth Catanzarite)
- 20-O-01013 (Brandon Woodward)
- 20-O-01014 (Tim James O'Keefe)

Pursuant to section 6086.1(b)(2) of the Business and Professions Code, the Chair of the Board may waive confidentiality, "but only when warranted for protection of the public." As Chair of the Board of Trustees, Mr. Duran declines to waive confidentiality with respect to the "Catanzarite Cases," on the basis that such waiver is not warranted for protection of the public. In this regard, we note that your claims regarding attorney misconduct in the Catanzarite Cases have been heavily litigated in public court proceedings that have given rise to two public (though unpublished) Court of Appeal decisions, and you have a pending lawsuit against the State Bar in which you repeat your claims regarding attorney misconduct in yet another public court proceeding.

Third, you requested "the summary of responses from attorneys in the foregoing specific Catanzarite Cases." Pursuant to section 6093.5 of the Business and Professions Code, the State Bar shall provide a complainant with "a written summary of any response by the attorney to his or her complaint if the response was the basis for dismissal of the complaint."

With respect to Case Numbers 21-O-01012, 21-O-01013, and 21-O-01014, these matters were not closed on the basis of any response by the attorney. With respect to Case Numbers 21-O-12371 and 21-O-05698, these matters were abated and have not been closed (*i.e.*, dismissed). Therefore, as to these matters, there is no written summary required under section 6093.5.

With respect to Case Number 21-O-11976, that matter was closed on December 13, 2021. The Office of Chief Trial Counsel explained the basis for its determination to close the complaint in its December 13, 2021, letter to you. That letter referred to the attorney's response to the extent it formed the basis for dismissal of the complaint. As such, the State Bar has provided the written summary required under section 6093.5.

Fourth, you requested a status update from the Complaint Review Unit regarding the two matters in abatement (Case Nos. 21-O-12371 and 21-O-05698). The Complaint Review Unit does not have a record of receiving a request for review in those matters. Importantly, those matters have been abated and as such, have not been closed. They remain as open matters within the Office of Chief Trial Counsel. Pursuant to Rule 2603(b) of the State Bar Rules of Procedure, the Complaint Review Unit only has authority to "review closures of inquiries, investigations and complaints upon request by complainant." Accordingly, because these matters have not been closed, the Complaint Review Unit does not have authority and is unable to review the abated matters. Review will be available in the event the Office of Chief Trial Counsel closes these matters in the future.  In the meantime, as the Office of Chief Trial Counsel explained to you in its November 22, 2021, letter, it has abated and will take no further action on these matters until resolution of the related pending civil matters because those matters "involve substantially the same misconduct that is at issue in the State Bar matters," "the harm

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 355

Document received by the CA Supreme Court.

Justin Beck
July 20, 2022
Page 3

caused by Mr. Catanzarite's violation of the conflict rules, as well as his other alleged misconduct, is an issue in pending litigation," and as a result, resolution of the pending civil matters will substantially assist the Office of Chief Trial Counsel in its investigation as well as in determining the harm caused by any misconduct.

With respect to Case Number 21-O-11976 (Jim Travis Tice), the Complaint Review Unit received your request for review on January 24, 2022. Review of that matter is still pending. That office will contact you in writing to inform you of its determination.

Fifth, you request information regarding "any prior cases that were brought to the Supreme Court under *In Re Walker*, and the circumstances/outcome of those cases." Such matters, known as accusations, are filed with the California Supreme Court, and not the State Bar. To the extent the State Bar may be in possession of records relevant to your request, you may submit a public records request. Information regarding that process is available at the State Bar's website at: https://www.calbar.ca.gov/About-Us/Our-Mission/Protecting-the-Public/Public-Records.

Sincerely,

*/s/ Suzanne C. Grandt*

Suzanne C. Grandt
Attorney V

Document received by the CA Supreme Court.

EXHIBIT 11



## The State Bar
## of California

**OFFICE OF GENERAL COUNSEL**

180 Howard Street, San Francisco, CA 94105

ellin.davtyan@calbar.ca.gov
415-538-2000

December 15, 2022

**Via U.S. Mail and Email: justintimesd@gmail.com**
Justin S. Beck
3501 Roselle Street
Oceanside CA 92056

Dear Mr. Beck:

As we have already informed you, on December 12, 2022 at approximately 9:56 a.m., you received an email containing communication that is confidential and privileged, pursuant to and without limitation Business and Professions Code section 6086.1(b), and attorney-work product and attorney-client privileges. The forwarding of this email was inadvertent and should not be construed as a waiver of state confidentiality laws.

You assert that the State Bar's internal communications with its counsel are not privileged because of your mistaken belief that the State Bar performing its public function differently than you believe it should constitutes a "fraud." Setting aside the fact that your mischaracterizations do not control the application of the privilege, the crime-fraud exception you cite only applies where the specific communication was made for the purpose of aiding a crime or fraud. On its face, the communication you were inadvertently sent related to whether to grant *your* request to waive confidentiality as to certain complaints you have made against various attorneys. The State Bar's consideration of your request that it exercise its discretion in such a manner is neither a crime nor a fraud.

We reiterate that you have no right to share or retain the State Bar's privileged communications, and request that you identify all persons to whom you have distributed the communication and destroy any copies in your possession.

Thank you for your anticipated cooperation.

Sincerely,

Ellin Davtyan
General Counsel

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

Complaint Supplement #30-2020-01159890 County of Orange
Exhibit #11: 001
Bank #300202020 of California
ADA Complaint Exhibits 358

EXHIBIT 12



**ROB BONTA**
*Attorney General*

*State of California*
**DEPARTMENT OF JUSTICE**

1300 I STREET, SUITE 125
P.O. BOX 944255
SACRAMENTO, CA 94244-2550
Public: (916) 445-9555
Telephone: (916) 210-6183
E-Mail: PublicRecords@doj.ca.gov

December 29, 2022

*Via E-mail to:*
Justin Beck
3501 Roselle Street
Oceanside, CA 92056
justintimesd@gmail.com

RE:   Public Records Act Request; DOJ PRA 2022-02717

Dear Mr. Beck:

This correspondence is in response to your online request form submission dated December 8, 2022, which was received by the California Department of Justice (the Department) on the same date, in which you sought records pursuant to the Public Records Act (PRA) as set forth in Government Code section 6250 et seq.

Specifically, you requested:

*1) When was Justin S. Beck v. State of California et al. (OCSC Case No. 30-2021-01237499) first disclosed to the DOJ, how, and by whom?*

*2) When was Justin S. Beck v. State of California et al. (OCSC Case No. 30-2020-01145998) first disclosed to the DOJ, how, and by whom?*

*3) When was Justin S. Beck v. The Superior Court of Orange County et al. (4DCA Original Writ Proceedings G061896) first disclosed to the DOJ, how, and by whom?*

*4) When was Justin S. Beck v. Catanzarite Law Corporation et al. (U.S. Southern District of California 22-CV-01616-BAS-DDL) first disclosed to the DOJ, how, and by whom?*

*5) Other than The State Bar of California, what other state agencies require Government Claims Act claim presentation to an entity other than the Department of General Services?*

*6) Has the Judicial Council reported my new claim for ratification and RICO against Orange County Superior Court to DOJ related to these matters? If so, when did it get reported and by whom?*

Complaint Supplement #30-2020-01145998

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 360

Exhibit #12: 001

Justin Beck
December 29, 2022
Page 2

*7) Why does the draft audit from MGO in April 2022 presented by The State Bar of California lack disclosure of the materiality of my government claims?*

*8) When was the California State Auditor notified of the materiality of my claims -- which could result in an award of monetary judgment exceeding $1B based on evidence presented, unobjected?*

*9) Who manages claims act litigation for the Department of Justice -- who has a duty to resolve claims act litigation and satisfaction of judgments?*

*10) Does the DOJ require me to file a new government claim related to these matters in order that DGS be joined to these cases?*

*11) I just experienced what I allege to be fraud and concealment by California Supreme Court clerk Jorge Navarette after the Office of General Counsel for The State Bar of California filed a fraudulent antitrust petition on my behalf without my authorization in CSC. Given the conflict, am I correct to assume the new claim should be presented to DGS or DOJ and not Mr. Navarette and CSC?*

*12) When the State of California is liable under the Government Claims Act, why is the DOJ not managing claim presentations and denials for The State Bar of California? "Investigation" of claims, denial, and legal representation of themselves for claims filed by the public violate California Rules of Professional Conduct 1.7(d)(3) and 15 U.S.C. Section 1.*

*13) Why does the DOJ allow the Board of Trustees for The State Bar of California, controlled by active market participant lawyers, to make decisions on behalf of itself after N.C. State Bd. of Dental Examiners v. Fed. Trade Comm'n, 574 U.S. 494, (2015) and its references to Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315?*

*14) Who is legal counsel for the claims act litigation for DOJ?*

*15) Who is representing LEGISLATURE in OCSC Case No. 30-2021-01237499 and G061896, and how will DOJ prevent unconstitutional use of State Bar Court from impeding or obstructing state and federal proceedings? 16) Why does DOJ allow The State Bar of California to use Office of General Counsel to defend tort claims against itself and its lawyers?*

For the reasons set forth below, the Department is extending the date for responding to your request. Agencies are permitted to extend the date for responding to a public records request for fourteen days beyond the original 10-day deadline for responding under specified circumstances (Gov. Code, § 6253, subd. (c)). As your request was received by this office on December 8, 2022, the time established for the original response was December 19, 2022. Fourteen days beyond that date is January 2, 2023. Due to the state holiday on January 2, the Department's response will be due on January 3, 2023.

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 361

Justin Beck
December 29, 2022
Page 3

Agencies may invoke the extension for several reasons, which may be summarized as follows:

1. The need to search for and collect records from field offices or other facilities that are separate from the office processing the request.
2. The need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records which are demanded in a single request.
3. The need for consultation, which shall be conducted with all practicable speed, with another agency having a substantial interest in the determination of the request or among two or more components of the agency having substantial subject matter interest therein.

In this instance, an extension is needed to consult with multiple components of the Department's with a substantial interest in the records requested.

Sincerely,

/s/ Public Records Coordinator

Public Records Coordinator

For    ROB BONTA
       Attorney General

Beck v. Superior Court of California, County of Orange
ADA Complaint Exhibits 362

EXHIBIT 13

Gmail - Call with attorney Matt Kinley

 Gmail

Justin Beck <justintimesd@gm…

## Call with attorney Matt Kinley

Steven A. Haskins <sah@mccunewright.com>
To: Justin Beck <justintimesd@gmail.com>
Cc: "Richard D. McCune" <rdm@mccunewright.com>, "Jessica L. Becerra" <jb@mccunewright.com>, "Sandy G. Gonzalez" <sgg@mccunewright.com>

Wed, Jan 13, 2021 at 10:25 AM

Justin,

I had a phone call today with a lawyer named Matt Kinley out of Long Beach which I think will interest you. Since 2015, he has represented a client that has been sued by Catanzarite in a manner very similar to the way that Catanzarite has operated in this situation. In particular, that case involved a partnership dispute, and like here, Catanzarite starting filing lawsuits and papers claiming to represent the partnership. Catanzarite was disqualified in that case as well. What is most interesting is that the Bar has taken investigatory steps on that case, interviewed Matt's clients and such, and so the wheels of bureaucracy are already in motion there. Though we need to think through some of the privilege issues, I think it would be a good idea to coordinate with Matt and that may be a better way in to get your complaints put before the bar. Let me know what you think.

Also, the notice of appeal deadline for Scudder and Aroha is coming up next week. I know that we have previously discussed not appealing that particular order, but just want to confirm as the deadline approaches. Otherwise, we are working on the response to the fee motion and coordinating with insurance counsel on the stay and designation motions.

Thanks. Talk to you soon.

Steve

Steven A. Haskins

**Partner**

 

McCune   Wright   Arevalo, LLP
P: 909.551.4521  |  F: 909.557.1275  |  3281 East Guasti Road, Suite 100  |  Ontario, CA 91761  |  **McCuneWright.com**



Complaint Supplement #30 - 2020-01-13998
Exhibit #13: 001

EXHIBIT 14

Beck v. Superior Court of California, County of Orange
ADA Complaint Exhibits 365



**The State Bar**
*of California*

**OFFICE OF GENERAL COUNSEL**

180 Howard Street, San Francisco, CA 94105

suzanne.grandt@calbar.ca.gov
415-538-2388

July 29, 2022

**Via Email: justintimesd@gmail.com**
Justin Beck
3501 Roselle Street
Oceanside, CA 92056

RE:    *Justin S. Beck v. State Bar of California, et al.*
       Orange County Superior Court Case No. 30-2021-01237499-CU-PN-CJC

Dear Mr. Beck:

On July 27, 2022, the State Bar Defendants filed and served the attached Special Motion to Strike your First Amended Complaint pursuant to the California Code of Civil Procedure section 425.16 (commonly referred to as an "anti-SLAPP motion"). Subsection (g) provides for an automatic stay of discovery upon filing of this motion, with the stay to remain in effect until notice of entry of order ruling on such motion.

As such, the State Bar has no obligation to respond to your July 26, 2022 deposition subpoena and will not be making a witness available for deposition on September 9, 2022. The State Bar will also not be responding to your pending Interrogatories, Request for Admissions, or Requests for Production of Documents until after our motion to strike is ruled upon.

Lastly, please be advised that if the Court grants our anti-SLAPP motion, you will be liable for the State Bar's attorney's fees and costs incurred in bringing the motion. (Cal. Code Civ. Proc.§ 425.16(c).) For the reasons outlined in the attached motion and our pending demurrer, your lawsuit is barred on a number of well-established legal grounds and we expect to prevail on our anti-SLAPP motion. Accordingly, I encourage you to dismiss your case now and avoid potential payment of attorney's fees and costs down the road.

Sincerely,

*/s/ Suzanne C. Grandt*

Suzanne C. Grandt
Assistant General Counsel

cc: Carissa N. Andresen
Enclosures

San Francisco Office
180 Howard Street
San Francisco, CA 94105

www.calbar.ca.gov

Los Angeles Office
845 South Figueroa Street
Los Angeles, CA 90017

Complaint Supplement #30-2020-01145908
Exhibit #14: 001

Bank #3, Superior Court of California, County of Orange
ADA Complaint Exhibits 366

EXHIBIT 15

 Gmail                                                     Justin Beck <justintimesd@gmail.com>

## COM-03242023-00824; Ruben Duran, The State Bar of California

**Laura Mandler** <lmandler@fppc.ca.gov>                                    Tue, Mar 28, 2023 at 4:39 PM
To: Justin Beck <justintimesd@gmail.com>

Good Afternoon Mr. Beck,

It appears that if there is a potential conflict of interest regarding members of the Board of Trustees, the State Bar may appoint a
Special Deputy Trial Counsel to investigate the allegations. As far as I am aware, that is the only oversight avenue.

Sincerely,

## Laura Mandler

Enforcement Division - Political Reform Consultant

Fair Political Practices Commission

1102 Q Street #3000

Sacramento, CA 95811



**From:** Justin Beck <justintimesd@gmail.com>
**Sent:** Tuesday, March 28, 2023 2:30 PM
**To:** Laura Mandler <lmandler@fppc.ca.gov>
**Subject:** Re: COM-03242023-00824; Ruben Duran, The State Bar of California

⌐**EXTERNAL EMAIL**

[Quoted text hidden]

EXHIBIT 16

 The State Bar *of California*

### Rule 5.1 Responsibilities of Managerial and Supervisory Lawyers
### (Rule Approved by the Supreme Court, Effective November 1, 2018)

(a)   A lawyer who individually or together with other lawyers possesses managerial authority in a law firm,* shall make reasonable* efforts to ensure that the firm* has in effect measures giving reasonable* assurance that all lawyers in the firm* comply with these rules and the State Bar Act.

(b)   A lawyer having direct supervisory authority over another lawyer, whether or not a member or employee of the same law firm,* shall make reasonable* efforts to ensure that the other lawyer complies with these rules and the State Bar Act.

(c)   A lawyer shall be responsible for another lawyer's violation of these rules and the State Bar Act if:

(1)   the lawyer orders or, with knowledge of the relevant facts and of the specific conduct, ratifies the conduct involved; or

(2)   the lawyer, individually or together with other lawyers, possesses managerial authority in the law firm* in which the other lawyer practices, or has direct supervisory authority over the other lawyer, whether or not a member or employee of the same law firm,* and knows* of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable* remedial action.

**Comment**

*Paragraph (a) – Duties Of Managerial Lawyers To Reasonably\* Assure Compliance with the Rules*

[1]   Paragraph (a) requires lawyers with managerial authority within a law firm* to make reasonable* efforts to establish internal policies and procedures designed, for example, to detect and resolve conflicts of interest, identify dates by which actions must be taken in pending matters, account for client funds and property, and ensure that inexperienced lawyers are properly supervised.

[2]   Whether particular measures or efforts satisfy the requirements of paragraph (a) might depend upon the law firm's structure and the nature of its practice, including the size of the law firm,* whether it has more than one office location or practices in more than one jurisdiction, or whether the firm* or its partners* engage in any ancillary business.

[3]   A partner,* shareholder or other lawyer in a law firm* who has intermediate managerial responsibilities satisfies paragraph (a) if the law firm* has a designated managing lawyer charged with that responsibility, or a management committee or other body that has appropriate managerial authority and is charged with that responsibility. For example, the managing lawyer of an office of a multi-office law firm* would not necessarily be required to promulgate firm-wide policies intended to reasonably* assure that the law firm's lawyers comply with the rules or State Bar Act.  However, a lawyer

1

remains responsible to take corrective steps if the lawyer knows* or reasonably should know* that the delegated body or person* is not providing or implementing measures as required by this rule.

[4]     Paragraph (a) also requires managerial lawyers to make reasonable* efforts to assure that other lawyers in an agency or department comply with these rules and the State Bar Act.  This rule contemplates, for example, the creation and implementation of reasonable* guidelines relating to the assignment of cases and the distribution of workload among lawyers in a public sector legal agency or other legal department. (See, e.g., State Bar of California, Guidelines on Indigent Defense Services Delivery Systems (2006).)

*Paragraph (b) – Duties of Supervisory Lawyers*

[5]     Whether a lawyer has direct supervisory authority over another lawyer in particular circumstances is a question of fact.

*Paragraph (c) – Responsibility for Another's Lawyer's Violation*

[6]     The appropriateness of remedial action under paragraph (c)(2) would depend on the nature and seriousness of the misconduct and the nature and immediacy of its harm.   A managerial or supervisory lawyer must intervene to prevent avoidable consequences of misconduct if the lawyer knows* that the misconduct occurred.

[7]     A supervisory lawyer violates paragraph (b) by failing to make the efforts required under that paragraph, even if the lawyer does not violate paragraph (c) by knowingly* directing or ratifying the conduct, or where feasible, failing to take reasonable* remedial action.

[8]     Paragraphs (a), (b), and (c) create independent bases for discipline. This rule does not impose vicarious responsibility on a lawyer for the acts of another lawyer who is in or outside the law firm.*  Apart from paragraph (c) of this rule and rule 8.4(a), a lawyer does not have disciplinary liability for the conduct of a partner,* associate, or subordinate lawyer.  The question of whether a lawyer can be liable civilly or criminally for another lawyer's conduct is beyond the scope of these rules.

Complaint Supplement #30-2020-01145998
Exhibit #16: 002

Book #30-2020-01145998
Superior Court of California, County of Orange
ADA Complaint Exhibits 371

**NEW RULE OF PROFESSIONAL CONDUCT 5.1**
**(See Former Rule 3-110 Discussion)**
**Responsibilities of Managerial and Supervisory Lawyers**

**EXECUTIVE SUMMARY**

In connection with consideration of current rule 3-110 (Failing to Act Competently), the Commission for the Revision of the Rules of Professional Conduct ("Commission") has reviewed and evaluated ABA Model Rules 5.1 (Responsibilities of Partners, Managers, and Supervisory Lawyers), 5.2 (Responsibilities of a Subordinate Lawyer), and 5.3 (Responsibilities Regarding Nonlawyer Assistants). The Commission also reviewed relevant California statutes, rules, and case law relating to the issues addressed by the proposed rules. The evaluation was made with a focus on the function of the rules as disciplinary standards, and with the understanding that the rule comments should be included only when necessary to explain a rule and not for providing aspirational guidance. Although these proposed rules have no direct counterpart in the current California rules, the concept of the duty to supervise is found in the first Discussion paragraph to current rule 3-110, which states: "The duties set forth in rule 3-110 include the duty to supervise the work of subordinate attorney and non-attorney employees or agents."[1] The result of this evaluation is proposed rules 5.1 (Responsibilities of Managerial and Supervisory Lawyers), 5.2 (Responsibilities of a Subordinate Lawyer), and 5.3 (Responsibilities Regarding Nonlawyer Assistants).

**Rule As Issued For 90-day Public Comment**

The main issue considered when evaluating a lawyer's duty to supervise was whether to adopt versions of ABA Model Rules 5.1, 5.2, and 5.3, or retain the duty to supervise only as an element of the duty of competence. The Commission concluded that adopting these proposed rules provides important public protection and critical guidance to lawyers possessing managerial authority by more specifically describing a lawyer's duty to supervise other lawyers (proposed rule 5.1) and non-lawyer personnel (proposed rule 5.3). Proposed rules 5.1 and 5.3 extend beyond the duty to supervise that is implicit in current rule 3-110 and include a duty on firm managers to have procedures and practices that foster ethical conduct within a law firm. Current rule 3-110 includes a duty to supervise but says nothing about the subordinate lawyer's duties. Proposed rule 5.2 addresses this omission by stating that a subordinate lawyer generally cannot defend a disciplinary charge by blaming the supervisor. Although California's current rules have no equivalent to proposed rule 5.2, there appears to be no conflict with the proposed rule and current California law in that there is no known California authority that permits a subordinate lawyer to defend a disciplinary charge based on clearly improper directions from a senior lawyer.

---

[1]   The first Discussion paragraph to current rule 3-110 provides:

The duties set forth in rule 3-110 include the duty to supervise the work of subordinate attorney and non-attorney employees or agents. (See, e.g., *Waysman v. State Bar* (1986) 41 Cal.3d 452; *Trousil v. State Bar* (1985) 38 Cal.3d 337, 342 [211 Cal.Rptr. 525]; *Palomo v. State Bar* (1984) 36 Cal.3d 785 [205 Cal.Rptr. 834]; *Crane v. State Bar* (1981) 30 Cal.3d 117, 122; *Black v. State Bar* (1972) 7 Cal.3d 676, 692 [103 Cal.Rptr. 288; 499 P.2d 968]; *Vaughn v. State Bar* (1972) 6 Cal.3d 847, 857-858 [100 Cal.Rptr. 713; 494 P.2d 1257]; *Moore v. State Bar* (1964) 62 Cal.2d 74, 81 [41 Cal.Rptr. 161; 396 P.2d 577].)

Complaint Supplement #30-2020-01145998
Exhibit #16: 003
Bank #30 Superior Court of California County of Orange
ADA Complaint Exhibits 372

The following is a summary of proposed rule 5.1 (Responsibilities of Managerial and Supervisory Lawyers).[2]

Proposed rule 5.1 incorporates the substance of ABA Model Rule 5.1. Paragraph (a) requires that managing lawyers make "reasonable efforts to ensure" the law firm has measures that provide reasonable assurance that all lawyers in the firm comply with the Rules of Professional Conduct and the State Bar Act. Paragraph (b) requires that a lawyer who directly supervises another lawyer make "reasonable efforts to ensure" the other lawyer complies with the Rules of Professional Conduct and the State Bar Act, whether or not the other lawyer is a member or employee of the same firm. Neither provision imposes vicarious liability. However, a lawyer will be responsible for a subordinate's violation of a rule under paragraph (c) if a lawyer either ordered or, with knowledge of the relevant facts and specific conduct, ratifies the conduct of the subordinate, ((c)(1)), or knowing of the misconduct, failed to take remedial action when there was still time to avoid or mitigate the consequences, ((c)(2)).

As initially circulated for 90-day public comment, there were nine comments to the rule. Comments [1] – [4] describe the duties of managerial lawyers to reasonably assure compliance with the rules under paragraph (a). Comment [5] states that whether a lawyer has direct supervisory authority over another lawyer in a specific instance is a question of fact. Comments [6] – [9] clarify when a supervisory lawyer is responsible for another lawyer's violation.

**National Background – Adoption of Model Rule 5.1**

As California does not presently have a direct counterpart to Model Rule 5.1, this section reports on the adoption of the Model Rule in United States' jurisdictions. The ABA Comparison Chart, entitled "Variations of the ABA Model Rules of Professional Conduct, Rule 5.1: Responsibilities of Partners, Managers, and Supervisory Lawyers," revised May 5, 2015, is available at:

- http://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/mrpc_5_1.pdf

Thirty-one states have adopted Model Rule 5.1 verbatim. Fourteen jurisdictions have adopted a slightly modified version of Model Rule 5.1. Five states have adopted a version of the rule that is substantially different to Model Rule 5.1. One state has not adopted a version Model Rule 5.1.[3]

**Revisions Following 90-Day Public Comment Period**

After consideration of comments received in response to the initial 90-day public comment period, the Commission added Comment [6], the concept of which is derived from proposed rule 5.2(b). In addition, the Commission modified Comment [3] for clarity and deleted Comment [9] as unnecessary.

With these changes, the Board authorized an additional 45-day public comment period on the revised proposed rule.

---

[2]   The executive summaries for proposed rules 5.2 and 5.3 are provided separately.

[3]   The one state is California.

Complaint Supplement #30-2020-01149958
Exhibit #16: 004

Superior Court of California County of Orange
ADA Complaint Exhibits 373

**Final Commission Action on the Proposed Rule Following 45-Day Public Comment Period**

After consideration of comments received in response to the additional 45-day public comment period, the Commission made no changes to the proposed rule and voted to recommend that the Board adopt the proposed rule.

The Board adopted proposed rule 5.1 at its March 9, 2017 meeting.

**Supreme Court Action (May 10, 2018)**

The Supreme Court approved the rule as modified by the Court to be effective November 1, 2018. Comment [6] was deleted in its entirety and subsequent Comments were renumbered accordingly.

Complaint Supplement #30-2020-01145998
Exhibit #16: 005
Bank of Superior Court of California County of Orange
ADA Complaint Exhibits 374

**Rule 5.1 Responsibilities of ~~a Partner or~~Managerial and Supervisory ~~Lawyer~~Lawyers**
**(Redline Comparison to the ABA Model Rule)**

(a)     A ~~partner in a law firm, and a~~ lawyer who individually or together with other lawyers possesses ~~comparable~~ managerial authority in a law firm,* shall make reasonable* efforts to ensure that the firm* has in effect measures giving reasonable* assurance that all lawyers in the firm ~~conform to the Rules of Professional Conduct~~* comply with these rules and the State Bar Act.

(b)     A lawyer having direct supervisory authority over another lawyer, whether or not a member or employee of the same law firm,* shall make reasonable* efforts to ensure that the other lawyer ~~conforms to the Rules of Professional Conduct~~complies with these rules and the State Bar Act.

(c)     A lawyer shall be responsible for another ~~lawyer's~~lawyer's violation of ~~the Rules of Professional Conduct~~these rules and the State Bar Act if:

    (1)     the lawyer orders or, with knowledge of the relevant facts and of the specific conduct, ratifies the conduct involved; or

    (2)     the lawyer ~~is a partner or has comparable~~, individually or together with other lawyers, possesses managerial authority in the law firm* in which the other lawyer practices, or has direct supervisory authority over the other lawyer, whether or not a member or employee of the same law firm,* and knows* of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable* remedial action.

**Comment**

[~~1~~] *Paragraph (a)* ~~applies to lawyers who have managerial authority over the professional work of a firm. See Rule 1.0(c). This includes members of a partnership, the shareholders in a law firm organized as a professional corporation, and members of other associations authorized to practice law; lawyers having comparable managerial authority in a legal services organization or a law department of an enterprise or government agency; and lawyers who have intermediate managerial responsibilities in a firm. Paragraph (b) applies to lawyers who have supervisory authority over the work of other lawyers in a firm.~~ *Duties Of Managerial Lawyers To Reasonably\* Assure Compliance with the Rules*

[~~2~~1]     Paragraph (a) requires lawyers with managerial authority within a law firm* to make reasonable* efforts to establish internal policies and procedures designed ~~to provide reasonable assurance that all lawyers in the firm will conform to the Rules of Professional Conduct. Such policies and procedures include those designed~~, for example, to detect and resolve conflicts of interest, identify dates by which actions must be taken in pending matters, account for client funds and property, and ensure that inexperienced lawyers are properly supervised.

Complaint Supplement #30-2020-01145998
Exhibit #16: 006

[2]    Whether particular measures or efforts satisfy the requirements of paragraph (a) might depend upon the law firm's structure and the nature of its practice, including the size of the law firm,* whether it has more than one office location or practices in more than one jurisdiction, or whether the firm* or its partners* engage in any ancillary business.

[3]    Other measures that may be required to fulfill the responsibility prescribed in paragraph (a) can depend on the firm's structure and the nature of its practice. In a small firm of experienced lawyers, informal supervision and periodic review of compliance with the required systems ordinarily will suffice. In a large firm, or in practice situations in which difficult ethical problems frequently arise, more elaborate measures may be necessary. Some firms, for example, have a procedure whereby junior lawyers can make confidential referral of ethical problems directly to a designated senior partner or special committee. See Rule 5.2. Firms, whether large or small, may also rely on continuing legal education in professional ethics. In any event, the ethical atmosphere of a firm can influence the conduct of all its members and the partners may not assume that all lawyers associated with the firm will inevitably conform to the Rules.

[3]    A partner,* shareholder or other lawyer in a law firm* who has intermediate managerial responsibilities satisfies paragraph (a) if the law firm* has a designated managing lawyer charged with that responsibility, or a management committee or other body that has appropriate managerial authority and is charged with that responsibility. For example, the managing lawyer of an office of a multi-office law firm* would not necessarily be required to promulgate firm-wide policies intended to reasonably* assure that the law firm's lawyers comply with the rules or State Bar Act.  However, a lawyer remains responsible to take corrective steps if the lawyer knows* or reasonably should know* that the delegated body or person* is not providing or implementing measures as required by this rule.

[4]    Paragraph (c) expresses a general principle of personal responsibility for acts of another. See also Rule 8.4(a). a) also requires managerial lawyers to make reasonable* efforts to assure that other lawyers in an agency or department comply with these rules and the State Bar Act.  This rule contemplates, for example, the creation and implementation of reasonable* guidelines relating to the assignment of cases and the distribution of workload among lawyers in a public sector legal agency or other legal department.   (See, e.g., State Bar of California, Guidelines on Indigent Defense Services Delivery Systems (2006).)

*Paragraph (b) – Duties of Supervisory Lawyers*

[5]    Paragraph (c)(2) defines the duty of a partner or other lawyer having comparable managerial authority in a law firm, as well as Whether a lawyer who has direct supervisory authority over performance of specific legal work by another lawyer. Whether a lawyer has supervisory authority in particular circumstances is a question of fact. Partners and lawyers with comparable authority have at least indirect responsibility for all work being done by the firm, while a partner or manager in charge

2

~~of a particular matter ordinarily also has supervisory responsibility for the work of other firm lawyers engaged in the matter. Appropriate remedial action by a partner or managing lawyer~~

*Paragraph (c) – Responsibility for Another's Lawyer's Violation*

[6]   The appropriateness of remedial action under paragraph (c)(2) would depend on the ~~immediacy of that lawyer's involvement and the~~nature and seriousness of the misconduct. ~~A supervisor is required to~~ and the nature and immediacy of its harm.  A managerial or supervisory lawyer must intervene to prevent avoidable consequences of misconduct if the ~~supervisor knows~~lawyer knows* that the misconduct occurred. ~~Thus, if a supervising lawyer knows that a subordinate misrepresented a matter to an opposing party in negotiation, the supervisor as well as the subordinate has a duty to correct the resulting misapprehension.~~

~~[6]   Professional misconduct by a lawyer under supervision could reveal a violation of paragraph (b) on the part of the supervisory lawyer even though it does not entail a violation of paragraph (c) because there was no direction, ratification or knowledge of the violation.~~

[7]   ~~Apart from this Rule and Rule 8.4(a), a lawyer does not have disciplinary liability for the conduct of a partner, associate or subordinate. Whether a lawyer may be liable civilly or criminally for another lawyer's conduct is a question of law beyond the scope of these Rules.~~A supervisory lawyer violates paragraph (b) by failing to make the efforts required under that paragraph, even if the lawyer does not violate paragraph (c) by knowingly* directing or ratifying the conduct, or where feasible, failing to take reasonable* remedial action.

[8]   ~~The duties imposed by this Rule on managing and supervising lawyers do not alter the personal duty of each lawyer in a firm to abide by the Rules of Professional Conduct.  See Rule 5.2(a). the Rules of Professional Conduct. See Rule 5.2(a).~~Paragraphs (a), (b), and (c) create independent bases for discipline. This rule does not impose vicarious responsibility on a lawyer for the acts of another lawyer who is in or outside the law firm.*  Apart from paragraph (c) of this rule and rule 8.4(a), a lawyer does not have disciplinary liability for the conduct of a partner,* associate, or subordinate lawyer.  The question of whether a lawyer can be liable civilly or criminally for another lawyer's conduct is beyond the scope of these rules.

Complaint Supplement #30-2020-01149095
Exhibit #16: 008
Bank #3Superior Court of California County of Orange
ADA Complaint Exhibits 377

EXHIBIT 17

Beck v. Superior Court of California, County of Orange
ADA Complaint Exhibits 378



## The State Bar
## of California

## INSTRUCTIONS FOR SERVICE OF LEGAL PROCESS

(This notice does not apply to filings in the State Bar Court. If you are filing such a document, please proceed to the State Bar Court filing window.)

## THE STATE BAR OF CALIFORNIA IS CURRENTLY ACCEPTING SERVICE OF LEGAL PROCESS (SUMMONSES, COMPLAINTS, AND SUBPOENAS) BY EMAIL INSTEAD OF PERSONAL SERVICE. [1]

➢ **PLEASE SERVE YOUR DOCUMENT(S) BY EMAILING THEM TO SERVICEOFPROCESS@CALBAR.CA.GOV.**

➢ **DO NOT LEAVE ANY DOCUMENTS WITH SECURITY IN THE LOBBY OR ELSEWHERE, AS THEY WILL NOT BE ACCEPTED.**

➢ **IF YOU ARE ATTEMPTING TO TENDER WITNESS FEES, PLEASE INDICATE THAT IN YOUR EMAIL MESSAGE AND YOU WILL RECEIVE FURTHER INSTRUCTIONS FOR DELIVERY OF THOSE FEES.**

---

[1] The State Bar will only accept legal documents naming the State Bar (or its employees and officers for matters in connection with their official duties). The State Bar is not authorized to accept service of process on behalf of its employees and officers regarding matters outside the scope of their official duties. By receiving your document(s), the State Bar and its employees and officers do not waive any right to object to the validity of service. Your document will be reviewed after receipt and you will be notified if service is rejected due to a defect.

| | | |
|---|---|---|
| San Francisco Office | www.calbar.ca.gov | Los Angeles Office |
| 180 Howard Street | | 845 S. Figueroa Street |
| San Francisco, CA 94105 | | Los Angeles, CA 90017 |

Complaint Supplement #30-2020-01493998
Exhibit #17: 001

Superior Court of California County of Orange
ADA Complaint Exhibits 379

EXHIBIT 18

Kevin J. Lane, Clerk/Executive Officer
Electronically FILED on 7/13/2022 by M. Castaneda, Deputy Clerk

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JUSTIN S. BECK, | |
| Plaintiff and Appellant, | G059766 |
| v. | (Super. Ct. No. 30-2020-01145998) |
| CATANZARITE LAW CORPORATION et al., | O P I N I O N |
| Defendants and Respondents. | |

Appeal from orders of the Superior Court of Orange County, Deborah C. Servino, Judge.  Affirmed in part and  reversed in part.  Motions to disqualify and for sanctions denied.  Request for judicial notice granted.  Motion to augment granted.

Justin S. Beck, in pro. per., for Plaintiff and Appellant.

Catanzarite Law Corporation, Kenneth J. Catanzarite and Nicole M. Catanzarite-Woodward for Defendants and Respondents.

Complaint Supplement #30-2020-01145998
Exhibit #18: 001

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 381

Justin S. Beck filed a malicious prosecution action against Catanzarite Law Corporation, its attorneys Kenneth J. Catanzarite, Brandon Woodward, Tim James O'Keefe (collectively Catanzarite unless the context requires otherwise) and the firm's clients (Amy Jeanette Cooper, Cliff Higgerson, and Mohammed Zakhireh).[1] He alleged some of these defendants were also liable for unfair business practices, slander of title, and intentional infliction of emotional distress (IIED). The trial court granted four special motions to strike (anti-SLAPP motion) (Code Civ. Proc., § 425.16).[2] On appeal, Beck asserts most of his claims are not based on petitioning activity and he would be successful on the merits of his malicious prosecution action. We conclude his contentions have merit and reverse the court's orders.[3]

HISTORY PRIOR APPEALS

Catanzarite filed multiple but similar lawsuits within a one-year period, all of which arise from a dispute between shareholders of MFS and Cultivation Technologies, Inc. (CTI). We incorporate by reference a detailed description of these cases from our opinion *FinCanna Capital Corp. v. Cultivation Technologies, Inc.* (June 28, 2021, G058700) [nonpub. opn.] (*FinCanna*) [for consistency we will continue to refer to these superior court cases as the Pinkerton Action, the MFS Action, the Mesa Action, the Cooper Action, the FinCanna Action, and the Scottsdale Action].)

---

[1]     The lawsuit included other defendants who are not parties to this appeal, including Mobile Farming Systems (MFS), Richard Francis O'Connor, Jr., Tony Scudder, James Duffy, TGAP Holdings (owned by Cooper/O'Connor), and Aroha Holdings (owned by Scudder).

[2]     All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

[3]     In this lawsuit, Catanzarite filed a cross-complaint on behalf of MFS against Beck and CTI's attorneys Horwitz + Armstrong. In a case filed concurrently with this appeal, we considered Catanzarite's appeal of the ruling granting Horwitz's anti-SLAPP motion. (*Mobile Farming Systems, Inc. v. Horwitz + Armstrong et al.* (July 13, 2022, G060315) [nonpub. opn.] (*Mobile Farming Systems*).) We reversed the order.

2

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 382

Earlier this year we considered three consolidated appeals concerning CTI's motion to disqualify Catanzarite in four of the six cases mentioned above. (*FinCanna, supra,* G058700.) As will be described in more detail below, we affirmed the trial court's determination Catanzarite could not represent CTI in any manner (including its prosecution of the FinCanna Action). We also concluded neither Catanzarite nor its attorneys could continue advocating for a group of shareholders bringing a derivative lawsuit against CTI and its board members in the Mesa Action. (*Ibid.*) We held in *FinCanna,* "The undisputed nature of the lawsuits, involving parties with conflicting interests, and a corporation with adversarial directors, supported mandatory disqualification as a matter of law." (*Ibid.*)

As for the remaining two cases (the Pinkerton and MFS Actions), we did not review the ruling denying disqualification because neither CTI nor the affected clients filed a notice of appeal challenging those rulings. In the *FinCanna* opinion, we noted a group of defendants in the Pinkerton Action and MFS Action attempted to join in CTI's disqualification motion. However, the trial court rejected the joinder motions as untimely and, alternatively, determined the moving parties lacked standing. The moving parties (Beck, Miguel Motta, Robert Bernheimer, Robert Kamm, and Irving Einhorn) did not appeal this ruling and, accordingly, we did not review it in the *FinCanna* opinion.

Following Catanzarite's disqualification, CTI and Beck filed lawsuits against Catanzarite and some of the firm's clients. Recently, we considered two appeals arising from anti-SLAPP rulings made in CTI's lawsuit. (*Cultivation Technologies, Inc., v. Duffy* (Nov. 12, 2021, G059457) [nonpub. opn.] (*Cultivation*).) We considered and found meritless Catanzarite's appeal of the order denying its anti-SLAPP motion. (*Ibid.*) We also affirmed the trial court's orders denying Cooper and Duffy's anti-SLAPP motion regarding breach of fiduciary claims. (*Ibid.*) We reversed orders granting Cooper and Duffy's anti-SLAPP motion on the remaining claims, concluding they qualified as mixed causes of action that required a claim by claim approach as discussed in *Bonni v. St.*

3

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 383

*Joseph Health System* (2021) 11 Cal.5th 995, 1010 (*Bonni*).  (*Cultivation, supra*, G059457.)

### BACKGROUND FACTS[4]

As set forth in Beck's complaint, the history of this case begins in 2015 when a failing corporation sought a new business opportunity in the cultivation and use of cannabis products.  MFS's board members, O'Connor, Cooper, and Richard J. Probst formed CTI and appointed themselves to CTI's board of directors.  Initially, the directors told MFS shareholders that CTI would become MFS's subsidiary, but their plans changed and they created a separate entity.  Beck asserts this was due to the board's concern CTI would be burdened by MFS's previous business failures.  The board hired Beck, who was experienced in the cannabis industry and with transitioning small investor-based start-up companies through "an exit or a public merger."  Eventually, Beck joined CTI's board of directors and became the president and chief executive officer (CEO) of the company.

In June 2015, O'Connor, Probst, and Cooper executed a document titled, "unanimous written consent of directors of [CTI] [¶] amended organizational acts & resolutions" (hereafter Amended Acts).  The Amended Acts stated the original organization consent of CTI's board (Organizational Consent) executed at the end of March 2015 was "made in error" and needed to be amended regarding the issuance of securities.  Specifically, the Organization Consent authorized the issuance of 28,000,000 shares of CTI's common stock to MFS in exchange for the contribution of certain assets and cash consideration.  The Amended Acts stated MFS failed to provide consideration

---

[4]     Our factual summary is a compilation of allegations of the operative complaint, declarations, and other evidence submitted in support of the anti-SLAPP motion.  (*Ralphs Grocery Co. v. Victory Consultants, Inc.* (2017) 17 Cal.App.5th 245, 249.)  It should go without saying, these are not litigated facts nor findings, and we imply no view on what actually happened in this case.

        For ease of reading, some formatting (such as boldface, underlining, or capitalization) has been omitted from our quotations from the complaint, documentary evidence, and briefing.

4

and the board determined it was in CTI's "best interests" to sell the stock to its founding shareholders "the 'Founders'" pursuant to a purchase agreement attached as an exhibit. The Amended Acts listed the following Founders: (1) O'Connor; (2) Probst; (3) Cooper; (4) TGAP Holdings (owned by Cooper/O'Connor); (5) I'm Rad (RAD) and EM2 Strategies (EM2) (owned by Beck); (6) Higgerson; (7) Aroha Holdings (owned by Scudder); and (8) Scott Unfug.

Cooper's father, Higgerson, was named one of CTI's Founders because at the time CTI was formed, MFS's "few remaining major liabilities was a $500,000 unpaid loan" owed to Higgerson. The board members of MFS/CTI negotiated a deal whereby Higgerson relinquished payment on the loan and in exchange he acquired 1,000,000 CTI Founder shares for a mere $1,000.

Beck explained Aroha acquired 1,000,000 CTI Founder shares due to Scudder's personal and professional relationship with O'Connor. Beck asserted in his complaint that the Amended Acts essentially granted all MFS shareholders the opportunity to purchase stock in CTI.

One shareholder at the time was Jolly Roger, Inc., owned by Roger Root. Beck alleged Root was contacted about whether Jolly Roger was interested in investing in CTI but Root stated he did not have the capital to pay $4,500 for 450,000 common CTI shares. Beck noted Root "expressed to Scudder that he 'supported' the structure under which CTI was being created."

Beck's complaint alleged CTI complied with the federal law requirement of authorizing a private placement memorandum (PPM) regarding the sale of its securities. CTI was obligated to disclose shareholders owning or controlling more than five percent of CTI's capital stock. MFS was not listed in the PPM. Thereafter, the Founders sold their CTI shares to others. Scudder acted as O'Connor's agent and earned commissions from selling O'Connor's shares. Cooper and O'Connor retained a transfer agent to sell CTI stock to their company TGAP. In October 2015, Duffy subscribed to buy CTI shares

5

through the PPM. Duffy often invested in the same projects as O'Connor. In March 2016, Zakhireh (O'Connor's plastic surgeon) also subscribed to buy CTI shares through the PPM. Thus, Duffy and Zakhireh received the PPM stating MFS was not a shareholder. In addition to the above mentioned new CTI shareholders, CTI issued stock certificates to approximately 70 new shareholders and MFS was not one of them.

Beck alleged that from 2015 until his resignation from CTI's board in May 2019, the company raised $3.5 million from private investors and approximately $5.9 million from a venture capital lender, FinCanna. Beck, who had initially been retained as a CTI's consultant, was appointed as a director and officer. He occupied various positions including chairman of the board, CEO, President, and chief strategy officer.

In his complaint, Beck asserted that soon after CTI adopted the Amended Acts, MFS stopped operating. The MFS board discussed shutting down the business. MFS's primary asset was a $676,000 executive loan O'Connor owed to MFS.

Beck asserted the rift between CTI board members started in October 2015, when Cooper "left CTI due to complications" arising from her extra-marital affair with O'Connor. Thereafter, in April 2016, CTI's board members asked O'Connor to resign. Beck explained O'Connor "had conducted himself in a manner contrary—and detrimental—to CTI's best interests, including not coming into the office, spending money irrationally, and other 'erratic behaviors.'" Beck believed O'Connor blamed him personally for his removal, and thereafter, began making threats of revenge.

The following year, CTI executed a $14 million funding agreement with FinCanna, which allowed the company to begin constructing manufacturing facilities in Southern California. Beck maintained CTI became "an attractive business opportunity for potential additional investors" which also made it a deep pocket target for those who "bore a grudge." Relevant to this appeal, O'Connor and Zakhireh each filed complaints against CTI. O'Connor's lawsuit asserted CTI breached its contract "related to payments associated with his 2016 settlement agreement." Zakhireh, on behalf of himself and other

6

CTI shareholders, filed a complaint challenging the board's decision to borrow money from FinCanna and disputing the issuance of "Preferred Series A shares." CTI settled these lawsuits. Zakhireh agreed to receive more CTI shares.

Beck produced evidence that after Cooper's resignation, she continued to work with CTI as an unpaid consultant. Beck recalled speaking with Cooper about Zakhireh's complaints and before he filed a lawsuit she agreed to speak with Zakhireh on CTI's behalf. Cooper told Beck that as a CTI shareholder she was not the only one who had a personal stake in the company's success, and the board was responsible for dozens of other CTI shareholders. In all their discussions about the duties of CTI leadership, Cooper never discussed MFS or that CTI was MFS's subsidiary.

Despite these setbacks due to the lawsuits, CTI pressed forward in the summer of 2018 with its business plan to build a $40 million cultivation and manufacturing facility. Beck maintained CTI engaged an investment bank to raise an additional $25 million and signed a letter of intent with Tidal Royalty for $5 million in financing. Meanwhile, CTI generated over $500,000 in revenue per month, and the board modified its business plan to shift away from cultivation and manufacturing to cannabis extraction. CTI entered several production and distribution agreements with retail cannabis companies and brands.

Beck's complaint alleged all was going well until Catanzarite filed a complaint in September 2018 for Denise Pinkerton. Pinkerton claimed to be acting as attorney in fact for Root, individually and as successor in interest to the claims of his deceased spouse (Sharon Root). The complaint alleged the Roots owned MFS common stock and that the lawsuit was also a shareholder derivative action on behalf of MFS.

The complaint alleged multiple causes of action against CTI, the original board members (O'Connor, Cooper, and Probst), Joseph R. Porche (MFS's securities salesperson), and all parties having a connection to CTI. This included Beck, as CTI's chief strategy officer and his two companies (RAD and EM2), which held CTI Founder's

7

stock. Similarly, the complaint named TGAP, Higgerson, Aroha, Scudder, and Unfug as defendants holding shares of CTI Founder's stock. The complaint included, Mobin, who held 250,000 shares of CTI stock, shared an office with Porche, and acted as vice president of shareholders relations of MFS and CTI. The complaint explained Bernheimer was included in the lawsuit because he was an attorney who worked with CTI's management team "since inception" and served as chief counsel since 2017. Another defendant, Einhorn, was an attorney and director of CTI. Finally, Motta was included due to his current role as CTI's CEO and a director.

The Roots alleged that in 2012 and 2013, MFS identified itself as an agricultural technology company that manufactured residential hydroponic growing systems. The Roots understood growing marijuana was the anticipated use of MFS's products. In 2014, they heard MFS's directors and Mobin discuss the business opportunities created by the anticipated legalization of marijuana. Root asserted the MFS shareholders were told about the formation of CTI and that it would become MFS's subsidiary. The complaint cited to CTI's Organizational Consent stating MFS would hold 28,000,000 CTI shares of common stock. The Roots claimed they received letters signed by Probst, O'Connor, Cooper, and Mobin about CTI's progress. The complaint also referred to CTI's Amended Acts, which stated the CTI "shares had not been transferred or provided" to MFS. The Roots quoted from the Amended Acts, explaining MFS's board members rescinded MFS's promised shares and instead issued 23,000,000 shares to the Founders. Specifically, the complaint noted O'Connor, Probst, Cooper, and TGAP spent a total of $15,500 to acquire 15,500,000 out of the 23,000,000 shares, giving them 67.3913 percent control of CTI. This percentage was "materially greater than their control ownership of MFS."

For the derivative claims, the Roots asserted Probst, O'Connor, and Cooper, while acting as MFS directors, worked against the interests of company by rescinding MFS's ownership of 100 percent of the outstanding shares of CTI "so that

8

Superior Court of California County of Orange
ADA Complaint Exhibits 388

they, simultaneously acting as the sole directors of the CTI and MFS boards of directors, could capture the entire business opportunity which belonged to MFS for themselves and their co-conspirators." The derivative claims on behalf of MFS included causes of action for breach of fiduciary duty, constructive fraud, conversion, misappropriation of trade secrets, and unfair competition. They sought declaratory relief in the form of a court order that CTI, Probst, O'Connor, Cooper, Beck, Higgerson, and the other defendants "surrender the certificate (or certificates) in their names for cancellation and or reissuance, costs, and expenses incurred in bringing this action and such other relief as the court" deemed proper.

In the constructive fraud cause of action, the Roots asserted "MFS and Root" relied on their fiduciaries, Probst, O'Connor, Cooper, and Mobin. The Roots claimed they were deceived and defrauded by these four specific individuals. They alleged EM2, RAD, Higgerson, Aroha, Scudder, Unfug, Beck, and Bernheimer were liable because they aided and abetted in the fiduciaries' breach of their duties. Alternatively, they maintained Probst, O'Connor, Cooper, and Mobin conspired to breach their fiduciary duties to MFS, while Kamm, Bernheimer, Einhorn, and Motta agreed to cover up their misconduct "in order to maintain their board positions, stock ownership and options, and compensation."

The Roots raised several claims on their own behalf, based on the following factual circumstances: Probst, O'Connor, Cooper, Mobin, and Porche took advantage of frail, elderly, and unsophisticated investors. Starting in 2012, O'Connor, Porche, and Mobin met with 75-year-old Root and his 69-year-old wife. They unscrupulously convinced the Roots to invest virtually all their retirement savings ($437,500) for 1,537,500 shares of MFS common stock "at a price grossly above the true fair market value of said securities."

The Roots initially wire transferred two payments of $125,000 in December 2012. Thereafter, Probst, O'Connor, Cooper, Mobin, and Porche continued to call and

9

e-mail the Roots asking for more money at an increasing MFS stock price per share. Root sent seven more checks from February to May 2013 to purchase additional shares. The exploitation of the elder abuse cause of action specifically alleged Probst, O'Connor, Cooper, Mobin, and Porche stayed at the Roots' home as house guests. It was alleged the group pretended to be friends with the Roots to gain their confidence and "reduce their guard and caution with the intent of deceiving and taking their retirement savings." In addition to compensatory damages, the Roots sought attorney fees, punitive damages, exemplary damages, treble damages, and the return of all MFS's property.

Several causes of actions were based on the factual allegation Probst, O'Connor, Cooper, Mobin, and Porche received illegal commissions on the sale of MFS securities to the Roots. These defendants were not licensed broker-dealers in California or Florida when they sold the shares. These specific five defendants told the Roots the MFS shares were being sold pursuant to a PPM, and therefore, "purportedly exempt from registration under the federal and state securities laws" when in fact "MFS securities did not qualify as exempt private placements" and were sold in violation of the federal and state securities laws. The Roots believed these individuals knew there were security law violations but rather than tell the Roots about their right to rescind the transactions, they concealed the illegal nature of the transactions.

The complaint alleged these specific individuals also misrepresented or failed to disclose the following material facts: (1) the risks with investing in MFS; (2) their commissions from the stock sales; (3) they claimed to be taking minimal salary compensation when in fact they were receiving excessive compensation and paying personal expenses from the stock subscription money; and (4) Porche was the subject of SEC civil and administrative proceedings resulting in permanent injunctions such as barring him from associating with any brokers, dealers, or investment advisors. Beck recalled that during a meeting with O'Connor and Cooper they revealed MFS's board directed a $340,000 commission payment using the Roots' investment funds.

10

Beck maintained the Pinkerton Action has several problems from the start. First, Jolly Roger, not the Roots, purchased MFS stocks.  More importantly, Roger Root knew CTI was not MFS's subsidiary because he was invited (on Jolly Roger's behalf) to participate in CTI's stock offering but he had declined.  Second, Beck submitted evidence showing Jolly Roger was a "defunct" corporation when the lawsuit was filed.  The documents revealed Jolly Roger filed articles of dissolution in early 2015 and was not reinstated until January 17, 2019.

Another issue was the inherent inconsistency in the requested remedies.  On one hand, the Roots were willing to settle their direct action for 10,000,000 CTI Founders shares and a seat on the CTI board.  On the other hand, the Roots derivative claims sought cancellation of all CTI stock certificates because MFS allegedly owned 100 percent of CTI.

Despite these issues, Catanzarite diligently prosecuted the case by serving MFS's counsel (Anderson, McPharlin & Conners) with over 500 discovery requests. Cooper was assigned counsel under CTI's policy.

Beck declared CTI held a shareholder meeting in November 2018 (two months after the Pinkerton Action was filed).  He noted Cooper and O'Connor at that time were acting as if CTI was a separate entity from MFS.  They did not discuss MFS or whether MFS had a right to vote in CTI's corporate affairs.  Rather, Cooper furnished a proxy to vote 4,900,000 shares of her CTI stock, which would not have been possible if MFS supposedly owned all of CTI's stock.  Beck recalled hearing Probst, O'Connor, and Cooper discuss whether to settle the Pinkerton Action derivative claims with Root, without involving Catanzarite or its lawyers.

The gravamen of Beck's complaint is the theory that sometime between November 2018 and January 2019, Catanzarite and the O'Connor Faction struck a deal. Specifically, they set into motion a scheme to save members of the O'Connor Faction from liability in the Pinkerton Action.  Beck provided evidence showing that around

11

January 2019 many Pinkerton Action defendants entered into settlement agreements with Catanzarite. They agreed to "renounce" their CTI shares in favor of MFS and entered "into separate agreements to allege—now, for the first time—that CTI had been a subsidiary of MFS all along . . . ." On December 13, 2018, Catanzarite dismissed Porche, and in early January it dismissed Mobin, two of the primary wrongdoers named in the Pinkerton Action.

While Catanzarite was negotiating agreements with other defendants, it continued litigating the Pinkerton Action. Beck asserted the parties eventually designed a scheme that involved misusing the judicial process, publicizing unlawful CTI shareholder written consents, and sending e-mails intent on destabilizing CTI's operations by interfering in merger negotiations and other business prospects. If this plan worked, MFS (controlled by the O'Connor Faction) would be able to regain control of CTI's business/profits and reallocate all the stock shares. MFS shareholders (including the Roots) would likely also benefit from the shift in power.

January 2019 was a busy month for Catanzarite, setting in motion the group's corporate takeover scheme. On January 4, 2019, it dismissed Scudder and Aroha from the Pinkerton Action. On January 22, 2019, it dismissed O'Connor, TGAP, and Unfug. The following day, Catanzarite dismissed Cooper and Higgerson. Thereafter, O'Connor and Cooper used their MFS shareholder votes to reconstitute the MFS board of directors. MFS hired Catanzarite as corporate counsel.

On January 23, 2019, O'Connor executed a "unanimous written consent of the sole shareholder of [CTI]" (2019 Consent), stating he was CEO of MFS and had authority to act by unanimous written consent without a meeting to adopt several resolutions. The first resolution stated MFS was the sole shareholder of CTI and O'Connor, in his capacity as CEO, could issue the written consent stating MFS fully paid for 28,000,000 shares of CTI common stock in March 2015. The next resolution stated the Amended Acts contained the false contention MFS "had not fully paid for all of its

12

Bank of America Superior Court of California County of Orange
ADA Complaint Exhibits 392

stock [was] facilitated by the wrongful and self-serving conduct" of Probst and Beck. Accordingly, all actions, issuance of shares, and promisors were void or voidable acts. In essence, the written consent sought to unwind three years of CTI's corporate acts.

In addition, the 2019 Consent "resolved" that the entire CTI board of directors was wrongly elected "by shareholders other than MFS" and they were immediately removed. MFS rescinded all CTI's stocks and promissory notes. It elected O'Connor, Zakhireh, and Murphy to serve as CTI's directors. It terminated CTI's auditor and legal counsel.

Around this same time, Catanzarite sent CTI's largest secured creditor, FinCanna, an e-mail stating future modifications or agreements between them must be signed by the new CTI board members (O'Connor, Zakhireh, and Duffy). (See *Cultivation, supra,* G059457 [detailed discussion of Catanzarite's damaging e-mails to CTI's business partners]). Catanzarite also took steps to interfere with CTI's proposed merger with Western Troy Capital Resources, Inc, by writing an e-mail to the company stating the new CTI directors objected to the merger. (*Ibid.*)

However, it was Catanzarite's misuse of the judicial process that formed the basis for Beck's malicious prosecution claims. On January 28, 2019, Catanzarite filed the MFS Action. The claims were brought "derivatively on behalf of its wholly owned subsidiary [n]ominal [d]efendant [CTI]." It named as defendants CTI's board of directors (Probst, Beck, Kamm, and Motta), CTI attorneys (Einhorn and Bernheimer) and several entities (EM2, RAD, and Tow and Grow).[5] CTI was named as a nominal defendant. MFS raised nine causes of action and sought declaratory relief and a permanent injunction. MFS asserted it was entitled to file a derivative action because it organized CTI and acquired 28,000,000 shares of CTI common stock, and therefore, CTI was its wholly owned subsidiary.

---

[5]        Tow and Grow is not a party to this appeal. The complaint alleged CTI purchased this company, but it was for Probst's personal benefit.

13

Catanzarite drafted a complaint telling a remarkably different story from the one set forth in the Pinkerton Action. The lawsuit reflected an abrupt shift in allegiances. O'Connor and his allies turned against their former board members Probst and Beck. Indeed, the MFS Action did not allege O'Connor, Cooper, TGAP, Higgerson, Aroha, or Unfug took part in any wrongdoing while they were in control of CTI. Rather these parties were portrayed as "the good guys" who were victimized by Probst, Beck, and other parties who wrongfully sold and purchased CTI shares that belonged to MFS. We note Catanzarite filed the MFS Action acting as MFS's purported corporate counsel while still representing different a shareholder in a derivative action against both MFS and CTI (Pinkerton Action).

In the MFS Action, the complaint asserted Probst and Beck conspired with and were aided and abetted by other Founders to falsely claim CTI's shares were not transferred to MFS and wrongfully reissued those shares. With respect to the other CTI directors and shareholders, the complaint offered the following explanation: "O'Connor, Cooper, TGAP, . . . Higgerson, Aroha, [and] Unfug have agreed to renounce their Founders' Shares in favor of MFS." The complaint failed to explain why renouncing shares and forming an alliance with MFS absolved O'Connor and Cooper from their role in executing the Amended Acts. Nor did the complaint reveal O'Connor's authority to publicize the 2019 Consent, which rescinded the Amended Acts, ousted the board members, and fired CTI's legal counsel. O'Connor's 2019 Consent rescinded CTI shares he and others sold to third parties such as Zakhireh, Cooper, and Higgerson.

To further meddle in CTI's business operations, the MFS Action's complaint asserted CTI's current board of directors were violating Corporations Code section 1507 by "preparing, signing and circulating false minutes, issuing securities, transacting business with insiders, [and] borrowing money from insiders and records relating to CTI." MFS requested that the court enjoin the CTI's board from operating the company until the court held a Corporations Code section 709 hearing (709 hearing) "to

14

determine the rightful ownership of CTI, its appropriate [b]oard of [d]irectors, and executive structure." The court initially granted a temporary restraining order (TRO), which was highly disruptive to CTI's ability to operate its business.

The trial court (Judge Randall J. Sherman) dissolved the TRO in May 2019 after the 709 hearing. Catanzarite argued MFS had the right to vote in CTI's last board meeting when it elected new officers. The court examined the original Organizational Consent, the Amended Acts, the 2019 Consent, MFS loan documents, and other relevant evidence. It noted CTI's securities agreements, which are required to contain a list of issued shares, did not mention MFS was a shareholder. It found telling that O'Connor signed 50 subscription agreements to sell CTI stock directly to MFS shareholders and all but six of MFS's 59 shareholders purchased CTI stock. It considered an e-mail Probst sent to Cooper and O'Conner in 2017 that discussed closing MFS or declaring bankruptcy because the only asset was a note from CTI. And no one disagreed with Probst's failure to list CTI stock as another MFS asset. The court considered CTI's assertion that beginning in 2015 CTI's board raised over 3,000,000 from over 60 private investors and 6,000,000 in financing based on representations MFS did not own any shares of CTI stock. At the hearing, Catanzarite represented Cooper and O'Connor would testify they signed documents making CTI a separate entity but did not understand it meant they were rescinding the shares promised to MFS. Finally, the court questioned Catanzarite about the reasons for the long delay in bringing the motion, during which CTI and MFS operated as separate entities.

The court determined CTI's election was valid and stated that "every fiber of my being says that the facts are overwhelming against" Catanzarite's position. It stated there was a repudiation of an agreement (the Subsidiary Promise) by people who were the same principles in MFS and then there was evidence of repeated actions after the Amended Actions that were consistent with the notion MFS was not a stockholder. The court concluded the delay in bring this claim further supported the conclusion MFS

15

"has been of the view that they are not a shareholder." "So the court concludes that the challenge [to CTI's] election is denied, and the court concludes that [MFS] is not a stockholder in CTI."

That same month, Beck resigned from CTI's board. Meanwhile, Catanzarite resumed filing lawsuits to further the O'Connor Faction's and MFS's interests. Each version represented a slight shift in trial tactics, but all were aimed at achieving the same result set forth in the MFS Action. Beck claimed the litigation against CTI created a sense of instability with CTI's business partners and lenders causing the company to lose money.

For example, Catanzarite filed the Mesa Action in April 2019 for Richard Mesa and a *putative class* of MFS shareholders who also purchased CTI shares. The complaint was framed as both a class action and a shareholder derivative action filed "on behalf of" CTI. The complaint asserted the class of MFS/CTI shareholders wanted to consolidate their lawsuit with MFS's derivative action "and to among other relief, recognize the ownership and control of CTI" by MFS's ownership of 28,000,000 shares, 5,000,000 "Friends & Family CTI shares," and 3,000,000 CTI shares issued pursuant to the 2015 PPM.

This Mesa Action grouped the "'[d]irector [d]efendants'" separately from the "'[p]referred [s]hares [d]efendants." The director defendants included members of the Probst Faction (Probst, Beck, Bernheimer, Kamm, Einhorn, and Motta). Ten defendants holding CTI series A preferred stock were collectively referred to as the preferred shares defendants. CTI was listed as a nominal defendant.

One month later, Catanzarite amended the Mesa Action complaint to add Cooper and Tom Mebane as plaintiffs and FinCanna as a defendant. (See *FinCanna, supra,* G58700.) Catanzarite also changed the nature of the action to focus on unraveling CTI's financial dealings with FinCanna and declare CTI's actions and contracts void.

16

Bank #: Superior Court of California County of Orange
ADA Complaint Exhibits 396

The shareholder no longer wished to join the MFS Action or seek recognition of MFS's controlling stock shares over CTI. (*Ibid.*)

Thus, to briefly recap, at this point Catanzarite's concurrent and successive representation of adverse parties included the following: (1) Catanzarite was representing the Roots' elder abuse lawsuit against CTI and some of its Founders (the Probst Faction) as well as a derivative action against MFS; (2) Catanzarite had made a deal with a handful of CTI Founders to dismiss them from the Pinkerton Action; (3) it became MFS's counsel of record; (4) Catanzarite filed a derivative shareholder lawsuit for MFS, claiming 100 percent control and ownership of CTI, despite having lawsuits filed by other people claiming to be MFS shareholders; and (5) after filing two *derivative* shareholder lawsuits, Catanzarite filed a third derivative action (the Mesa Action) claiming to represent a different set of outsider shareholders, i.e., a class of derivative shareholders willing to join in the MFS Action but also independently seeking damages from CTI, its current shareholders, and board of directors.

At the end of May 2019, Catanzarite filed a lawsuit on behalf of Cooper and Mebane against CTI. The Cooper Action requested the court direct CTI to (1) hold a shareholder's meeting to elect a board of directors; (2) deliver an annual report; (3) appoint an accountant to conduct an audit; and (4) order CTI to pay the costs for an investigation, audit, and costs of the suit. CTI's corporate counsel filed an opposition, asserting a shareholder meeting was scheduled for August 2019. (See *FinCanna, supra,* G058700 [description of Catanzarite's six lawsuits].)

In July 2019, Catanzarite filed first amended complaints (FAC) in the Pinkerton Action and the MFS Action. It removed all derivative action claims made on

Back #30-2: Superior Court of California County of Orange
ADA Complaint Exhibits 397

behalf of MFS and CTI.[6] Catanzarite claimed to be MFS's and CTI's corporate counsel. Catanzarite next filed two lawsuits as CTI's corporate counsel (the FinCanna Action and Scottsdale Action). The Scottsdale Action is noteworthy in that Catanzarite demanded that CTI's insurance company stop providing a defense or indemnify Beck and other Probst Faction defendants in the Mesa Action. (See *FinCanna, supra,* G058700 [description of Catanzarite's six lawsuits].)

In January 2020, the trial court disqualified Catanzarite and its attorneys from representing CTI and the Mesa Action plaintiffs. (*FinCanna, supra,* G058700.) What happened next is described in full detail in our *FinCanna* and *Cultivation* opinions. (*FinCanna, supra,* G058700; *Cultivation, supra,* G059457), which we incorporate by reference. Relevant to this appeal, on March 5, 2020, Catanzarite dismissed the Pinkerton Action and MFS Action.

Meanwhile, CTI filed a lawsuit against Cooper, Duffy, and Catanzarite for interfering in its business relationships, breaching fiduciary duties, legal malpractice and other allegations related to their misconduct. As discussed in *Cultivation, supra,* G059457, defendants anti-SLAPP motions (for the most part) failed.

Beck, represented by counsel, filed the case underlying this appeal. MFS filed a cross-complaint against Beck, Probst, Bernheimer, Horwitz + Armstrong, Horwitz, Armstrong and other entities (discussed in more detail in our concurrently filed opinion *Mobile Farming Systems, supra,* G060315).

Beck filed a demur to the cross-complaint, a motion to disqualify Catanzarite, and a request for judicial notice of documents supporting these motions. Out of the 13 defendants named in Beck's lawsuit, a handful filed anti-SLAPP motions. Beck

---

[6]    We note the Pinkerton Action FAC was deeply sanitized to remove all traces of accusations against the O'Connell Faction, Porche, Mobin, and TGAP. Where the original complaint specified four people (O'Connell, Probst, Porche, and Mobin) befriended the Roots to swindle the elderly couple out of their retirement funds, the FAC asserted Probst was acting alone.

opposed the anti-SLAPP motions and submitted declarations and a request for judicial notice.[7]

In his opposition to Cooper's motion, Beck asserted Cooper turned her back on CTI and Beck when she and O'Connor were asked to resign from CTI. Beck alleged Cooper, joined by her father Higgerson, had been harassing Beck and CTI for two years. He maintained they helped the other defendants in a two-prong scheme. "First, Cooper and Higgerson assisted [in] the creation of false shareholder consents and other corporate acts claiming that MFS was the 'sole shareholder' of CTI. [This was] a false statement that contradicted the fact that Cooper herself had facilitated sales of CTI shares to dozens of individual CTI shareholders. The MFS Action could not exist without their signatures and alleged collusion with [Catanzarite] and other [d]efendants, because Cooper as a major shareholder of MFS and as its largest debt-holder of MFS had to cooperate. Cooper's cooperation was needed to remove the existing MFS board and purportedly retain [Catanzarite] to file the MFS Action on facts known to be false. Second, both falsified testimony for the purpose of engaging in malicious litigation against Beck and CTI, a second track that [d]efendants hoped would give them the leverage to obtain through illicit means what they could not otherwise have." Beck argued his non-malicious prosecution causes of action did not arise from protected speech, but rather "from corporate actions aided and abetted by Cooper and Higgerson." Moreover, Cooper and Higgerson participated in defendants' malicious prosecution scheme by creating false testimony to support MFS's narrative it was CTI's sole shareholder.

---

[7] Our appellate record is lengthy and disorganized. Appellant's appendix and Respondent's appendix contain only select parts of the record. As will be explained in further detail anon, we granted Beck's motion to augment the record with additional relevant exhibits, i.e., copies of his written oppositions and some of the anti-SLAPP motions. However, all the oppositions refer to Beck's 1,209-page request for judicial notice, which is not part of our record. On our own motion, we augment the record to include this document as it was considered by the trial court and necessary for our required de novo review.

19

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 399
Exhibit #18: 019

Beck's opposition to Zakhireh's motion contained similar arguments. Beck acknowledged Zakhireh was not a plaintiff in any of Catanzarite's previous lawsuits. He argued the malicious prosecution claim could be based on Zakhireh's participation in the conspiracy to prosecute frivolous actions. In addition, "Zakhireh is liable for the other claims against him because he participated directly in various non-judicial actions that constituted corporate sabotage against CTI and Beck. Beck can offer evidence establishing a prima facie case for these claims, and Zakhireh acts as a corporate director or officer to sabotage CTI are not privileged under . . . Civil Code section 47."

Beck filed separate oppositions to Catanzarite's and the attorney's motions, but the arguments overlapped. He alleged anti-SLAPP should not apply when these defendants conspired to use MFS as a vehicle for corporate sabotage of CTI, and "engaged in a series of private, corporate acts to slander and destroy CTI and Beck." He added the basis for liability against the individual lawyers was their direct participation in "various non-judicial actions that constituted corporate sabotage against CTI and Beck."

On October 23, 2020, the trial court considered Zakhireh and Catanzarite's anti-SLAPP motions. It granted Zakhireh's motion as to all claims other than slander of title and granted Catanzarite's motion in full. On November 20, 2020, the court considered and granted Cooper and Higgerson's anti-SLAPP motions.

MOTIONS ON APPEAL

I. *Disqualification Motion*

Beck filed a motion to disqualify Catanzarite (and the firm's attorneys Kenneth Catanzarite (Kenneth), Nicole Marie Catanzarite-Woodward (Nicole), Brandon Woodward (Brandon), and O'Keefe) from this appeal.[8] He argues that for the same reasons this court upheld the disqualification orders regarding the Mesa Action shareholders (Cooper, Higgerson, and Duffy), we must now disqualify Catanzarite from

---

[8]      For the sake of clarity, we will refer to parties having the same last names by their first given names.

20

Complaint Supplement #30-20-2014569 Superior Court of California County of Orange
Exhibit #18: 020                    ADA Complaint Exhibits 400
Beck v Superior Court of California County of Orange

representing MFS/CTI shareholders in this appeal. Specifically, he asserts Catanzarite's ongoing concurrent representation of clients with conflicting interests triggered mandatory disqualification. (Citing *FinCanna, supra,* G058700.) We disagree.

As explained in *FinCanna, supra,* G058700, at the same time the trial court granted CTI's disqualification motion, it denied Beck's motion seeking joinder for Catanzarite's disqualification in the Pinkerton and MFS Actions. Beck filed a disqualification motion in his malicious prosecution action, but it appears from our record that the court did not rule on it before granting the defendants' anti-SLAPP motions. Beck waited eight months after filing his notice of appeal to file a disqualification motion directed at the respondents' counsel.

The disqualification motion in this appeal was filed too late. The trial court's order denying Beck's original disqualification motion was immediately appealable. (*Meehan v. Hopps* (1955) 45 Cal.2d 213, 217 [order denying motion for disqualification "left nothing further of a judicial nature for a final determination of his rights regarding opposing counsel, [and] the order was final for purposes of appeal"]; *Apple Computer, Inc. v. Superior Court* (2005) 126 Cal.App.4th 1253, 1263-1264 [either writ petition or appeal may be filed following denial of motion to disqualify].) In *FinCanna, supra,* G058700, we noted Catanzarite was the only party to appeal the court's disqualification rulings. To consider Beck's current motion on appeal, we would essentially be reviewing an order from which a separate appeal should have been pursued.

"'Collateral estoppel precludes a party from relitigating in a second proceeding the matters litigated and determined in a prior proceeding. The requirements for invoking collateral estoppel are the following: (1) the issue necessarily decided in the previous proceeding is identical to the one that is sought to be relitigated; (2) the previous proceedings terminated with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party to or in privity with a party in the

21

previous proceeding.' [Citation.] An order disqualifying an attorney, which was not appealed, has collateral estoppel effect in a subsequent action involving the same issue. [Citation.]" (*A.I. Credit Corp. Inc. v. Aguilar & Sebastinelli* (2003) 113 Cal.App.4th 1072, 1078.) The disqualification issue in the previous proceeding is identical to the one sought to be relitigated. The trial court determined Beck and his codefendants did not have standing to bring the motion, which qualifies as a judgment on the merits. The third element is satisfied in that this malicious prosecution action involves the same parties as the previous proceeding. Beck is collaterally estopped from relitigating the issue of Catanzarite's disqualification.

II. *Request for Judicial Notice (RJN)*

Our court's docket reflects that on August 19, 2021, this court rejected Beck's motion to augment the record with several documents because there was a problem with the pagination. That same day, Beck filed a separate RJN with the following unhelpful caption: "Filed concurrently with index of exhibits and exhibits in support of motion to augment record on appeal." This court filed the RJN and determined the matter would be decided in conjunction with the decision on appeal.

Defendants separately filed an opposition and evidentiary objections to the RJN. They argued the motion was moot because this court rejected Beck's motion to augment. Alternatively, they maintained the motion should be denied because Beck failed to show good cause for the delay and some of the matters were not admissible. These contentions are frivolous. We were dismayed that the evidentiary objections simply repeated the meritless arguments raised in the opposition. The only new argument alleged the documents listed in the RJN lacked relevance, which also turns out to be a frivolous argument.

The RJN includes copies of Beck's oppositions to three different anti-SLAPP motions considered by the trial court, but that were not included in either the appellant's appendix or respondent's appendix. Because we review the trial court's

22

ruling on the anti-SLAPP motion de novo, these documents are highly relevant to resolving this appeal. Similarly, a copy of Beck's declaration supporting one of the oppositions was relevant for our de novo review. Finally, Beck sought judicial notice of our prior *FinCanna* opinion. As demonstrated above, we frequently refer to it and incorporate portions in this opinion. The opinion certainly was relevant to this appeal.

Contrary to defendants' assertion, appellate courts routinely take judicial notice of the records of their own cases under Evidence Code sections 452, subdivision (d) and 459.2. (See, e.g., *Rel v. Pacific Bell Mobile Services* (2019) 33 Cal.App.5th 882, 886 [on court's own motion, took judicial notice of two prior opinions in the same case as well as underlying appellate records]; *People v. Bilbrey* (2018) 25 Cal.App.5th 764, 769, fn. 7 [taking judicial notice of related appeal in writ proceeding]; *Eden Township Healthcare Dist. v. Eden Medical Center* (2013) 220 Cal.App.4th 418, 421 ["We quote at length from our discussion of the facts in our prior opinion"].)

As for the oppositions and declarations, the trial court considered these documents and we could, on our own motion, augment the record. However, we conclude it would be more time efficient to construe Becks RJN as a motion to augment the record on appeal. Thus, we will grant Beck's motion to augment the record with the exhibits attached to his RJN.

Beck also filed a motion for sanctions against Catanzarite and its attorneys for filing frivolous lawsuits below and baseless objections to his motions on appeal. While sanctions are tempting due to the repetitive and groundless objections, we conclude the opposition to the disqualification motion was at least partially correct. At this time, we deny Beck's motion for sanctions.

### DISCUSSION

Section 425.16 authorizes a special motion to strike claims arising from any act "in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue." (§ 425.16,

23

subd. (b)(1).)  The purpose of the anti-SLAPP statute is to encourage participation in matters of public significance by allowing defendants "to request early judicial screening of legal claims targeting free speech or petitioning activities."  (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 880-881.)

"Resolution of an anti-SLAPP motion involves two steps.  First, the defendant must establish that the challenged claim arises from activity protected by section 425.16, and if the defendant makes this showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success.  [Citation.]  On appeal, we review the trial court's ruling on the anti-SLAPP motion de novo.  [Citation.]"  (*Wittenberg v. Bornstein* (2020) 50 Cal.App.5th 303, 311-312 (*Wittenberg*).)

"To establish a probability of prevailing, the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'  [Citations.]  For purposes of this inquiry, 'the trial court considers the pleadings and evidentiary submissions of both the plaintiff and the defendant (§ 425.16, subd. (b)(2)); though the court does not *weigh* the credibility or comparative probative strength of competing evidence, it should grant the motion if, as a matter of law, the defendant's evidence supporting the motion defeats the plaintiff's attempt to establish evidentiary support for the claim.'  [Citation.]  In making this assessment it is 'the court's responsibility . . . to accept as true the evidence favorable to the plaintiff . . . .'  [Citation.]  The plaintiff need only establish that his or her claim has 'minimal merit' [citation] to avoid being stricken as a SLAPP.  [Citations.]"  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 291-292 (*Soukup*).)  We will address each cause of action separately.

I. *Slander of Title*

Beck's complaint alleged, inter alia, that Zakhireh, Catanzarite, and Kenneth were liable for slander of title.  The complaint stated:  "Defendants effected, or

24

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 404

caused to be effected, certain shareholder consents of MFS and CTI which they knew to be false, stating that MFS was the sole shareholder of CTI.  On the basis of these alleged consents, title to ownership by Plaintiff of CTI shares was thereby compromised.  Indeed, such slander also prevented [Beck] from pursuing valuable business opportunities or growth capital on behalf of CTI."  He alleged these defendants acted "with reckless regard in making statements that they knew were false.  Defendants knew that other parties would rely upon their statements.  Here, the slander of title by [d]efendants destroyed [Beck's] opportunity to sell shares in the public markets through a proposed merger with Troy, or other public offering as an alternative, each at times when public market valuations in 2019 were superior to current market conditions."

Thus, Beck's claim appears to be based on publication of the 2019 Consent, which was intended to reinstate MFS as CTI's primary shareholder and purportedly replaced CTI's board members.  As pled, this conduct does not obviously relate to protected litigation-related activity, which the first prong of anti-SLAPP requires.  Accordingly, we agree with the trial court's determination Zakhireh failed to meet his burden on the first prong and properly denied the motion as to this claim.

With respect to Catanzarite/Kenneth, the trial court concluded these moving parties met their burden on first prong because Beck "conceded" in his opposition the law firm "published" the 2019 Consent when drafting the MFS Action's complaint.  Filing a complaint certainly falls under section 425.16 subdivision (e)(1) [writing made in judicial proceeding].  However, we read Beck's opposition differently.  While he mentions Catanzarite's reference to the 2019 Consents in the complaint, he adamantly refuted the contention his slander of title claim was entirely based on protected activity.  He asserted Catanzarite/Kenneth "was one of those responsible for the non-privileged publications that directly slandered Beck's title to CTI shares."  He explained that *after* publishing the written consent in the MFS Action's complaint, Catanzarite/Kenneth and their "allies" changed tactics because the MFS Action and Pinkerton Action failed.  Beck maintained

25

the scheming defendants tried to take control of CTI through a shareholder vote with O'Connor holding the shareholders' proxies. Beck concluded the alleged actions of corporate sabotage outside of the courtroom were not protected actions. "[R]ecission of the Amended Acts through the issuance of the shareholder consent" were not dependent on the pursuit of litigation.

Beck's opposition revisited this line of argument when discussing the second prong of anti-SLAPP. He repeated the slander of title claim was not based "on acts that were made in any kind of 'judicial proceeding.'" He asserted, "the most damaging representations made regarding Beck's CTI shares were made completely separate from litigation, when [Catanzarite/Kenneth] and the individuals purporting to make up the MFS board issued the supposed consent that knowingly claimed false ownership of CTI." None of the above language suggests Beck conceded the basis of his slander of title claim was litigation-related conduct.

Because we read the complaint and Beck's opposition differently than the trial court, we reverse the decision to grant Catanzarite/Kenneth's anti-SLAPP motion with respect to the slander of title claim. Catanzarite did not meet its burden of showing this claim was based on protected activity. We conclude Beck's reference to allegations in the complaint merely served to provide context to the timing of the publication of the 2019 Consent and events amounting to acts of corporate sabotage following the lawsuits. "'Allegations of protected activity that merely provide context, without supporting a claim for recovery, cannot be stricken under the anti-SLAPP statute.' [Citation]" (*Bonni, supra,* 11 Cal.5th at p. 1012 [incidental or collateral assertions not subject to section 425.16].)

II. *Intentional Infliction of Emotional Distress (IIED)*

Beck's complaint contains a very short discussion of a factual basis for this cause of action. It alleged all the defendants caused him to suffer emotional distress, including those involved in "conducting their malicious prosecution scheme." He

Complaint Supplement #30-2020-01145998
Beck #30-2020-01145998 Superior Court of California County of Orange
ADA Complaint Exhibits 406
Exhibit #18: 026

asserted these defendants engaged in reckless disregard, knowing he "would be required to answer baseless claims made against him on the basis of knowingly false statements made by [d]efendants." We agree with the trial court's determination that to the extent this claim is dependent on the malicious prosecution claim, it satisfies the first prong of anti-SLAPP. (*Lee v. Kim* (2019) 41 Cal.App.5th 705, 719 (*Lee*) ["every claim of malicious prosecution is a cause of action arising from protected activity, because every such claim necessarily depends upon written and oral statements in a prior judicial proceeding"].)

Beck's complaint also contains the broadly worded allegation the defendants "engaged in a pattern of despicable conduct, as set forth in the allegations described herein." As mentioned, the "pattern of despicable conduct" includes non-litigation claims, such as the publication of the 2019 Consent (supporting the slander of title cause of action). Because this cause of action refers to both protected conduct and non-litigation actions, it qualifies as a "mixed cause[] of action," a concept discussed at length in our prior opinion *Cultivation, supra,* G059457, which we incorporate by reference.

As discussed in more detail in our prior opinion, our Supreme Court has recently clarified that courts must take a claim by claim approach when considering each cause of action subject to an anti-SLAPP motion. (*Bonni, supra,* 11 Cal.5th at p. 1010; *Baral v. Schnitt* (2016) 1 Cal.5th 376, 382 (*Baral*).) "Section 425.16 is not concerned with how a complaint is framed, or how the primary right theory might define a cause of action. While an anti-SLAPP motion may challenge any claim for relief founded on allegations of protected activity, it does not reach claims based on unprotected activity." (*Baral, supra,* 1 Cal.5th at p. 382.) Accordingly, "'[C]ourts should analyze each claim for relief—each act or set of acts supplying a basis for relief, of which there may be several in a single pleaded cause of action—to determine whether the acts are protected

27

Complaint Supplement #30-2020-01145998
Exhibit #18: 027

and, if so, whether the claim they give rise to has the requisite degree of merit to survive the motion. [Citation.]'" (*Ibid.*)

In light of this case authority, we conclude the moving parties did not meet their burden of showing Beck's *entire* IIED claim rested on protected activity. Taking a claim by claim approach, it appears there were non-litigation allegations supporting the cause of action that cannot be stricken under anti-SLAPP. The claims relating to malicious prosecution satisfy the first prong, but as we will discuss in more detail below, Beck met his burden on the second prong, i.e., regarding probability of prevailing. Therefore, we must reverse the ruling on this cause of action.

III. *Unfair Business Practices*

Like the IIED cause of action, we conclude the unfair business practices claims were a mixed cause of action. In addition to the moving parties' actions of filing frivolous lawsuits (the malicious prosecution allegations), this cause of action referred to unprotected acts of attorney malpractice (violations of the Rules of Professional Conduct), violation of Corporations Code section 1507 regarding the false publication of documents about a corporate entity (the 2019 Consent), and violation of Business and Professions Code section 6104 regarding an attorney appearing without authority.

The trial court viewed the attorney malpractice allegations as relating to protected conduct because Beck did not prove he was Catanzarite's client. It reasoned anti-SLAPP must apply when a non-client raises a professional negligence claim against an opponent's attorney. This ruling improperly conflates the first and second prongs of anti-SLAPP.

The existence or nonexistence of an attorney client relationship is a dispute that relates only to the second prong. "'The sole inquiry' under the first prong of the test is whether the plaintiff's claims arise from protected speech or petitioning activity. [Citation.] In making this determination, '[w]e do not consider the veracity of [the plaintiff's] allegations' [citation] nor do we consider '[m]erits based arguments.'

28

Beck #3 Superior Court of California County of Orange
ADA Complaint Exhibits 408

[Citations.]  If the defendant demonstrates the plaintiff's claims do arise from protected activity, we then review the potential merits of the plaintiff's claims in the second step of the analysis.  [Citation.] . . . Whether [plaintiff] actually shared an attorney-client relationship with defendants relates to the merits of [his] claims and is therefore not relevant to our first prong analysis.  Although defendants may ultimately defeat [Beck's] claims by proving the absence of an attorney-client relationship, that does not alter the substance of [his] claims.  [Citation.]"  (*Sprengel v. Zbylut* (2015) 241 Cal.App.4th 140, 156-158, fns. omitted.)

Beck's unfair business practices cause of action was also based on an alleged violation of Corporations Code section 1507.  In the briefing, the moving parties assert the acts giving rise to liability under the statute "are the lawsuits and related litigation activity concerning MFS's status as CTI's sole shareholder and the veracity of the CTI preferred stock issuance."  As aptly stated by Beck in his opposition, the moving parties "assume[]" this cause of action arises from protected activity because there was clear evidence of Catanzarite's "pattern of litigation abuse."  Beck explained, "Though this pattern exists and [was] discussed [by both parties regarding the malicious prosecution cause of action, Catanzarite] wrongly assumes that Beck's other causes of action arise from litigation acts.  To the contrary, they arise from non-expressive acts of what amounts to corporate sabotage of CTI and Beck.  These are not acts that the Legislature meant the anti-SLAPP statute to protect."  Beck asserts his causes of action were not based on protected activity, "but instead on the fact that [Catanzarite] willingly participated in MFS's use as a corporate shell to sabotage CTI and Beck.  [Catanzarite's] participation in this conspiracy, even if contemporaneous with its abuses of the judicial process, [should] not mean that Beck's claims arises from protected activity."

To support this argument, Beck referred to allegations in the complaint regarding several defendants (including Zakhireh) who "reconstituted the MFS board of directors" to sabotage CTI and Beck.  Beck asserts these defendants adopted corporate

29

documents to renounce the Amended Acts and attempted to remove CTI's board, none of which was protected litigation-related conduct. He alleged Catanzarite "was the hub of the [d]efendant's scheme" because it "arranged and maintained the agreements by which the [d]efendants asserted control of MFS and agreed to attack Beck and CTI, then divide the soils among themselves." We agree the factual basis for the Corporations Code violation allegations do not satisfy the first prong, and should not be stricken pursuant to the anti-SLAPP statute.

Finally, Beck's unfair business practices cause of action contained allegations Catanzarite/Kenneth (aided by Zakhireh) violated Business and Professions Code section 6104. The moving parties assert this cause of action relates to protected conduct because it includes the factual allegation Zakhireh aided MFS's attorneys by providing false supporting declarations for lawsuits. Supplying a written declaration for a lawsuit would qualify as protected activity, however, the complaint specifies a different factual basis for the claim. Specifically, Beck's complaint set forth the following three points: (1) Business and Professions Code section 6104 provided an attorney cannot appear for a party corruptly or without authority; (2) Catanzarite and its attorneys "were well aware that they lacked authority to appear on behalf of CTI and other parties" but they did so anyway; and (3) Zakhireh, O'Conner, and Duffy aided the other defendants in violating this statute.

We conclude the activity underlying the claim—Catanzarite's representation of CTI in the trial court—is constitutionally protected conduct. "[A]ll communicative acts performed by attorneys as part of their representation of a client in a judicial proceeding or other petitioning context are per se protected as petitioning activity by the anti-SLAPP statute. [Citation.]" (*Cabral v. Martins* (2009) 177 Cal.App.4th 471, 479-480.) Thus, the moving parties established the first prong of the SLAPP analysis.

Turning to the second prong, we conclude Beck cannot show minimal merit on this sub-claim of the unfair business practices cause of action. Violations of Business

30

and Professions Code section 6104 does not authorize Beck to sue or recover damages from Catanzarite or its aider and abettors.  Violation of a disciplinary rule allows the Supreme Court to suspend or disbar an attorney.  (Bus. & Prof. Code, § 6100.)  It does not give "'an antagonist in a collateral proceeding or transaction . . . standing to seek enforcement of the rule.'  [Citation.]"  (*Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 303.)  Beck cannot prevail on this claim and it must be stricken from the cause of action.

IV.  *Malicious Prosecution*

Beck alleged all the defendants were liable for malicious prosecution because the Pinkerton Action, MFS Action, and Scottsdale Action were initiated and prosecuted without probable cause and with malice.  He maintained the first two lawsuits were "rooted on the fraudulent assertion of MFS's ownership of CTI," which each defendant knew was untrue.  He added Catanzarite filed the Scottsdale Action without any authorization from CTI's board, and therefore knew it also lacked probable cause.

The first step of the anti-SLAPP inquiry, whether defendants made a threshold showing the malicious prosecution claim arose from protected activity, is not disputed here.  "The plain language of the anti-SLAPP statute dictates that every claim of malicious prosecution is a cause of action arising from protected activity, because every such claim necessarily depends upon written and oral statements in a prior judicial proceeding.  [Citation.]  Accordingly, our inquiry shifts to whether [Beck] satisfied [his] burden[] to demonstrate a probability of prevailing on the merits of [his] claims for malicious prosecution.  [Citations.]"  (*Lee, supra,* 41 Cal.App.5th at p. 719.)

"To prevail on a malicious prosecution claim, the plaintiff must show that the prior action (1) was commenced by or at the direction of the defendant and was pursued to a legal termination favorable to the plaintiff; (2) was brought without probable cause; and (3) was initiated with malice.  [Citation.]"  (*Soukup, supra,* 39 Cal.4th at p. 292.)

31

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 411

A. *Favorable Termination*

It is undisputed Catanzarite voluntarily dismissed the Root Action and the MFS Action on March 5, 2020. It dismissed the Scottsdale Action on November 18, 2019. "[A] voluntary dismissal is presumed to be a favorable termination on the merits[.] [Citation.]" (*Lee, supra,* 41 Cal.App.5th at p. 720.)

In its briefing, Catanzarite notes the trial court questioned whether Beck satisfied his burden of showing there were favorable dismissals. The court opined Catanzarite likely dismissed the action after it received the ruling at the Corporations Code section 709 hearing that MFS was not a shareholder (and therefore lacked standing to bring the derivative action). The court added a dismissal for this kind of technical reason would not indicate Beck was innocent of wrongdoing, especially when he was still a defendant in the ongoing Mesa Action. We disagree with this analysis.

"It is not essential to maintenance of an action for malicious prosecution that the prior proceeding was favorably terminated following trial on the merits." (*Lackner v. LaCroix* (1979) 25 Cal.3d 747, 750 (*Lackner*).) "'The fact that such legal termination would not be a bar to another civil suit or criminal prosecution founded on the same alleged cause is no defense to the action for malicious prosecution; otherwise a party might be continuously harassed by one suit after another, each dismissed before any opportunity for a trial on the merits.' [Citation.]" (*Kennedy v. Byrum* (1962) 201 Cal.App.2d 474, 480.) Thus, Beck's status as a defendant in a different action has little relevance.

We appreciate the trial court's concern that "termination must *reflect* on the merits of the underlying action. [Citation.]" (*Lackner, supra,* 25 Cal.3d at p. 750.) "To determine 'whether there was a favorable termination,' we 'look at the judgment as a whole in the prior action . . . .' [Citation.]" (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 341.) "[C]ourt[s] must examine the reasons for termination to see if the disposition reflects the opinion of the court or the prosecuting party that the action would

32

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 412

not succeed." (*Sierra Club Foundation v. Graham* (1999) 72 Cal.App.4th 1135, 1149.) Dismissals that result from negotiation, settlement or consent are generally considered not to be a favorable termination, because such a dismissal "reflects ambiguously on the merits of the action . . . ." (*Minasian v. Sapse* (1978) 80 Cal.App.3d 823, 827 fn. 4 (*Minasian*).) Likewise, a dismissal based upon the statute of limitations is not a favorable termination, because it is technical or procedural termination rather than one on the merits. (*Lackner, supra,* 25 Cal.3d at p. 751.)

In contrast, a dismissal for failure to prosecute is "not a dismissal on technical grounds" but rather reflects on the merits based upon "the natural assumption that one does not simply abandon a meritorious action once instituted." (*Minasian, supra,* 80 Cal.App.3d at p. 827.) A voluntary dismissal not based upon the parties' settlement or consent, even where it is made without prejudice, is generally considered to be a favorable termination to support a malicious prosecution action. (*Fuentes v. Berry* (1995) 38 Cal.App.4th 1800, 1808; *Villa v. Cole* (1992) 4 Cal.App.4th 1327, 1335.) In the *Sycamore Ridge Apartment* case, the court held that a voluntary dismissal is presumed to be a favorable termination, unless proved to the contrary by the party who prosecuted the underlying action and dismissed it. (*Sycamore Ridge Apartments, LLC v. Naumann* (2007) 157 Cal.App.4th 1385, 1400 (*Sycamore*).)

In this case, Catanzarite dismissed two complaints on the same day, March 5, 2020. There was no evidence these dismissals occurred as a result of a settlement between Beck and plaintiffs. The trial court reasoned the dismissals were likely due to the previous Corporations Code section 709 ruling, holding MFS was not one of CTI's shareholders. However, the record shows that when Catanzarite learned MFS lacked standing to bring a derivative suit on CTI's behalf, it did not dismiss the lawsuits. Catanzarite filed FACs instead.

The record shows that three months after the court ruled MFS was not CTI's shareholder, Catanzarite amended the complaints in the Pinkerton Action and MFS

33

Beck v Superior Court of California County of Orange
ADA Complaint Exhibits 413

Action by deleting the derivative causes of action. Catanzarite transformed both lawsuits into direct actions against Probst, Beck, and other CTI-related entities. Thus, the record does not support the court's conclusion Catanzarite dismissed the lawsuits for the mere technical reason MFS was not a shareholder. The complaints were amended to purportedly reflect this correction.

It is more likely Catanzarite's voluntary dismissal of the two lawsuits was related to a later disqualification ruling and the lack of tenable claims. The dismissals took place just a few months after the court disqualified Catanzarite and its attorneys from representing CTI and the Mesa Action plaintiffs (the class action shareholder derivative lawsuit). Given Catanzarite's zeal for filing multiple lawsuits against the same defendants, we can assume it would not abandon a meritorious action already initiated. Thus, we conclude the voluntary dismissal in this case should be regarded as a favorable termination of the two lawsuits (Pinkerton Action and MFS Action).

There is very little information in our record about the Scottsdale Action. Beck submitted a document filed in the United States District Court, Central District, showing Catanzarite filed the Scottsdale Action claiming to be CTI's authorized corporate counsel. The document reflected that on November 18, 2019, CTI dismissed the action against CTI's insurance company "in its entirety." As noted in our prior opinion, on November 15, 2019, the court granted the motion disqualifying Catanzarite from representing CTI. (*FinCanna, supra,* G058700.) In making its ruling, the court noted Catanzarite could not represent two client adversaries and in the Scottsdale Action CTI claimed to be representing the corporation and at the same time sought to invalidate a defense and indemnity for CTI directors under CTI's insurance policy. (*Ibid.*) The court stated a denial of coverage could put CTI "'on the hook for the individuals' costs of defense and/or liability.'" In other words, the court recognized Catanzarite was improperly using the Scottsdale Action for an improper purpose, i.e., to help his clients in the Mesa Action. Accordingly, this dismissal was a favorable termination on the merits.

34

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 414

B. *Commencement of Action*

As for the issue of commencement, the parties do not dispute Catanzarite and Attorneys were responsible for filing the lawsuits at issue in this case.

Zakhireh asserts he was not a party to the lawsuits at issue and cannot be held liable. We disagree. While he did not direct the commencement of the Pinkerton Action, there was evidence supporting the conclusion he was instrumental in the MFS Action. As mentioned, the complaint alleged that after O'Connor and Cooper secured their dismissals from the Pinkerton Action, they used the near-bankrupt MFS as a litigation tool to raise untenable claims against their former business partners (Probst and Beck). Beck presented evidence showing O'Connor (on behalf of MFS) selected Zakhireh to be CTI's treasurer and chief financial officer. Beck alleged Zakhireh, at the same time, was part of MFS's new board comprised of O'Connor's allies. In his newfound position with MFS, Zakhireh would have the duty of discussing litigation plans with MFS's corporate counsel Catanzarite and the other MFS board members. How could MFS have filed the MFS Action without the approval of its board members?

We conclude Zakhireh's position as both an MFS and CTI director raises a strong inference he aided the O'Connor Faction and MFS's corporate counsel (Catanzarite) with the group's plans for an illegal corporate takeover. As noted by Beck, a person who aids and abets a malicious prosecution can be held liable. (*Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1131, fn. 11 ["A person who is injured by groundless litigation may seek compensation from any person who procures or is actively instrumental in putting the litigation in motion or participates after the institution of the action"].)

As for Cooper and Higgerson, they were not responsible for commencing the Pinkerton Action because they were the defendants. However, one can reasonably infer Cooper and Higgerson, like O'Connor, made a deal with Catanzarite in exchange for their dismissal from the Pinkerton Action. Beck alleged Cooper and Higgerson were

35

instrumental in assisting MFS and its shareholders in their efforts to take over CTI. These dismissed defendants helped by agreeing to testify in support of MFS's new allegedly fabricated claim to own 100 percent of CTI. Cooper's participation was further demonstrated by Beck's evidence her vote was needed before MFS's corporate counsel (Catanzarite) could file the lawsuit, because she held five million MFS shares. Cooper did not refute this evidence.

C. *Probable Cause*

"An action is deemed to have been pursued without probable cause if it was not legally tenable when viewed in an objective manner as of the time the action was initiated or while it was being prosecuted. The court must 'determine whether, on the basis of the facts known to the defendant, the institution of the prior action was legally tenable.' [Citation.] 'The resolution of that question of law calls for the application of an *objective* standard to the facts on which the defendant acted. [Citation.]' [Citation.] The test the court is to apply is whether 'any reasonable attorney would have thought the claim tenable . . . .' [Citation.] The tort of malicious prosecution also includes the act of 'continuing to prosecute a lawsuit discovered to lack probable cause.' [Citation.] In determining the probable cause issue, the same standard applies 'to the continuation as to the initiation of a suit.' [Citation.]" (*Sycamore, supra,* 157 Cal.App.4th at p. 1402.)

"'Continuing an action one discovers to be baseless harms the defendant and burdens the court system just as much as initiating an action known to be baseless from the outset.' [Citation.] 'A person who had no part in the commencement of the action, but who participated in it at a later time, may be held liable for malicious prosecution.' [Citations.]" (*Sycamore, supra*, 157 Cal.App.4th at p. 1398.) "A claim for malicious prosecution may also apply to a defendant who has brought an action charging multiple grounds of liability when some, but not all, of the grounds were asserted without probable cause and with malice. [Citations.]" (*Id.* at p. 1399.)

36

Beck v. Superior Court of California County of Orange
ADA Complaint Exhibits 416

"In analyzing the issue of probable cause in a malicious prosecution context, the trial court must consider both the factual circumstances established by the evidence and the legal theory upon which relief is sought. A litigant will lack probable cause for his action either if he relies upon facts which he has no reasonable cause to believe to be true, or if he seeks recovery upon a legal theory which is untenable under the facts known to him." (*Sangster v. Paetkau* (1998) 68 Cal.App.4th 151, 164-165.) "In making its determination whether the prior action was legally tenable, the trial court must construe the allegations of the underlying complaint liberally in a light most favorable to the malicious prosecution defendant. [Citation.]" (*Id.* at p. 165.)

We conclude Beck met the low burden of proving his claim had minimal merit with respect to Catanzarite. Unlike the trial court, we find it relevant Catanzarite initiated the Pinkerton Action, a shareholder derivative action on behalf of MFS, without first verifying the Roots owned shares in MFS. Beck presented evidence they did not. He submitted stock certificates showing the Roots' corporation, Jolly Roger, invested in MFS, but this entity lost its corporate status between 2015 to 2019. Thus, both the Roots and Jolly Roger lacked standing to bring a shareholder derivative lawsuit. Before agreeing to become an attorney of record in a case, an attorney should, at a minimum, be familiar with the client's claims as a purported shareholder, and should have made a preliminary determination about whether probable cause existed to support the asserted claims.

Here, Catanzarite filed a shareholder derivative lawsuit on behalf of clients who were not actually shareholders. The basic nature of a shareholder derivative action is to *permit shareholders* to "'bring a derivative suit to enforce the corporation's rights and redress its injuries when the board of directors fails or refuses to do so.' [Citation.]" (*Patrick v. Alacer Corp.* (2008) 167 Cal.App.4th 995, 1003.) There are stock ownership requirements for standing to pursue a shareholder's derivative suit. (See Corp. Code, § 800.)

37

Catanzarite also drafted a complaint seeking recovery upon two legal theories which were untenable under the facts known to the firm's attorneys. The Pinkerton Action's derivative shareholder claims all related to the following factual circumstances: In 2015, MFS board of directors (Probst, O'Connor, and Cooper) promised its shareholders MFS owned 100 percent of the CTI's outstanding shares (a total of 28,000,000 CTI common stock) (hereafter referred to as the Subsidiary Promise). MFS's board of directors became CTI's board of directors and "captured the entire business opportunity" for themselves, reneging on the Subsidiary Promise. And thereafter, CTI entered into agreements with third parties to implement its marijuana business plan and sold shares to investors. The MFS board members' recission of the Subsidiary Promise was the basis for the following shareholder derivative claims: constructive fraud; breach of fiduciary duty; misappropriation of trade secrets; and unfair competition.

The Roots' direct claims related to misconduct by the MFS board members but the Roots indicated they were willing to settle the case in exchange for a large quantity of CTI Founder shares and a seat on CTI's board. The Roots inexplicably did not want to be on MFS's board, despite their allegations about the Subsidiary Promise and decision to raise claims on MFS's behalf. The complaint's internal inconsistency and standing issues certainly raise red flags.

Given the Roots' settlement request for CTI shares, it is reasonable to infer Catanzarite and his clients knew only those shares had value and also understood those shares were available because MFS did not own 100 percent of CTI. Under these circumstances, a reasonable attorney may not have found the Pinkerton Action claims tenable. Moreover, when the factual allegations of the Pinkerton Action and the MFS Action are compared in an objective manner, no reasonable attorney would conclude both had merit. Simply stated, one action was based on the factual premise CTI's board members improperly renounced the Subsidiary Promise, leaving MFS *without any* CTI

38

Back - Superior Court of California County of Orange
ADA Complaint Exhibits 418

shares, and the other was based on the factual premise MFS *currently owned* 100 percent of CTI's shares, rendering any other CTI stock certificates worthless.

The lack of probable cause for maintaining the two lawsuits was further demonstrated by evidence Catanzarite filed multiple lawsuits while unethically representing clients with conflicting interests. For good reason, it is difficult to apply the "reasonable attorney" test when there is evidence the attorneys initiating the cases violated multiple rules of professional conduct. For example, no reasonable attorney would agree to act as corporate counsel of MFS while at the same time representing shareholders in a derivative lawsuit against that corporation. Yet this is exactly what happened when Catanzarite filed the MFS Action while also litigating the Pinkerton Action. We conclude the concurrent representation of directly adverse parties creates a strong inference the attorneys and litigants knew the claims in one or both lawsuits were untenable.

Beck also presented evidence Catanzarite and the O'Conner Faction created a mutually beneficial alliance. In exchange for their dismissal from the Pinkerton Action, these former defendants agreed to help opposing counsel file a different lawsuit against CTI and the Probst Faction (which included Beck). Beck's evidence suggested these CTI shareholders agreed to create and support a false story about MFS's ownership of CTI, revive MFS by reconfiguring its board of directors, and then use MFS as a litigation tool to sabotage CTI and its board members. In addition to providing testimony that MFS owned CTI, the O'Connor Faction members publicly renounced their CTI stock shares. O'Connor executed the 2019 Consent, without objection from his cohorts, which rendered worthless all their CTI stocks. As pointed out by Beck, all of this anti-CTI activity, following their dismissals from the Pinkerton Action, was highly suspect especially when one considers their actions and business dealings as CTI board members and shareholders from 2015 to 2019.

39

As discussed in more detail in our factual summary, after the formation of an alliance between Catanzarite and the O'Conner Faction, Catanzarite embarked on a spectacularly relentless mission (inside and outside of the courtroom) to replace CTI's board members with members of the O'Connor Faction. MFS/Catanzarite could not have initiated the MFS Action without the evidence and testimony provided by members of the O'Connor Faction. Accordingly, there was enough evidentiary support for Beck's claim Cooper, Higgerson, and Zakhireh, who were O'Connor's loyal allies, were instrumental in the maintenance of MFS Action knowing it lacked probable cause. We conclude Beck submitted enough evidence to satisfy his low burden at this stage of the proceedings with respect to the element of probable cause as to all the moving parties.

D. *Malice*

The above evidence also lends support to the malice requirement of anti-SLAPP. "'Malice "may range anywhere from open hostility to indifference." [Citations.]' [Citation.] While the mere absence of probable cause, without more, 'is not sufficient to demonstrate malice' [citation] "'[m]alice may also be inferred from the facts establishing lack of probable cause." [Citation.]' [Citation.] . . . '[T]he extent of a defendant attorney's investigation and research may be relevant to the further question of whether or not the attorney acted with malice.' [Citation.]" (*Sycamore, supra,* 157 Cal.App.4th at p. 1409.)

It appears the complaints were filed by plaintiffs lacking standing and/or included untenable claims. If Catanzarite knew the relevant facts, and only dismissed the O'Conner Faction and not the entire CTI board, we can infer the continued prosecution of those claims was motivated by malicious intent. If Catanzarite was not aware of the plaintiffs' lack of standing because it failed to adequately familiarize itself with the case before filing the lawsuit, this too would indicate indifference, and therefore also, the inference of malice.

Complaint Supplement #30: 2020-01-14990B
Exhibit #18: 040
Beck v Superior Court of California County of Orange
ADA Complaint Exhibits 420

Malice can also be inferred from evidence the MFS Action was initiated and maintained as part of a larger scheme to replace CTI's board with MFS shareholders, i.e., a hostile corporate takeover. The MFS Action complaint included a request for declaratory relief in the form of a court order declaring MFS owed 100 percent of CTI's stock, replacement of CTI's board, and confirmation CTI's business deals were invalidated. Catanzarite also separately filed a motion under Corporations Code section 709, asking the court to confirm MFS was a shareholder and must be permitted a vote in CTI's board elections. After losing the motion and hearing the court rule MFS was not CTI's shareholder, the parties did not immediately dismiss the lawsuit. Instead, Catanzarite filed more lawsuits and began acting as corporate counsel of both MFS and CTI. It can be inferred O'Connor, Cooper, Higgerson, and Zakhireh continued to authorize and support Catanzarite's efforts to reallocate CTI's shares to MFS and oust the Probst Faction from CTI's board.

In light of all of the above, we conclude Beck submitted enough evidence to satisfy his burden with respect to the element of malice. "'[T]he defendant's motivation is a question of fact to be determined by the jury.' [Citation] 'Because direct evidence of malice is rarely available, "malice is usually proven by circumstantial evidence and inferences drawn from the evidence." [Citation.]' [Citation.]" (*Citizens of Human., LLC v. Hass* (2020) 46 Cal.App.5th 589, 607.) We conclude the evidence supports a reasonable inference Catanzarite, O'Connor, Cooper, Higgerson, and Zakhireh were working together and pursuing litigation lacking probable cause against Beck with an improper purpose.

## DISPOSITION

We affirm the court's orders granting the moving party's anti-SLAPP motion regarding paragraph 124 of the complaint, regarding violation of Business and Professions Code section 6104.

41

We affirm the court's order denying Zakhireh's anti-SLAPP motion regarding the slander of title cause of action.

We reverse the court's orders granting the moving party's anti-SLAPP motion regarding Beck's causes of action for malicious prosecution, unfair business practices, slander of title, and intentional infliction of emotional distress. The matter is remanded for further proceedings.

We treat Beck's request for judicial notice as a motion to augment and grant it. We deny all requests for sanctions on appeal. We deny Beck's disqualification motion. On our own motion, we augment the record with the request for judicial notice Beck filed with his oppositions to the anti-SLAPP motions. In the interests of justice, each party shall bear their own costs on appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


SANCHEZ, J.

42

EXHIBIT 19

Court of Appeal, Fourth Appellate District, Division Three
Kevin J. Lane, Clerk/Executive Officer
Electronically FILED on 6/28/2021 by Lilian De La Torre, Deputy Clerk

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| FINCANNA CAPITAL CORP., <br><br> Plaintiff and Cross-defendant, <br><br> v. <br><br> CULTIVATION TECHNOLOGIES, INC., et al., <br><br> Defendants, Cross-complainants, and Respondents. <br><br> CATANZARITE LAW CORPORATION, <br><br> Objector and Appellant. | G058700 consol. w/ G058942 & G058931 <br><br> (Super. Ct. Nos. 30-2019-01072088 & 30-2019-01064267) <br><br> O P I N I O N |
| RICHARD MESA et al., <br><br> Plaintiffs, <br><br> v. <br><br> CULTIVATION TECHNOLOGIES, INC., <br><br> Defendant and Respondent. <br><br> CATANZARITE LAW CORPORATION, <br><br> Objector and Appellant. | |

Bank #3: Superior Court of California County of Orange
ADA Complaint Exhibits 424

Appeal from orders of the Superior Court of Orange County, Randall J. Sherman. Affirmed.

Catanzarite Law Corporation, Kenneth J. Catanzarite and Nicole M. Catanzarite-Woodward for Objector and Appellant.

Horwitz + Armstrong, John R. Armstrong and Alexander Avakian for Defendant, Cross-complainant, and Respondent.

\* \* \*

These three consolidated appeals concern Cultivation Technologies, Inc.'s (CTI) motion to disqualify its own legal counsel, the Catanzarite Law Corporation (Catanzarite), in related cases. The trial court granted CTI's disqualification motion relating to two lawsuits, deciding Catanzarite could not represent the following parties (1) CTI; (2) three CTI subsidiaries (Coachella Manufacturing, LLC, Coachella Distributors, LLC, and DS Gen, LLC, hereafter collectively referred to as CTI Subsidiaries); and (3) a group of CTI shareholders bringing a derivative lawsuit. We conclude the trial court was correct and we affirm its disqualification orders.

## FACTS

The appellate briefing in this case does not provide any background facts to give context to the current attorney disqualification dispute. We have pieced together the story by reviewing the multiple complaints and the parties' declarations related to six separate lawsuits. The keystone of each lawsuit (and this appeal) is a battle between two groups of shareholders over who controls CTI. Thus, it is helpful to understand the underlying dispute before jumping into a factual summary of the disqualification motion.

I. *Background Facts*

In 2012, Richard Probst and Richard O'Connor were the controlling shareholders and directors of Mobile Farming Systems, Inc., (MFS), an agricultural technology company selling hydroponic growing systems. Anticipating MFS's products and technology would be in high demand during the expected "medical marijuana boom"

2

the corporation convinced new investors to purchase MFS common stock. In 2015, the MFS board reported to investors that MFS intended to form a subsidiary, CTI, to purchase several acres of land and build a 100,000 square foot building in Coachella, California, to process marijuana and gain "up to $10,000,000 of high margin annual revenues." The MFS shareholders (who invested over $3 million) believed MFS acquired 28,000,000 shares of CTI common stock and the new corporation would be a wholly owned subsidiary of MFS.

 As promised, Probst and O'Connor incorporated CTI, and these two MFS directors, and along with Amy Cooper, became CTI's appointed board of directors. However, for reasons that are unclear, CTI did not become MFS's subsidiary, angering MFS's shareholders. In addition, CTI not only refused to acknowledge MFS's 28,000,000 shares but also issued 23,000,000 shares of common stock to CTI's "Founders." The "'CTI Founders Common Stock'" shares were held by Probst, O'Connor, Cooper, TGAP Holdings, LLC, EM2 Strategies LLC, I'm Rad LLC, Cliff Higgerson, Aroha Holdings Inc., and Scott Unfug. Soon thereafter, CTI's board members began fighting amongst themselves.

 In October 2015, Cooper resigned as president, secretary, and board member of CTI. In February 2016, CTI's remaining board members removed O'Connor from the board. This was the starting point of the rift between CTI shareholders, creating two factions, the O'Connor Faction (comprised of O'Connor, Cooper, and a group of CTI/MFS shareholders) and the Probst Faction (Probst and the remaining CTI directors). These two groups became locked in a struggle for control over the corporation.

 The Probst Faction issued additional shares, gaining more votes for themselves plus more investors. In 2016, the Probst Faction, which included CTI's controlling board of directors, entered into several agreements with FinCanna Capital Corp. (FinCanna), a Canadian royalty corporation. Over the next two years, FinCanna loaned CTI nearly $6 million dollars to develop cannabis cultivation, distribution, and

3

extraction operations in California. In 2018, CTI was unable to make its loan payments to FinCanna and several CTI directors resigned.

Meanwhile, the O'Connor Faction and some disgruntled MFS shareholders hired Catanzarite. In total, Catanzarite filed six lawsuits within a one-year period as follows:

(1) The Pinkerton Action. *Denise Pinkerton v. Cultivation Technologies, Inc., et al.,* OCSC No. 30-2018-01018922.

Catanzarite filed this lawsuit on September 14, 2018, on behalf of an elderly woman (via an attorney in fact) who invested all her retirement savings in MFS shares. This shareholder, individually and derivatively on behalf of MFS, asserted CTI, Probst, O'Connor, Cooper, and others involved with CTI, engaged in fraud, conversion, breach of fiduciary duty, conspiracy, fraudulent concealment, and theft of trade secrets.

In addition to damages, this derivative action demanded the cancellation of CTI stock certificates, an injunction preventing the sale of CTI stock, an injunction forcing CTI to stop using MFS's trade secrets, and the payment of punitive damages and attorney fees. For this lawsuit, CTI attorney of record was Winget, Spadafora, Schwartzberg LLP (Winget).

On January 23, 2019, a few days before Catanzarite filed a shareholder derivative action involving CTI shareholders, Catanzarite dismissed several defendants from the Pinkerton Action, including CTI and members of the O'Connor Faction (O'Connor and Cooper). It also deleted causes of action for misappropriation of trade secrets, unfair competition, and declaratory relief against CTI. In August 2019, Catanzarite amended the complaint to remove all shareholder derivative causes of action on behalf of MFS. Thus, the only defendants remaining were members of the Probst Faction (Probst, Justin Beck, I'm Rad, LLC, Robert Kamm, Robert Bernheimer, Irving Einhorn, and Miguel Motta).

4

(2) The MFS Action. *Mobile Farming Systems, Inc. v. Cultivation Technologies, Inc., et al.*, OCSC No. 30-2019-01046904.

Catanzarite filed this lawsuit in January 28, 2019, for MFS and "derivatively on behalf of its wholly owned subsidiary [n]ominal [d]efendant [CTI]." MFS asserted it was entitled to file a derivative action because it organized CTI and acquired 28,000,000 shares of CTI common stock, and therefore, CTI was its wholly owned subsidiary. The complaint asserted MFS contributed assets to CTI (a seedling trailer and a shipping container) and paid start-up costs. MFS sought cancellation of CTI's shares as well as any "insider loans and transactions." It alleged CTI owed MFS "$75,007.24 plus accrued interest of $12,444.29" (MFS's start-up loan) and other damages to be proven at trial. (Underline omitted.) The complaint sought attorney fees, punitive damages, and interest. The lawsuit was based on the premise that no CTI shareholders, other than MFS shareholders, had any valid stock or voting rights.

This complaint also asserted the Probst Faction violated Corporations Code section 1507[1] by "preparing, signing and circulating false minutes, issuing securities, transacting business with insiders, [and] borrowing money from insiders and records relating to CTI." MFS requested that the court enjoin the Probst Faction from operating CTI until the court held a section 709 hearing "to determine the rightful ownership of CTI, its appropriate [b]oard of [d]irectors, and executive structure.[2]

The court initially granted a temporary restraining order (TRO). According to Probst, the TRO was financially devastating for CTI because "CTI's operations ground

---

[1]      All further statutory references are to the Corporations Code, unless otherwise indicated.

[2]      Section 709 "'was intended to confer upon the superior court the power to determine in a summary proceeding whether or not a particular director or the entire board was or was not properly elected or appointed in order that the corporation can properly function.' [Citation.]" (*Morrical v. Rogers* (2013) 220 Cal.App.4th 438, 457.)

5

to a halt" for several months.  Probst declared, "CTI did not have access to its working capital and . . . key customers became aware of the TRO and refused to continue to place orders and the cash flow began to severely suffer."[3]  The court dissolved the TRO in May 2019, after holding a section 709 hearing.  The court determined MFS was not a CTI shareholder and could not challenge the election of CTI's directors.

In August 2019, the same day Catanzarite amended the Pinkerton Action to be a direct rather than derivative action, Catanzarite also transformed the MFS Action into a direct action.  The first amended complaint (FAC) omitted CTI as a party and alleged only direct claims against members of the Probst Faction for breach of fiduciary duty, conversion, misappropriation of trade secrets, and unfair competition.

(3)  The Mesa Action.  *Mesa, et al. v. Probst, et al.,* OCSC No. 30-2019-01064267.

Catanzarite filed this shareholder derivative class action on April 16, 2019.  The complaint asserted the "nature of [the] action" was on behalf of shareholders owning both MFS and CTI shares seeking to "join MFS in a consolidated action with [the MFS Action] and to among other relief, recognize the ownership and control of CTI as held by" four groups of shareholders.  (Capitalization and bold omitted.)  These shareholder groups included MFS (holding 28,000,000 CTI shares), as well as any MFS shareholders who purchased CTI shares in various offerings.  The complaint expressly excluded shares held by Probst Faction members, their attorneys, agents, or affiliates.

Richard Mesa initiated the lawsuit in three capacities:  (1) individually as a "shareholder of both" MFS and CTI shares; (2) in a representative capacity on behalf of over 100 similarly situated shareholders; and (3) derivatively on behalf of CTI.  The Mesa Action asserted nine causes of action against the Probst Faction and CTI as a nominal defendant.  Identical to allegations in the MFS Action, the Mesa Action sought

---

[3]        This declaration was prepared in response to Catanzarite's later request for a section 709 hearing in a subsequent CTI shareholder derivative action.

Superior Court of California County of Orange
ADA Complaint Exhibits 429

to enjoin the Probst Faction from operating CTI until there could be an expedited section 709 hearing.  In addition to damages, the class sought punitive damages and attorney fees.

One month later, Catanzarite amended the complaint to add Cooper and Tom Mebane as plaintiffs and FinCanna as a defendant.  More significantly, the complaint's "nature of the action" changed.  The class members no longer sought to join the MFS Action or seek recognition of MFS's controlling shares over CTI.  Instead, the Mesa Action plaintiffs sought to declare the current CTI directors' meetings and actions void.  In particular, the class sought to unravel CTI's financial dealings with FinCanna, who had just foreclosed on CTI's properties.  The FAC included two new causes of action, as well as allegations the Probst Faction wrongfully liquidated CTI's assets and that FinCanna should not have initiated foreclosure proceedings.  The FAC asserted FinCanna "claims ownership of the extraction facility and CTI's employees have effectively become [FinCanna] employees."  Furthermore, it maintained CTI shareholders "have suffered a total loss of their share value of not less than $5,000,000 and millions more in business opportunities. . . ."  CTI's attorney of record, Winget, filed an answer asserting the plaintiffs lacked standing or were not qualified to maintain a derivative lawsuit on CTI's behalf.  In October 2019, the Mesa Action plaintiffs filed a motion requesting the court appoint a receiver for CTI.

(4) The Cooper Action.  *Cooper, et al., v. Cultivation Technologies, Inc.,* OCSC No. 30-2019-01072443.

On May 23, 2019, Catanzarite filed an action directly against CTI on behalf of two CTI shareholders (Cooper and Mebane), who were members of the O'Connor Faction.  The previous day, FinCanna had filed a breach of contract action against CTI and CTI Subsidiaries and requested a receivership.  The Cooper Action requested the court direct CTI to (1) hold a shareholder's meeting to elect a board of directors; (2) deliver an annual report; (3) appoint an accountant to conduct an audit; and (4) order

7

CTI to pay the costs for an investigation, audit, and costs of the suit.  Winget, on behalf of CTI filed an opposition, asserting a shareholder meeting was scheduled for August 2019.[4]

(5) The FinCanna Action Cross-complaint.  *FinCanna v. Cultivation Technologies, Inc., et al.,* OCSC No. 30-2019-01072088.

As mentioned, in May 2019, FinCanna filed a breach of contract action against CTI and CTI Subsidiaries.  On July 2, 2019, Catanzarite filed a cross-complaint on behalf of CTI and CTI Subsidiaries against FinCanna and three of its directors.  Large sections of the cross-complaint appear to have been cut and pasted from the Mesa Action complaint.  Catanzarite purported to represent CTI and its subsidiaries.

In Probst's declaration, prepared to oppose the section 709 request in the Mesa Action, he explained Catanzarite's actions in the FinCanna Action created confusion and harm.  He noted Catanzarite filed a cross-complaint and propounded discovery against CTI's "primary secured lender" without telling CTI's board "and during a time when FinCanna has not yet served their complaint on CTI due to ongoing settlement negotiations."

(6) The Scottsdale Action.  *Cultivation Technologies, Inc., v. Scottsdale Insurance Company,* OCSC No. 30-2019-01096233.

On September 6, 2019, Catanzarite filed this declaratory relief action purporting to represent CTI.  In this lawsuit, CTI demanded that its insurance company, Scottsdale, stop providing a defense or indemnity to the Probst Faction defendants in the Mesa Action.  The complaint asserted Scottsdale "refused to communicate with the officers and directors elected by the common shareholders of CTI and who are of the position that only they and their elected officers and directors speak for CTI."  In the complaint, CTI sought the court's declaration of its rights under the insurance policy and

---

[4]     On our own motion, we took judicial notice of CTI's opposition filed in the Cooper Action.

8

Superior Court of California County of Orange
ADA Complaint Exhibits 431

orders forbidding Scottsdale from providing a defense "unless and until the vote of the disinterested common shareholders of CTI [was] obtained."

We note that immediately before filing the Scottsdale Action, Catanzarite amended the complaints in the first two derivative actions transforming them into direct actions against individuals who were part of the Probst Faction (the Pinkerton and MFS Actions). Additionally, after filing the Scottsdale Action, Catanzarite dismissed the Cooper Action on September 13, 2019.

## II. *The FinCanna Action*

Before discussing the disqualification motions, it is helpful to briefly summarize the FinCanna Action. The complaint alleged that in 2016, FinCanna loaned nearly $6 million dollars to CTI. FinCanna asserted it attempted to renegotiate the deal, but after several key CTI members resigned, CTI's "attention and resources [were] devoted to litigation" and "its management [was] in disarray, which pos[ed] further threat to FinCanna's chances of recovery." FinCanna asked the court to appoint a receiver to protect its interests in CTI and order an injunction to stop any interference in the receivership.

FinCanna's complaint specifically referred to the upheaval created by the MFS Action. It explained that in April 2019, it foreclosed on property used as collateral for some of the loan proceeds (recovering nearly $3.9 million). Thereafter, four board members and CTI's Chief Operating Officer (CEO) resigned, leaving two directors. FinCanna explained it filed the lawsuit because it believed that after these resignations, CTI's operations became impaired and the ability to recover the money owed (over $4 million due to owed interest) was "placed in serious risk."

## III. *Disqualification Motions*

### A. *First Disqualification Motion in the FinCanna Action*

Horwitz + Armstrong (Horwitz) filed a motion on behalf of CTI, the cross-complainant in the FinCanna Action, to recuse and/or disqualify the "purported attorneys

Back # 30 Superior Court of California County of Orange
ADA Complaint Exhibits 432

of record." (Capitalization and bold omitted.) Horwitz argued CTI did not retain Catanzarite to represent it and there were unwaivable conflicts of interest. In support of the motion, Probst filed a declaration, "on behalf of [himself] and CTI's duly elected [b]oard of [d]irectors, who have authorized the filing" of the disqualification motion.

Probst declared that at CTI's annual meeting, the shareholders elected himself, Hank Casillas, Michael Burdick, James Lally and Cooper to CTI's board of directors and there were no other shareholder meetings held to elect different officers. Probst explained Catanzarite claimed it obtained "written shareholder consents" to remove CTI's elected board and install different directors, who then hired Catanzarite to represent CTI. Probst submitted a copy of the "written consent promulgated by . . . Catanzarite purportedly removing" all the board members on May 2019. Catanzarite initiated this legal maneuvering after the court ruled against its clients at the section 709 hearing and refused to overturn the board of directors election.

Probst explained, "Rather than holding a shareholder's meeting for the purpose of electing a new [b]oard since Catanzarite knew his clients lacked a sufficient number of shares necessary to win such an election, on May 14, 2019, he instead unlawfully procured a purported 'Majority Written Consent' of CTI's shareholders that removed the entire shareholder-elected and sitting CTI Board and subsequently elected a new board consisting of Catanzarite's true clients who are a faction of CTI shareholders." After providing several reasons why the written consent was "ineffective and unlawful," Probst noted the shareholders' election of O'Connor and Duffy to the board "by way of unanimous written consent" was not effective, and therefore, they were not authorized to act on behalf of CTI or retain Catanzarite as counsel.

In his declaration, Probst stated Catanzarite filed a cross-complaint and answer in the underlying case "despite his having been opposing counsel against CTI and/or its management in at least four other related cases, and despite his personal participation in a proxy battle for control of CTI." He explained Catanzarite recently

10

filed a lawsuit, on behalf of CTI, against the corporation's insurance carrier to withhold coverage. He declared, "It is no coincidence that it is this insurance coverage which is financing the defense of the various parties Catanzarite is suing in the various other matters. This is the essence of conflict of interest: he is challenging insurance coverage for the benefit of one of his clients, which is being used to finance the defense of the multiple lawsuits he has filed."

Catanzarite, on behalf of CTI, filed an opposition and submitted declarations written by Kenneth J. Catanzarite, O'Connor, and several others. Catanzarite also filed evidentiary objections to Probst's declaration. The opposition asserted that removing the Probst Faction from the board and filing a cross-complaint and answer in the FinCanna Action were all "[v]alidly [a]uthorized" actions. Catanzarite asserted its representation of other clients was not adverse to CTI. For example, the Scottsdale Action would directly benefit CTI by preserving the "$3 million Business and Management Indemnity Policy from being depleted by Probst and others who failed and refuse to post the undertaking required by CTI's Bylaws and . . . section 317." Similarly, in the derivative actions, CTI was named as a nominal defendant and the claims "are not asserted against it but instead for the benefit of CTI." Moreover, Catanzarite maintained it requested the receivership to protect CTI's assets.

In its reply, Horwitz addressed Catanzarite's assertion its representation of other clients was not adverse to CTI. "[Catanzarite] cannot ethically represent certain shareholders suing defendant/cross-complainant [CTI] in shareholder derivative actions, shareholder class actions, and making motions to appoint a receiver to control [CTI] *while at the same time* acting as legal/litigation counsel of record *for* CTI directly. Rule of Professional Conduct, rule 1.7 expressly prohibits a lawyer from so representing clients with such direct and adverse interests at the same time. When, as here, the lawyers' clients' interest are so directly adverse, the clients cannot even consent to such joint representation, because it makes the entire judicial machinery appear unfair." On

11

Bank of Superior Court of California County of Orange
ADA Complaint Exhibits 434

CTI's behalf, Horwitz argued the drastic measure of seeking a receivership in the shareholder derivative Mesa Action was "adverse to the corporation's interests" due to the "extravagant costs." CTI argued the request was "similar to claiming 'we had to destroy the village in order to save it.'"

B. *November 2019 Disqualification Order*

On November 15, 2019, the court granted the motion but did not rule on the evidentiary objections on the grounds they were "not directed at evidence that the court considers material to its disposition of this motion." The court ruled as follows: "Catanzarite's simultaneous representation of CTI and interests adverse to CTI compel the firm's disqualification. In *Flatt v. Superior Court* (1994) 9 Cal.4th 275 (*Flatt*), the California Supreme Court held, 'Courts and ethical codes alike prohibit an attorney from simultaneously representing two client adversaries, even where the substance of the representations are unrelated.' [Citation.] The court added, 'Indeed, in all but a few instances, the rule of disqualification in simultaneous representation cases is a per se or automatic one.' [Citation.] Catanzarite is representing CTI in this case, but in the pending [Mesa Action] Catanzarite is representing one faction of CTI shareholders who have an upcoming motion scheduled seeking to impose a receiver on CTI, relief that would be adverse to CTI. In the pending [Scottsdale Action], Catanzarite represents CTI yet seeks to invalidate a defense and indemnity for CTI directors in the [Mesa Action] under an insurance policy issued on CTI's behalf. A denial of coverage could put CTI on the hook for the individuals' costs of defense and/or liability."

The court cited authority holding an attorney cannot avoid the disqualification rule by "unilaterally converting a present client into a former client before the hearing" on the disqualification motion. The court reached the following conclusions: "In the pending [Pinkerton Action], Catanzarite represents the plaintiffs, and the original [c]omplaint named CTI as a defendant, although the first amended complaint dropped CTI as a party. In the Cooper [Action], Catanzarite represented the

12

petitioners, who sought to compel CTI to hold a shareholders meeting to elect directors. Petitioners dismissed that action on September 13, 2019. Catanzarite represents the plaintiffs in the [MFS Action], in which the original [c]omplaint alleged in [paragraph] 50 that CTI owes money to the plaintiff [referring to MFS start up loan totaling $87,451.53]. The [FAC] omitted that allegation. Thus, there are five lawsuits in which the Catanzarite firm is or was adverse to CTI, compelling the firm's disqualification."

Alternatively, the court determined disqualification was warranted because "corporate counsel's professional duties run to the corporation, [and] counsel must refrain from taking part in any controversies or factional differences among shareholders as to control of the corporation." It noted, "Catanzarite represents CTI's common stockholders, who are fighting with CTI's preferred stockholders in several lawsuits for CTI's control." Finally, the court explained that in light of the above rulings, "the court need not and will not reach the issue of whether Catanzarite was authorized to represent CTI in this action based on his shareholder faction allegedly being in control of CTI."

C. *Second Disqualification Motion in the FinCanna Action*

Less than a week later, Horwitz filed a motion to recuse and/or disqualify Catanzarite from representing the CTI Subsidiaries in the FinCanna Action. The motion asserted CTI and the CTI Subsidiaries should be treated as the same client for conflict purposes. Horwitz explained that after the court's disqualification ruling, it asked Catanzarite to voluntarily withdraw from representing the CTI Subsidiaries. Catanzarite refused, stating it intended to appeal the prior disqualification order.[5]

Catanzarite filed an opposition, confirming it intended to file an appeal. It argued Horwitz filed an "abusive disqualification motion[]" brought "solely for the improper and strategic purpose to leave the CTI Subsidiaries without their counsel of choice." The hearing was scheduled for January 2020.

---

[5]      Before the trial court considered CTI's second motion, Catanzarite, representing itself, filed a notice of appeal from the November disqualification order.

13

D. *Two Disqualification Motions in the Mesa Action*

        Catanzarite's appellant's appendix does not include one of the disqualification motions filed in the Mesa Action.  On our own motion, we augmented the record on appeal to include missing documents.[6]  (Cal. Rules of Court, rule 8.155(a)(1)(A).)  Horwitz filed a motion on behalf of CTI.  Several members of the Probst Faction, who were named defendants in the Mesa Action (Beck, Miguel Motta, Robert Bernheimer, Robert Kamm, Eric Mathur, Robert Schmidt, and Jason Pitkin, hereafter referred collectively and in the singular as Beck), filed a motion to "join in" CTI's motion.  Beck was represented by attorneys from O'Hagan Meyer LLC.

        Our record contains Catanzarite's oppositions to these motions, filed on behalf of the Mesa Action plaintiffs.  Catanzarite addressed the merits of CTI's motion.  However, Catanzarite argued Beck's motion was procedurally improper because the November disqualification order stayed all the lawsuits, and Beck did not ask for permission to file the joinder motion.  In addition, Catanzarite argued Beck's motion raised different issues from CTI and should be treated as a separate independent motion for disqualification.  It noted a separate motion would be untimely filed because the hearing on CTI's motion was scheduled for early January.

E. *January 2020 Disqualification Orders*

        On January 10, 2020, the court considered the two disqualification motions filed in the Mesa Action, as well as the CTI Subsidiaries' motion filed in the FinCanna Action.  It ruled as follows:  "The [m]otions to [d]isqualify [Catanzarite] in the four related cases are granted in [the Mesa Action and the FinCanna Action] and denied in

---

[6]      We caution counsel that it is not this court's responsibility to obtain the documents necessary to consider the arguments raised on appeal.  We have used our discretionary authority to take judicial notice of documents discussed by the parties and augment the record to assist us in reviewing the appeals on their merits.  But we are not required to do so.  (See *State Comp. Ins. Fund v. WallDesign Inc.* (2011) 199 Cal.App.4th 1525, 1529.)

14

[the Pinkerton Action and the MFS Action].  [¶] This court previously granted a motion to disqualify [Catanzarite] from representing CTI in the FinCanna [Action] because principles prohibiting dual representation prohibit [Catanzarite's] simultaneous representation of CTI and interests adverse to CTI.  In [the Mesa Action] Catanzarite is representing the plaintiffs in a derivative action on behalf of CTI, meaning that its representation is for the benefit of CTI.  Thus, the same principles that warranted Catanzarite's disqualification in the FinCanna [Action] apply to [the Mesa Action] and compel disqualification here."

As for the CTI subsidiaries, the court ruled as follows:  "Here, the FinCanna plaintiff sued CTI and its three wholly-owned subsidiaries, alleging that plaintiff loaned CTI $5.9 million and that CTI still owes plaintiff about $4.7 million.  Plaintiff's theory against the subs[idiaries] is that they owe CTI money . . . .  Thus, the [three subsidiaries'] liability to plaintiff is dependent on CTI owing plaintiff money, and as a result all four defendants have a unity of interest in the case.  Catanzarite filed an [a]nswer and [c]ross-[c]omplaint on behalf of all four named defendants.  The [c]ross-[c]omplaint is based primarily on the relationship between FinCanna and CTI, with little reference to the subs[idiaries], and alleges all of its causes of action jointly on behalf of all four cross-complainants, without any distinction as to any of the allegations, or in any of the six causes of action or in the prayer as to which cross-complainants are seeking what relief.  Thus, all four of the defendants and cross-complainants have a unity of interest in the FinCanna [Action], warranting Catanzarite's disqualification from representing the subs[idiaries], on the heels of being disqualified from representing CTI."

The court denied the motion with respect to the Pinkerton Action.  It noted the case was originally a derivative action on behalf of MFS, but Catanzarite amended the complaint and CTI was no longer a party in this lawsuit.  The court concluded CTI, therefore, lacked standing to seek Catanzarite's disqualification from representing MFS

15

Bank of Superior Court of California County of Orange
ADA Complaint Exhibits 438

shareholders against defendants other than CTI "even if the allegations involve the world of CTI."

Likewise, the court determined CTI lacked standing in the MFS Action. Although the complaint "originally asserted derivative claims on behalf of CTI, and named CTI as a nominal defendant," the FAC omitted CTI as a party. The court noted, "CTI (through other counsel) filed a cross-complaint against MFS which is still pending. Although MFS alleges it was and is CTI's sole shareholder, the court ruled at a [section] 709 hearing in April 2019 that MFS was not a CTI shareholder as of November 2018." The court concluded, "Although Catanzarite represents MFS as a cross-defendant, there is no dual representation involved, and Catanzarite's disqualification from representing MFS is not warranted."

The court denied Beck's joinder motion as being untimely filed. It added, "The moving parties also lack standing to seek Catanzarite's disqualification from representing the parties that firm represents." The court granted Catanzarite's requests for judicial notice and ruled on some of Catanzarite's evidentiary objections. The court stayed the Mesa Action pending the appeal. It vacated all future motions scheduled in the case including a motion to appoint a receiver.

IV. *Appellate Procedural History*

Catanzarite, representing itself, filed a notice of appeal from the November disqualification order (G058931 [the FinCanna Action]), and it filed two notices of appeal challenging the January order (G058700 [additional disqualification in FinCanna Action]; G058942 [disqualification in the Mesa Action]). We granted Catanzarite's request to consolidate its two appeals related to the FinCanna Action (G058700 & G058942), and on our own motion consolidated Catanzarite's appeal from the disqualification order in the Mesa Action (G058931). None of Catanzarite's clients filed appeals. CTI filed its respondent's brief in support of the disqualification orders.

16

DISCUSSION

This case raises issues related to motions to disqualify Catanzarite, a law firm filing six lawsuits while simultaneously representing two corporations, three corporate subsidiaries, and a group of minority shareholders of both corporations. Specifically, the corporate entities are the following: (1) MFS, the plaintiff in the MFS Action, (2) CTI, the cross-complainant and defendant in the FinCanna Action, (3) CTI Subsidiaries, the cross-complainants and defendants in the FinCanna Action, and (4) CTI, the plaintiff in the Scottsdale Action. The minority shareholders groups include members of the O'Connor Faction as follows: (1) Pinkerton, a MFS shareholder and plaintiff in the Pinkerton Action; (2) Mesa, Cooper, Mebane and a class action of shareholders, all plaintiffs in the Mesa Action; (3) Cooper and Mebane, who are MFS/CTI shareholders and plaintiffs in the Cooper action.

No party appealed from the orders denying Catanzarite's disqualification in the MFS and Pinkerton Actions. Catanzarite, representing itself, seeks to reverse the disqualification orders regarding the firm's representation of CTI, CTI Subsidiaries, and the Mesa Action plaintiffs. Accordingly, this opinion will be limited to our review of the orders regarding those three concurrently represented clients.

I. *Applicable Law*

A. *Attorney Disqualification Generally*

"A trial court's authority to disqualify an attorney derives from the power inherent in every court '[t]o control in furtherance of justice, the conduct of its ministerial officers, and of all other persons in any manner connected with a judicial proceeding before it, in every matter pertaining thereto.' [Citations.]" (*People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145 (*SpeeDee Oil*); Code Civ. Proc., § 128, subd. (a)(5).)

"Disqualification motions implicate competing considerations. On the one hand, these include clients' rights to be represented by their preferred counsel and

17

deterring costly and time-consuming gamesmanship by the other side. . . . [¶] Balanced against these are attorneys' duties of loyalty and confidentiality and maintaining public confidence in the integrity of the legal process. . . . [Citation.] 'The loyalty the attorney owes one client cannot be allowed to compromise the duty owed another.' [Citation.]" (*Banning Ranch Conservancy v. Superior Court* (2011) 193 Cal.App.4th 903, 911 (*Banning Ranch*).)[7]

B.  *Standard of Review*

"Generally, a trial court's decision on a disqualification motion is reviewed for abuse of discretion.  [Citations.]  If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence.  [Citations.]  When substantial evidence supports the trial court's factual findings, the appellate court reviews the conclusions based on those findings for abuse of discretion.  [Citation.]  However, the trial court's discretion is limited by the applicable legal principles.  [Citation.]  Thus, where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law.  [Citation.]"  (*SpeeDee Oil, supra*, 20 Cal.4th at pp. 1143-1144.)

C.  *Successive vs. Concurrent Representation*

"There are different disqualification standards for attorneys who have conflicts with former clients and those who have conflicts with current clients.  As to conflicts involving successive representation with former clients, courts look to whether there is a 'substantial relationship' between the subjects of the current and the earlier

---

[7]    """Normally, an attorney's conflict is imputed to the law firm as a whole on the rationale 'that attorneys, working together and practicing law in a professional association, share each other's, and their clients', confidential information."' [Citation.]" (*Beachcomber Management Crystal Cove, LLC, v. Superior Court* (2017) 13 Cal.App.5th 1105, 1116 (*Beachcomber Management*).  Accordingly, the disqualification ruling made as to Catanzarite is binding on the associates of that firm.

18

proceedings. [Citations.] [¶] In contrast, there is a more stringent standard when an attorney simultaneously represents two current clients with conflicting interests. Disqualification . . . is *mandatory* in such circumstances even though the simultaneous matters may have nothing in common. (*Flatt, supra,* 9 Cal.4th at p. 284.) "'Something seems radically out of place if a lawyer sues one of the lawyer's own present clients on behalf of another client. Even if the representations have nothing to do with each other, so that no confidential information is apparently jeopardized, the client who is sued can obviously claim that the lawyer's sense of loyalty is askew.'" [Citation.]" (*Banning Ranch, supra,* 193 Cal.App.4th at pp. 911-912; see Rules Prof. Conduct rule 1.7(a) & (b) [attorney may not without informed written consent "represent a client if the representation is directly adverse to another client in the same or a separate matter" or "there is a significant risk the lawyer's representation of the client will be materially limited by the lawyer's responsibilities to or relationships with another client"].)

In summary, courts recognize the "chief fiduciary value jeopardized" in cases involving successive representation is client confidentiality. (*M'Guinness v. Johnson* (2015) 243 Cal.App.4th 602, 613.) Whereas in concurrent "representation of multiple clients resulting in a conflict of interest" the "'primary value at stake'" is the attorney's duty and "the client's legitimate expectation" of loyalty, not confidentiality.[8]

D. *Corporate Counsel*

Corporate counsel's professional responsibilities and allegiances are owed to the corporate entity, not the officers, directors, or shareholders "and the individual shareholders or directors cannot presume that corporate counsel is protecting their interests. [Citations.]" (*La Jolla Cove Motel & Hotel Apartments, Inc. v. Superior Court* (2004) 121 Cal.App.4th 773, 784 (*La Jolla Cove*).) Generally, a lawyer representing a

---

[8]     This case involves issues related to concurrent representation, invoking the fiduciary duty of loyalty, rather than confidentiality. For this reason, we will not discuss any of Catanzarite's arguments about maintaining client confidentiality.

19

Superior Court of California County of Orange
ADA Complaint Exhibits 442

corporation may also represent any of the corporation's officers or directors upon the clients' written consent. (*Id.* at p. 785; see Rules Prof. Conduct rule 1.13(g).)

"Conflicts of interest between a corporation and its officers, directors and shareholders are particularly problematic for corporate counsel where . . . the corporation is a closely held one, with few shareholders. [Citation.] Corporate counsel may develop a fiduciary relationship with individual shareholders or directors. However, even in that situation, the attorney's ultimate loyalty is to the corporation, not individual shareholders, officers or directors. [Citation.] Thus, where an adversarial setting presents itself, pitting the corporation against one or more of its officers, directors or shareholders, corporate counsel may still represent the corporation against those individuals, even though he or she may have received confidential information about them in the course of representing the corporation. [Citations.]" (*La Jolla Cove, supra,* 121 Cal.App.4th at p. 785.)

However, "[O]nce a conflict has arisen between a corporation and one or more of its officers, directors or shareholders, corporate counsel may not simultaneously represent the corporation and the adverse officer, director or shareholder." (*La Jolla Cove, supra,* 121 Cal.App.4th at p. 785; see Rules Prof. Conduct rule 1.7.) "Thus, where a shareholder has filed an action questioning [the corporation's] management or the actions of individual officers or directors, such as in a shareholder derivative or . . . dissolution action, corporate counsel cannot represent both the corporation and the officers, directors or shareholders with which the corporation has a conflict of interest. [Citation.]" (*Id.* at pp. 785-786.)

Consequently, there can be no dual representation of a corporation and directors when the suit is brought by other shareholders. "In an action by a shareholder alleging *harm to the corporation,* an attorney cannot represent both the corporation and defendant shareholders who are accused of wrongdoing or whose interests are otherwise adverse to the corporation. This is so whether or not the suit is framed as a derivative action." (Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2021)

20

¶ 1:11.2a; see *Ontiveros v. Constable* (2016) 245 Cal.App.4th 686, 696-699, [attorney could not represent both corporation and 60 percent shareholder in derivative action brought by 40 percent shareholder]; *Blue Water Sunset, LLC v. Markowitz* (2011) 192 Cal.4th 477, 488-489, [attorney could not represent both LLC and defendant member in derivative action brought by LLC's only other member]; *Gong v. RFG Oil, Inc.* (2008) 166 Cal.App.4th 209, 216 (*Gong*) [attorney cannot represent both 51 percent shareholder and corporation in suit by 49 percent shareholder alleging personal use of corporate funds and other claims showing harm to corporation].)

Of course, the case before us involves the opposite scenario. Not surprisingly, we found no cases (and Catanzarite cites to none) holding an attorney may simultaneously represent both the corporation and the *plaintiff shareholders* who are accusing the board of directors of wrongdoing. The lack of authority can be explained by the existence of well-settled legal authority holding a derivative plaintiffs' attorney does not ipso facto represent the corporation, but rather "the shareholder's attorney is acting *against* the corporation's wishes." (*Shen v. Miller* (2012) 212 Cal.App.4th 48, 57-60, italics added (*Shen*).) In order for a shareholder to have standing to bring a derivative action, counsel must plead the corporation refused to pursue the claim. (*Id.* at pp. 57-58.) For this reason, in a shareholder derivative suit the corporation is included as a nominal defendant because it is in conflict with the outsider shareholder about the advisability of suing. (*Id.* at p. 58.)

Moreover, "[T]he corporation that is the subject of the derivative claim is generally a nominal party only. '"Because the claims asserted and the relief sought in [the derivative] complaint would, if proven, advance rather than threaten the interests of the nominal defendant[], the nominal defendant[] must *remain neutral* in [the] action." [Citation.]' [Citation.]" (*Shen, supra,* 212 Cal.App.4th at p. 58, italics added.) Logically, if the derivative plaintiffs' attorney also represented the corporation, there would be no need for a derivative action because "the corporation itself would be

21

pursuing" the outside shareholder's claims. (*Ibid.*) An attorney representing plaintiff shareholders cannot both advocate those claims and remain neutral. Concurrent representation of clients with such obvious conflicting interests is not permissible.

II. *Analysis of Disqualification Order in the FinCanna Action*

To briefly summarize, the trial court disqualified Catanzarite from representing CTI on the grounds it was simultaneously representing "two client adversaries."[9] It reasoned Catanzarite was representing CTI in the FinCanna Action but representing a faction of CTI shareholders in the Mesa Action. Moreover, the court determined Catanzarite improperly took sides in a shareholder dispute by filing the Scottsdale Action to promote the interests of the O'Connor Faction by stopping CTI's insurance company from providing a defense or indemnity to the Probst Faction defendants in the Mesa Action. On appeal, Catanzarite asserts the court abused its discretion in making this ruling because the moving party lacked standing and its clients did not have adversarial interests. We address each contention separately, concluding both lack merit.

A. *Standing*

Catanzarite's first and primary challenge to the trial court's ruling is that the party filing the disqualification motion lacked standing. Catanzarite asserts the trial court could not possibly decide this issue without first resolving the parties' complicated dispute about which shareholder faction rightfully controlled CTI. Catanzarite provides a lengthy argument supporting its theory the O'Connor Faction controlled CTI. It argues the court abused its discretion by failing to consider and agree with its contentions. Not

---

[9]  On appeal, Catanzarite does not challenge the trial court's conclusion CTI and CTI Subsidiaries had a unity of interest in the FinCanna Action. Catanzarite, conceding that the same principles regarding its representation of CTI apply equally to CTI Subsidiaries, does not distinguish between them in its legal discussions. We will do the same for purposes of this opinion; our discussion of CTI applies equally to CTI Subsidiaries unless otherwise indicated.

22

so. CTI had standing to file the motion because all the facts relevant to the issue of disqualification were undisputed. There was no need for the court to prematurely consider and resolve other factual disputes (rending many causes of action moot before trial).

"A 'standing' requirement is implicit in disqualification motions. Generally, before the disqualification of an attorney is proper, the complaining party must have or must have had an attorney-client relationship with that attorney. [Citation.]" (*Great Lakes Construction, Inc. v. Burman* (2010) 186 Cal.App.4th 1347, 1356.)

Catanzarite is in the awkward position of asserting it had an attorney-client relationship with CTI for purposes of filing complaints in the Scottsdale and FinCanna Actions, but not with CTI for purposes of a disqualification motion. To avoid this conundrum, Catanzarite frames its lack-of-standing argument on the premise there was never an attorney-client relationship between itself and members of the Probst Faction. We agree the Probst Faction never entered into an attorney-client relationship with Catanzarite. Instead, the Probst Faction, the directors purportedly controlling CTI, hired Horwitz to act as corporate counsel for CTI, i.e., the same corporate entity Catanzarite claims to represent. Catanzarite cannot avoid the undisputed fact it was not the only law firm representing the corporation in litigation. Indeed, Winget was CTI's attorney of record in the three derivative actions filed by Catanzarite.[10]

The problem with Catanzarite's lack-of-standing argument is that it ignores the fact CTI is not an individual, but rather an inanimate corporate entity having a board of directors with authority to hire corporate counsel. Catanzarite's authority to represent CTI arose from its relationship with the O'Connor Faction. Yet, as discussed at length in

---

[10]        It is noteworthy that CTI's directors who were members of the Probst Faction hired Winget to defend CTI in the three shareholder derivative actions (the Pinkerton, MFS, and Mesa Actions). Catanzarite does not suggest these directors lacked authority to retain Winget as CTI's corporate counsel in these lawsuits. It offers no distinction between CTI's retention of Winget from the decision to hire Horwitz.

23

Complaint Supplement #30: Superior Court of California County of Orange
Exhibit #19: 023    Back # Superior Court of California County of Orange
ADA Complaint Exhibits 446

the briefs, and as evidenced by the pleadings in multiple lawsuits, the O'Connor Faction's control over CTI is a hotly contested issue. Thus, the O'Connor Faction's authority to hire Catanzarite and defend CTI's choice of counsel is necessarily the same legal rights afforded to the Probst Faction, who hired Horwitz to act as corporate counsel (and challenge Catanzarite). We conclude that because the chief fiduciary duty at stake is loyalty, CTI had standing to file the motion to disqualify one of its attorneys regardless of which shareholder faction *currently* claimed to control CTI.

We reject Catanzarite's argument the court was required to determine *before trial* the issue of which shareholder faction rightfully controlled CTI before ruling on CTI's disqualification motion. The trial court wisely understood the relevant facts pertaining to disqualification were undisputed. The parties agreed the two factions of shareholders were promoting very different agendas for CTI's operations. As mentioned, the O'Connor Faction sought to nullify actions taken by the prior board of directors (the Probst Faction). This included cancelling shares and voting rights, voiding contracts, repaying money owed to MFS, and changing CTI's business relationship with FinCanna. On the other hand, the Probst Faction was fighting to remain in control and maintain the status quo of voting rights, shares, financial obligations, and contracts with FinCanna. Due to the undisputed contentious nature of their dispute, it would be absurd to suggest the same attorney could simultaneously represent these two factions of shareholders. Similarly, there was no need to determine which faction controlled CTI to disqualify an attorney simultaneously purporting to act as corporate counsel while pursuing a derivative action filed against the corporation. If the interests of these two clients were in accord, there would be no need for a derivative action. (*Shen, supra,* 212 Cal.App.4th at p. 58.)

As mentioned earlier, although disqualification motions are generally reviewed for abuse of discretion, "where there are no material disputed factual issues, the appellate court reviews the trial court's determination as a question of law. [Citation.]"

24

Back #3 Superior Court of California County of Orange
ADA Complaint Exhibits 447

(*SpeeDee Oil, supra,* 20 Cal.4th at p. 1144.) Here, the trial court correctly determined *it need not* "reach the issue" of which shareholder faction rightfully controlled CTI. We agree. The undisputed nature of the lawsuits, involving parties with conflicting interests, and a corporation with adversarial directors, supported mandatory disqualification as a matter of law.

B. *Adverse Interests*

Catanzarite asserts the trial court exacerbated its abuse of discretion by finding it was representing interests adverse to CTI. Catanzarite suggests its legal maneuverings, undertaken on behalf of the O'Connor Faction, actually benefitted the corporation. For example, Catanzarite maintains the Mesa Action plaintiffs' receivership motion would prevent corporate waste. This and similar contentions CTI benefitted from Catanzarite's legal tactics are disingenuous. This is not a case where Catanzarite was comprised of neutral lawyers, hired by a cohesive board of directors.

The record plainly shows MFS shareholders (the O'Connor Faction) hired Catanzarite to regain shares and control of CTI through litigation and by removing and replacing the Probst Faction from CTI's then board of directors. Indeed, it is undisputed that within six months, Catanzarite filed three separate shareholder derivative actions all designed to give its clients more control over CTI and to revoke business decisions made by directors from the Probst Faction. Catanzarite's involvement in these derivative actions, in which a corporation must remain neutral, highlights critical issues regarding its fiduciary duty of loyalty. Particularly troubling was Catanzarite's active role in helping its clients forcibly remove CTI's directors, after Catanzarite was unable to achieve this same result in the MFS Action's section 709 hearing.

Even if we assume the transition of power was executed correctly with written consents, the scheme clearly demonstrated an allegiance to one faction of shareholders and corporate counsel's professional responsibilities and allegiances are owed to the corporate entity, not the officers, directors, or shareholders. (See *La Jolla*

25

Bank - Superior Court of California County of Orange
ADA Complaint Exhibits 448

*Cove, supra,* 121 Cal.App.4th at p. 784.)  As stated earlier, "[O]nce a conflict has arisen between a corporation and one or more of its officers, directors or shareholders, corporate counsel may not simultaneously represent the corporation and the adverse officer, director or shareholder." (*Id.* at p. 785; see Rules Prof. Conduct rule 1.7.)

We found other evidence of Catanzarite's conflicting loyalties after comparing the complaints Catanzarite prepared for the Mesa Action (a derivative lawsuit) with the one used for CTI in the FinCanna Action.  Large sections appear to have been cut and pasted from one to the other.  Perhaps Catanzarite believed the mirror complaints filed on behalf of different clients were appropriate due to its theory the derivative action, filed "on behalf of" CTI, would necessarily benefit the corporation.  This assertion demonstrates its misunderstanding of derivative actions and the limited role of counsel representing the outsider shareholder plaintiffs.  As mentioned earlier in this opinion, the *Shen* case is instructive on attorney client relationships arising from derivative actions. (*Shen, supra,* 212 Cal.App.4th at pp. 56-57.)  That case involved three related actions and concerned a dispute between 50/50 shareholders over control of a closely held corporation.  (*Id.* at p. 52.)  The trial court denied one co-president's (Miller) motion to disqualify the other co-president's (Shen) attorney.  (*Ibid.*)  Miller filed the motion after Shen filed a petition for court supervision of voluntary winding up proceedings, as well as a complaint derivatively on behalf of the company.  (*Id.* at pp. 52-53.)  Miller recognized Shen lacked a formal attorney-client relationship with the company, but he argued for automatic disqualification.  He reasoned disqualification was necessary due to the attorney's role in prosecuting the derivative action, which involved representing the interests of the corporation, while at the same time the attorney took an adverse position to the company in related litigation (winding up proceedings).  (*Id.* at pp. 56-57.)

The *Shen* court clarified the limited significance of the "on behalf of" language commonly utilized when referring to shareholder derivative lawsuits.  "[A] shareholder may only bring a derivative suit on behalf of the corporation if the

26

corporation has refused to pursue the claim. In bringing the derivative action, the shareholder's attorney is acting *against* the corporation's wishes. [¶] Nevertheless, should the shareholder prevail in the derivative action, the corporation is the ultimate beneficiary. [Citation.] Therefore, the corporation must be joined in the action . . . as a nominal defendant because of 'its refusal to join the action as a plaintiff. [Citation.]' [Citation.] In other words, in a shareholder derivative suit, "'[t]he corporation has traditionally been aligned as a defendant because it is in conflict with its stockholder about the advisability of bringing suit . . . ." [Citation.]' [Citation.]" (*Shen, supra,* 212 Cal.App.4th at p. 58, italics added.) The court cautioned the corporation that is the subject of a derivative action "'"must remain neutral in [the] action." [Citation.]' [Citation.]" (*Id.* at p. 58.) Thus, Catanzarite's role in bringing the derivative action conflicts with the corporation's obligation to remain neutral in the action. Filing the lawsuit was an act against the corporation's wishes. Thus, Catanzarite's decision to reuse the same derivative type claims in a cross-complaint, filed directly by the corporation in a different lawsuit against a third party, was plainly disloyal to the corporation (regardless of whether the directors were recently replaced).

C. *Waivers*

Catanzarite suggests we can ignore any conflicts arising from the concurrent representation of members of the O'Connor Faction and CTI because Pinkerton, Cooper, Mebane, Mesa, CTI and MFS waived any conflicts. As pointed out by CTI's counsel on appeal, Catanzarite obtained these waivers in December 2019, after the trial court's November hearing/ruling disqualifying Catanzarite from representing CTI. Catanzarite does not address this issue. It fails to explain why it could file five lawsuits (for and against CTI) before obtaining the waivers. Moreover, Catanzarite does not explain why these waivers would be relevant to a *mandatory* disqualification for ongoing concurrent representation of clients with conflicting interests.

Once again, Catanzarite ignores the problem with its dual representation in this case and that the O'Connor Faction cannot waive the conflict on behalf of the inanimate corporate entity, CTI.  "[While] in some circumstances multiple representation may be permissible if both clients are fully informed of potential conflict and the parties consent to the representation.  This consent rationale seems peculiarly inapplicable to a derivative suit, because the corporation must consent through the directors, who, as in the present case, are the individual defendants.  [Citations.]" (*Forrest v. Baeza* (1997) 58 Cal.App.4th 65, 76-77 (*Forrest*).)  The directors and the corporation cannot act independently of each other.  (*Id.* at p. 76.)

Stated another way, "'[A]n inanimate corporate entity, which is run by directors who are themselves defendants in the derivative litigation, cannot effectively waive a conflict of interest as might an individual under applicable professional rules such as [rules] 3-600(E) and 3-310.'  One commentator noted: 'But it would be meaningless in derivative litigation to allow the consent of the parties defendant to exculpate the practice of dual representation, for most often it would be the defendant directors and officers who would force the corporation's consent.'  (Comment, Independent Representation for Corporate Defendants in Derivative Suits (1965) 74 Yale L.J. 524, 528.)" (*Forrest, supra,* 58 Cal.App.4th at p. 77, capitalization and italics omitted.)

Catanzarite appears to be arguing concurrent representation was possible because after the O'Connor Faction asserted control of the corporation, these shareholders effectively became insiders of the corporation.  This is twisted logic.  A shareholder only needs to file a derivative action, on the company's behalf, when the insiders who control the company refuse to do so.  (*Beachcomber Management, supra,* 13 Cal.App.5th at p. 1118.)  By filing the derivative action, Catanzarite implicitly acknowledged its clients are outsiders with interests adverse to CTI's directors.  Having

Complaint Supplement #30-2020-01145539
Exhibit #19: 028

Bank #3 Superior Court of California County of Orange
ADA Complaint Exhibits 451

sided with the O'Connor Faction early on, the appearance of impropriety compels disqualification.

If this case involved a deadlocked corporation, Catanzarite would have needed to secure written consent from all directors before continuing as corporate counsel. "An attorney who is asked by an officer/director to represent the corporation on a matter over which the board is deadlocked, or otherwise sharply divided, should obtain *each board member's* informed written consent to act as corporate counsel. If that consent cannot be obtained, the attorney must withdraw from representing the corporation: The attorney cannot purport to act as corporate counsel when in fact he or she is representing one faction of the board against another. [Citations.]" (Friedman, Cal. Practice Guide: Corporations (The Rutter Group 2021) ¶ 1:11.1e.) The same principles apply in this case. For several years, the CTI board of directors, comprised of both O'Connor and Probst Faction members, have been sharply divided on many issues. Accordingly, an attorney wishing to become corporate counsel, but who has an existing client at odds with some of the corporation's directors, would need more than the existing client's written waivers to concurrently represent the corporation.

V. *The Mesa Action Plaintiffs*

Catanzarite maintains the trial court abused its discretion in disqualifying it as counsel for the Mesa Action plaintiffs. We note the Mesa Action plaintiffs did not file an appeal. We do not know if these shareholders agreed with the court's ruling and have retained new counsel. CTI's respondent's brief does not address the issue. In any event, we conclude the court's ruling was correct with respect to the Mesa Action plaintiffs.

In its ruling, the court concluded the same principles preventing Catanzarite from representing CTI in the FinCanna Action prevented it from representing "plaintiffs in the derivative action *on behalf of* CTI, meaning that its representation is for the benefit of CTI." (Italics added.) As discussed earlier in this opinion, the derivative action was filed *against* CTI's wishes. (*Shen, supra,* 212 Cal.App.4th at pp. 57-58.) The derivative

29

Superior Court of California County of Orange
ADA Complaint Exhibits 452

action's "on behalf of" language signifies only a mere possibility the corporation may benefit from the litigation's outcome and should not be confused with which party holds an expectation of loyalty from Catanzarite.  Thus, we disagree with the notion Catanzarite was representing CTI in the Mesa Action.  Nevertheless, disqualification was appropriate.

In reaching this conclusion, we reject Catanzarite's argument the court abused its discretion by failing to determine whether the Probst Faction or the O'Connor Faction controlled CTI and had authority to retain counsel.  Disqualification in the Mesa Action was appropriate under either scenario.  If the O'Connor Faction gained control of CTI and hired Catanzarite, the firm still could not concurrently represent derivative shareholders at the same time it was representing a corporation experiencing conflict between those same derivative shareholders and others.  Prosecuting the derivative action also clearly conflicts with a corporate counsel's duty to remain neutral in the derivative action.  (*Shen, supra,* 212 Cal.App.4th at pp. 57-58.)  Similarly, if the Probst Faction never lost control of CTI, then there were certainly problems created by Catanzarite's unauthorized litigation on the corporation's behalf.  However, we consider the fact most relevant to CTI's disqualification motion in the Mesa Action, was CTI's newly created status as Catanzarite's former client (following the firm's disqualification in the FinCanna Action).  As a former client, CTI, a defendant in the Mesa Action, had standing to challenge the firm's representation of plaintiffs having adverse interests from CTI.  CTI, under the direction of the Probst Faction would certainly never give Catanzarite informed written consent to represent outsider shareholders suing the corporation and board members.  Catanzarite tainted all litigation involving CTI after purporting to represent the corporation and at the same time prosecuting a derivative shareholder action against CTI.

Back – Superior Court of California, County of Orange
ADA Complaint Exhibits 453

DISPOSITION

We affirm the court's orders disqualifying Catanzarite from representing CTI, CTI Subsidiaries, and the group of shareholder plaintiffs in the Mesa Action. Respondent shall recover its costs on appeal.


O'LEARY, P. J.

WE CONCUR:


BEDSWORTH, J.


FYBEL, J.

31